No. __-____

# IN THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

SHELDON ADELSON; PATRICK DUMONT; NEWS+MEDIA CAPITAL GROUP, LLC; LAS VEGAS REVIEW-JOURNAL, INC.; INTERFACE OPERATIONS, LLC D/B/A ADFAM,

*Petitioners-Defendants,*

v.

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEVADA,

*Respondent*,

LAS VEGAS SUN, INC.,

*Real-Party-in-Interest-Plaintiff.*

## ADDENDUM VOLUME 1 OF 4
### (Pages APP0001 – APP0254)

J. Randall Jones
KEMP JONES LLP
3800 Howard Hughes Pkwy., 17th Fl.
Las Vegas, Nevada 89169
(702) 385-6000

Richard L. Stone
850 Devon Avenue
Los Angeles, California 90024
(310) 993-2068

Michael J. Gayan, Esq.
CLAGGETT & SYKES LAW FIRM
4101 Meadows Lane, Suite 100
Las Vegas, Nevada 89107
(702) 333-7777

Ian Heath Gershengorn
Tanner J. Lockhead
JENNER & BLOCK LLP
1099 New York Ave. NW, Suite 900
Washington, DC 20001
(202) 639-6000
igershengorn@jenner.com

David R. Singer
Amy M. Gallegos
JENNER & BLOCK LLP
515 South Flower Street, Suite 3300
Los Angeles, California 90071
(213) 239-5100

Gabriel K. Gillett
JENNER & BLOCK LLP
353 N. Clark Street
Chicago, IL 60654
(312) 840-7220

*Counsel for Petitioners-Defendants*

E. LEIF REID, Nevada Bar No. 5750
KRISTEN L. MARTINI, Nevada Bar No. 11272
NICOLE SCOTT, Nevada Bar No. 13757
LEWIS ROCA ROTHGERBER CHRISTIE LLP
One East Liberty Street, Suite 300
Reno, NV 89501-2128
Tel:    775.823.2900
Fax:    775.823.2929
Email: lreid@lrrc.com
          kmartini@lrrc.com
          nscott@lrrc.com

JOSEPH M. ALIOTO, CA STATE BAR NO.
42680, *PRO HAC VICE TO BE FILED*
JAMIE L. MILLER, CA STATE BAR NO.
271452, *PRO HAC VICE TO BE FILED*
ALIOTO LAW FIRM
One Sansome Street, 35th Floor
San Francisco, CA  94104
Tel:  415.434.8900
Fax:  415.434.9200
Email:  jmalioto@aliotolaw.com
            jmiller@aliotolaw.com

JAMES J. PISANELLI, Nevada Bar No. 4027
TODD L. BICE, Nevada Bar No. 4534
JORDAN T. SMITH, Nevada Bar No. 12097
PISANELLI BICE PLLC
400 South 7th Street, Suite 300
Las Vegas, Nevada 89101
Telephone: 702.214.2100
Email: JJP@pisanellibice.com
          TLB@pisanellibice.com
          JTS@pisanellibice.com

*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| LAS VEGAS SUN, INC., a Nevada corporation,<br><br>    Plaintiff,<br><br>v.<br><br>SHELDON ADELSON, an individual and as the alter ego of News+Media Capital Group LLC and as the alter ego of Las Vegas Review Journal, Inc.; PATRICK DUMONT, an individual; NEWS+MEDIA CAPITAL GROUP LLC, a Delaware limited liability company; LAS VEGAS REVIEW-JOURNAL, INC., a Delaware corporation; and DOES, I-X, inclusive,<br><br>    Defendants. | CASE NO. 2:19-CV-01667-RFB-BNW<br><br><br>**STIPULATION AND [PROPOSED] ORDER TO MAINTAIN STATUS QUO** |

109408057.1

APP0001

Plaintiff LAS VEGAS SUN, INC. ("Sun"), by and through its counsel LEWIS ROCA ROTHGERBER CHRISTIE, LLP, PISANELLI BICE PLLC, and THE ALIOTO LAW FIRM, and Defendants SHELDON ADELSON, PATRICK DUMONT, NEWS+MEDIA CAPITAL GROUP LLC, and LAS VEGAS REVIEW-JOURNAL, INC. (together with Defendant News+ Media Capital Group LLC referred to herein as "RJ") (together collectively referred to herein as "Defendants"), by and through their counsel of record, KEMP, JONES & COULTHARD, LLP, hereby stipulate and agree as follows:

1. The Sun and RJ each own a daily morning newspaper of general circulation in Las Vegas, Nevada. The Sun owns the Las Vegas Sun (also referred to herein as the "Sun"). The RJ owns the Las Vegas Review-Journal (also referred to herein as the "Review-Journal").

2. The Sun and the Review-Journal entered into a Joint Operating Agreement in 1989 ("the 1989 JOA") in accordance with the Newspaper Preservation Act of 1970, 15 U.S.C. §§ 1801-04 (the "Act"). The 1989 JOA was approved, as required by law, by the Attorney General of the United States.

3. The Sun and the Review-Journal entered into an Amended and Restated Joint Operating Agreement in 2005 ("the 2005 JOA"). The 2005 JOA, by its terms, remains effective through an initial period ending on December 31, 2040.

4. RJ has filed a counterclaim in *Las Vegas Sun, Inc. v. News+Media Capital Group LLC*, Case No. A-18-772591-B, in the Eighth Judicial District Court in and for Clark County, Nevada (the "State Action"), alleging, among other things that Sun has materially breached the 2005 JOA between Sun and RJ and seeking a ruling that allows RJ to terminate the 2005 JOA.

5. On September 24, 2019, the Sun filed a complaint initiating this action, *Las Vegas Sun, Inc. v. Adelson, et al.*, Case No. 2:19-CV-01667 (the "Federal Action"), alleging, among other things, that the RJ's threatened termination of the 2005 JOA violates Section 2 of the Sherman Act, 15 U.S.C. § 2, Section 7 of the Clayton Act, 15 U.S.C. § 18, and Nevada's Unfair Practice Act, NRS Chapter 598A.

- 2 -

109408057.1

APP0002

6. On September 27, 2019, the Sun informed Defendants of its intent to file a motion for preliminary injunction in the Federal Action, seeking a preliminary injunction to prevent the termination of the 2005 JOA and to maintain the status quo through the pendency of this dispute.

7. In lieu of litigating the motion for preliminary injunction, and without any admission by Defendants of the merits of such a motion, Defendants hereby agree, by and through this stipulation and order, that Defendants will maintain the status quo (i.e., RJ will continue to perform under the 2005 JOA), including without limitation, that Defendants will refrain from

[This space intentionally left blank]

- 3 -

109408057.1

APP0003

taking any non-judicial steps to terminate the 2005 JOA until after the entry of final judgment by a court of competent jurisdiction permitting such termination. The parties dispute which court has jurisdiction and do not waive their rights or arguments by signing this stipulation.

DATED: October 4, 2019

LEWIS ROCA ROTHGERBER CHRISTIE LLP

By: _____
E. LEIF REID, ESQ., SBN 5750
KRISTEN L. MARTINI, ESQ., SBN 11272
NICOLE SCOTT, ESQ., SBN 13757
One East Liberty Street, Suite 300
Reno, Nevada 89501

JAMES J. PISANELLI, ESQ., SBN 4027
TODD L. BICE, ESQ., SBN 4534
JORDAN T. SMITH, ESQ., SBN 12097
PISANELLI BICE PLLC
400 South 7th Street, Suite 300
Las Vegas, Nevada 89101

JOSEPH M. ALIOTO
*PRO HAC VICE TO BE FILED*
JAMIE L. MILLER
*PRO HAC VICE TO BE FILED*
ALIOTO LAW FIRM
One Sansome Street, 35th Floor
San Francisco, California 94104

*Attorneys for Plaintiff*

KEMP, JONES & COULTHARD, LLP

By: _____
J. RANDALL JONES, ESQ., SBN 1927
MICHAEL J. GAYAN, ESQ. SBN 11135
MONA KAVEH, ESQ., SBN 11825
3800 Howard Hughes Parkway
17th Floor
Las Vegas, Nevada 89169

RICHARD STONE, ESQ.
*PRO HAC VICE TO BE FILED*
AMY GALLEGOS, ESQ.
*PRO HAC VICE TO BE FILED*
DAVID SINGER, ESQ.
*PRO HAC VICE TO BE FILED*
JENNER & BLOCK, LLP
633 West 5th Street, Suite 3600
Los Angeles, California 90071

*Attorneys for Defendants*

**ORDER**

**IT IS SO ORDERED.**

_____
RICHARD F. BOULWARE, II
UNITED STATES DISTRICT JUDGE

DATED this 9th day of October, 2019.

CASE NO. 2:19-CV-01667

- 4 -

109408057.1

APP0004

# EXHIBIT 1

## Defendants News+Media Capital Group LLC and Las Vegas Review-Journal, Inc.'s First Amended Answer to Complaint and Counterclaims

# EXHIBIT 1

APP0005

Electronically Filed
9/30/2019 8:41 AM
Steven D. Grierson
CLERK OF THE COURT

J. RANDALL JONES, ESQ. (#1927)
MICHAEL J. GAYAN, ESQ. (#11135)
KEMP, JONES & COULTHARD, LLP
3800 Howard Hughes Parkway, 17th Fl.
Las Vegas, Nevada 89169
Ph.: (702) 385-6000
Fax: (702) 385-6001
r.jones@kempjones.com
m.gayan@kempjones.com

Attorneys for Defendants and Counterclaimants
    News+Media Capital Group LLC &
    Las Vegas Review-Journal, Inc.

# DISTRICT COURT

# CLARK COUNTY, NEVADA

| | |
|---|---|
| LAS VEGAS SUN, INC., a Nevada corporation,<br><br>      Plaintiff,<br><br>vs.<br><br>NEWS+MEDIA CAPITAL GROUP LLC, a Delaware limited liability company; LAS VEGAS REVIEW-JOURNAL, INC., a Delaware corporation; and DOES, I-X, inclusive,<br><br>      Defendants.<br><hr>LAS VEGAS REVIEW-JOURNAL, INC., a Delaware corporation,<br><br>      Counterclaimant,<br><br>vs.<br><br>LAS VEGAS SUN, INC., a Nevada corporation,<br><br>      Counterclaim-Defendant. | Case No. A-18-772591-B<br><br>DEPT.: XVI<br><br>**FIRST AMENDED ANSWER TO COMPLAINT AND COUNTERCLAIMS** |

1

2929395.10

APP0006

## FIRST AMENDED ANSWER TO COMPLAINT

1.     Answering Paragraph "1" of the Plaintiff's Complaint, the Defendants deny the allegations contained in said paragraph.

2.     Answering Paragraph "2" of the Plaintiff's Complaint, the allegations contained in said paragraph are legal conclusions, and as such, require no response. To the extent that a response is required, the Defendants deny said allegations.

3.     Answering Paragraph "3" of the Plaintiff's Complaint, the Defendants deny the allegations purporting to represent factual matters. The remaining allegations are legal conclusions, and require no response. To the extent that a response is required, the Defendants deny said allegations.

4.     Answering Paragraph "4" of the Plaintiff's Complaint, the allegations contained in said paragraph are legal conclusions, and as such, require no response. To the extent that a response is required, the Defendants deny said allegations.

5.     Answering Paragraph "5" of the Plaintiff's Complaint, the allegations contained in said paragraph are legal conclusions, and as such, require no response. To the extent that a response is required, the Defendants deny said allegations.

6.     Answering Paragraph "6" of the Plaintiff's Complaint, the Defendants admit the allegations contained in said paragraph.

7.     Answering Paragraph "7" of the Plaintiff's Complaint, the Defendants admit the allegations contained in said paragraph.

8.     Answering Paragraph "8" of the Plaintiff's Complaint, Defendants admit that Defendant LAS VEGAS REVIEW-JOURNAL, INC. is a Delaware corporation doing business in the State of Nevada, which operates and publishes the Las Vegas Review-Journal.

9.     Answering Paragraph "9" of the Plaintiff's Complaint, the Defendants deny the allegations contained in said paragraph.

10.     Answering Paragraph "10" of the Plaintiff's Complaint, the Defendants admit that the Plaintiff owns and operates the Las Vegas Sun ("the Sun"), the Defendants operate and publish the Las Vegas Review-Journal, and both the Sun and Las Vegas Review-Journal are daily newspapers of general circulation in Las Vegas, Nevada. The Defendants deny the remaining

2

2929395.10

APP0007

allegations in said paragraph.

11. Answering Paragraph "11" of the Plaintiff's Complaint, the Defendants are without sufficient knowledge or information upon which to base a response to said paragraph, and therefore deny the allegations in said paragraph.

12. Answering Paragraph "12" of the Plaintiff's Complaint, the Defendants are without sufficient knowledge or information upon which to base a response to said paragraph, and therefore deny the allegations in said paragraph.

13. Answering Paragraph "13" of the Plaintiff's Complaint, Defendants admit that the Sun and Donrey of Nevada, Inc. entered into a joint operating agreement, the 1989 JOA. As to the remaining allegations as to the reasons for the agreement and/or its compliance with the Newspaper Preservation Act of 1970, the Defendants are without sufficient knowledge or information upon which to base a response to said allegations, and therefore deny said allegations.

14. Answering Paragraph "14" of the Plaintiff's Complaint, the allegations in such paragraph are legal conclusions, alleged statements of law and alleged interpretations of statutory language, to which no responsive pleading is required. To the extent any response is required, the Defendants deny the allegations in said paragraph.

15. Answering Paragraph "15" of the Plaintiff's Complaint, the 1989 JOA speaks for itself and Defendants deny the unnecessary characterizations of its provisions, as worded.

16. Answering Paragraph "16" of the Plaintiff's Complaint, the 1989 JOA speaks for itself and Defendants deny the unnecessary characterizations of its provisions, as worded.

17. Answering Paragraph "17" of the Plaintiff's Complaint, the 1989 JOA speaks for itself and Defendants deny the unnecessary characterizations of its provisions, as worded.

18. Answering Paragraph "18" of the Plaintiff's Complaint, the Defendants are without sufficient knowledge or information upon which to base a response to said paragraph, and therefore deny the allegations in said paragraph.

19. Answering Paragraph "19" of the Plaintiff's Complaint, the 1989 JOA speaks for itself and Defendants deny the unnecessary characterizations of its provisions, as worded.

20. Answering Paragraph "20" of the Plaintiff's Complaint, the Defendants admit that

3

the 1989 JOA contains the quoted language, but the Defendants are without sufficient knowledge or information upon which to base a response to the remaining allegations and characterizations contained in said paragraph, and therefore deny the remaining allegations and characterizations in said paragraph.

21. Answering Paragraph "21" of the Plaintiff's Complaint, the 1989 JOA speaks for itself and Defendants deny the unnecessary characterizations of its provisions, as worded.

22. Answering Paragraph "22" of the Plaintiff's Complaint, the Defendants admit that the 1989 JOA contains the quoted language, but the Defendants are without sufficient knowledge or information upon which to base a response to the remaining allegations and characterizations contained in said paragraph, and therefore deny the remaining allegations and characterizations in said paragraph.

23. Answering Paragraph "23" of the Plaintiff's Complaint, the 1989 JOA speaks for itself and Defendants deny the unnecessary characterizations of its provisions, as worded.

24. Answering Paragraph "24" of the Plaintiff's Complaint, the 1989 JOA speaks for itself and Defendants deny the unnecessary characterizations of its provisions, as worded.

25. Answering Paragraph "25" of the Plaintiff's Complaint, the 1989 JOA speaks for itself and Defendants deny the unnecessary characterizations of its provisions, as worded.

26. Answering Paragraph "26" of the Plaintiff's Complaint, the Defendants admit that the 1989 JOA did not provide for any alternative dispute resolution procedure. The Defendants are without sufficient information upon which to form a belief as to the truth of the remaining allegations and characterizations contained in said paragraph and therefore, deny said allegations and characterizations.

27. Answering Paragraph "27" of the Plaintiff's Complaint, the Defendants are without sufficient knowledge or information upon which to base a response to said paragraph, and therefore deny the allegations in said paragraph.

28. Answering Paragraph "28" of the Plaintiff's Complaint, the Defendants are without sufficient knowledge or information upon which to base a response to said paragraph, and therefore deny the allegations in said paragraph.

4

29. Answering Paragraph "29" of the Plaintiff's Complaint, the Defendants are without sufficient knowledge or information upon which to base a response to said paragraph, and therefore deny the allegations in said paragraph.

30. Answering Paragraph "30" of the Plaintiff's Complaint, the Defendants are without sufficient knowledge or information upon which to base a response to said paragraph, and therefore deny the allegations in said paragraph.

31. Answering Paragraph "31" of the Plaintiff's Complaint, the Defendants admit the allegations contained in said paragraph.

32. Answering Paragraph "32" of the Plaintiff's Complaint, the 2005 JOA speaks for itself and the Defendants deny the unnecessary characterizations of its provisions, as worded.

33. Answering Paragraph "33" of the Plaintiff's Complaint, the 2005 JOA speaks for itself and the Defendants deny the unnecessary characterizations of its provisions, as worded.

34. Answering Paragraph "34" of the Plaintiff's Complaint, the Defendants are without sufficient knowledge or information upon which to base a response to said paragraph, and therefore deny the allegations in said paragraph.

35. Answering Paragraph "35" of the Plaintiff's Complaint, the Defendants admit that the 2005 JOA contains the quoted language, but the Defendants are without sufficient knowledge or information upon which to base a response to the remaining allegations and characterizations contained in such paragraph, and therefore deny the remaining allegations and characterizations in said paragraph. The 2005 JOA speaks for itself.

36. Answering Paragraph "36" of the Plaintiff's Complaint, the Defendants admit that the quoted language does not appear in Section 5.2 of the 2005 JOA. As to the remaining allegations and characterizations in said paragraph, the Defendants are without sufficient knowledge or information upon which to base a response to said allegations, and therefore deny said allegations. The 2005 JOA speaks for itself.

37. Answering Paragraph "37" of the Plaintiff's Complaint, the 2005 JOA speaks for itself and the Defendants deny the unnecessary characterizations of its provisions, as worded.

38. Answering Paragraph "38" of the Plaintiff's Complaint, the Defendants are without

5

sufficient knowledge or information upon which to base a response to said paragraph, and therefore deny the allegations in said paragraph.

39. Answering Paragraph "39" of the Plaintiff's Complaint, the 2005 JOA speaks for itself and the Defendants deny the unnecessary characterizations of its provisions, as worded.

40. Answering Paragraph "40" of the Plaintiff's Complaint, the 2005 JOA speaks for itself and the Defendants deny the unnecessary characterizations of its provisions, as worded.

41. Answering Paragraph "41" of the Plaintiff's Complaint, the 2005 JOA speaks for itself and the Defendants deny the unnecessary characterizations of its provisions, as worded.

42. Answering Paragraph "42" of the Plaintiff's Complaint, the 2005 JOA speaks for itself and the Defendants deny the unnecessary characterizations and conjecture of its provisions, as worded.

43. Answering Paragraph "43" of the Plaintiff's Complaint, the 2005 JOA speaks for itself and the Defendants deny the unnecessary characterizations of its provisions, as worded.

44. Answering Paragraph "44" of the Plaintiff's Complaint, the Defendants are without sufficient knowledge or information upon which to base a response to said paragraph, and therefore deny the allegations in said paragraph.

45. Answering Paragraph "45" of the Plaintiff's Complaint, the 2005 JOA speaks for itself and the Defendants deny the unnecessary characterizations of its provisions, as worded.

46. Answering Paragraph "46" of the Plaintiff's Complaint, the 1989 JOA and the 2005 JOA speak for themselves and the Defendants deny the unnecessary characterizations of their provisions, as worded.

47. Answering Paragraph "47" of the Plaintiff's Complaint, the 2005 JOA speaks for itself and the Defendants deny the unnecessary characterizations of its provisions, as worded.

48. Answering Paragraph "48" of the Plaintiff's Complaint, the Defendants admit that the language quoted in said paragraph is contained in Section 5.1.4 of the JOA. The Defendants deny remaining allegations in said paragraph.

49. Answering Paragraph "49" of the Plaintiff's Complaint, the 2005 JOA speaks for itself and the Defendants deny the unnecessary characterizations of its provisions, as worded.

6

50.     Answering Paragraph "50" of the Plaintiff's Complaint, the Defendants are without sufficient knowledge or information upon which to base a response to said paragraph, and therefore deny the allegations in said paragraph.

51.     Answering Paragraph "51" of the Plaintiff's Complaint, the 2005 JOA speaks for itself and the Defendants deny the unnecessary characterizations of its provisions, as worded.

52.     Answering Paragraph "52" of the Plaintiff's Complaint, the Defendants admit that the quoted language contained in said paragraph is contained in the 2005 JOA, but the Defendants are without sufficient knowledge or information upon which to base a response to the remaining allegations and characterizations in said paragraph, and therefore deny the allegations in said paragraph.

53.     Answering Paragraph "53" of the Plaintiff's Complaint, the 2005 JOA speaks for itself and the Defendants deny the unnecessary characterizations of its provisions, as worded.

54.     Answering Paragraph "54" of the Plaintiff's Complaint, the Defendants admit and affirmatively state that Section 5.1, and Appendices A and B set forth specifications that apply to the Sun's pages and its "noticeable mention" on the front page of the Las Vegas Review-Journal. The Defendants deny the remaining allegations in said paragraph, as worded.

55.     Answering Paragraph "55" of the Plaintiff's Complaint, the Defendants admit that the quoted language is contained in Appendix A to the 2005 JOA, but deny the remaining allegations and characterizations contained in said paragraph.

56.     Answering Paragraph "56" of the Plaintiff's Complaint, the 2005 JOA, including Appendix B, speaks for itself, and Defendants deny the unnecessary allegations and characterizations contained in said paragraph.

57.     Answering Paragraph "57" of the Plaintiff's Complaint, the 2005 JOA speaks for itself and the Defendants deny the unnecessary characterizations of its provisions, as worded.

58.     Answering Paragraph "58" of the Plaintiff's Complaint, the Defendants deny the allegations (as worded) contained in said paragraph.

59.     Answering Paragraph "59" of the Plaintiff's Complaint, the 2005 JOA speaks for itself and the Defendants deny the unnecessary characterizations of its provisions, as worded.

7

60. Answering Paragraph "60" of the Plaintiff's Complaint, the 2005 JOA speaks for itself and the Defendants deny the unnecessary characterizations of its provisions, as worded.

61. Answering Paragraph "61" of the Plaintiff's Complaint, the 1989 JOA and the 2005 JOA speak for themselves and the Defendants deny the unnecessary characterizations of their provisions, as worded.

62. Answering Paragraph "62" of the Plaintiff's Complaint, the Defendants admit that the quoted language in said paragraph is contained in the 2005 JOA.

63. Answering Paragraph "63" of the Plaintiff's Complaint, the Defendants admit that the quoted language in said paragraph is contained in the 2005 JOA.

64. Answering Paragraph "64" of the Plaintiff's Complaint, the Defendants admit that the language quoted is contained in Section 10.8 of the 2005 JOA, but Defendants are without sufficient knowledge or information upon which to base a response to the remaining allegations and characterizations, and therefore deny the remaining allegations and characterization in said paragraph.

65. Answering Paragraph "65" of the Plaintiff's Complaint, the Defendants are without sufficient knowledge or information upon which to base a response to said paragraph, and therefore deny the allegations in said paragraph.

66. Answering Paragraph "66" of the Plaintiff's Complaint, the Defendants are without sufficient knowledge or information upon which to base a response to said paragraph, and therefore deny the allegations in said paragraph.

67. Answering Paragraph "67" of the Plaintiff's Complaint, the Defendants are without sufficient knowledge or information upon which to base a response to said paragraph, and therefore deny the allegations in said paragraph.

68. Answering Paragraph "68" of the Plaintiff's Complaint, the Defendants admit that the litigation mentioned in said paragraph was in fact initiated. The Defendants deny the remaining allegations and characterizations contained in said paragraph.

69. Answering Paragraph "69" of the Plaintiff's Complaint, the Defendants admit the allegations contained in said paragraph.

8

2929395.10

70. Answering Paragraph "70" of the Plaintiff's Complaint, the Defendants admit the allegations contained in said paragraph.

71. Answering Paragraph "71" of the Plaintiff's Complaint, the Defendants admit the allegations contained in said paragraph.

72. Answering Paragraph "72" of the Plaintiff's Complaint, the Defendants admit that the language quoted in said paragraph is contained in the Order entered by the Nevada Supreme Court in Las Vegas Sun, Inc. v. D.R. Partners d/b/a Stephens Media Group, Appeal No. 68700. The Defendants deny the remaining characterizations and allegations in said paragraph.

73. Answering Paragraph "73" of the Plaintiff's Complaint, the Defendants admit that the language quoted in said paragraph is contained in the Order entered by the Nevada Supreme Court in Las Vegas Sun, Inc. v. D.R. Partners d/b/a Stephens Media Group, Appeal No. 68700. The Defendants deny the remaining characterizations and allegations in said paragraph.

74. Answering Paragraph "74" of the Plaintiff's Complaint, the Defendants admit that the language quoted in said paragraph is contained in the Order entered by the Nevada Supreme Court in Las Vegas Sun, Inc. v. D.R. Partners d/b/a Stephens Media Group, Appeal No. 68700. The Defendants deny the remaining characterizations and allegations in said paragraph.

75. Answering Paragraph "75" of the Plaintiff's Complaint, the Defendants deny the allegations contained in said paragraph.

76. Answering Paragraph "76" of the Plaintiff's Complaint, the Defendants are without sufficient knowledge or information upon which to base a response to said paragraph, and therefore deny the allegations in said paragraph.

77. Answering Paragraph "77" of the Plaintiff's Complaint, the Defendants admit that the dispute settled and deny the remainder of the allegations contained in said paragraph.

78. Answering Paragraph "78" of the Plaintiff's Complaint, the Defendants admit the allegations contained in said paragraph.

79. Answering Paragraph "79" of the Plaintiff's Complaint, the Defendants admit the allegations contained in said paragraph.

80. Answering Paragraph "80" of the Plaintiff's Complaint, the Defendants admit that

9

2929395.10

they became aware of the pending legal proceedings when they succeeded in ownership.

81. Answering Paragraph "81" of the Plaintiff's Complaint, the Defendants are without sufficient knowledge or information upon which to base a response to said paragraph, and therefore deny the allegations in said paragraph.

82. Answering Paragraph "82" of the Plaintiff's Complaint, the Defendants admit that early in 2018 they were provided with a copy of the settlement agreement reached in the Sun's litigation with DR Partners and Stephens Media, subject to protective, use and confidentiality stipulations.

83. Answering Paragraph "83" of the Plaintiff's Complaint, the Defendants deny the allegations contained in said paragraph.

84. Answering Paragraph "84" of the Plaintiff's Complaint, the Defendants admit that their accounting practices did not change as a result of the Sun's litigation with DR Partners and Stephens Media. The Defendants deny all other allegations, and characterizations in said paragraph.

85. Answering Paragraph "85" of the Plaintiff's Complaint, the Defendants deny the allegations contained in said paragraph.

86. Answering Paragraph "86" of the Plaintiff's Complaint, the Defendants admit that the Plaintiff and Defendants disagree as to meaning and interpretation of certain provisions of the 2005 JOA regarding editorial costs, and certain of those disagreements are the same or similar to those between the Sun and the prior owners of the Las Vegas Review-Journal. The Defendants deny the remaining allegations and characterizations in said paragraph.

87. Answering Paragraph "87" of the Plaintiff's Complaint, the Defendants admit that for the fiscal year ending March 31, 2017, the Las Vegas Review-Journal recorded a negative EBITDA in the approximate amount of $2.25 million. The Defendants are without sufficient knowledge or information to form a response to the remaining characterizations and allegations in said paragraph, and deny such characterizations and allegations.

88. Answering Paragraph "88" of the Plaintiff's Complaint, the Defendants are without sufficient knowledge or information upon which to base a response to said paragraph, and

10

2929395.10

therefore deny the allegations in said paragraph.

89. Answering Paragraph "89" of the Plaintiff's Complaint, the Defendants admit the allegations contained in said paragraph.

90. Answering Paragraph "90" of the Plaintiff's Complaint, the Defendants are without sufficient knowledge or information upon which to base a response to said paragraph, and therefore deny the allegations in said paragraph.

91. Answering Paragraph "91" of the Plaintiff's Complaint, the Defendants affirmatively state that after the Defendants' purchase of the Las Vegas Review-Journal, Jason Taylor served as manager, from December 2015 until March 2016. The Defendants deny the remaining allegations and characterizations in said paragraph.

92. Answering Paragraph "92" of the Plaintiff's Complaint, the Defendants affirmatively state that Jason Taylor created an unreasonable assessment of the anticipated advertising revenues for the Las Vegas Review-Journal. The Defendants deny the remaining allegations and characterizations contained in said paragraph.

93. Answering Paragraph "93" of the Plaintiff's Complaint, the Defendants affirmatively state that Jason Taylor created an unreasonable assessment of the anticipated advertising revenues for the Las Vegas Review-Journal. The Defendants deny the remaining allegations and characterizations contained in said paragraph.

94. Answering Paragraph "94" of the Plaintiff's Complaint, the Defendants affirmatively state that Jason Taylor left employment with the Defendants in March of 2016, and that he was replaced with a new manager. New management advised the Plaintiff's management that the rate of decline in print advertising revenues would negatively impact the profitability of the Las Vegas Review-Journal. The Defendants deny the remaining allegations and characterizations contained in said paragraph, as worded.

95. Answering Paragraph "95" of the Plaintiff's Complaint, the Defendants deny the allegations contained in said paragraph.

96. Answering Paragraph "96" of the Plaintiff's Complaint, the Defendants deny the allegations contained in said paragraph.

11

97.     Answering Paragraph "97" of the Plaintiff's Complaint, the Plaintiff's allegations are vaguely worded with respect to time, and specifically what activity is the subject of its allegation. Consequently, the Defendants are without sufficient knowledge or information upon which to form a response, and therefore deny the allegations and characterizations contained in said paragraph.

98.     Answering Paragraph "98" of the Plaintiff's Complaint, the 2005 JOA speaks for itself. The Defendants deny the characterizations and allegations contained in said paragraph.

99.     Answering Paragraph "99" of the Plaintiff's Complaint, the Defendants deny the allegations contained in said paragraph.

100.     Answering Paragraph "100" of the Plaintiff's Complaint, the Defendants are without sufficient knowledge or information upon which to base a response to said paragraph, and therefore deny the allegations in said paragraph.

101.     Answering Paragraph "101" of the Plaintiff's Complaint, the Defendants deny the allegations contained in said paragraph.

102.     Answering Paragraph "102" of the Plaintiff's Complaint, the Defendants deny the allegations contained in said paragraph.

103.     Answering Paragraph "103" of the Plaintiff's Complaint, the Plaintiff's allegations are vaguely worded with respect to time, specifically what activity is the subject of its allegation. Consequently, the Defendants are without sufficient knowledge or information upon which to form a response, and therefore deny the allegations and characterizations contained in said paragraph.

104.     Answering Paragraph "104" of the Plaintiff's Complaint, the 2005 JOA, including Appendix B, speaks for itself, and Defendants deny the unnecessary allegations and characterizations contained in said paragraph.

105.     Answering Paragraph "105" of the Plaintiff's Complaint, the Plaintiff's allegations are vaguely worded with respect to time, specifically what activity is the subject of its allegation. Consequently, the Defendants are without sufficient knowledge or information upon which to form a response, and therefore deny the allegations and characterizations contained in said

12

2929395.10

paragraph.

106. Answering Paragraph "106" of the Plaintiff's Complaint, the Defendants deny the allegations contained in said paragraph.

107. Answering Paragraph "107" of the Plaintiff's Complaint, the Defendants deny the allegations contained in said paragraph.

108. Answering Paragraph "108" of the Plaintiff's Complaint, the Defendants deny the allegations contained in said paragraph.

109. Answering Paragraph "109" of the Plaintiff's Complaint, the Defendants deny the allegations contained in said paragraph.

110. Answering Paragraph "110" of the Plaintiff's Complaint, the Defendants deny the allegations contained in said paragraph.

111. Answering Paragraph "111" of the Plaintiff's Complaint, the Defendants admit that they informed the Plaintiff in March 2017 that they would be publishing the Las Vegas Review-Journal with a redesigned front page commencing with the beginning of April 2017. Defendants further affirmatively state that the redesigned front page was and is in full compliance with the provisions of the 2005 JOA. The Defendants deny the remaining allegations and characterizations in said paragraph.

112. Answering Paragraph "112" of the Plaintiff's Complaint, the Defendants admit that the Las Vegas Review-Journal was published with the aforementioned redesigned front page at the beginning of April. Defendants further affirmatively state that the redesigned front page was and is in compliance with the provisions with the 2005 JOA. The Defendants deny the remaining allegations and characterizations in said paragraph.

113. Answering Paragraph "113" of the Plaintiff's Complaint, the Defendants deny the allegations contained in said paragraph.

114. Answering Paragraph "114" of the Plaintiff's Complaint, the Defendants admit that the redesigned front page of the Las Vegas Review-Journal has been published from April 2017 to the present. The Defendants deny the remaining allegations and characterizations in said paragraph.

13

2929395.10

115.    Answering Paragraph "115" of the Plaintiff's Complaint, the Defendants admit that the Plaintiff, through its lawyers, sent to the Defendants a letter on or about May 12, 2016, purporting to be its 30 day notice of intent to examine and audit the Las Vegas Review- Journal's books and records. The Defendants deny the remaining allegations and characterizations contained in said paragraph.

116.    Answering Paragraph "116" of the Plaintiff's Complaint, the Defendants admit that the Plaintiff stated that its "audit request" was made pursuant to Appendix D of the 2005 JOA. The Defendants deny any remaining allegations or characterizations in said paragraph.

117.    Answering Paragraph "117" of the Plaintiff's Complaint, the Defendants admit that they received a list of the documentation which the Plaintiff was requesting.

118.    Answering Paragraph "118" of the Plaintiff's Complaint, the Defendants admit and affirmatively state that the Defendants responded in July 2016 to the Sun's "request" by way of a letter from its counsel objecting to the Sun's request as being outside the scope of the Sun's rights under the 2005 JOA. The Defendants deny the remaining allegations and characterizations in said paragraph.

119.    Answering Paragraph "119" of the Plaintiff's Complaint, the Defendants admit the allegations contained in said paragraph.

120.    Answering Paragraph "120" of the Plaintiff's Complaint, the Defendants admit the allegations contained in said paragraph.

121.    Answering Paragraph "121" of the Plaintiff's Complaint, the Defendants admit the allegations contained in said paragraph.

122.    Answering Paragraph "122" of the Plaintiff's Complaint, the Defendants deny the allegations contained in said paragraph, as worded.

123.    Answering Paragraph "123" of the Plaintiff's Complaint, the Defendants admit the allegations contained in said paragraph.

124.    Answering Paragraph "124" of the Plaintiff's Complaint, the Defendants admit that the Sun's representatives met with the management of the Las Vegas Review-Journal and explained its rationale for requesting the information it did. The Defendants deny the remaining

14

2929395.10

allegations and characterizations contained in said paragraph.

125. Answering Paragraph "125" of the Plaintiff's Complaint, the Defendants admit the allegations contained in said paragraph.

126. Answering Paragraph "126" of the Plaintiff's Complaint, the Defendants admit the allegations contained in said paragraph.

127. Answering Paragraph "127" of the Plaintiff's Complaint, the Defendants admit that the anticipated provision of documents and information to the Sun did not occur within the first two weeks of January 2018, due to logistical considerations.

128. Answering Paragraph "128" of the Plaintiff's Complaint, the Defendants admit that the Plaintiff advised them on or about January 15, 2018 that it wanted immediate compliance with its audit request, and would otherwise include a claim concerning the audit in its anticipated arbitration demand. Defendants further admit that it subsequently agreed to share with the Sun additional records and information (beyond that to which the Sun was actually entitled), and made arrangements to begin the Sun's audit on January 23, 2018. The Defendants deny the remaining allegations and characterizations contained in said paragraph.

129. Answering Paragraph "129" of the Plaintiff's Complaint, the Defendants deny the allegations contained in said paragraph.

130. Answering Paragraph "130" of the Plaintiff's Complaint, the Defendants admit the allegations contained in said paragraph.

131. Answering Paragraph "131" of the Plaintiff's Complaint, the Defendants deny the allegations contained in said paragraph.

132. Answering Paragraph "132" of the Plaintiff's Complaint, the Defendants affirmatively state that they were prepared to commence the audit in January 2018, as agreed, but objected to the Certified Public Accountant designated by the Plaintiff to examine the materials to be provided. The 2005 JOA required that a law firm or a Certified Public Accounting Firm be the entity conducting the audit. Upon learning of the Defendants' objection, instead of redesignating a person/or entity qualified under the 2005 JOA, the Plaintiff abandoned its audit efforts, and commenced an arbitration proceeding with the American Arbitration Association. The Defendants

15

2929395.10

APP0020

deny the remaining allegations and characterizations in said paragraph, as worded.

133. Answering Paragraph "133" of the Plaintiff's Complaint, the Defendants admit the allegations contained in said paragraph.

134. Answering Paragraph "134" of the Plaintiff's Complaint, the allegations in such paragraph are legal conclusions, alleged statements of law and alleged interpretations of statutory language, to which no responsive pleading is required. To the extent any response is required, the Defendants deny the allegations in said paragraph.

135. Answering Paragraph "135" of the Plaintiff's Complaint, the Defendants admit the allegations contained in said paragraph.

136. Answering Paragraph "136" of the Plaintiff's Complaint, the Defendants admit that an Administrative Call was conducted with the AAA on February 23, 2018, and that scheduling, qualifications of the arbitrator, procedures, and potential discovery issues were discussed. The official records of the AAA regarding the results and subject matter of the call speak for themselves, and the Defendants consequently deny the remaining characterizations and allegations in said paragraph.

137. Answering Paragraph "137" of the Plaintiff's Complaint, the Defendants admit the allegations contained in said paragraph.

138. Answering Paragraph "138" of the Plaintiff's Complaint, the Defendants admit the allegations contained in said paragraph.

139. Answering Paragraph "139" of the Plaintiff's Complaint, the Defendants admit the allegations contained in said paragraph.

140. Answering Paragraph "140" of the Plaintiff's Complaint, the Defendants admit that on March 22, 2018 they advised the Sun and the AAA that they contested and objected to the AAA's jurisdiction to resolve the four (4) claims set forth in the Sun's Arbitration Demand. The Defendants deny the remaining allegations and characterizations contained in said paragraph.

141. Answering Paragraph "141" of the Plaintiff's Complaint, the Defendants admit that on or about March 22nd, they proposed to discuss a three person arbitration panel as a compromise solution for resolving the parties' dispute, a settlement framework to which the

16

2929395.10

APP0021

Plaintiff was not receptive. The Defendants deny the remaining characterizations and allegations contained in said paragraph, as worded.

142.    Answering Paragraph "142" of the Plaintiff's Complaint, the Defendants deny the allegations contained in said paragraph.

143.    Answering Paragraph "143" of the Plaintiff's Complaint, the Defendants deny the allegations contained in said paragraph.

**FIRST CLAIM FOR RELIEF**
(Declaratory Relief)

144.    Answering Paragraph "144" of the Plaintiff's Complaint, the Defendants hereby reallege and incorporate by reference as through fully set forth herein, the responses contained in the paragraphs above.

145.    Answering Paragraph "145" of the Plaintiff's Complaint, the allegations in such paragraph are legal conclusions, alleged statements of law and alleged interpretations of statutory language, to which no responsive pleading is required. To the extent any response is required, the Defendants deny the allegations in said paragraph.

146.    Answering Paragraph "146" of the Plaintiff's Complaint, the allegations in such paragraph are legal conclusions, alleged statements of law and alleged interpretations of statutory language, to which no responsive pleading is required. To the extent any response is required, the Defendants deny the allegations in said paragraph.

147.    Answering Paragraph "147" of the Plaintiff's Complaint, the allegations in such paragraph are legal conclusions, alleged statements of law and alleged interpretations of statutory language, to which no responsive pleading is required. To the extent any response is required, the Defendants deny the allegations in said paragraph.

148.    Answering Paragraph "148" of the Plaintiff's Complaint, the Defendants admit the allegations contained in said paragraph.

149.    Answering Paragraph "149" of the Plaintiff's Complaint, the Defendants admit the allegations contained in said paragraph.

150.    Answering Paragraph "150" of the Plaintiff's Complaint, the language of said

17

paragraph sets forth legal conclusions, alleged statements of law, and a description of the relief sought by the Plaintiff, to which no responsive pleading is required. To the extent any response is required, the Defendants deny the allegations contained in said paragraph, and deny that the Plaintiff is entitled to any of the relief it seeks.

151.    Answering Paragraph "151" of the Plaintiff's Complaint, the Defendants deny the allegations contained in said paragraph.

152.    Answering Paragraph "152" of the Plaintiff's Complaint, the Defendants deny the allegations contained in said paragraph.

## SECOND CLAIM FOR RELIEF
### (Breach of Contract – Arbitration Provision)

153.    Answering Paragraph "153" of the Plaintiff's Complaint, the Defendants hereby reallege and incorporate by reference as through fully set forth herein, the responses contained in the paragraphs above.

154.    Answering Paragraph "154" of the Plaintiff's Complaint, the allegations in such paragraph are legal conclusions, alleged statements of law and alleged interpretations of statutory language, to which no responsive pleading is required. To the extent any response is required, the Defendants deny the allegations in said paragraph.

155.    Answering Paragraph "155" of the Plaintiff's Complaint, the 2005 JOA speaks for itself and the Defendants deny the unnecessary characterizations of its provisions, as worded.

156.    Answering Paragraph "156" of the Plaintiff's Complaint, the language of said paragraph purports to set forth the ruling of the Nevada Supreme Court, and contains a legal conclusion and purported interpretation of that conclusion. The referenced Order of the Nevada Supreme Court speaks for itself. The Defendants deny the allegations and unnecessary characterizations contained in said paragraphs.

157.    Answering Paragraph "157" of the Plaintiff's Complaint, the Defendants deny the allegations contained in said paragraph.

158.    Answering Paragraph "158" of the Plaintiff's Complaint, the Defendants are without sufficient knowledge or information upon which to base a response to said paragraph, and

18

2929395.10

therefore deny the allegations in said paragraph.

159.    Answering Paragraph "159" of the Plaintiff's Complaint, the Defendants deny the allegations contained in said paragraph.

160.    Answering Paragraph "160" of the Plaintiff's Complaint, the Defendants deny the allegations contained in said paragraph.

161.    Answering Paragraph "161" of the Plaintiff's Complaint, the Defendants admit that the 2005 JOA contains provisions pertinent to editorial costs. As to the remaining characterizations and allegations, such characterizations and allegations are legal conclusions, to which no responsive pleading is required. To the extent any response is required, the Defendants deny the remaining allegations in said paragraph.

162.    Answering Paragraph "162" of the Plaintiff's Complaint, the Defendants deny the allegations contained in said paragraph.

163.    Answering Paragraph "163" of the Plaintiff's Complaint, the Defendants deny the allegations contained in said paragraph.

164.    Answering Paragraph "164" of the Plaintiff's Complaint, the Defendants deny the allegations contained in said paragraph.

165.    Answering Paragraph "165" of the Plaintiff's Complaint, the Defendants deny the allegations contained in said paragraph.

## THIRD CLAIM FOR RELIEF
### (Breach of Contract – Editorial Costs: Section 4.2 and Related Provisions)

166.    Answering Paragraph "166" of the Plaintiff's Complaint, the Defendants hereby reallege and incorporate by reference as through fully set forth herein, the responses contained in the paragraphs above.

167.    Answering Paragraph "167" of the Plaintiff's Complaint, the allegations in such paragraph are legal conclusions, alleged statements of law and alleged interpretations of statutory language, to which no responsive pleading is required. To the extent any response is required, the Defendants deny the allegations in said paragraph.

168.    Answering Paragraph "168" of the Plaintiff's Complaint, the 2005 JOA speaks for

19

2929395.10

APP0024

itself and the Defendants deny the unnecessary characterizations of its provisions, as worded.

169.   Answering Paragraph "169" of the Plaintiff's Complaint, the Defendants deny the allegations contained in said paragraph.

170.   Answering Paragraph "170" of the Plaintiff's Complaint, the Defendants are without sufficient knowledge or information upon which to base a response to said paragraph, and therefore deny the allegations in said paragraph.

171.   Answering Paragraph "171" of the Plaintiff's Complaint, the Defendants deny the allegations contained in said paragraph.

172.   Answering Paragraph "172" of the Plaintiff's Complaint, the Defendants deny the allegations contained in said paragraph.

173.   Answering Paragraph "173" of the Plaintiff's Complaint, the Defendants admit that the 2005 JOA contains provisions pertinent to editorial costs. As to the remaining characterizations and allegations, such characterizations and allegations are legal conclusions, to which no responsive pleading is required. To the extent any response is required, the Defendants deny the remaining allegations in said paragraph.

174.   Answering Paragraph "174" of the Plaintiff's Complaint, the Defendants deny the allegations contained in said paragraph.

175.   Answering Paragraph "175" of the Plaintiff's Complaint, the Defendants deny the allegations contained in said paragraph.

176.   Answering Paragraph "176" of the Plaintiff's Complaint, the Defendants deny the allegations contained in said paragraph.

177.   Answering Paragraph "177" of the Plaintiff's Complaint, the Defendants deny the allegations contained in said paragraph.

### FOURTH CLAIM FOR RELIEF
**(Breach of Contract – the Review-Journal's Independent Promotional Activities and Expenses: Section 5.1.4)**

178.   Answering Paragraph "178" of the Plaintiff's Complaint, the Defendants hereby reallege and incorporate by reference as through fully set forth herein, the responses contained in the paragraphs above.

20

179. Answering Paragraph "179" of the Plaintiff's Complaint, the allegations in such paragraph are legal conclusions, alleged statements of law and alleged interpretations of statutory language, to which no responsive pleading is required. To the extent any response is required, the Defendants deny the allegations in said paragraph.

180. Answering Paragraph "180" of the Plaintiff's Complaint, Section 5.1.4 of the 2005 JOA speaks for itself and the Defendants deny the characterizing of said provision, as worded.

181. Answering Paragraph "181" of the Plaintiff's Complaint, the allegations in such paragraph are legal conclusions, alleged statements of law and alleged interpretations of statutory language, to which no responsive pleading is required. To the extent any response is required, the Defendants deny the allegations in said paragraph.

182. Answering Paragraph "182" of the Plaintiff's Complaint, the Defendants deny the allegations contained in said paragraph.

183. Answering Paragraph "183" of the Plaintiff's Complaint, the Defendants deny the allegations contained in said paragraph.

184. Answering Paragraph "184" of the Plaintiff's Complaint, the Defendants deny the allegations contained in said paragraph.

185. Answering Paragraph "185" of the Plaintiff's Complaint, the Defendants admit that the 2005 JOA includes a Section 5.1.4 and Appendices A and B. As to the remaining characterizations and allegations, such characterizations and allegations are legal conclusions, to which no responsive pleading is required. To the extent any response is required, the Defendants deny the remaining allegations in said paragraph.

186. Answering Paragraph "186" of the Plaintiff's Complaint, the Defendants deny the allegations contained in said paragraph.

187. Answering Paragraph "187" of the Plaintiff's Complaint, the Defendants deny the allegations contained in said paragraph.

188. Answering Paragraph "188" of the Plaintiff's Complaint, the Defendants deny the allegations contained in said paragraph.

189. Answering Paragraph "189" of the Plaintiff's Complaint, the Defendants deny the

21

APP0026

allegations contained in said paragraph.

### FIFTH CLAIM FOR RELIEF
**(Breach of Contract – The Front Page Format: Section 5.1, and Appendices A and B)**

190. Answering Paragraph "190" of the Plaintiff's Complaint, the Defendants hereby reallege and incorporate by reference as through fully set forth herein, the responses contained in the paragraphs above.

191. Answering Paragraph "191" of the Plaintiff's Complaint, the allegations in such paragraph are legal conclusions, alleged statements of law and alleged interpretations of statutory language, to which no responsive pleading is required. To the extent any response is required, the Defendants deny the allegations in said paragraph.

192. Answering Paragraph "192" of the Plaintiff's Complaint, the Defendants admit and affirmatively state that Section 5.1, and Appendices A and B set forth specifications which apply to the Sun's pages and its "noticeable mention" on the front page of the Las Vegas Review-Journal. The Defendants deny the remaining allegations in said paragraph, as worded.

193. Answering Paragraph "193" of the Plaintiff's Complaint, the Defendants deny the allegations contained in said paragraph.

194. Answering Paragraph "194" of the Plaintiff's Complaint, the Defendants deny the allegations contained in said paragraph.

195. Answering Paragraph "195" of the Plaintiff's Complaint, the Defendants deny the allegations contained in said paragraph.

196. Answering Paragraph "196" of the Plaintiff's Complaint, the Defendants admit that the 2005 JOA includes a Section 5.1 and Appendices A and B. As to the remaining characterizations and allegations, such characterizations and allegations are legal conclusions, to which no responsive pleading is required. To the extent any response is required, the Defendants deny the remaining allegations in said paragraph.

197. Answering Paragraph "197" of the Plaintiff's Complaint, the Defendants deny the allegations contained in said paragraph.

198. Answering Paragraph "198" of the Plaintiff's Complaint, the Defendants deny the

22

2929395.10

APP0027

allegations contained in said paragraph.

199. Answering Paragraph "199" of the Plaintiff's Complaint, the Defendants deny the allegations contained in said paragraph.

200. Answering Paragraph "200" of the Plaintiff's Complaint, the Defendants deny the allegations contained in said paragraph.

**SIXTH CLAIM FOR RELIEF**
**(Breach of Contract – Audit)**

201. Answering Paragraph "201" of the Plaintiff's Complaint, the Defendants hereby reallege and incorporate by reference as through fully set forth herein, the responses contained in the paragraphs above.

202. Answering Paragraph "202" of the Plaintiff's Complaint, the allegations in such paragraph are legal conclusions, alleged statements of law and alleged interpretations of statutory language, to which no responsive pleading is required. To the extent any response is required, the Defendants deny the allegations in said paragraph.

203. Answering Paragraph "203" of the Plaintiff's Complaint, the Defendants admit that the quoted language in said paragraph appears in Appendix D to the JOA. As to the remaining characterizations and allegations, such characterizations and allegations are legal conclusions, to which no responsive pleading is required. To the extent any response is required the Defendants deny the remaining allegations in said paragraph.

204. Answering Paragraph "204" of the Plaintiff's Complaint, the Defendants deny the allegations contained in said paragraph.

205. Answering Paragraph "205" of the Plaintiff's Complaint, the Defendants deny the allegations contained in said paragraph.

206. Answering Paragraph "206" of the Plaintiff's Complaint, the Defendants deny the allegations contained in said paragraph.

207. Answering Paragraph "207" of the Plaintiff's Complaint, the Defendants admit that Appendix D to the 2005 JOA contains an audit provision. As to the Plaintiff's characterization of that provision, such characterization is a legal conclusion, to which no responsive pleading is

23

2929395.10

APP0028

required. To the extent a response is required, the Defendants are without sufficient knowledge or information upon which to base a response to said paragraph, and therefore deny the allegations in said paragraph.

208.   Answering Paragraph "208" of the Plaintiff's Complaint, the Defendants deny the allegations contained in said paragraph.

209.   Answering Paragraph "209" of the Plaintiff's Complaint, the Defendants deny the allegations contained in said paragraph.

210.   Answering Paragraph "210" of the Plaintiff's Complaint, the Defendants deny the allegations contained in said paragraph.

211.   Answering Paragraph "211" of the Plaintiff's Complaint, the Defendants deny the allegations contained in said paragraph.

## SEVENTH CLAIM FOR RELIEF
### (Tortious Breach of the Implied Covenant of Good Faith and Fair Dealing)

212.   Answering Paragraph "212" of the Plaintiff's Complaint, the Defendants the Defendants hereby reallege and incorporate by reference as through fully set forth herein, the responses contained in the paragraphs above.

213.   Answering Paragraph "213" of the Plaintiff's Complaint, the allegations in such paragraph are legal conclusions, alleged statements of law and alleged interpretations of statutory language, to which no responsive pleading is required. To the extent any response is required, the Defendants deny the allegations in said paragraph.

214.   Answering Paragraph "214" of the Plaintiff's Complaint, the Defendants deny the allegations contained in said paragraph.

215.   Answering Paragraph "215" of the Plaintiff's Complaint, the allegations in such paragraph are legal conclusions, alleged statements of law and alleged interpretations of statutory language, to which no responsive pleading is required. To the extent any response is required, the Defendants deny the allegations in said paragraph.

216.   Answering Paragraph "216" of the Plaintiff's Complaint, the Defendants are without sufficient knowledge or information upon which to base a response to said paragraph, and

24

therefore deny the allegations in said paragraph.

217. Answering Paragraph "217" of the Plaintiff's Complaint, the Defendants deny the allegations contained in said paragraph.

218. Answering Paragraph "218" of the Plaintiff's Complaint, the Defendants deny the allegations contained in said paragraph.

219. Answering Paragraph "219" of the Plaintiff's Complaint, the Defendants deny the allegations contained in said paragraph.

220. Answering Paragraph "220" of the Plaintiff's Complaint, the Defendants deny the allegations contained in said paragraph.

## PRAYER FOR RELIEF

221. Answering the provisions of the Plaintiff's Complaint designated as its "Prayer for Relief", the statements contained therein constitute descriptions of the remedies sought by the Plaintiff and require no response. To the extent the Plaintiff's Prayer for Relief requires a response, the Defendants deny that the Plaintiff is entitled to any of the relief it seeks from the Court.

\*\*\*

Defendants deny any allegation not specifically admitted.

Defendants deny all argument made in the headings of the Sun's complaint.

### AFFIRMATIVE DEFENSES

### FIRST AFFIRMATIVE DEFENSE

Plaintiff fails to state a claim upon which relief can be granted.

### SECOND AFFIRMATIVE DEFENSE

Plaintiff's claims are barred, in whole or in part, by the doctrine of accord and satisfaction.

### THIRD AFFIRMATIVE DEFENSE

Plaintiff's claims are barred, in whole or in part, by the doctrine of waiver.

### FOURTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred, in whole or in part, by the doctrine of estoppel.

25

2929395.10

**FIFTH AFFIRMATIVE DEFENSE**

Plaintiff's claims are barred, in whole or in part, by the doctrine of laches.

**SIXTH AFFIRMATIVE DEFENSE**

Plaintiff's claims are barred, in whole or in part, by the doctrine of setoff.

**SEVENTH AFFIRMATIVE DEFENSE**

Plaintiff's claims are barred, in whole or in part, by the doctrine of recoupment.

**EIGHTH AFFIRMATIVE DEFENSE**

Plaintiff's claims are barred, in whole or in part, by the Statute of Frauds.

**NINTH AFFIRMATIVE DEFENSE**

Plaintiff's claims are barred, in whole or in part, by a failure of a condition.

**TENTH AFFIRMATIVE DEFENSE**

The Defendants obligations were excused by Plaintiff's conduct.

**ELEVENTH AFFIRMATIVE DEFENSE**

Plaintiff's claims fail for the want of any controversy as Plaintiff already settled its claims with Las Vegas Review-Journal.

**TWELFTH AFFIRMATIVE DEFENSE**

Plaintiff's claims are barred by the applicable statute of limitations.

**THIRTEENTH AFFIRMATIVE DEFENSE**

The Defendants did not have confidential relationship with the Plaintiff.

**FOURTEENTH AFFIRMATIVE DEFENSE**

Plaintiff's claims are barred, in whole or part, by the Parol Evidence Rule.

**FIFTEENTH AFFIRMATIVE DEFENSE**

The Complaint is barred, in whole or in part, by the doctrines of acquiescence, unclean hands, unjust enrichment and/or ratification, as well as other applicable equitable doctrines.

**SIXTEENTH AFFIRMATIVE DEFENSE**

The Complaint is barred, in whole or in part, because the Defendants at all times acted in good faith and did not directly or indirectly induce any act or acts constituting a cause of action arising under any law.

26

2929395.10

## SEVENTEENTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred, in whole or part, by release, compromise and settlement.

## EIGHTEENTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred, in whole or part, by payment.

## NINETEENTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred, in whole or part, by mistake.

## TWENTIETH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred, in whole or part, by ratification.

## TWENTY-FIRST AFFIRMATIVE DEFENSE

Plaintiff's claims are barred, in whole or part, by acquiescence.

## TWENTY-SECOND AFFIRMATIVE DEFENSE

Plaintiff's claims are barred, in whole or in part, because the Court lacks jurisdiction over them.

## TWENTY-THIRD AFFIRMATIVE DEFENSE

Plaintiff's claims for punitive damages are barred because none of the alleged acts or omissions was or is malicious, willful, wanton, reckless, or grossly negligent.

## TWENTY-FOURTH AFFIRMATIVE DEFENSE

Any alleged damages allegedly incurred by Plaintiff are the result of acts and omissions of persons other than Defendants and therefore any alleged acts or omissions of the Defendants did not proximately cause Plaintiff's alleged damages.

## TWENTY-FIFTH AFFIRMATIVE DEFENSE

Plaintiff failed to mitigate its alleged damages.

## TWENTY-SIXTH AFFIRMATIVE DEFENSE

Defendants' performance is excused by the doctrines of commercial frustration and/or frustration of purpose.

## TWENTY-SEVENTH AFFIRMATIVE DEFENSE

Defendants' performance is excused under section 8.2 of the parties' agreement because of events substantially beyond their control.

27

2929395.10

## TWENTY-EIGHTH AFFIRMATIVE DEFENSE

Pursuant to Nevada Rule of Civil Procedure 11, at the time of the filing of this Answer, all possible affirmative defenses may not have been alleged inasmuch as sufficient facts and other relevant information may not have been available after reasonable inquiry, and therefore, the Defendants reserve their right to amend this Answer to allege additional affirmative defenses if subsequent investigation warrants the same.

## PRAYER FOR RELIEF

WHEREFORE, the Defendants pray for relief as follows:

1. Dismissal of Plaintiff's Complaint with prejudice;

2. An award of reasonable attorney's fees and costs to the Defendants for their defense of this matter; and

3. For such other relief as the Court deems just and proper.

DATED this 30th day of September, 2019.

KEMP, JONES & COULTHARD, LLP

By: /s/ Michael Gayan
    J. RANDALL JONES, ESQ.
    Nevada Bar No. 1927
    MICHAEL J. GAYAN, ESQ.
    Nevada Bar No. 11135
    3800 Howard Hughes Parkway, 17th Fl
    Las Vegas, Nevada 89169

28

2929395.10

APP0033

## LAS VEGAS REVIEW-JOURNAL INC.'S COUNTERCLAIM

### NATURE OF THE ACTION

1.     The Las Vegas Review-Journal was forced to file these counterclaims because the Las Vegas Sun, its business partner under the parties' 2005 joint operating arrangement ("2005 JOA"), has consistently failed to cooperate and to take all necessary steps in producing a successful joint media product, the printed Review-Journal/Sun newspaper.[1] If not for the fact that the Review-Journal is carrying the Sun financially and literally (as a daily insert to the Review-Journal newspaper)—including printing and distributing the Sun newspaper, subsidizing the Sun's newsroom, running its business operations, and providing the Sun with free exposure to the Review-Journal's exponentially larger readership—the print edition of Sun newspaper would have gone out of business years ago.

2.     The 2005 JOA contractually requires the Sun to cooperate "in every reasonable way" that will promote the creation of a successful joint product, and to preserve high standards of newspaper quality. However, the Sun is not only flouting these contractual obligations, it is actively working to *sabotage* the joint product. The Sun has intentionally allowed the printed Sun newspaper to deteriorate. And it has been using the Review-Journal's financial resources, and its free access to Review-Journal readers, to advertise *against* the joint Review-Journal/Sun print product. A column on the front page of the Sun newspaper insert urged readers not to subscribe to the Review-Journal newspaper and told readers that all the best content is on the LasVegasSun.com website—a separate product outside of the 2005 JOA that is operated by the Sun's parent company, Greenspun Media Group.

3.     Although the Sun publicly complains about the 2005 JOA, the reality is that the two newspapers enjoyed a profitable business partnership for many years. When the Sun's daily edition was converted to a Sun-branded insert in the Review-Journal, it was a lucrative deal for the Sun—the Sun's circulation increased by 700 percent, exposing multitudes of new readers to its

---

[1] Las Vegas Review-Journal, Inc. is the owner and publisher of the Las Vegas Review-Journal newspaper. Las Vegas Sun, Inc. is the owner and publisher of the Las Vegas Sun newspaper. Except where otherwise specified, references to the "Review-Journal" and the "Sun" refer to each newspaper's publisher.

29

2929395.10

APP0034

content and significantly increasing its brand awareness. In 2009, the Sun won a Pulitzer Prize. However, it is not a secret that the print newspaper industry has faced many challenges in recent years, due in large part to the smartphone-fueled rise of online news and social media, and the corresponding exponential growth of digital advertising. Despite the changing times and onslaught of new competition, the Review-Journal has done all that it can to continue producing a high-quality printed paper for the Las Vegas community.

4.     The Sun should have cooperated with the Review-Journal and taken all necessary steps to help improve their joint product and meet these challenges. Instead, the Sun decided to throw in the towel, and it is actively undermining the joint media product it is contractually obligated to help create and support. To drive subscribers away from the printed Review-Journal/Sun and divert them to LasVegasSun.com, the Sun has largely ceased running high-quality, breaking local news content in its printed pages. Instead, the printed Sun is now filled with recycled national wire-service stories, providing virtually no valuable breaking local news to readers. To be clear, the Sun is still *producing* original local news content—in a newsroom subsidized by the Review-Journal—but recently, its original local news content has run primarily on the separately-owned LasVegasSun.com, at times behind an $8.99 paywall. It would cost the Sun nothing to also publish this valuable content in the printed Sun. But it won't, because doing that would not help the Sun siphon readers from the printed Sun to LasVegasSun.com.

5.     The Sun has even stooped to publishing advertisements in the Review-Journal/Sun telling readers ***not to subscribe*** to the Review-Journal/Sun printed newspaper. For example, when LasVegasSun.com put up its paywall, the Sun newspaper insert ran a message on the front page – above the fold –telling readers to subscribe to LasVegasSun.com instead of buying a print subscription because "***purchasing a print subscription to the Sun and R-J doesn't benefit the Sun.***" [2] The Sun newspaper has also been running a permanent advertisement admitting that the Sun's best content is on LasVegasSun.com, not in the printed Sun newspaper, and directing readers (as recently as August 28, 2019) to go online "TO FIND EVERYTHING WE'VE GOT."

---

[2] https://m.lasvegassun.com/news/2018/jan/11/a-note-from-the-sun/, last visited August 21, 2019 (emphasis added).

30

2929395.10

6.      The Sun has blamed the Review-Journal for the declining quality of its printed newspaper insert, when the evidence clearly shows the Sun is the master of its own decline. The Sun falsely claims to be the victim of a plot to starve it of funds and drive it out of the market— but the Sun clearly has the ability to produce timely, original local news content, as it is publishing that content on LasVegasSun.com and has charged subscribers for it.

7.      The Sun plainly does not want a successful business relationship with the Review-Journal. And the Review-Journal should not be yoked to a business partner who is actively trying to sabotage their joint product. Under the 2005 JOA, each party has the right to terminate the agreement in the event of the other party's material breach. Moreover, it seems obvious that the time has come for the parties to go their separate ways. Accordingly, these counterclaims seek damages and a declaration from the Court terminating the 2005 JOA due to the Sun's material breaches.

## PARTIES, JURISDICTION, AND VENUE

8.      Counterclaimant Las Vegas Review-Journal, Inc. is a Delaware corporation with its principal place of business in Las Vegas, Nevada. It is the owner and publisher of the print and online Las Vegas-Review-Journal newspaper, which serves the metropolitan Las Vegas area. It is, and has been since on or about December 10, 2015, the ultimate successor in interest of DR Partners.

9.      Counterclaim-Defendant Las Vegas Sun, Inc. is a Nevada corporation with its principal place of business in Henderson, Nevada. It is the owner and publisher of the print and online Las Vegas Sun newspaper, which also serves metropolitan Las Vegas.

10.      Jurisdiction and venue are proper in this Court because these counterclaims arise out of events that occurred in Clark County, Nevada, and both parties' principal place of business is in Clark County, Nevada.

## GENERAL ALLEGATIONS

**A.      The Review-Journal and the Sun Enter a Joint Operating Agreement To Rescue The Failing Sun.**

31

2929395.10

11. The Sun newspaper was first published in 1950 and has a long history of publishing original local news stories of interest to the community. On its website, the Sun boasts of its longstanding reputation for "in-depth reporting," and the "dozens of journalism awards" it has won.[3] Notwithstanding these claims, the Sun struggled to turn a profit. By the 1980s, the Sun was operating at a substantial loss and on the verge of financial collapse.

12. In June 1989, Donrey of Nevada, Inc., then owner of the Review-Journal newspaper, entered into a joint operating arrangement ("the 1989 JOA") with the Sun pursuant to the Newspaper Preservation Act, 15 U.S.C. §1801, et seq. (the "NPA"). That Act allows financially troubled newspapers to partner with their competitors. Its goal is to prevent communities with struggling papers from losing editorial diversity. As a result of the JOA, the Sun became profitable.

13. In 2005, DR Partners, the then-successor in interest to Donrey of Nevada, Inc., and Las Vegas Sun, Inc. amended and restated their JOA in a document entitled "Amended and Restated Agreement." Under the 2005 JOA, as under the prior agreement, the Review-Journal is responsible for handling and paying the costs of all business functions of the Sun—including production, distribution, and advertising—thereby eliminating these significant expenses for the Sun. The Review-Journal and the Sun maintain separate and independent news and editorial operations.

14. The 2005 JOA also provides that, instead of being distributed as a separate afternoon newspaper, the Sun would be distributed mornings as a separately-branded newspaper insert within the Review-Journal. This arrangement was highly lucrative for the Sun—its circulation skyrocketed by 700 percent, exposing multitudes of new readers to its content, and significantly increasing its brand awareness. In 2009, the Sun won a Pulitzer Prize for a year-long series of original investigative reports, including 53 stories and 21 editorials, on construction deaths in Las Vegas. Its website catalogues numerous other journalism awards received in this time period, including awards for investigative reporting, writing, editing, art, design, and photography.

---

[3] https://lasvegassun.com/about/, last visited August 21, 2019.

32

APP0037

**B.      The 2005 JOA Requires the Sun to Take All Action Necessary to Carry Out The JOA, and to Maintain High Quality Standards.**

15.     The purpose of the 2005 JOA was, among other things, to provide the Las Vegas metropolitan area with a high-quality joint media product and create a joint product that is successful.

16.     Consistent with that purpose, the 2005 JOA requires the parties to work together to make the joint product successful.

17.     This requirement is made explicit in Section 5.3 of the JOA. In that section, both parties agreed "to take *all corporate action necessary* to carry out and effectuate the intent, purposes and provisions of this Restated Agreement." 2005 JOA, § 5.3 (emphasis added). They also agreed to "*cooperate with the other party in every reasonable way that will promote successful and lawful operation under this Restated Agreement for both parties*." *Id.* (emphasis added).

18.     The JOA also required the parties to maintain the quality of their respective newspapers. Section 5.2 states that each party "*agrees to preserve high standards of newspaper quality throughout the term of this Restated Agreement consistent with United States metropolitan daily newspapers*." 2005 JOA, §5.2 (emphasis added).

**C.      The Sun Sabotages The Joint Review-Journal/Sun Newspaper and Diverts Readers to a Separate Online News Product Outside of the JOA.**

19.     It is well-known that this is a challenging time for the print newspaper industry. Smartphones have given nearly every adult in America 24-7 internet access, fueling rapid, exponential growth in online news and social media. Many advertisers have fled to the vast array of digital advertising platforms to reach customers and get their messages out. These radical changes have broken down barriers and led to hyper-competition in the news industry—giving Las Vegas citizens access to more competing voices and options than anyone could ever have imagined, and at the same time depriving print newspapers of the revenue upon which they have depended. This substantial threat to the print newspaper business was unforeseeable when the parties executed the JOA 2005—after all, in 2005, there were no iPhones or Androids, and the mass exodus from print to digital advertising had not occurred. Notwithstanding these game-

33

2929395.10

changing new developments, the Review-Journal has worked tirelessly to continue providing the Las Vegas community with a quality printed newspaper.

20. In the face of these challenges, the Sun should have worked with the Review-Journal to make the Review-Journal/Sun newspaper as successful as it could be. In fact, it was contractually obligated to do so.

21. Instead, the Sun essentially abandoned the joint product and its obligations under the business arrangement that had kept the Sun afloat for the last thirty years. And the Sun started actively undermining the joint product it is contractually obligated to help create and support. Rather than help make the Review-Journal/Sun stronger, the Sun has been aggressively working to undermine and subvert it by diverting readers away from the joint printed newspaper to the Sun's separately-owned online site, LasVegasSun.com.

22. LasVegasSun.com is outside of the JOA, meaning that it exclusively belongs to the Sun's parent company, Greenspun Media Group, and the Review-Journal receives no revenue from it.

23. Although the Review-Journal receives nothing from LasVegasSun.com, it is involuntarily subsidizing it. Greenspun Media Group's owner has publicly admitted that he uses the profit payments from the Review-Journal to fund the operations of LasVegasSun.com, and other magazines and websites owned by the Greenspun Media Group.

24. To drive readers away from the Review-Journal/Sun newspaper and to LasVegasSun.com, the Sun has largely ceased publishing original and/or breaking local news stories in the printed Sun. Instead, the Sun hoards the breaking local news stories generated by its newsroom for LasVegasSun.com and, on information and belief, other Greenspun Media Group publications.

25. For example, the Sun won first place for Best Breaking News Reporting in the 2018 Nevada Press Association Better Newspaper Contest for its coverage of the October 1, 2017, mass shooting on the Las Vegas Strip.[4] The award-winning story appeared only on LasVegasSun.com, never in print. In the following days, the printed Sun contained woefully little original coverage of

---

[4] https://nevadapress.com/wabuskamangler/2018-contest-winners-for-urban-dailies/.

34

2929395.10

APP0039

the biggest breaking news story in Las Vegas history. On information and belief, the Sun instead used its newsroom to produce content for a story about the shooting that ran in another Greenspun Media publication outside of the JOA.

26.     Other award-winning stories that ran on LasVegasSun.com but not in the Sun newspaper include *Children on the Cusp: The Transition from Foster Care to Adulthood is Leaving Some Behind*, an in-depth look at Clark County youths who had aged out of the foster-care system, published on LasVegasSun.com on March 13, 2017, and *Celebrating the Las Vegas Showgirl*, published on LasVegasSun.com on June 13, 2016.

27.     More recent examples abound. On August 22, 2019, LasVegasSun.com provided live coverage of a heated meeting of Clark County School District Board, which is facing a threatened teachers' strike. The story was not published in the printed Sun. On August 20, 2019, LasVegasSun.com ran an original story reporting on a poll showing Joe Biden leading Elizabeth Warren and Bernie Sanders in Nevada; the story likewise never appeared in the printed Sun.

28.     Instead of original content, the Sun now fills its printed pages with national syndicated and wire service content that is readily available from other sources and often days old by the time it appears in the Sun. When the printed Sun does run local stories, they are often stories that had already appeared earlier in other Greenspun Media Group publications. For example, on August 15, 2019, LasVegasSun.com ran an article about a petition filed the day before (August 14) by the Center for Biological Diversity that had the potential to derail a controversial proposal put forth by Clark County to open protected lands to development. The story did not appear in the printed Sun until over a week later, on August 22, 2019. Similarly, an article about the impact the reorganization of the Bureau of Land Management would have on Nevadans appeared on LasVegasSun.com on August 14, 2019, but did not appear in the printed Sun until August 21, 2019.

29.     This means that instead of a co-branded newspaper with original reporting and in-depth news stories from diverse perspectives, the Review-Journal/Sun newspaper has been reduced to a single newspaper (the Review-Journal) with a slapped together insert containing recycled content

35

2929395.10

APP0040

(the Sun). As a result, the printed Review-Journal/Sun newspaper is less attractive to readers and subscribers, and in turn to advertisers, than it could be otherwise.

30. The Sun could easily run its original news stories in the printed Sun, in addition to LasVegasSun.com, at no extra cost. The same newsroom—which the Review-Journal is subsidizing—generates content for both the printed Sun and LasVegasSun.com. And because the Review-Journal is carrying the costs of publishing and distributing the printed Sun, the cost to the Sun is the same (i.e., zero dollars) whether its pages contain original news or days-old reprints.

31. In early 2018, Greenspun Media Group moved LasVegasSun.com behind a paywall.

32. For more than 30 days beginning on January 11, 2018, the Sun published a message to its readers on the first page of its printed insert to the Review-Journal. It was called "A Note from the Sun" (the "Note").

33. In the Note, the Sun urged readers to "subscribe to the Las Vegas Sun online" and promised that by doing so readers would be "doing your part in providing fact-based, quality journalism to readers across the valley who depend on that information for their daily family, business and political decisionmaking."[5]

34. The Note did not explain why the "fact based, quality journalism" readers could access on LasVegasSun.com was not appearing in the printed Sun. The Review-Journal, by contrast, also has an online version (ReviewJournal.com) that is outside the parties JOA —but the most important original, breaking news stories that appear in the online Review-Journal are also published in the print newspaper.

35. The Note made clear that LasVegasSun.com was intended to be direct competition for the Review-Journal/Sun newspaper. By subscribing to LasVegasSun.com, the Note told readers, "you will ensure that Nevada has multiple, vibrant viewpoints on the news and competing opinions about what the news means to each of us."[6] This, of course, was the entire point of the

---

[5] https://m.lasvegassun.com/news/2018/jan/11/a-note-from-the-sun/, last visited August 21, 2019.
[6] *Id*.

36

2929395.10

JOA, under which the Review-Journal has been carrying the production, distribution, and business costs of the Sun to ensure that Nevada readers have access to diverse news and editorial content.[7]

36. The Note attacked the Review-Journal's management—the Sun's JOA business partner—and blamed it for ongoing revenue and circulation decline.



37. The Note expressly told readers **not** to subscribe to the printed Review-Journal/Sun, advising them that "***no, purchasing a print subscription to the Sun and R-J doesn't benefit the Sun in this current scenario.***"[8]

38. The Sun has continued to use the free printing and distribution being provided by the Review-Journal to advertise **against** the Review-Journal. For example, every printed Sun now carries an advertisement admitting that the best content is on LasVegasSun.com, not in the printed paper, and directing readers to LasVegasSun.com "TO FIND EVERYTHING WE'VE GOT":

39. To put it mildly, the Sun is not taking all actions necessary or cooperating with the Review-Journal to successfully carry out the intent and purpose of the JOA. It is doing the exact opposite. Instead of helping to make the Review-Journal/Sun newspaper a success, the Sun is deliberately subverting it—starving the Sun's pages of original content, loading them with syndicated filler, and using its access to the Review-Journal's large readership to try to convince those readers to drop the printed newspaper in favor of LasVegasSun.com.

---

[7] *See, e.g.*, 1989 JOA, Preliminary Statement ("It is the firm belief of the parties that the continued publication of at least two newspapers of general circulation, editorially and reportorially separate and independent, is of paramount importance to the citizens of Las Vegas and its environs.").

[8] https://m.lasvegassun.com/news/2018/jan/11/a-note-from-the-sun/, last visited August 21, 2019.

37

**FIRST CAUSE OF ACTION—BREACH OF CONTRACT**

40. The Review-Journal realleges paragraphs 1 through 39 of this complaint as if fully set forth herein.

41. The 2005 JOA requires the parties to "take all corporate action necessary to carry out and effectuate the intent, purposes, and provisions of this Restated Agreement." 2005 JOA, § 5.3.

42. The 2005 JOA also requires each party "to cooperate with the other party in every reasonable way that will promote successful and lawful operation under this Restated Agreement for both parties." 2005 JOA, § 5.3.

43. The 2005 JOA additionally requires the parties to "preserve high standards of newspaper quality throughout the term of this Restated Agreement consistent with United States metropolitan daily newspapers." 2005 JOA, § 5.2.

44. The Sun has breached Section 5.3 by engaging in a course of conduct that includes, among other things: intentionally withholding original and/or breaking local news content from the printed Sun newspaper; filling the printed Sun newspaper with dated, recycled content such as days-old wire-service articles and stories that had already appeared days earlier on LasVegasSun.com instead of original content; taking these and other actions to undermine the quality of the printed product for the purpose of diverting readers from the printed Review-Journal/Sun newspaper to LasVegasSun.com, which is outside of the JOA; and telling readers not to subscribe to the Review-Journal/Sun.

45. The Sun has likewise breached Section 5.2 by failing to preserve high standards of newspaper quality consistent with United States metropolitan newspapers and instead relying primarily on recycled content to fill the Sun's printed pages. By any objective measure, the printed Sun of today is a far cry from the high standards of newspaper quality required by the 2005 JOA.

46. The Sun's breaches have damaged the Review-Journal. Among other things, the Sun's conduct has diverted revenues and made the printed Review–Journal/Sun newspaper less attractive to readers, subscribers, and advertisers, causing a loss of revenue and profits to the JOA and Review–Journal. If not for the Sun's breaches, the printed Review-Journal/Sun would have experienced higher circulation and greater profits. Furthermore, by undermining the quality of the

2929395.10

APP0043

printed Review-Journal/Sun newspaper while simultaneously using the printed Sun to advertise for and promote other business ventures with which Greenspun Media is affiliated and which are outside the JOA, the Sun has improperly diverted sales and profits from the JOA and the Review–Journal to those other business ventures and thereby has been unjustly enriched.

### SECOND CAUSE OF ACTION—BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

47.     The Review-Journal realleges paragraphs 1 through 46 of this complaint as if fully set forth herein.

48.     An implied covenant of good faith and fair dealing is recognized in every contract under Nevada law. Accordingly, in the 2005 JOA there was an implied covenant of good faith and fair dealing between the Review-Journal and the Sun whereby each party covenanted not to do anything to destroy or injure the rights of the other to receive the benefits of the agreement.

49.     The Sun breached the covenant of good faith and fair dealing by, among other things, intentionally causing the printed Sun to deteriorate and using the Review-Journal's resources and the joint media product created under the JOA to advertise against the Review-Journal/Sun newspaper and urge readers to instead subscribe to its owner's online product outside of the JOA.

50.     The Sun's breaches of the covenant have damaged the Review-Journal. Among other things, the Sun's disloyalty and subversion of the JOA have diverted revenues and made the printed Review-Journal/Sun newspaper less attractive to readers, subscribers, and advertisers, causing a loss of revenue and profits to the JOA and Review–Journal. If not for the Sun's conduct, the printed Review-Journal/Sun would have experienced higher circulation and greater profits. Furthermore, by undermining the quality of the printed Review-Journal/Sun newspaper while simultaneously using the printed Sun to advertise for and promote other business ventures with which Greenspun Media is affiliated, the Sun has improperly diverted sales and profits from the JOA and the Review–Journal to those other business ventures and thereby has been unjustly enriched.

### THIRD CAUSE OF ACTION—DECLARATORY RELIEF (TERMINATION FOR MATERIAL BREACH)

39

2929395.10

51.     The Review-Journal realleges paragraphs 1 through 50 of this complaint as if fully set forth herein.

52.     The 2005 JOA allows a party to terminate the agreement in the event of a material breach by the other party. Specifically, Section 9.1.2 provides, in relevant part: "[I]f either party defaults in the performance of any of its material obligations hereunder and does not cure such default within sixty (60) days after receiving written notice thereof from the other party, then such other party may, at its election, and in addition to all other remedies available to it at law or in equity, terminate this restated Agreement."

53.     The Sun's conduct, as alleged herein, was disloyal and a breach of trust. It went to the essence of the agreement, as the entire purpose of the 2005 JOA was to create a high quality, joint media product that would contain a daily Sun newspaper within a daily Review-Journal newspaper. The Sun's conduct, as alleged herein, was designed to subvert these efforts by sabotaging the printed Sun and diverting readers to LasVegasSun.com, a product outside of the JOA. By engaging in this conduct, the Sun has already irreparably damaged reader goodwill, irreparably harmed the Review-Journal, and has destroyed the mutual trust essential to the parties' continued business relationship. Accordingly, the Sun's breaches are incurable, such that any alleged legal obligation on the part of the Review-Journal to give notice or wait out a cure period before seeking relief from this Court was excused.

54.     A justiciable controversy exists between the Review-Journal and the Sun, insofar as the Review-Journal contends that the Sun is in material breach of the 2005 JOA such that the Review-Journal is entitled to terminate the agreement, and, on information and belief, the Sun contends there has been no such breach. The Review-Journal, as a party to the 2005 JOA, has a legally protected interest in the controversy, and the issue is ripe for judicial determination.

55.     The Review-Journal is entitled to a judicial declaration that the Sun is in material breach of Sections 5.3 and 5.2 of the 2005 JOA, and the implied covenant of good faith and fair dealing, and that the 2005 JOA is therefore terminated.

**FOURTH CAUSE OF ACTION—DECLARATORY RELIEF (TERMINATION FOR FRUSTRATION OF PURPOSE)**

40

2929395.10

56.        The Review-Journal realleges paragraphs 1 through 55 of this complaint as if fully set forth herein.

57.        The Review-Journal is entitled to a judicial declaration that its obligation to continue performance under the JOA is excused pursuant to the doctrine of frustration of purpose. The proliferation of smartphones and mobile devices that made internet access ubiquitous, and the exponential growth of online advertising, was not foreseeable when the JOA was executed in 2005. Nor was it foreseeable that in the face of this existential threat to the print newspaper industry, the Sun would essentially abandon the JOA and divert readers to its separate online product, LasVegasSun.com. These events have destroyed the value of the JOA and rendered it unenforceable due to the commercial frustration of its intended purpose.

58.        There has been another frustration of purpose, as well. Both the original JOA agreement and the 2005 Amendment were made under the NPA. The purpose of the NPA is to preserve editorial voices that otherwise might be lost by permitting a failing newspaper and another newspaper to combine their business operations, and thus achieve profitability for the business as a whole. But the NPA was never intended to cause the risk of loss of editorial voices by requiring the JOA as a whole to lose money. As a result of the Sun's conduct, the Sun has become an albatross around the neck of the Review-Journal with no associated benefits, in an increasingly challenging business environment for print newspapers. The continuation of the JOA would frustrate the purpose of the statute under which it was formed, and the basis of the parties' bargain.

59.        A justiciable controversy exists between the Review-Journal and the Sun, insofar as the Review-Journal contends that its performance under the 2005 JOA is excused and, on information and belief, the Sun contends that the Review-Journal's performance is not excused. The Review-Journal, as a party to the 2005 JOA, has a legally protected interest in the controversy, and the issue is ripe for judicial determination.

/ / /

41

2929395.10

APP0046

## **PRAYER FOR RELIEF**

The Review-Journal respectfully requests the following relief:

1. A judgment in its favor on all claims herein.

2. Damages in an amount to be proven at trial. The Review-Journal's damages are substantial and well above $15,000.

3. A judicial declaration that the Sun is in material breach of the 2005 JOA.

4. A judicial declaration that the 2005 JOA is terminated and has no further effect.

5. Costs, as allowable by law.

6. Such other relief as the Court deems just and proper.

DATED this 30th day of September, 2019.

KEMP, JONES & COULTHARD, LLP


By: _/s/ Michael Gayan_
J. RANDALL JONES, ESQ. (#1927)
MICHAEL J. GAYAN, ESQ. (#11135)
3800 Howard Hughes Parkway, 17th Fl.
Las Vegas, Nevada 89169

42

2929395.10

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on the 30th day of September, 2019, I served a true and correct copy of the foregoing **FIRST AMENDED ANSWER TO COMPLAINT AND COUNTERCLAIMS** via the Court's electronic filing system only, pursuant to the Nevada Electronic Filing and Conversion Rules, Administrative Order 14-2, to all parties currently on the electronic service list.

 */s/ Pam Montgomery*
An Employee of Kemp, Jones & Coulthard, LLP

43

# EXHIBIT 4
## Opinion of the Assistant Attorney General

# EXHIBIT 4

APP0049

BEFORE THE
ATTORNEY GENERAL OF THE UNITED STATES

| | |
|---|---|
| In the Matter of: ) | Public File No. : |
| Application by Las Vegas Sun, Inc., and ) | |
| Donrey of Nevada, Inc., for Approval ) | 44-03-14 |
| of a Joint Newspaper Operating ) | |
| Arrangement Pursuant to the Newspaper ) | |
| Preservation Act, 15 U.S.C. §§ 1801-1804 ) | |

OPINION

On August 8, 1989, the Las Vegas Sun, Inc. ("LVS"), owner of the Las Vegas Sun ("Sun"), and Donrey of Nevada, Inc. ("Donrey"), owner of the Las Vegas Review-Journal ("Review-Journal"), applied pursuant to the Newspaper Preservation Act ("NPA"), 15 U.S.C. §§ 1801-1804, for approval of a joint newspaper operating arrangement ("JOA").

I.

A.    Facts and Procedural History

The Sun and the Review-Journal are daily newspapers serving Las Vegas, Nevada.  The Review-Journal was the only daily newspaper serving the area from the time its predecessor was founded in 1909 until the Sun began publication in 1950.  The Application for Approval of a Joint Newspaper Operating Arrangement ("Application") states that the Sun is now a failing newspaper and that "[i]n the absence of the proposed JOA, the Sun's future as an independent second newspaper voice in Las Vegas is in grave jeopardy."  Application at 5.

The proposed JOA is intended to combine the business operations of the two newspapers, while preserving the newspapers' editorial and reportorial independence.  Through a subsidiary to be known as the "Agency," Donrey will take responsibility for the management, printing, and other commercial functions of the newspapers.  Report of the Assistant Attorney General in charge of the Antitrust Division ("Antitrust Report") at 16; JOA, Art. 5.1.  It will set the advertising and

APP0050

altogether, economic and editorial competition will both be reduced.

B.    The Sun as a Failing Newspaper

On the record here, the Sun has been shown to be a "failing newspaper" within the meaning of the NPA.  The record demonstrates that the Sun's losses are, in all likelihood, irreversible.

Since 1984, the cumulative pre-tax losses of the Sun have been nearly $13 million.  Antitrust Report at 28.  In 1988, the Sun posted a pre-tax loss of $3.6 million on less than $21 million in revenues.  The newspaper has lost money every year since 1981, when it posted a modest pre-tax profit of $183,000 on just under $16 million in revenues.  Application at Exhibit A. Cash flow was a negative $2 million in 1987 and a negative $6 million in 1988.  Antitrust Report at 38.

The total debt of the Sun, moreover, now amounts to $11 million.  The Greenspun family and companies controlled by the Greenspuns have advanced $6.5 million in unsecured loans for working capital.  Antitrust Report at 29-30.[7]

The Sun's trends in advertising and circulation have been unfavorable and leave little hope that these losses can be reversed.  From 1984 to 1988, total advertising lineage declined steadily, from almost 2,000,000 column inches to less than 1,300,000.  Antitrust Report at Table 6.  Advertising market share fell from 40 percent to less than 30 percent.  Retail, classified, and national lineage showed a comparable decline. Total advertising revenue shrank from over $17,250,000 to just over $15,135,000.  Id. at Table 10.[8]

---

[7] Under the NPA, whether a newspaper is "failing" must be determined "regardless of its ownership or affiliations."  15 U.S.C. § 1802(5).  Even if additional infusions of cash were available from the Greenspuns (and there is no indication that they would be), the availability of those funds would be irrelevant to the decision in this proceeding.  See Committee for an Independent P-I v. Hearst Corp., supra, 704 F.2d at 480.

[8] Because the Review-Journal's total advertising revenues have been given confidential treatment under 28 C.F.R. § 48.5, the figures for the drop in the Sun's market share of advertising revenues are not on the public record.  However, as the Review-Journal and the Sun have argued, those figures for market share would only reinforce the conclusion that the Sun is in serious and sustained financial difficulty.

- 8 -

APP0051

Circulation trends, too, have been generally unfavorable to the Sun. Daily paid circulation was almost 58,000 in 1982; in 1989 it was less than 52,000. Antitrust Report at Table 1. During that period, the Sun's market share fell from 38.2 percent to 28.4 percent. Id. Paid circulation for the Sunday edition declined from over 63,000 in 1982 to less than 56,000 in 1989. Id. at Table 2. Market share was reduced from 38 percent to less than 27 percent. Id. Although the population of the Las Vegas area grew in the 1980s at an annual rate of 3.6 percent, compared to the national rate of 1.1 percent, Application at 13 n.3, the Sun has been unable to prevent the loss of readers.[9]

Indeed, the applicants contend that the Sun "is inextricably caught in the so-called 'downward spiral' . . . . where losses in circulation share lead to losses in advertising share, leading in turn to further circulation losses." Application at 1. However, the record does not unambiguously point to a classic "downward spiral." Although the Sun's market share in circulation has fallen in most years since 1982, market share in daily circulation increased in 1986, and the share for the Sunday edition held steady in 1985 and increased in 1986.[10] Antitrust Report at Table 1 and Table 2. Furthermore, while the Sun's circulation market share went down in 1989, the absolute numbers for both the daily and Sunday editions increased. Id. In this

---

[9] The Antitrust Division observes that "newspapers whose readers are generally wealthier or who are members of population groups that tend to spend more are more attractive to advertisers, other things being equal," but concludes that "[t]he limited evidence available here suggests that [Sun] readers are substantially outnumbered by [Review-Journal] readers in all age, education and income groups." Antitrust Report at 25 n.20. However, a report prepared in 1988 by management consultants Deloitte, Haskins & Sells ("DHS") determined that "the Sun does maintain a dominant market share in the 45-54 age group and an even more dominant market share in the 55+ age group" and that these groups are important, in part, because "they have a high per capita disposable income."

The Antitrust Division's conclusion rests on a study performed by Belden Associates, based on data collected from May to August 1988 through a telephone study of 1026 persons and 509 written questionnaires. See Doc. RJ 0085, 0158-59. In contrast, the DHS study used 1987 data. In light of its use of more recent data, the Antitrust Division's conclusion is accepted.

[10] The 1986 increases are probably attributable, in large measure, to a program undertaken from 1985 to 1987 in which the Sun sought to expand circulation by providing the Sunday edition (later replaced by the Saturday edition) free of charge to CCTV subscribers. Antitrust Report at 34 n.52; Application at 18-19.

- 9 -

APP0052

respect, too, the record does not point unambiguously to a "downward spiral."[11]

Nevertheless, a newspaper can show that its losses are irreversible, even if it is not in a "downward spiral." See Michigan Citizens for an Independent Press v. Thornburgh, 868 F.2d 1285, 1292 (D.C. Cir.), aff'd by an equally divided court, 110 S. Ct. 398 (1989); York at 8-11. Here, the Sun's advertising revenues have declined in every year since 1982, without exception; the newspaper has lost money in each of those years; and, even with the 1989 increases in circulation, both the daily and the Sunday circulations are considerably smaller than in 1982. For an enterprise of its size, the Sun has serious cash flow problems and a large burden of debt. In addition, the Sun has deferred capital expenditures that would probably be necessary if the newspaper were to remain competitive. These deferred costs would include $1.5 to $2 million for new mailroom equipment and $13 to $15 million for a new press. Application at 27-28. The record therefore demonstrates that the Sun's losses are, in all likelihood, irreversible.[12]

Moreover, no alternative to the JOA appears feasible. New management would not be likely to reverse the Sun's losses, because the present management has made reasonable and diligent efforts to achieve profitability for the newspaper but has still failed in that attempt. See Committee for an Independent P-I v. Hearst Corp., supra, 704 F.2d at 478; Michigan Citizens for an Independent Press v. Thornburgh, supra, 868 F.2d at 1292. During the 1970s and 1980s, the Sun published "zoned" editions, which were distributed in specific local areas and contained advertisements and editorial material suited for those areas. The Sun at first tried four zoned editions and later published only two, but, in both instances, the zoned editions failed to improve the newspaper's market position. Antitrust Report at 31-32 & n.40. The Sun also attempted to publish two "total market coverage" publications designed to reach all readers, including those not subscribing to the Sun. These publications, The

---

[11] Perhaps significantly, the Antitrust Report, while noting the overall trends in circulation and advertising over the last several years and recommending approval of the JOA, never states that the Sun is in a downward spiral.

[12] The only indication in this record that there may remain sufficient time to reverse the Sun's losses is the DHS study, which projected that the Sun could again become profitable in 1992. Antitrust Report at 39. However, even assuming the Sun could continue to absorb losses until 1992, the DHS study assumed that the Sun could increase its market share while raising advertising rates. This assumption conflicts with recent experience. Id. at 40.

- 10 -

APP0053

Advertiser (in 1978) and Food News (in 1982), did not appreciably improve the Sun's position. Id. at 32 & n.41. In addition, the Sun made two unsuccessful efforts to establish an afternoon edition to compete with the Review-Journal's afternoon edition. Id. at 32. In 1988, the Sun also began to print, as additional sections in its regular editions, a Monday business tabloid and a special Tuesday sports section, but these efforts, too, failed to attract more readers. Id. at 34.

The Sun retained consultants to recommend measures for strengthening the paper. In 1985, McGladrey and Pullen suggested a cost reduction program. Although the Sun adopted many of the recommendations, the Sun's financial condition failed to improve. Id. at 32. In 1988, Deloitte, Haskins & Sells recommended various managerial improvements, which were implemented. Id. at 33-34. The Sun's losses, however, have continued.

As discussed above, the Sun carried out a program from 1985 to 1987 in which it used CCTV in an attempt to increase circulation of the newspaper. The program proved a costly failure. Id. at 37. The program, however, followed the outline of similar programs elsewhere that had succeeded. Id. Thus, as the Antitrust Division concludes, the "evidence establishes that the [Sun] management took a calculated, but unsuccessful, risk that the short term costs of the program would produce greater long term gains." Id. at 37-38.

The Sun has also tried to cut costs by reducing salaries and increasing commissions for advertising representatives. Id. at 33. It has tried to enlarge revenues by eliminating discounts in advertising rates. Id. These efforts, however, have not stopped the Sun's accumulating losses.[13]

In sum, the record reveals that the Sun's losses are, in all likelihood, irreversible. New management would not be likely to save the Sun from the continuing losses with which the newspaper is threatened.

C.   Policy and Purpose of NPA in This Case

The record also establishes that approval of the JOA would serve the policy and purpose of the NPA. The Sun faces probable failure, and there appears to be no feasible alternative to the JOA that would preserve the Sun in operation. By enabling the Sun to continue publication as a second editorial voice in Las

---

[13] Although the record does not show that there were any attempts to sell the Sun, the owners apparently did seek, without success, to sell minority interests to other newspaper companies. Antitrust Report at 15. See Committee for an Independent P-I v. Hearst Corp., supra, 704 F.2d at 478.

- 11 -

APP0054

# EXHIBIT 13

## Counterclaimant Las Vegas Review-Journal's Opposition to Counter-Defendant Las Vegas Sun's Motion to Dismiss Counterclaims

# EXHIBIT 13

APP0055

Electronically Filed
10/28/2019 4:29 PM
Steven D. Grierson
CLERK OF THE COURT

J. Randall Jones, Esq. (#1927)
r.jones@kempjones.com
Michael J. Gayan, Esq. (#11135)
m.gayan@kempjones.com
Mona Kaveh, (#11825)
m.kaveh@kempjones.com
KEMP, JONES & COULTHARD
3800 Howard Hughes Parkway, 17th Fl.
Las Vegas, Nevada 89169
Ph.: (702) 385-6000
Fax: (702) 385-6001

Richard L. Stone, Esq. (*pro hac vice*)
rstone@jenner.com
David R. Singer, Esq. (*pro hac vice)*
dsinger@jenner.com
Amy M. Gallegos, Esq. (*pro hac vice*)
agallegos@jenner.com
JENNER & BLOCK
633 West 5th Street, Suite 3600
Los Angeles, CA 90071-2054

*Attorneys for Defendants and Counterclaimant*

KEMP, JONES & COULTHARD, LLP
3800 Howard Hughes Parkway
Seventeenth Floor
Las Vegas, Nevada 89169
(702) 385-6000 • Fax (702) 385-6001
kjc@kempjones.com

## DISTRICT COURT

## CLARK COUNTY, NEVADA

| | |
|---|---|
| LAS VEGAS SUN, INC., a Nevada corporation, | Case No. A-18-772591-B |
| Plaintiff, | DEPT.: XVI |
| vs. | |
| NEWS+MEDIA CAPITAL GROUP LLC, a Delaware limited liability company; LAS VEGAS REVIEW-JOURNAL, INC., a Delaware corporation; and DOES, I-X, inclusive, | **COUNTERCLAIMANT LAS VEGAS REVIEW-JOURNAL'S OPPOSITION TO COUNTER-DEFENDANT LAS VEGAS SUN'S MOTION TO DISMISS COUNTERCLAIMS** |
| Defendants. | |
| LAS VEGAS REVIEW-JOURNAL, INC., | Hearing Date:   November 20, 2019 Hearing Time:  9:00 a.m. |
| Counterclaimant, | |
| vs. | |
| LAS VEGAS SUN, INC., a Nevada corporation, | |
| Counter-Defendant. | |

1

APP0056

# EXHIBIT B

APP0057



**U.S. Department of Justice**

Antitrust Division

---

*Liberty Place Building*
*325 Seventh Street, NW*
*Washington, DC  20530*

April 9, 2008

VIA ELECTRONIC MAIL

Gordon Lang, Esq.
Nixon Peabody L.L.P.
401 Ninth Street, NW
Suite 900
Washington, DC 20004

Alan L. Marx, Esq.
King and Ballow
1100 Union Street Plaza
315 Union Street
Nashville, TN 37201

Re:   Las Vegas Joint Operating Agreement

Dear Messrs. Lang and Marx:

I am writing to advise you of the status of the above-referenced investigation.  The Antitrust Division has closed its investigation.  However, that decision was not based on a conclusion that the 2005 amendments to the parties' Joint Operating Agreement are protected by the antitrust immunity afforded by the Newspaper Preservation Act.  Accordingly, the parties' conduct pursuant to those amendments – and in particular conduct not integral to the parties' revised arrangements for the joint distribution of the *Review-Journal* and the *Sun*, the effects of which we reviewed as part of our investigation – remains subject to antitrust scrutiny.

Please advise me within 30 days whether your clients prefer that we return the documents produced pursuant to the Civil Investigative Demands or destroy them per our usual procedure.

Sincerely,

Bennett J. Matelson
Trial Attorney

APP0058

E. Leif Reid, Nevada Bar No. 5750
Kristen L. Martini, Nevada Bar No. 11272
Marla J. Hudgens, Nevada Bar No. 11098
Nicole Scott, Nevada Bar No. 13757
LEWIS ROCA ROTHGERBER CHRISTIE LLP
3993 Howard Hughes Parkway, Suite 600
Las Vegas, Nevada 89169
One East Liberty Street, Suite 300
Reno, Nevada 89501
Tel:     775.823.2900
Fax:     775.823.2929
Email: lreid@lewisroca.com
         kmartini@lewisroca.com
         mhudgens@lewisroca.com
         nscott@lewisroca.com

James J. Pisanelli, Nevada Bar No. 4027
Todd L. Bice, Nevada Bar No. 4534
Jordan T. Smith, Nevada Bar No. 12097
PISANELLI BICE PLLC
400 South 7th Street, Suite 300
Las Vegas, Nevada 89101
Telephone: 702.214.2100
Email: JJP@pisanellibice.com
         TLB@pisanellibice.com
         JTS@pisanellibice.com

*Attorneys for Plaintiff/Counterdefendants*

Joseph M. Alioto, *PRO HAC VICE*
ALIOTO LAW FIRM
One Sansome Street, 35th Floor
San Francisco, California 94104
Tel: 415.434.8900
Fax: 415.434.9200
Email: jmalioto@aliotolaw.com

UNITED STATES DISTRICT COURT
DISTRICT OF NEVADA

LAS VEGAS SUN, INC., a Nevada corporation,

Plaintiff,

v.

SHELDON ADELSON, an individual, and as the alter ego of News+Media Capital Group LLC, Las Vegas Review-Journal, Inc., and Interface Operations LLC dba Adfam; PATRICK DUMONT, an individual, and as alter ego of Las Vegas Review-Journal, Inc., News+Media Capital Group, LLC, and Interface Operations LLC dba Adfam; NEWS+MEDIA CAPITAL GROUP LLC, a Delaware limited liability company; LAS VEGAS REVIEW-JOURNAL, INC., a Delaware corporation; INTERFACE OPERATIONS LLC DBA ADFAM, a Delaware limited liability company and as alter ego of Las Vegas Review-Journal,

Case No. 2:19-cv-01667-GMN-VCF

**AMENDED AND SUPPLEMENTAL COMPLAINT FOR DIVESTITURE, INJUNCTION, AND DAMAGES BY REASON OF DEFENDANTS' VIOLATIONS OF THE SHERMAN ANTITRUST ACT, THE CLAYTON ANTITRUST ACT, AND THE NEVADA UNFAIR TRADE PRACTICES ACT**

**JURY DEMAND**

116312629.2

APP0059

Inc., and News+Media Capital Group, LLC; and DOES, I-X, inclusive,

Defendants.

LAS VEGAS REVIEW-JOURNAL, INC., a Delaware corporation,

Counterclaimant,

v.

LAS VEGAS SUN, INC. a Nevada corporation; BRIAN GREENSPUN, an individual and as the alter ego of Las Vegas Sun, Inc.; GREENSPUN MEDIA GROUP, LLC, a Nevada limited liability company, as the alter ego of Las Vegas Sun, Inc.,

Counterclaim Defendants.

## **INTRODUCTION**

Defendant Sheldon Adelson has been a long-time enemy of the First Amendment and the press. For decades, he has filed and prosecuted one frivolous and ultimately unsuccessful defamation case after another. His object has always been clear: chill free speech and silence those that would speak out against him. Against this campaign of oppression, courageous journalists have nonetheless doggedly investigated Adelson's suspicious business dealings, lawsuits, and political activities while shining a disinfecting sunlight on his actions. Honest reporters, scathing editorials, and negative press coverage have continually plagued and maddened Adelson. In December 2015, Adelson's intolerance for the Fourth Estate finally boiled over when he sought to commit a modern-day smashing of the printing presses. He purchased the Las Vegas Review-Journal—one of only two daily newspapers published and distributed in Clark County, Nevada—and began a systematic silencing of all his local media critics. He used his family members, including his son-in-law Defendant Patrick Dumont, and their significant resources to accomplish his grand scheme.

Not only did Adelson remove any Review-Journal reporter who dared to challenge him, he began a calculated scheme to monopolize the local newspaper industry by strangling the sole remaining competitor and dissenting voice—the Las Vegas Sun ("the Sun"). Since 1989, the

- 2 -

116312629.2

APP0060

Review-Journal has published and distributed both papers under a 50-year Joint Operating Agreement ("JOA") authorized by the Newspaper Preservation Act (the "NPA") and approved by the Department of Justice. The NPA provides a limited antitrust exemption for newspapers to combine production, marketing, distribution, and sales, so long as their editorial and reportorial functions are maintained separate and independent. Congress designed the NPA, and allowed JOAs, to preserve the publication of competing newspapers that are facing economic distress.

Adelson, however, has weaponized the JOA for the opposite purpose. Adelson has wielded the JOA to place the Sun *into* economic distress. He virtually eliminated the required profit sharing under the JOA by predatorily adding improper expenses to reduce any share amount to zero. At Adelson's direction, the Review-Journal's publisher omitted the Sun from promotional advertising and covered up the Sun's required "noticeable mention" on the front page of the Review-Journal.

Despite these and other efforts to suffocate the Sun, the Sun remains steadfast. The Sun stands as political and philosophical counterbalance to the Review-Journal. The Sun covers local news in greater depth, breadth, and accuracy. It reports on breaking stories and provides a more attractive mix of news, features, and formats. The Sun's editorial page often speaks the truth to Adelson's power.

Unable to financially blot out the Sun, and tired of publishing his only rival, Adelson and the Review-Journal have recently filed a baseless and unlawful claim in Nevada state court seeking to terminate the JOA—the same agreement that grants antitrust protection to the Review-Journal. The JOA renders the Sun operationally and economically dependent on the Review-Journal. Terminating the JOA would effectively kill the Sun. A termination would complete Adelson's plan to achieve 100% monopoly power of local daily newspapers in Las Vegas and stifle all dissenting views.

By reasons of these antitrust violations, under the authority of Sections 4 and 16 of the

- 3 -

116312629.2

APP0061

Clayton Antitrust Act, 15 U.S.C. §§ 15, 26,[1,2] and Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2,[3,4] and Section 7 of the Clayton Act, 15 U.S.C. § 18,[5,6] an injunction should and must be issued to prevent any efforts by Adelson or the Review-Journal to terminate the JOA. Further, because they have misused their fiduciary responsibilities to the specific detriment to the Sun, the Court must divest Adelson of any control over the Review-Journal.

In addition, any damages found by a jury for the substantial loss of profits, the harm to the Las Vegas Sun brand, and the value of the Las Vegas Sun as a going concern, must be trebled by the Court as a just and reasonable estimate, which actual damages are reasonably believed to be in excess of tens of millions of dollars before trebling, and award of attorney's fees and costs.

## THE PARTIES

**Plaintiff Sun**

1.      The Las Vegas Sun, Inc. (the "Sun"), a Nevada corporation, publishes the Sun newspaper in Clark County, Nevada. The Sun is a wholly-owned subsidiary of Greenspun Media Group, LLC, which publishes various weekly magazines in Clark County, Nevada.

2.      The Sun is the second longest running daily newspaper in Las Vegas's history. The first edition of the Sun was published under the name, "Las Vegas Morning Sun," on July 1, 1950,

---

[1] Under Section 4 of the Clayton Act, 15 U.S.C. § 15, "Any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States . . . and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee."

[2] Under Section 16 of the Clayton Act, 15 U.S.C. § 26, "Any person, firm, corporation, or association shall be entitled to sue for and have injunctive relief, in any court of the United States having jurisdiction over the parties, against threatened loss or damage by a violation of the antitrust laws. . . . ."

[3] Under Section 1 of the Sherman Act, 15 U.S.C. § 1, "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal."

[4] Under Section 2 of the Sherman Act, 15 U.S.C. § 2, "Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony . . . . "

[5] Under Section 7 of the Clayton Act, 15 U.S.C. § 18, "No person engaged in commerce or in any activity affecting commerce shall acquire, directly or indirectly, the whole or any part of the stock or other share capital and no person subject to the jurisdiction of the Federal Trade Commission shall acquire the whole or any part of the assets of another person engaged also in commerce or in any activity affecting commerce, where in any line of commerce or in any activity affecting commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly."

[6] While Plaintiff's Section 7 Clayton Act claim, and Section 2 Sherman Act conspiracy claims, were dismissed in the Court's Order on motions to dismiss  (ECF No. 243), Plaintiff maintains those claims and allegations in this Amended Complaint for appellate preservation purposes only.

- 4 -

by Hank Greenspun.[7] Hank Greenspun remained the Sun's editor and publisher until he passed away in 1989. Hank's son, Brian Greenspun, has been the Sun's editor since 1989 and the publisher since 2010.

3.   The Sun's distinct journalistic voice is grounded in the newspaper's rich history. Hank Greenspun, who wrote a front-page column entitled, "Where I Stand," was known for taking on U.S. Senator Patrick McCarran and the casinos in federal court in 1952 for orchestrating an illegal group boycott of advertising in the Sun newspaper, and for his public battles with Senator Joseph McCarthy. The Sun's record of "courageous reporting" and "forthright journalism" has garnered it numerous awards and industry recognition, including: the Pulitzer Prize for Public Service in 2009 for its reporting on construction deaths on the Las Vegas Strip; the Alfred I. duPont-Columbia University Award in 2010 for its coverage of gambling addiction; first place for the Best Editorial Page in 2018 from the Nevada Press Association, "Better Newspaper Contest"; first place in Editorial Writing, Editorial of the Year, and Sports Feature Writing for 2019 from the Nevada Press Association; and a multitude of other national, state, and regional awards.

4.   Today, the Sun is considered a left-leaning editorial voice in Southern Nevada for its liberal tilting editorials and its frequent endorsement of Democratic candidates. It is known for its editorials by Brian Greenspun, the longest running metro columnist in Las Vegas history, which speak to everything from local events to observations of national politics, including challenging Donald Trump, the Review-Journal, and Adelson himself. The Sun and its sister publications currently employ approximately 90 individuals in Southern Nevada.

**Defendant Las Vegas Review-Journal, Inc., and the Review-Journal**

5.   Defendant Las Vegas Review-Journal, Inc., is a Delaware corporation doing business in the State of Nevada. Upon information and belief, Las Vegas Review-Journal, Inc., is a wholly-owned subsidiary of News+Media Group LLC ("News+Media"). Las Vegas Review-Journal, Inc., operates and publishes the Review-Journal daily newspaper in Clark County, Nevada.

---

[7] https://lasvegassun.com/history/timeline/

- 5 -

The Review-Journal began as a daily newspaper publication in 1929, under the name, "Las Vegas Evening Review-Journal." It is the longest running daily newspaper in Las Vegas.

6.     Today the Review-Journal is known as a right-leaning newspaper that mirrors the conservative views and personal business interests of its owners, casino magnate Sheldon Adelson and the Adelson family. The Review-Journal was the one of only two of the largest 100 newspapers in the country to endorse Donald J. Trump for President.

**Defendant News+Media**

7.     Defendant News+Media is a Delaware limited-liability company, doing business in the State of Nevada. News+Media acquired the Review-Journal on December 10, 2015, from New Media Investment Group Inc. for $140 million. As part of the transaction, New Media Investment Group Inc.'s subsidiary, GateHouse Media LLC ("GateHouse"), agreed to continue operating the Review-Journal under a management agreement. The management agreement ended within only six weeks after the acquisition, when the Review-Journal hired a new publisher to replace the one under the GateHouse management agreement.

8.     News+Media continues to operate as the parent company to Defendant Las Vegas Review-Journal, Inc., its subsidiary. Upon information and belief, News+Media does not have any employees who are not also co-employed by Defendant Las Vegas Review-Journal, Inc. News+Media has one member: Orchid Flower LLC, which is wholly owned by The Orchid Trust, whose Trustees are Dr. Miriam Adelson, Defendant Dumont, and Sivan Ochshorn-Dumont.

9.     News+Media is managed solely by Stephen O'Connor, who also holds all corporate positions with Defendant Las Vegas Review-Journal, Inc. O'Connor is the Chief Financial Officer of Interface Group Massachusetts, which owns Defendant Interface Operations LLC dba Adfam, an entity whose sole purpose is to benefit and promote the business and personal interests of the Adelson family. In his role with Interface Group, Mr. O'Connor works with and directs employees under the Adfam umbrella.

/ / /

/ / /

- 6 -

116312629.2

APP0064

**Defendant Sheldon Adelson**

10.    Defendant Sheldon Adelson ("Adelson"), substituted with the Estate of Defendant Sheldon Adelson, was a resident of Nevada. Adelson was the 24th richest person in the world,[8] and the billionaire founder, chairman, and chief executive officer of the Las Vegas Sands Corporation (the "Sands"). The Sands owns and operates luxury hotels and casinos, including the Venetian Las Vegas and The Palazzo Las Vegas, among others. Mr. Adelson, his family members and trusts and other entities established for the benefit of Mr. Adelson and/or his family members, own[ed] approximately 56% of Sands' outstanding common stock as of December 31, 2018. As a result, "Mr. Adelson exercise[d] significant influence over the [Sands] business policies and affairs."[9] Adelson, now through his Estate, is sued as an individual and as the alter ego of News+Media, Las Vegas Review-Journal, Inc., and Interface Operations LLC dba Adfam.

11.    Upon information and belief, Mr. Adelson, his family members and trusts, and other entities established for the benefit of Mr. Adelson and/or his family members, own News+Media and the Review-Journal. As he does with the Sands properties, Mr. Adelson exercises significant influence over the RJ's business policies and affairs, including its editorial content. For example, until his death, Mr. Adelson was secretly "co-employed" by Las Vegas Review-Journal, Inc., and News+Media as "Co-Publisher" of the Review-Journal, which afforded Mr. Adelson the unfettered right:

> to confer with and provide editorial advice and assistance) as appropriate, to the President and Publisher and other editorial employees and contributors to the Las Vegas Review-Journal (the "Newspaper") concerning the direction of the Newspaper, topics for day-to-day or investigative or other coverage by the Newspaper and, from time to time, published or unpublished information obtained or prepared in gathering, receiving or processing information for communication by the Newspaper to the public, including the sources for and reliability of the information.

---

[8] https://www.forbes.com/billionaires/#2add0a251c71
[9] https://s21.q4cdn.com/635845646/files/doc_financials/2018/annual/Annual-Report-2018.pdf, at p. 27.

- 7 -

116312629.2

APP0065

For pretense only, Mr. Adelson was given a nominal annual salary of $2,000. Despite his unfettered control and authority over the Review-Journal. Mr. Adelson was never disclosed to the public on the Review-Journal's masthead or otherwise in the Newspaper.

12. Adelson is well-known for his record-breaking donations to Republican political candidates and causes and has "established himself as an influential figure in American politics with the amount of money that he has contributed."[10] Forking over $30 million, Adelson was the largest donor to Donald Trump's presidential campaign in 2016 and of the entire presidential election. Adelson gave more than $100 million to support the Republican party in the 2018 midterm elections, and in 2020 set a new donation record in a single election cycle, giving $172.7 million.

**Defendant Patrick Dumont**

13. Defendant Patrick Dumont, an individual, is a resident of Nevada and is an officer and owner of Defendant News+Media. He is also an employee of both Las Vegas Review-Journal, Inc., and News+Media, and, upon information and belief, the Deputy Publisher of the Review-Journal. Dumont, a trustee of The Orchid Trust (the entity that ultimately owns News+Media), speaks as the primary voice for all trustees on issues related to the Review-Journal. The former executive vice president and Chief Financial Officer of the Sands, as of January 2021, Dumont is now the President and Chief Operating Officer of the Sands and a member of its Board of Directors. Dumont is the son-in-law of Sheldon Adelson and "orchestrated" the Adelson family's purchase of the Review-Journal, under the direction of Adelson.

**Defendant Interface Operations LLC dba Adfam**

14. Defendant Interface Operations LLC dba Adfam ("Adfam"), is a Delaware limited liability company doing significant business in the State of Nevada (Adfam, together with Adelson, News+Media, Las Vegas Review-Journal, Inc., and Dumont are referred to as the "RJ" or "Defendants").

15. Adfam was founded by Adelson and operates as the private family office of Dr. Miriam and Sheldon G. Adelson and their family. Adfam provides professional services to support

---

[10] https://www.theguardian.com/us-news/2018/jun/08/sheldon-adelson-trump-middle-east-policy

- 8 -

116312629.2

the Adelson family and members' personal and business interests, including Las Vegas Review-Journal, Inc., and News+Media.

16. Mr. Adelson and his family members, including Dumont, use Adfam as a tool to exercise significant corporate, strategic, and day-to-day control over the Review-Journal.

17. Upon information and belief, Adelson and Dumont appointed the family office's long-time Chief Financial Officer, Steven O'Connor, to serve as the only corporate officer of Las Vegas Review-Journal, Inc., *i.e.*, its President, Secretary, Treasurer, and Director. Likewise, Mr. O'Connor is the sole manager of News+Media. O'Connor is not a "newspaper person," does not have any newspaper industry experience, and did not build his career in the newspaper business. He is employed strictly by the family office and does not receive compensation for services rendered for or on behalf of the Review-Journal from Las Vegas Review-Journal, Inc., or News+Media.

18. Adfam shares such a unity of interest and decision-making with Defendants Las Vegas Review-Journal, Inc., and/or News+Media, that they function as a single economic unit. In the alternative, Adfam is an entity sufficiently separate and distinct as an economic unit from Defendants Las Vegas Review-Journal, Inc., and/or News+Media such that they operate as separate decision-makers.

**Doe Defendants**

19. The Sun alleges that Defendants named herein as Does I through X are individuals, corporations, limited-liability companies, partnerships, associations, or other persons or entities who are responsible in some manner or capacity for the acts alleged herein, but whose names are unknown to The Sun at this time. The Sun will seek leave to amend this Complaint to include the names of Does I through X when the identities of such defendants become known to the Sun.

## JURISDICTION, VENUE, AND INTERSTATE COMMERCE

20. This action is brought under Sections 4 and 16 of the Clayton Antitrust Act, 15 U.S.C. §§ 15, 26, for damages and for injunctive relief for Defendants' monopolization, attempted monopolization, and conspiracy to monopolize the relevant market for the sale of local daily

- 9 -

116312629.2

APP0067

newspapers in Clark County, Nevada, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2, and Nevada's Unfair Trade Practice Act, NRS Chapter 598A, and for injunctive relief to prohibit the unlawful elimination and/or acquisition of the Sun by RJ, in violation of Section 7 of the Clayton Act's, 15 U.S.C. § 18, prohibition on acquisitions that, "may . . . substantially . . . lessen competition, or . . . tend to create a monopoly,"[11] and in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

21.     This Court has subject matter jurisdiction of the federal antitrust claims asserted in this action under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15, 26, and 28 U.S.C. Sections 1331 and 1337. This Court has supplemental jurisdiction over the Sun's claim arising under Nevada's Unfair Trade Practice Act pursuant to 28 U.S.C. Section 1367.

22.     Defendants reside in or maintain offices, transact business, and own substantial assets in this District. Accordingly, this Court has personal jurisdiction over Defendants. Because Defendants transact business in this judicial district, venue is proper pursuant to 15 U.S.C. Sections 15, 22 and 26, and 28 U.S.C. Section 1391.

23.     Both the RJ and the Sun publish substantial quantities of local, state, national, and international news. The parties both pay substantial sums for such news and for material sent to them from various parts of the United States and the rest of the world. The parties' single-media product carries substantial quantities of national advertising sent to them from throughout the United States. In addition, purchases of materials to publish the paper, including paper and ink, involve transactions in interstate or foreign commerce. Thus, Defendants' violations of the antitrust laws involve and affect interstate commerce.

### **FACTUAL BACKGROUND AND HISTORY**

### **The Newspaper Preservation Act of 1970**

24.     In response to the Supreme Court's decision in *Citizen Publishing Co. v. United States,* 394 U.S. 131 (1969), which held that a joint newspaper operating agreement constituted illegal price fixing in violation of the antitrust laws, Congress enacted the Newspaper Preservation

---

[11] *See supra* n.6.

- 10 -

116312629.2

APP0068

Act, 15 U.S.C. §§ 1801-04 (the "Act"), in 1970. In so doing, Congress determined that the public interest in preserving multiple editorial voices was best served by permitting joint newspaper operations in the same market that were conditioned on maintenance of separate editorial functions. While the Act exempts newspapers in a JOA from some provisions of the antitrust laws, it expressly excludes predatory conduct and practices from antitrust immunity. 15 U.S.C. § 1803(c).

**1989 Joint Operating Agreement**

25.    By the late 1980s, the Sun had been operating at a substantial loss and was in probable danger of financial failure. In order to ensure the continued publication of two separate and independent daily newspapers in Las Vegas, in June 1989, the Sun and the RJ's prior owners entered into a Joint Operating Agreement (the "1989 JOA").

26.    As consideration for the execution of the 1989 JOA, and in exchange for the ability to remain in publication until at least December 31, 2040, the Sun paid the Review-Journal $25 million in stock and relinquished its printing press, circulation lists, advertising lists, and all non-editorial business functions.

27.    Under the terms of the 1989 JOA, the Sun and Review-Journal produced and distributed separate daily newspapers using a single platform (the Review-Journal's plant and equipment). The 1989 JOA required the Sun to cease publication as a morning newspaper and to instead be circulated in the less desirable afternoon position. The Sun's circulation dropped precipitously as a result of its afternoon placement.

28.    The parties agreed that the Review-Journal would, among other things, handle all print advertising and circulation functions for both print newspapers, including setting pricing for all advertising and subscriptions. Both newspapers maintained their editorial independence, while enjoying the savings of joint production, distribution, advertising, business administration, accounting, and other non-editorial functions.

29.    The Sun became profitable under the 1989 JOA.

/ / /

/ / /

- 11 -

116312629.2

APP0069

**The Operative JOA – The 2005 Amended and Restated Joint Operating Agreement**

30.     In 2005, the 1989 JOA was amended and called the Amended and Restated [Joint Operating] Agreement (the "2005 JOA").

31.     Under the 2005 JOA, the parties combined the two newspapers into a single-media product that separately branded the Review-Journal and the Sun, and included the Sun as a separate newspaper located inside the Review-Journal.

32.     The 2005 JOA explicitly acknowledges the public interest in remaining editorially independent, as required by the Act. ("Because of the public interest in maintaining editorially and reportorially independent and competitive newspapers" specific performance is available to enforce the 2005 JOA). Article 5.2 of the 2005 JOA states: "Preservation of the news and editorial independence and autonomy of both the Review-Journal and the Sun is of the essence of this restated agreement."

33.     Under the terms of the 2005 JOA, the RJ agreed to continue to print the Sun and the RJ together in its facilities, and oversee all accounting, management, and operational control, except for the operation of the Sun's news and editorial department.

34.     With the new, single-media product, the 2005 JOA contains strict and mutually-agreed upon formatting specifications for the Sun's pages, including "the number, placement, and characteristics." The 2005 JOA also requires the RJ to publish a box above the Review-Journal's own banner on its front page containing a "noticeable mention" for the Sun, which includes the Sun's logo and a headline describing the Sun's lead story and where the Sun's lead story is located. The RJ promised to feature the Sun's "noticeable mention" according to the detailed specifications in the JOA, which provide as follows:

> The Monday-Sunday editions of the Review-Journal shall include a noticeable mention of the Sun, on the front page of the Review-Journal. The noticeable mention will appear in a box above the Review-Journal's masthead (the "Sun Box") and shall be in the form shown on Appendix B. The Sun Box shall not be smaller in proportion than shown in Appendix B. The Sun Box shall also include the Sun's masthead, and any emblem that is part of the Sun's masthead. The Sun Box shall include a promotion of a story in the

- 12 -

116312629.2

APP0070

Sun and refer readers to the Sun inside. The type face, editorial artwork, font, and editorial promotional content appearing in the Sun Box shall be determined by Sun, in its sole discretion. Any color in the Sun Box shall be restricted to constituent colors used by the Review-Journal on its front page. The Sun Box shall be the left-hand box unless it would be obscured by a spaeda fold, in which case the Sun Box shall be the right-hand box. In the event of major breaking news or for exigent production circumstances, the Sun Box may be moved below the Review-Journal's masthead. The Sun, on average, will receive as much editorial color as the local news section of the Review-Journal.

35. The 2005 JOA changed the prior marketing provisions and requires the RJ to market and promote the Sun (using commercially reasonable efforts to maximize the circulation of both newspapers), including equal mention of the Sun in the RJ's promotional activities to ensure the Sun's brand remains as robust as the Review-Journal's. The 2005 JOA requires the RJ to use "commercially reasonable efforts" to promote the Sun in "equal prominence" to the Review-Journal:

> 5.1.4 Promotional Activities. Review-Journal shall use commercially reasonable efforts to promote the Newspapers. Any promotion of the Review-Journal as an advertising medium or to advance circulation shall include mention of equal prominence for the Sun. Either the Review-Journal or Sun may undertake additional promotional activities for their respective newspaper at their own expense. For all promotional activities for the Newspapers paid for by the Review-Journal, the Review-Journal shall be responsible for all promotional copy preparation and placement, provided however, that the Sun shall have the right to approve all promotional copy for the Sun that does not generically and concurrently promote both Newspapers.

36. The 2005 JOA also included a new provision regarding the RJ's requirement to publish the Sun paper as part of its electronic replica edition. The 2005 JOA, in part, provides:

> Review-Journal shall have the exclusive right and obligation to distribute the Sun through electronic replica technology (i.e. technology customarily used by metropolitan daily newspapers which transmits an entire Sun page to the subscriber or consumer in any form) to the same extent the Review-Journal distributes its own pages by such means provided.

116312629.2

APP0071

37. Under the 2005 JOA, the Sun and the RJ are required to "bear their own respective editorial costs" and "to maintain a staff of news and editorial employees." However, the 2005 JOA provides that the "Sun shall receive an annual profits payment" which shall be paid monthly in advance of the first day of each month during the term of the agreement. The amount of subsequent Annual Profits Payments fluctuates in direct correlation with the amount of the joint operation EBITDA.

38. Between 2005 and 2015, the Annual Profits Payments to the Sun had been as much as $12 million per year, and never less than $1.3 million per year.

39. The 2005 JOA is effective for an initial period ending on December 31st of the 50th year from July 1, 1990, *i.e.*, December 31, 2040, at which point it automatically renews for succeeding periods of 10 years unless terminated by either party.

40. The parties incorporated audit and arbitration rights exercisable only by the Sun in the 2005 JOA. Because Defendants were in control of all aspects of non-editorial management, an audit was the Sun's sole mechanism to ensure that that Defendants were complying with the 2005 JOA.

41. The 1989 JOA had originally provided that the Review-Journal had the right to terminate the agreement if the JOA failed to turn a profit for two consecutive years. This provision was intentionally omitted from the 2005 JOA. As set forth in the 2005 JOA, only three events may trigger its termination: (1) the expiration of the term (December 31, 2040); (2) bankruptcy or default by either party; and (3) a change in the controlling ownership interest in the Las Vegas Sun away from any lineal descendants of Hank Greenspun without prior approval from the RJ.

42. Under the 2005 JOA, "[i]n the event that the Review-Journal determines that the Sun's continued placement in the Review-Journal has a material and substantial negative financial impact on the revenue and profit of the Newspapers it may deliver the Sun separately from the Review-Journal but at the same time, place, and manner as the Review-Journal" and it requires the RJ to provide the Sun with 15 days' notice of its intent to change the manner in which the RJ publishes the Sun.

- 14 -

116312629.2

## NATURE OF TRADE AND COMMERCE

### Relevant Product Market

43.     Local daily newspapers provide a distinct package of characteristics to their readers. They supply readers with national, state, and local news and sports information in a timely manner and in a convenient, portable, hardcopy format. Local newspapers are able to offer news stories with more in-depth coverage than the news reported by radio or television, and they cover a wider array of topics of interest to local readers—not just breaking news and major news stories of the day. Newspapers are portable, allowing the reader to read the news, advertisements, and other information at his/her own convenience without the need to use an electronic device to access content. Newspapers are also inexpensive, meaning there are virtually no socio-economic barriers for citizens to have access to news and information about their community, including those who are unable to afford Internet services. Readers enjoy other features of local daily newspapers, such as local event calendars, movie and television listings, classified advertisements, commercial advertisements, legal notices, comics, syndicated columns, and obituaries. Most readers of local daily newspapers in Clark County do not consider weekly newspapers, radio news, television news, Internet news, or any other media to be adequate substitutes for the only two local daily newspapers serving the Las Vegas area.

44.     Thus, the sale of local daily newspapers is a distinct relevant product market and line of commerce within the meaning of Section 2 of the Sherman Act and Section 7 of the Clayton Act.

### Relevant Geographic Market

45.     The Sun and the Review-Journal are produced, published, and distributed to readers in or near Clark County, Nevada. Both newspapers provide news relating to Clark County, in addition to state, national, and international news. These two organizations gather Clark County news to include in their print newspapers as well as their associated news websites.

46.     Local daily newspapers that are not produced, published, and distributed in Clark County do not regularly provide local news specific to that county. Local daily newspapers from

- 15 -

116312629.2

APP0073

outside of Clark County do not have any significant circulation or sales inside Clark County. Thus, local newspapers serving areas outside of Clark County are not acceptable substitutes for the Sun and the Review-Journal.

47.     Accordingly, Clark County, Nevada is the relevant geographic market and section of the country for antitrust purposes under Section 2 of the Sherman Act and Section 7 of the Clayton Act.

**Market Power**

48.     The Review-Journal and the Sun together account for 100% of the circulation of local daily newspapers in Clark County. The combined print media product that includes the Review-Journal and the Sun has a paid circulation for Sunday of 86,593 and an average daily (non-Sunday) paid circulation of 67,514. Those two papers have been published and distributed under the terms of a Joint Operating Agreement that was first entered into in 1989 and amended in 2005, as authorized under the NPA. The 2005 JOA confers monopoly power in RJ, who under terms of the JOA maintains the only printing facilities capable of efficiently printing a daily local newspaper in Clark County, sets the prices for daily newspaper advertising and circulation, and prints, distributes, and promotes the only two daily local newspapers in the relevant market—the Sun and the RJ. Accordingly, the RJ has market power and monopoly power in the relevant market in this case—the sale of daily local newspapers in Clark County.

**Barriers to Entry**

49.     Entry into the local daily newspaper market in Clark County is not timely, likely, or sufficient to prevent harm to competition that would result from the Sun's elimination from the market.

50.     Local newspapers incur significant fixed costs, including building or gaining access to a printing facility, establishing a distribution network, hiring reporters and editors, news gathering, and marketing the newspaper, among others, that present barriers to entry.

51.     By way of example, printing presses for daily newspapers can cost more than $100 million. Any new local daily paper would require a massive printing facility, typically over 150,000

- 16 -

116312629.2

APP0074

square feet, to house and store newsprint, that includes a sufficiently large loading dock capable of taking 1-ton rolls of newsprint in and feeding out thousands of printed newspapers to be distributed. There is no printing facility in the Clark County market that can efficiently and effectively print a local daily newspaper other than the facilities owned and controlled by the RJ.

52.     By way of further example, establishment of a highly efficient distribution operation capable of circulating the newspaper across the County immediately after printing is complete and the corresponding need to develop a network of drivers to support home delivery presents another barrier to entry in the market.

53.     No local daily newspaper has attempted to enter the Clark County market since the Las Vegas Valley Times (the "Valley Times") in 1975 when it converted from a weekly newspaper to a daily. The Valley Times was a small, community paper, with a maximum circulation of 10,000. That paper, which closed in 1984, was sold only in racks and never competed in a meaningful way against the Sun or the Review-Journal.

54.     Further, expansion of daily newspapers in areas adjacent to Clark County is not timely, likely, or sufficient to prevent the harm to competition resulting from the threatened elimination of the Sun from the market. There are no local daily newspapers adjacent to Clark County. The nearest local daily newspapers are hundreds of miles away and do not regularly provide local news specific to Clark County. Expanding into Clark County would require local daily newspapers in areas hundreds of miles away to expand their coverage of local news specific to Clark County, to attract local advertisers who target readers in those counties, and to expand their distribution into those counties.

**DEFENDANTS' PREDATORY CONDUCT AND ANTICOMPETITIVE SCHEME**

55.     Prior to and following the acquisition of the Review-Journal, Defendants orchestrated and implemented an anticompetitive scheme to eliminate the RJ's sole competitor, the Sun, and to monopolize, attempt to monopolize, and to conspire to monopolize the market for daily local newspapers in Clark County. In addition, Defendants' unlawful attempts to acquire the Sun or put it out of business violate Section 7 of the Clayton Act.

- 17 -

116312629.2

APP0075

56. Dumont and Adelson agreed to purchase the Review-Journal, which was inspired, in part, by their belief that the Review-Journal was a significant opportunity to influence public perception and achieve a monopoly position in the daily print newspaper market in Clark County. Defendants Adelson and Dumont wanted a newspaper in their hometown that reflected their conservative political views, took favorable stances on their "passion topics" (*i.e.*, opposition to the legalization of marijuana, attacks on competitors of the Sands, advancement of specific state legislation and amendments to the Nevada Constitution to benefit their companies, pressure applied to judges overseeing cases involving Adelson, the Adelson family's involvement with the Oakland Raiders' planned move to Las Vegas and the Sands' convention business competitors), and that printed coverage biased in his favor of any ongoing court proceedings in which Adelson may be involved. Unlike most people, Adelson was in a financial position to buy the sympathetic press coverage he craved by acquiring a paper over which he could have complete and unfettered editorial control. To that end, Adelson, his family, and Defendants, acquired the Review-Journal on December 10, 2015.

57. Despite advice to the contrary from retained industry experts and consultants, at first, Adelson and Dumont attempted to conceal the Adelson family's interest in the Review-Journal by naming an unknown and unqualified figurehead to lead the RJ, Michael Schroeder, so that Adelson could manipulate the content of the Review-Journal without people realizing it was being controlled. Soon after the deal closed, reporters at the newly-acquired Review-Journal broke the story of his ownership. In response, the Adelson family released a statement acknowledging their new stake in the paper:

> Today we are proud to announce that the Adelson family has purchased the Review-Journal through a wholly owned fund both as a financial investment as well as an investment in the future of the Las Vegas community.

58. One of Adelson's first actions, even before the purchase transaction closed, exerted control over the Review-Journal by ordering RJ reporters to be stationed in the courtroom of Nevada District Judge Elizabeth Gonzalez. Judge Gonzalez was presiding over a high-profile wrongful

116312629.2

APP0076

termination case in which Adelson was a defendant and had issued rulings unfavorable to Adelson. Adelson's objective was to intimidate Judge Gonzalez by seating reporters in her courtroom all day long to search for dirt.

59.    Prior to the announcement of the sale, Adelson and Dumont directed Michael Schroeder to use one of Schroeder's Connecticut newspapers and write and publish an article condemning Judge Gonzalez's record, which also contained plagiarized material and fabricated quotes. Schroeder did so under the pen name Edward Clarkin. As one 20-year journalist who worked for Schroeder announced during his departure from Schroeder's newspaper, Schroeder had funneled "a terrible, plagiarized piece of garbage about the court system" into the paper, and had "used the pages of my newspaper, secretly, to further the political agenda of his master out in Las Vegas." Dumont was the point person for Schroeder's disparaging article, with Adelson weighing in. Dumont reviewed, approved, and applauded drafts sent to him by Schroeder, and, upon information and belief, reported his impressions of the article to Adelson, who was similarly pleased when the article was published.

60.    As soon as Adelson and Defendants took over the Review-Journal, and even earlier, Adelson began taking an active role in its editorial voice by weighing in on the Review-Journal's coverage in advance of its publication, holding almost daily teleconferences with then-publisher Jason Taylor. They directed Adfam lawyers to draft secret employment agreements with nominal salaries for Adelson and all trustees of The Orchid Trust (Dumont, Sivan Ochshorn-Dumont, and Dr. Adelson)—the parent of Orchid Flower LLC—under the façade of legitimacy all while guaranteeing they each had unrestrained, and undisclosed, control over the Review-Journal.

61.    Even after the Adelson family was forced to disclose their ownership interests in the Review-Journal, Adelson and Dumont continued to conceal the extent of their influence over the editorial content and operations of the newspaper. The Review-Journal discloses in each print publication its publishers and other key employees, but it has never disclosed Adelson or Dumont's roles as Co-Publisher or Deputy Publisher, respectively. Likewise, it has never disclosed Dr.

- 19 -

116312629.2

APP0077

Miriam Adelson's, Sivan Ochshorn-Dumont's, or Adfam's or its employees' key roles in the Review-Journal either.

62.     But just one thing, or one newspaper, stands between Adelson and his vision of the Review-Journal as his mouthpiece and sole editorial voice in the Las Vegas area—the Sun. The 2005 JOA envisions the publication of two distinct editorial voices that are packaged together for readers in the community. The Sun often expresses attitudes that are contrary to Adelson's, and when necessary, features pieces that take direct aim at Adelson himself. On one occasion, Adelson showed his then-publisher Jason Taylor a liberal column written by Brian Greenspun, and suggested that he did not want to include the Sun.

63.     During negotiations for the purchase of the Review-Journal, Dumont led the due diligence team using Adfam's services, employees, and consultants, on behalf of and in collaboration with Adelson.

64.     Along with Adfam's Chief Accounting Officer and other Adfam employees, Adfam retained several consultants to conduct due diligence on behalf of the Adelson family. Adfam's General Counsel advised the Adelson family on strategies regarding the JOA, and the Review-Journal's business performance, employment, salary information, and commercial agreements, and provided analysis and assessment of this information and the overall strengths and weaknesses of the Review-Journal. The due-diligence consultants, along with Adfam employees, including Adfam's General Counsel and Chief Accounting Officer, reported to Dumont. Upon information and belief, Adfam's lawyers ultimately determined the corporate structure of the RJ entities, including the relationship between Defendants and Orchid Flower LLC (the sole member of News+Media). After the purchase was consummated, Adfam remained, and still remains today, intimately involved with the business of the Review-Journal, including overseeing, advising on, and participating in the control of the Review-Journal's accounting and operations.

65.     To maximize their influence and the profits for the Review-Journal, Adelson and Dumont sought to eliminate the Sun. From the inception of the due diligence process, both Dumont and Adelson began exploring ways to either terminate the 2005 JOA or to acquire the Sun in order

- 20 -

116312629.2

APP0078

to dissolve the JOA. In meetings held before and after Defendants' acquisition of the Review-Journal, Adelson, and his son-in law, Patrick Dumont, asked then-publisher Jason Taylor how they could get out of the JOA with the Sun, whether the Sun had to exist at all, and how they could either buy Greenspun out or get rid of the Sun. During one such meeting, Adelson asked what would happen to the Sun if, under the JOA, there was no profit, and in other meetings continued to hypothesize about what would happen to the Sun if the RJ squeezed the Sun out of the market by eliminating its profits payments.

66.    These discussions launched Defendants' predatory and anticompetitive scheme further, the components of which comprise the wide-sweeping operational and accounting abuses can be grouped as follows: (1) removing a publisher with a proven record of turning around declining newspapers, who had already been implementing a plan that was reversing negative trends, and installing a replacement publisher to execute their predatory scheme to eliminate the Sun; (2) abusing the RJ's control over operations and advertising (and the accounting thereof) under the JOA in such a way so as to either put the Sun out of business or to so diminish its value that the Sun will be forced to sell to the RJ at a fire-sale price; (3) redesigning the Review-Journal's front page and the Sun's box with the purpose of making the Sun's presence on the Review-Journal's front page less noticeable and selling advertising products concealing the Sun's front page presence; and (4) threatening involuntary termination of the JOA.

**The RJ Terminated Its Relationship with Then-Publisher Jason Taylor in Furtherance of Its Anticompetitive Scheme**

67.    Jason Taylor, publisher of the Review-Journal from July 2015 to January 2016, was brought in initially by the Review-Journal's prior owner, GateHouse, to turn around declining trends at the Review-Journal. Taylor is known in the industry as having success in generating revenue and being a powerful force, and he has won countless industry awards and honors.

68.    Soon after Taylor's arrival, he began implementing a strategic plan to reverse the Review-Journal's declining trends by reducing unnecessary costs, increasing revenue through improved advertising sales and circulation, increasing the RJ's visibility, and modernizing its brands. Taylor's plan began to see improved financial performance almost immediately.

- 21 -

116312629.2

APP0079

69.     In a meeting with Greenspun before Defendants' acquisition of the Review-Journal, Taylor projected that the JOA would have a financially strong close for fiscal year-end 2016, and that, based on trend, the Sun's profit payments could increase by more than 18% in 2017. Under Taylor's plan, the JOA profits in 2016-2017 were projected to be substantial. Taylor was also vocal about the value of the Sun and desired to strengthen the partnership between the newspapers in the JOA.

70.     As Review-Journal publisher, Taylor also discovered that the Review-Journal's former owner, Stephens Media Group, had been dishonest in calculating the profit payments under the 2005 JOA due and owing to the Sun. Because Taylor believed it was important to resolve any outstanding profit payment issues with the Sun in order to successfully implement his strategic plan for the Review-Journal, he raised the issue with Adelson on several occasions. But no resolution ever came.

71.     Even though Dumont was involved in interviewing Taylor and Adelson had lobbied for Taylor to stay on as publisher of the Review-Journal after its acquisition, six weeks later, Taylor was removed from the Review-Journal because Adelson and Dumont wanted someone who was more in line with their vision and control.

72.     Consistent with journalistic practices, Taylor had been determined to insulate the newsroom from direct Adelson influence.

73.     The RJ did not follow Taylor's strategic plan after he was removed, and the revenue that was trending upward under Taylor quickly evaporated after his departure.

74.     In Taylor's place, Defendants hired Craig Moon as the new publisher of the Review-Journal in January 2016. At the close of the fiscal year March 31, 2016—buoyed by Taylor's performance the prior year, the JOA still reported a profit, though much smaller than Taylor had projected. Under Moon's tenure the RJ's fortunes quickly began to deteriorate. Moon executed on Defendants' strategy to financially starve the Sun and to force it out of business.

75.     A meeting was held on or about January 25, 2017, to preview financial results for the end of the fiscal year, in which Moon, Robert Cauthorn (the Sun's COO), Greenspun, and

- 22 -

116312629.2

Adelson's newspaper consultant Frank Vega were in attendance. At that meeting, the Sun was informed that its Annual Profits Payments were expected to significantly decrease as a result of poor performance of the joint operation, and that the RJ did not project *any* profits going forward for the joint operation. At that same meeting, Greenspun and Cauthorn were also informed that, "Patrick [Dumont] says the JOA will never be worth more than it is now and Brian should call Patrick to make a deal."

76.  Alarmed at the situation at the conclusion of the meeting, the parties discussed the terms of a possible deal, but no offer made by Defendants was sufficient to maintain the Sun as an independent editorial voice.

77.  In March 2017, before the end of the close of fiscal year, Moon directed the RJ accounting department to write off hundreds of thousands of dollars so that when the Sun's profit payment was calculated that the payment owed to the Sun would be close to zero.

78.  Defendants made good on their promise and no profit payments have been made to the Sun since the close of the fiscal year on March 31, 2017.

79.  Taylor was removed by the RJ as an act in furtherance of its anticompetitive plan. Because Taylor advocated ceasing dishonest accounting practices utilized by the RJ and resolving the profit payments issues under the JOA to the Sun, and projected Annual Profit Payments *increases* to the Sun under his new strategic plan—which was contrary to Adelson and the remaining Defendants' plan to starve the Sun of funds needed to operate—Taylor was removed to pave the way for another publisher, Craig Moon, who would agree to engage in predatory conduct to eliminate the Sun.

80.  Despite his role as President of the Review-Journal, and highlighting the charade that is his so-called leadership position, O'Connor was not involved in the removal of Taylor as publisher of the Review-Journal or the selection of Moon as Taylor's replacement. Instead, the Adelson family made the decision with no input from the supposed corporate head.

/ / /

/ / /

- 23 -

116312629.2

APP0081

**Defendants Exploit the JOA by Charging Prohibited Editorial Expenses Against The Joint Operation to Reduce Profit Payments to the Sun**

81. Defendants' plan to deprive the Sun of funds needed to operate by recording zero profit was successful by the fiscal year ending March 31, 2017. Defendants, for the first time in the history of the joint operation, recorded a negative EBITDA in the amount of negative $2.25 million, constituting a negative 122.43% EBITDA change from the year prior.

82. Higher operating expenses under the 2005 JOA reduce the joint EBITDA and, consequently, lead to lower Annual Profits Payments to the Sun.

83. Defendants had increased the Review-Journal's editorial costs from $6.78 million in 2016 to $8.88 million in 2017 and charged all of the Review-Journal's editorial costs against the joint operation, even though under the 2005 JOA the parties are to "bear their own respective editorial costs" and "to maintain a staff of news and editorial employees."

84. The Review-Journal's editorial costs in the amount of $8.88 million in 2017 was around the same level maintained by the Review-Journal in 2005, when the joint operation EBITDA was far greater – $121.56 million.

85. Defendants continue to illegally charge the Review-Journal's individual editorial costs against the joint operation to this day, reducing the Sun's Annual Profits Payments, and furthering Defendants' unlawful plan to put the Sun out of business and to extinguish its distinct and independent editorial voice in the Las Vegas area.

**Defendants Charge the Review-Journal's Individual and Uncovered Promotional Expenses to the Joint Operation to Reduce Annual Profits Payments to the Sun in Furtherance of its Exclusionary Scheme**

86. The 2005 JOA, which charged the RJ with responsibility for promoting and advertising both newspapers, requires the RJ to "use commercially reasonable efforts to promote the Newspapers" and any advertising requires the RJ to mention the Sun in "equal prominence." Any individual promotional costs are to be borne by each newspaper.

87. Nearly all promotion for a newspaper is either to promote it as an advertising medium or to advance circulation.

- 24 -

116312629.2

APP0082

88.     Defendants' predatory tactics include marketing and promoting the Review-Journal in various advertising mediums without any mention of the Sun, or displaying the Sun's logo disproportionately to the Review-Journal's, in contravention to the RJ's promotional responsibilities under the 2005 JOA, and then, compounding the effect of these failures to promote the Sun by charging these separate expenses against the joint operation, reducing the Sun's Annual Profits Payments.

89.     Virtually none of the RJ's promotional efforts comply with the demands of the 2005 JOA.

90.     All external RJ advertising, including television and billboards, omits the Sun entirely.

91.     When the Sun challenged the RJ to produce examples of promotional activities that mention the Sun in equal prominence, Defendants could not do so.

92.     Defendants admit that they have excluded the Sun from their advertising initiatives. Below is an example of an RJ advertisement that makes no mention of the Sun:

 

- 25 -

116312629.2

APP0083

93. Defendants have not used commercially reasonable efforts to promote the Sun in accordance with their obligation to do so.

94. The RJ charged all promotional activity for the Review-Journal against the joint operation, the vast majority of which was either individual Review-Journal promotion or did not comply with the requirements of the JOA. In addition, the RJ included millions of dollars of expenses it incurred for promoting itself and its separate website, reviewjournal.com. Under the 2005 JOA, the newspapers' websites operate outside of the joint arrangement and are not costs chargeable to the JOA.

95. While Defendants may promote the Review-Journal individually, those expenses are not chargeable against the joint operation. Defendants' inclusion of costs incurred for advertising the RJ individually, expenses that are barred by the 2005 JOA, reduces joint EBITDA, and, in turn, the Sun's Annual Profits Payments.

96. Defendants continue to refuse to use commercially reasonable efforts to promote the Sun and continue to wrongly charge the RJ's unilateral promotional activities against the joint operation. These are overt acts in furtherance of Defendants' plan to eliminate the Sun and to monopolize the market for the sale of local daily newspapers in Clark County.

**Defendants Abused Their Power Under the JOA by Unilaterally Removing the Sun Box from the Front Page Entirely, Minimizing Visibility of the Sun Logo on the Front Page, and by Covering the Sun's Mention on the Front Page with Advertising Stickers**

97. In 2017, shortly after promising no further profit payments to the Sun and attempting to coerce the Sun into selling, the RJ informed the Sun that it was unilaterally changing the format of the front page of the combined publication.

98. Two days later, the RJ commenced publishing a new front-page design that eliminates the Sun Box entirely and deviates from the Sun's noticeable mention specifications and illustrations in the 2005 JOA, including forcing a reduction in size of the Sun's logo. The Sun Box had been published in compliance with the 2005 JOA for the preceding 12 years.

99. Upon information and belief, Dumont was a key decision-maker in the RJ's redesign and approved the redesign on behalf of the Adelson family.

- 26 -

116312629.2

APP0084

100. An example of the Sun Box on the Review-Journal front page from March 31, 2017, before the changes were unilaterally made by the RJ, is shown below:



101. An example of the unilaterally-redesigned noticeable mention of the Sun on the Review-Journal front page from April 2, 2017, after the changes were unilaterally made by the RJ and the new design was rolled out, is shown below:



102. By destroying the Sun's Box, the RJ also ensured that when a "spadea fold" (an advertising element covering approximately 40% of the left side of the page) was sold, the Sun content in the noticeable mention would be covered. The 2005 JOA specifically requires that the Sun Box move to the right side when a spadea is present, ensuring the Sun is always visible. That is no longer the case. The RJ compounds this by regularly covering the Sun front page presence with advertising stickers. It does so with strategic intent: in both the 2016 and 2018 elections, the

- 27 -

APP0085

Sun's announcements of political endorsements were covered by advertising stickers placed by the RJ. In the 2018 example, the Sun specifically asked the Review-Journal publisher not cover the endorsement announcements. He refused and the Sun's endorsements were covered on the front page.

103.    Not only has the Sun suffered damage to its brand as a result of the RJ's unauthorized design, but by making the Sun less visible and less accessible to consumers, it reduces the number of available choices perceived by consumers and voters.

104.    The RJ continues to publish the unauthorized front-page design over the Sun's repeated objections.

105.    The RJ places advertising stickers on top of the Sun's logo and mentions on the front page of the Review-Journal, obscuring the Sun's message and making it less visible and accessible to readers.

106.    Defendants' acts to obscure the visibility of the Sun on the front page are designed to advance Defendants' unlawful and anticompetitive scheme.

**Defendants Eliminated the Sun from the Electronic Replica Edition**

107.    Section 10.6 of the JOA requires that the RJ include the Sun in all electronic replica editions it publishes.

108.    Prior to the time that the Review-Journal was owned by the Defendants, the Review-Journal always complied with Section 10.6 of the JOA and included the Sun in the digital replica editions of the newspapers.

109.    On or about January 25, 2018, the Sun requested that the RJ submit to an audit of its books and records. Immediately following this request, the RJ stopped including the Sun in the electronic replica edition of the newspapers.

110.    On or about May 3, 2019, Keith Moyer, the Review-Journal's current publisher and editor telephoned Mr. Cauthorn, COO for the Sun, stating the RJ restored the Sun in the replica edition that day. Mr. Moyer further stated that he had looked into the removal and stated it was "kind of a unilateral decision by Craig Moon. He said, 'just take it out.'"

116312629.2

APP0086

111.  The replica edition constitutes a meaningful percentage of Review-Journal circulation and is mostly used in educational environments, thus the RJ deprived the Sun of an opportunity to reach new young readers to allow its voice to be introduced to future readers.

112.  Defendants' removal of the Sun from the electronic replica edition, thereby reducing its visibility, is an act in furtherance of Defendants' predatory plot.

**Defendants Blocked the Sun from Exercising Its Audit Rights Under the JOA to Extend and Further their Plan to Eliminate the Sun**

113.  On May 12, 2016, and in accordance with the 2005 JOA (Appendix D), the Sun notified Defendants of its intent to examine and audit the Review-Journal's books and records to verify the RJ's Annual Profit Payment calculation, and to ensure that Defendants had not illegally redirected revenues from or charged expenses to the joint operation.

114.  The Sun forwarded its initial list of documentation, and Defendants rejected the Sun's request in late July 2016.

115.  Following the RJ's objection, the Sun attempted to informally negotiate with Defendants to obtain documents from the Review-Journal, party-to-party.

116.  Unable to reach an agreement, on September 5, 2017, the Sun renewed its formal audit request, expressly appointing its chosen law firm auditor to examine and audit the books and records of the Review-Journal. The RJ rejected the request on the grounds that it "far exceed[ed] the limited audit provisions" of the 2005 JOA, even though all requested material had been available in prior audits when other ownership was in charge. The RJ agreed to gather relevant, albeit very limited, information for production in due course. The RJ changed its position on November 16, 2017, a dilatory tactic commonly employed by Defendants, when the RJ again disputed the validity of the Sun's audit. On, November 28, 2017, the RJ changed course again when it agreed to produce limited categories of documents requested by the Sun.

117.  After further discussions between counsel, on December 21, 2017, the RJ represented that its anticipated production would occur within the first two weeks of January 2018.

- 29 -

APP0087

118. The RJ never produced the requested documents, until after the Sun filed an action in state court and the matter was compelled to arbitration.

119. Defendants' efforts to prevent the Sun from exercising its audit rights and from uncovering the truth regarding the RJ's misallocation of expenses and revenue are acts in furtherance of Defendants' illegal plan.

**Defendants Seek to Terminate the JOA on Made-Up Grounds**

120. Following Defendants' loss in arbitration, they moved to amend their answer and assert counterclaims in the state court action to terminate the JOA. The grounds upon which the RJ seeks to terminate the JOA, that purportedly, the "Sun fails to meet the JOA's required high standards of newspaper quality," are not only bogus but are also objectively baseless, unreasonable, and impermissible grounds identified in the 2005 JOA to seek termination. No reasonable litigant could realistically expect success on the merits. The counterclaims are a sham meant to directly interfere with, and destroy, a competitor.

121. Defendants' steps to terminate the JOA are overt acts in furtherance of their scheme to monopolize the Clark County newspaper market in violation of antitrust laws.

**ANTICOMPETITIVE EFFECTS**

122. The Review-Journal and the Sun are the only local daily newspapers in Clark County. If Defendants' predatory conduct is permitted to continue unchecked and/or if the JOA is terminated, Defendants will control and monopolize 100% of the sale of local daily newspapers in Clark County. Defendants' monopolistic practices in the market for the sale of newspapers in Clark County harm competition by weakening and threatening to eliminate the Review-Journal's only competition in the market— the Sun.

123. There is no compelling commercial benefit under the joint operation for the RJ to attempt to end the 2005 JOA. The RJ's actions speak to its true motive: more than simply a commercial monopoly, it wants a monopoly in daily print newspapers on thought and expression and to silence those who would disagree. This of course, is exactly the circumstance the NPA and the JOA sought to prevent. The RJ's actions are intended to prevent anyone from naysaying the

- 30 -

116312629.2

APP0088

newspaper's owner in front of the important print audience. Absent the Sun's editorial voice, the RJ would gain unrivaled powers in the relevant market.

124.    The owners of the Sun and the Review-Journal have always competed vigorously against each other for readers. They do so in various ways, such as seeking to generate original news and other content of interest to readers; trying to cover local news with greater depth, breadth, and accuracy; breaking stories first; and offering the most attractive mix of news, features, and editorials to readers. This head-to-head competition between the owners of the Sun and the Review-Journal will be lost unless Defendants' anticompetitive conduct is enjoined.

125.    Defendants' predatory conduct has already had and will continue to have the effect of reducing output (both quality and quantity) of newspapers. By way of example, as a direct result of the Defendants' plan to squeeze out the Sun, the Sun had to lay off staff, including cutting back on their night staff in January 2018. The practical consequence of cutting back on night staff meant that instead of sending stories over to the Review-Journal for print at 10:00 p.m., as it used to, the limited Sun staff now has to send stories to the Review-Journal for print at 4:00 p.m. Before, a story arriving at 5:00 p.m. or later might have made it to print in the Sun the next morning, now it appears later than it otherwise would have in print.

126.    The termination of the 2005 JOA will eliminate the Sun newspaper by leaving it with no infrastructure or facilities within which to produce, print, and distribute its newspaper. It will also improperly deprive the Sun of a print audience it has worked to build for more than 60 years.

127.    Further, Defendants' anticompetitive scheme threatens to decrease output. From 2015-2018, the national total circulation revenue for newspapers increased by 1.1%. During that same time period, 2015-2018, circulation revenue for the Review-Journal decreased by a whopping 16%. Without the constraining influence of the Sun, and the independent editorial voice in the Las Vegas community that readers want, circulation, and thus, output is likely to decrease even further.

128.    Defendants' practices harm consumers by robbing them of the choice of an independent editorial voice in the Las Vegas area, offering them a check on and an alternative to

- 31 -

116312629.2

APP0089

Review-Journal coverage, and by limiting the Sun's ability to produce quality content. After the RJ announced its intention to seek termination of the 2005 JOA, consumers loudly voiced their objections.

129.    Further, the Sun's readers' concerns are confirmed by a study of 2008-2009 of data following the ending of a joint operating agreement between the Denver Post and the Rocky Mountain News.[12] The Rocky Mountain News printed its last edition on February 27, 2009. Comparing civic engagement following the death of the JOA to other cities in the nation, the study concluded that, "eliminating a local newspaper from a community leads to less civic engagement in the immediate aftermath among the citizens of that community."

130.    Absent outside influences or monopolistic business misconduct, neither the Sun nor the Review-Journal is in danger of failing in the near future. The 2005 JOA ensures continued publication of both newspapers until December 31, 2040.

## DEFENDANTS' JOINT AND SEVERAL, AND ALTER EGO, LIABILITY

131.    Defendants Adelson, Dumont, Adfam, News+Media, and the Las Vegas Review-Journal, Inc., each personally, individually, and directly, knowingly engaged and participated in the anticompetitive conduct alleged herein.

132.    Defendants have a unity of interest and at all relevant times have acted together in a coordinated activity, and collectively as a part of a single enterprise, or in the alternative as co-conspirators, in furtherance of the anticompetitive scheme.

### Defendants Adelson and Dumont

133.    Adelson and Dumont used corporate shells Las Review-Journal, Inc., News+Media, and Adfam as their alter egos in committing the legal violations alleged herein. To the extent that Adfam, Las Vegas Review-Journal, Inc., and News+Media are held liable for acts, actions, and violations herein, Defendants Adelson and Dumont should be held liable based on alter ego liability.

---

[12]  Lee Shaker, *Dead Newspapers and Citizens' Civic Engagement,* http://leeshaker.com/wp-content/uploads/2013/01/Dead-Newspapers-and-Citizens-Civic-Engagement-Lee-Shaker-Forthcoming-in-Political-Communication.pdf, last accessed on September 20, 2019.

- 32 -

APP0090

134.    There is such unity of interest and ownership that the separate personalities of Defendants Adelson and Dumont cannot be separated from those of the Las Vegas Review-Journal, Inc., News+Media, and Adfam.

135.    Las Vegas Review-Journal, Inc., News+Media, and Adfam are so dominated by Defendants Adelson and Dumont that the corporate form of Las Vegas Review-Journal, Inc., News+Media, and Adfam can be disregarded.

136.    Specifically, as further alleged herein, one or more of the following are present which permits personal liability against Defendants Adelson and Dumont for the acts of Las Vegas Review-Journal, Inc. and News+Media:

(i)    the significant exercise of editorial control as alleged herein;

(ii)    the absence of corporate formalities such as holding regular corporate meetings, keeping corporate minutes, election of directors, etc.—O'Connor, since being appointed to every corporate role for the Las Vegas Review-Journal, Inc. and sole manager for News+Media in early 2016 has not noticed formal corporate meetings, nor does he keep corporate minutes;

(iii)    inadequate or under capitalization—Adelson family members, including Dumont, who are trustees of The Orchid Trust, have infused millions of dollars into the Review-Journal, and the trustees have approved the Las Vegas Review-Journal, Inc.'s budget to operate at a loss each year since the Adelson acquisition;

(iv)    overlap in ownership, officers, directors, and personnel—upon information and belief, all or most "employees" of News+Media are "co-employed" by Las Vegas Review-Journal, Inc.;

(v)    the lack of arm's-length dealing between Defendants Adelson and Dumont and the corporations—Adelson and Dumont influence, control, and direct the business of the Las Vegas Review-Journal, Inc. and News+Media, including financial decisions and funding decisions;

(vi)    the significant influence and control over Las Vegas Review-Journal, Inc., News+Media's business policies and affairs, and;

/ / /

- 33 -

116312629.2

APP0091

(vii)   the use of Adfam's services to benefit Las Vegas Review-Journal, Inc. and News+Media, which in turn, only benefits Adelson and Dumont.

137.   Similarly, as further alleged herein, one or more of the following are present which permits personal liability against Defendants Adelson and Dumont for the acts of Adfam:

(i)   significant influence and control over Adfam's policies and affairs—Adfam's sole purpose is to support and promote the Adelson family, and the family ultimately directs all of Adfam's decisions;

(ii)   the lack of arms-length dealing between Dumont and Adelson and Adfam;

(iii)   the corporate structure and purpose of Adfam, which is designed solely to benefit the affairs and finances of Adelson and Dumont and their family members;

(iv)   inadequate or undercapitalization—upon information and belief, Adfam has no business interests that are not ultimately funded or supported by the Adelson family;

(v)   the absence of corporate formalities;

(vi)   the use of corporate assets as an extension of individual assets, and;

(vii)   the admitted use of employees/personnel and Adfam services to serve Dumont and Adelson's individual business and personal interests.

138.   Adelson and Dumont have integrated the operations and resources of Las Vegas Review-Journal, Inc., News+Media, and Adfam to achieve a common business purpose such that disregarding their individual entities is necessary to avoid an unjust result.

139.   To control the Review-Journal and News+Media, Adelson and Dumont selected a loyal Adfam employee, O'Connor, to hold every corporate role at Las Vegas Review-Journal, Inc. and at News+Media. Despite his leadership and supposed role as head of Las Vegas Review-Journal, Inc. and News+Media, O'Connor's work consists of little more than holding corporate titles. Mr. O'Connor invests very little time in the Review-Journal's business. The Review-Journal's publisher reports to the Adelsons, not to O'Connor. O'Connor is not involved in operational matters; he is not involved in the hiring or firing of key employees, including publishers; he does not make any independent decisions on behalf of either Las Vegas Review-Journal, Inc.,

- 34 -

116312629.2

APP0092

or News+Media; he does not approve budgets or funding requests; he does not know basic information about the Review-Journal such as the price of a newspaper subscription or the pattern of advertising rates, and; O'Connor is not paid by either the Review-Journal or News+Media. Rather, O'Connor is merely a tool for the Adelson family, employed by the family business—to control the Review-Journal. The Adelson family makes all decisions about the Review-Journal and O'Connor views his role as information gatherer for the Adelson family to "carry out their wishes." For example, despite being the President of the Review-Journal, O'Connor executed Adelson's Employment Agreement without ever discussing the Agreement with Adelson. Instead, Adfam attorneys drafted the Employment Agreement, instructed Mr. O'Connor to sign it, and Mr. O'Connor did so at their behest.

140.    Defendant Adelson has a pattern of creating corporate forms to serve as the entity to run and manage his business interests, even though these businesses are only shell corporations that serve as his personal alter ego. It is not uncommon for Adelson to have O'Connor serve as apparent corporate head of Adelson's companies.

141.    Upon information and belief, Las Vegas Review-Journal, Inc., News+Media, and Adfam would not be able to pay an eventual judgment without resort to Defendants Adelson's and Dumont's assets.

142.    Failure to disregard Las Vegas Review-Journal, Inc., News+Media, and Adfam's corporate personalities and pierce the corporate veil would result in fraud or injustice.

**Defendant Adfam**

143.    Adfam also acts as alter ego to Las Vegas Review-Journal, Inc., and News+Media.

144.    The Adelson family, including Adelson and Dumont, own, either directly or through another entity, Adfam. Adfam provides services to Adelson family businesses, including Las Vegas Review-Journal, Inc., and its parent company, News+Media. The intimately intertwined nature of the relationship between Adfam and Las Vegas Review-Journal, Inc./News+Media results in Las Vegas Review-Journal, Inc./News+Media being nothing more than an instrument and/or conduit of Adfam in the pursuit of a single business venture and/or enterprise, which, in turn, benefits Adelson

- 35 -

116312629.2

APP0093

and Dumont. Economic unity exists between Adfam, Adelson, Dumont, News+Media, and Las Vegas Review-Journal, Inc.

145. Similarly, as further alleged herein, one or more of the following are present, which permits personal liability against Adfam for the acts of Las Vegas Review-Journal, Inc. and News+Media:

(i) Adfam possesses and dominates control over Defendant Las Vegas Review-Journal, Inc.'s finances, policies, and business practices, and Adfam directly and personally participated in the accounting and operational abuses alleged herein.

(ii) Adfam and Las Vegas Review-Journal, Inc./News+Media share common directors, officers, and consultants/employees, and jointly benefit from transactions entered into by one another;

(iii) upon information and belief, Adfam fails to adhere to corporate formalities such as holding regular corporate meetings, keeping corporate minutes, election of directors, etc.;

(iv) inadequate or under capitalization—upon information and belief, Adelson family members have infused millions of dollars into Adfam-run or -operated businesses for their own benefit;

(v) the lack of arm's-length dealing between Adfam and the corporations the Las Vegas Review-Journal, Inc. and News+Media—Adelson and Dumont and other Adelson family members influence, control, and direct the business of Adfam, including financial decisions and funding decisions;

(vi) the significant influence and control over Las Vegas Review-Journal, Inc./News+Media's business policies and affairs as alleged herein, and;

(vii) the use of Adfam's services to benefit Las Vegas Review-Journal, Inc. and News+Media, which in turn, only benefits Adelson and Dumont.

146. Critical to this case, Adfam's Chief Financial Officer lead a team that developed accounting policies and procedures for the Review-Journal, which were in contravention of the joint operation. On at least a monthly basis, Adfam received and continues to receive sensitive financial

- 36 -

116312629.2

APP0094

information and documents from the Review-Journal's Chief Financial Officer, publisher, and Controller, and weighs in on the Review-Journal's financial and operational decisions. Adfam also reviews, oversees, and is the intermediary communicator to Dumont, Adelson, and other involved members of the Adelson family regarding, the Review-Journal's funding requests. Adfam receives quarterly and monthly budget updates from the Review-Journal to provide to Adelson, Dumont, and other involved members of the Adelson family. Adfam's employees perform monthly control checks on the Review-Journal, including creating internal controls separate from the Review-Journal's independent accounting firm. Adfam further drafts and provides, on the Review-Journal's behalf, yearly "going concern" letters to the Review-Journal's outside auditing firm, which are approved by Dumont and executed by O'Connor, Chief Financial Officer for the Adelson family office. Upon information and belief, Adfam employees and/or owners participated in the redesign of the Newspapers' front page in violation of the JOA.

147.    Defendants established this corporate relationship to avoid liability and to promote injustice.

### FIRST CLAIM FOR RELIEF

**(Violation of Section 2 of the Sherman Act – Monopolization, 15 U.S.C. § 2)**

148.    Plaintiff realleges and incorporates by reference as though fully set forth herein the allegations contained in the above paragraphs.

149.    The relevant market is the sale of local daily newspapers in Clark County.

150.    Defendants have gained and maintain monopoly power in the relevant market through a JOA permitted by the Department of Justice under the Newspaper Preservation Act of 1970. 15 U.S.C. §§ 1801-04. Defendants have abused and maintained such power through patently exclusionary conduct, including, exploiting their powers and responsibilities under the 2005 JOA to deprive the Sun of its Annual Profit Payments, by reducing the visibility of the Sun to consumers in contravention to its obligations under the JOA, and by threatening to terminate the JOA.

151.    For the reasons stated herein, substantial barriers to entry and expansion exist in the relevant market.

- 37 -

116312629.2

APP0095

152. Defendants have the power to exclude competition in the relevant market and have used that power, including by way of its predatory conduct as described herein, in order to maintain and expand its monopoly power in that market.

153. Defendants have behaved as alleged herein to maintain and grow its monopoly in the relevant market with the effect that competition is foreclosed, and consumer choice is gravely diminished in that the Sun's editorial voice in the Las Vegas community has been impaired, as alleged in this complaint. Further, RJ's actions have and will decrease output (quantity and quality) of newspapers.

154. There is no business necessity or other pro-competitive justification for Defendants' conduct.

155. Plaintiff has been injured and will continue to be injured in its business and property as a result of Defendants' conduct, by way of the diminished value to the Sun's brand and business and as a result of the fraudulent and deficient profits payments to the Sun by Defendants. *See* 15 U.S.C. § 15.

156. Plaintiff is entitled to preliminary and permanent injunctive relief to prevent Defendants from persisting in their unlawful, inequitable, and unjustified behavior to Plaintiff's detriment, with such an injunction prohibiting Defendants from terminating the 2005 JOA, prohibiting Defendants from abusing the terms of the JOA to eliminate the Sun from the market, and ordering the RJ to divest itself of the newspaper, or in the alternative to divest itself of the newspaper's non-editorial business operations and to require the creation of an independent agency (or trustee) to conduct the non-editorial business of the joint operation. *See* 15 U.S.C. § 26.

## SECOND CLAIM FOR RELIEF

**(Violation of Section 2 of the Sherman Act – Attempted Monopolization, 15 U.S.C. § 2)**

157. Plaintiff realleges and incorporates by reference as though fully set forth herein the allegations contained in the above paragraphs.

158. The relevant market is the sale of local daily newspapers in Clark County.

/ / /

- 38 -

116312629.2

APP0096

159. Defendants have attempted to monopolize the market for the sale of local daily newspapers in Clark County. Defendants gained and maintain monopoly power in the relevant market through a JOA permitted by the Department of Justice under the Newspaper Preservation Act of 1970. 15 U.S.C. §§ 1801-04. Defendants have abused and maintained market power through patently exclusionary conduct, including, exploiting their powers and responsibilities under the 2005 JOA to deprive the Sun of its Annual Profit Payments, by reducing the visibility of the Sun to consumers in contravention of their obligations under the JOA, and by threatening to terminate the JOA.

160. Defendants have created a dangerous probability of success that they will achieve monopoly power in the relevant market.

161. Defendants have a specific intent to achieve monopoly power in the relevant market, as alleged in the paragraphs above. Now, if their predatory and anticompetitive conduct is not checked, Defendants have a dangerous probability of success of monopolizing the relevant market.

162. Defendants have the power to exclude competition in the relevant market for the sale of local daily newspapers in Clark County, and have used that power, including by way of their unlawful practices in restraint of trade as described herein, in an attempt to monopolize that relevant market.

163. Defendants have behaved as alleged herein in an attempt to obtain a monopoly in the relevant market with the effect that competition is foreclosed, and consumer choice is gravely diminished in that the Sun's editorial voice in the Las Vegas community has been impaired and may be eliminated altogether, as alleged in this Complaint. Further, Defendants' actions have and will decrease output (quantity and quality) of newspapers.

164. There is no business necessity or other pro-competitive justification for Defendants' conduct.

165. Plaintiff has been injured and will continue to be injured in its business and property as a result of Defendants' conduct, by way of the diminished value to the Sun's brand and business

116312629.2

APP0097

and as a result of the fraudulent and deficient profits payments to the Sun by RJ. *See* 15 U.S.C. § 15.

166. Plaintiff is entitled to preliminary and permanent injunctive relief to prevent Defendants from persisting in their unlawful, inequitable, and unjustified behavior to Plaintiff's detriment, with such an injunction prohibiting Defendants from terminating the JOA, prohibiting Defendants from abusing the terms of the JOA to eliminate the Sun from the market, and ordering the RJ to divest itself of the newspaper, or in the alternative to divest itself of the newspaper's non-editorial business operations and to require the creation of an independent agency (or trustee) to conduct the non-editorial business of the joint operation. *See* 15 U.S.C. § 26.

### THIRD CLAIM FOR RELIEF[13]

**(Violation of Section 2 of the Sherman Act – Conspiracy to Monopolize, 15 U.S.C. § 2)**

167. Plaintiff realleges and incorporates by reference as though fully set forth herein the allegations contained in the above paragraphs.

168. Defendants have unlawfully conspired to monopolize the market for the sale of local daily newspapers in Clark County.

169. Defendants have the specific intent to achieve monopoly power in the relevant market, as alleged in the paragraphs above. Now, and if their predatory and anticompetitive conduct is not checked, Defendants have a dangerous probability of success of monopolizing the relevant market.

170. In furtherance of the conspiracy, Defendants have committed several overt acts as set out herein.

171. Defendants' conspiracy has had the effect of foreclosing competition and reducing consumer choice in that the Sun's editorial voice in the Las Vegas community has been impaired and may be eliminated altogether, as alleged in this Complaint. Further, Defendants' actions have and will decrease output (quantity and quality) of newspapers.

---

[13] *See supra* n.6.

- 40 -

116312629.2

APP0098

172. Defendants have engaged in anticompetitive conduct in an attempt to create a monopoly in the relevant market.

173. The conspirators are jointly and severally liable for all damages caused by their conspiracy, at any time during the damage period, and by each member of the conspiracy, with no right of contribution against the other members of the conspiracy.

174. Defendants' conduct has had anticompetitive effects in the relevant market, including those alleged and described above.

175. Plaintiff has been injured and will continue to be injured in its business and property as a result of Defendants' conduct, by way of the diminished value to the Sun's brand and business and as a result of the fraudulent and deficient profits payments to the Sun by Defendants. *See* 15 U.S.C. § 15.

176. Plaintiff is entitled to preliminary and permanent injunctive relief to prevent Defendants from persisting in their unlawful, inequitable, and unjustified behavior to Plaintiff's detriment, with such an injunction prohibiting Defendants from terminating the JOA, prohibiting Defendants from abusing the terms of the JOA to eliminate the Sun from the market, and ordering the RJ to divest itself of the newspaper, or in the alternative to divest itself of the newspaper's non-editorial business operations and to require the creation of an independent agency (or trustee) to conduct the non-editorial business of the joint operation. *See* 15 U.S.C. § 26.

### FOURTH CLAIM FOR RELIEF[14]

**(Violation of Section 7 of the Clayton Act – 15 U.S.C. § 18)**

177. Plaintiff realleges and incorporates by reference as though fully set forth herein the allegations contained in the above paragraphs.

178. The anticompetitive conduct described above, specifically Defendants' plan to attempt to purchase the Sun or terminate the 2005 JOA and silence editorial competition with the Sun constitutes a violation of Section 7 of the Clayton Act, 15 U.S.C. § 18.

---

[14] *See supra* n.6.

- 41 -

116312629.2

APP0099

179. The effect of the proposed termination of the JOA by Defendants may be to substantially lessen competition or tend to create a monopoly in the market for the sale of local daily newspapers in Clark County, Nevada.

180. By reason of this violation, the Plaintiff is threatened with irreparable harm for which damages will be inadequate to fully compensate Plaintiff.

181. Plaintiff is entitled to bring suit under Section 16 of the Clayton Act, 15 U.S.C. § 26, to obtain preliminary and permanent injunctive relief against Defendants' threatened termination of the 2005 JOA.

## FIFTH CLAIM FOR RELIEF

### (Violation of Nevada Unfair Trade Practices Act – NRS 598A)

182. Plaintiff realleges and incorporates by reference as though fully set forth herein the allegations contained in the above paragraphs.

183. The Nevada Unfair Trade Practices Act construed in conformity with federal antitrust laws.

184. Defendants' violation of the Nevada Unfair Trade Practices Act has caused or will cause injury to the Plaintiff as set forth above.

185. Plaintiff is entitled to damages for Defendants' violation of the Nevada Unfair Trade Practices Act, in an amount to be demonstrated.

186. Plaintiff is entitled to obtain preliminary and permanent injunctive relief for Defendants' violation of the Nevada Unfair Trade Practices Act.

## SIXTH CLAIM FOR RELIEF

### (Violation of Section 1 of the Sherman Act – 15 U.S.C. § 1)

187. Plaintiff realleges and incorporates by reference as though fully set forth herein the allegations contained in the above paragraphs.

188. Defendants knowingly acted in concert in furtherance of a common scheme to eliminate the Sun and monopolize the daily print newspaper market in Clark County, Nevada.

- 42 -

116312629.2

APP0100

189.   These actions were undertaken as a result of agreement, both express and tacit, between and among Defendants.

190.   Defendants' exclusionary conduct has produced, and if unchecked will continue to produce, significant anticompetitive effects in the local daily print newspaper market in Clark County, Nevada. Defendants' actions have increased, and if unchecked will continue to increase, the RJ's market power, which harms consumers and reduces consumer welfare.

191.   Defendants' actions constitute a conspiracy or combination in restraint of trade, which restraint is unreasonable, so inherently anticompetitive due to the predictable and pernicious anticompetitive effect and so lacking in procompetitive benefit that it is unlawful in and of itself, or its principal or only effect is anticompetitive.

192.   Plaintiff has been injured and will continue to be injured in its business and property as a result of Defendants' conduct, by way of the diminished value to the Sun's brand and business and as a result of the fraudulent and deficient profits payments to the Sun by the RJ. *See* 15 U.S.C. § 15.

193.   By reason of this violation, Plaintiff is threatened with irreparable harm for which damages will be inadequate to fully compensate Plaintiff.

194.   Plaintiff is entitled to bring suit under Section 16 of the Clayton Act, 15 U.S.C. § 26, to obtain preliminary and permanent injunctive relief against Defendants' threatened termination of the JOA.

## JURY TRIAL DEMANDED

195.   The Sun demands a trial by jury as its right under the Seventh Amendment to the Constitution of the United States or as given by statute. Fed. R. Civ. P. 38.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests the following relief:

A.   A judicial declaration that:

(1)   Defendants have unlawfully monopolized, attempted to monopolize, and/or

- 43 -

116312629.2

APP0101

conspired to monopolize the market for the sale of local daily newspapers in Clark County, Nevada, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2;

(3)     Defendants' threatened acquisition of the Sun and/or termination of the JOA may substantially lessen competition or tend to create a monopoly in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18;[15]

(4)     Defendants' unlawful conduct violates the Nevada Unfair Trade Practices Act;

(5)     Defendants' actions also constitute a conspiracy or combination in restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1;

B.     That the Court enter judgment granting Plaintiff an injunction requiring Defendants to cease the abusive, unlawful, and anticompetitive practices described herein, including the threat to terminate the JOA before 2040;

C.     That the Court enter judgment granting Plaintiff an injunction prohibiting the Defendants from acquiring the Sun;

D.     That the Court enter judgment enjoining Defendants from terminating the 2005 JOA;

E.     That the Court enter judgment granting Plaintiff a preliminary and permanent injunction ordering the RJ to divest itself of the newspaper, or in the alternative to divest itself of the newspaper's non-editorial business operations and to require the creation of an independent agency (or trustee) to conduct the non-editorial business of the joint operation as done in other similar JOAs;

F.     That the Court enter judgment for the Plaintiff to recover treble damages in the amount of three times the actual damages found by the jury (*see* 15 U.S.C. § 15(a));

G.     That the Court grant such additional orders or judgments as may be necessary to remedy or prevent the unlawful practices complained of herein; and

---

[15] *See supra* n.6.

- 44 -

116312629.2

APP0102

H.      That the Court enter judgment granting Plaintiff its cost of suit, including reasonable attorney's fees, costs, and expenses, as provided by Section 4 of the Clayton Act, 15 U.S.C. § 15; Section 16 of the Clayton Act, 15 U.S.C. § 26, and NRS 598A.210.

DATED this 24th day of March, 2022.

LEWIS ROCA ROTHGERBER CHRISTIE LLP


By: */s/ E. Leif Reid*
    E. Leif Reid, Bar No. 5750
    Kristen L. Martini, Bar No. 11272
    Marla J. Hudgens, Bar No. 11098
    Nicole Scott, Bar No. 13757
    3993 Howard Hughes Parkway, Suite 600
    Las Vegas, Nevada 89169
    One East Liberty Street, Suite 300
    Reno, Nevada 89501

    PISANELLI BICE PLLC
    James J. Pisanelli, Bar No. 4027
    Todd L. Bice, Bar No. 4534
    Jordan T. Smith, Bar No. 12097
    400 South 7th Street, Suite 300
    Las Vegas, Nevada 89101

    ALIOTO LAW FIRM
    Joseph M. Alioto, Pro Hac Vice
    One Sansome Street, 35th Floor
    San Francisco, California 94104

    *Attorneys for Plaintiff/Counterdefendants*

- 45 -

116312629.2

APP0103

**<u>CERTIFICATE OF SERVICE</u>**

Pursuant to Federal Rule of Civil Procedure 5(b), I certify that I am an employee of Lewis Roca Rothgerber Christie LLP, and that on the 24th day of March, 2022, I caused the foregoing **AMENDED AND SUPPLEMENTAL COMPLAINT FOR DIVESTITURE, INJUNCTION, AND DAMAGES BY REASON OF DEFENDANTS' VIOLATIONS OF THE SHERMAN ANTITRUST ACT, THE CLAYTON ANTITRUST ACT, AND THE NEVADA UNFAIR TRADE PRACTICES ACT** to be served by electronically filing the foregoing with the CM/ECF electronic filing system, which will send notice of electronic filing to:

J. Randall Jones, Esq.
Michael J. Gayan, Esq.
Mona Kaveh, Esq.
KEMP JONES, LLP
3800 Howard Hughes Parkway, 17th Floor
Las Vegas, Nevada 89169

Amy M. Gallegos, Esq.
David R. Singer, Esq.
Andrew G. Sullivan, Esq.
JENNER & BLOCK LLP
633 West 5th Street, Suite 3600
Los Angeles, California 90071

Richard L. Stone, Esq.
850 Devon Avenue
Los Angeles, California 90024

Hon. Philip M. Pro (Ret.)
Special Master
philipmpro@gmail.com
sparreno@jamsadr.com

*/s/ Autumn D. McDannald*
Employee of Lewis Roca Rothgerber Christie LLP

- 46 -

116312629.2

APP0104

# EXHIBIT 2

1989 Joint Operating Agreement
(SUN_00001996-2039)

# EXHIBIT 2

APP0105
SA10

# AGREEMENT

This Agreement is dated as of June /2 , 1989, between Donrey of Nevada, Inc., a Nevada corporation ("Donrey"), and the Las Vegas Sun, Inc., a Nevada corporation ("Sun").

## PRELIMINARY STATEMENT

Donrey owns and publishes in Las Vegas, Nevada, an all day newspaper on weekdays, a morning newspaper on Saturdays and holidays, and a Sunday newspaper, each known as the Las Vegas Review-Journal (hereinafter referred to as the "Review-Journal"). Sun owns and publishes in Las Vegas, Nevada, a morning newspaper on weekdays and Saturdays and a Sunday newspaper, each known as the Las Vegas Sun (hereinafter referred to as the "Sun"). The Sun presently operates and for a number of years has operated at a substantial loss, and is in probable danger of financial failure. It is the firm belief of the parties that the continued publication of at least two newspapers of general circulation, editorially and reportorially separate and independent, is of paramount importance to the citizens of Las Vegas and its environs. The parties further believe that publication of the Sun can be carried on profitably, and its continued editorial existence and independence thereby assured, if its production, distribution and advertising functions and related non-news and non-editorial activities are conducted and performed by the Review-Journal, through a single staff of Review-Journal employees utilizing Review-Journal's plant and equipme t nder a joint

*Pages 22-23 relate to barkium.*

APP0106
SA11
SUN_00001996

newspaper operating arrangement (hereinafter referred to as "Agreement"), under which the Review-Journal will act on its own behalf with respect to the Las Vegas Review-Journal and on behalf of the Sun with respect to the Las Vegas Sun.

NOW, THEREFORE, in consideration of the premises and of the mutual covenants and agreements hereinafter set forth, the parties hereto agree as follows:

ARTICLE I

TERM

1.1  Effective Date.  The term of this Agreement shall begin at 12:01 a.m. on the 10th day (or on such later day as the parties may agree) after the filing of written consent of the Attorney General of the United States to this Agreement under the Newspaper Preservation Act, which shall be known as "the Effective Date".  The parties agree to pursue diligently the filing of the application for approval of this Agreement to the Department of Justice and to use their best efforts and take all action necessary to obtain such written consent as expeditiously as possible within the procedures set forth in applicable regulations of the Department of Justice.  This Agreement does not constitute any limitation on either party's obligation to engage in good faith labor negotiations if and as required by the National Labor Relations Act, and to implement any understandings it may reach in such negotiations.

Upon execution hereof, each party shall furnish to the other a written opinion of its counsel that all necessary

-2-

APP0107
SA12
SUN_00001997

corporate action has been taken to authorize this Agreement and that, subject to the conditions of the preceding paragraph, this Agreement shall constitute the valid and binding obligation of the respective party. The parties agree to cooperate in coordinating meetings with government officials, community leaders, employees and their representatives, advertisers and others to explain the Agreement.

If, within eighteen (18) months after the filing of the application with the Department of Justice, the application has neither been approved by the Attorney General without a hearing nor been the subject of an order for a hearing, or if, within eighteen (18) months after the Attorney General has issued an order for a hearing, the application has not been approved by the Attorney General, the parties shall discuss the feasibility of continuing to seek approval of the application and either party may, after notification to the other, withdraw from the application. The Review-Journal and Donrey intend to make a request, at the time of filing the application, under 28 CFR Section 48.5 for a protective order withholding from public disclosure their financial and other privileged and confidential commercial information to be filed with this application and restricting access to such materials to the applicants and the Department of Justice. If the request is not granted the Review-Journal and Donrey reserve the right to unilaterally withdraw the application. If the protective order is initially granted but, at a later date, access to or inspection of the protected information is to be afforded anyone other than the

-3-

APP0108
SA13
SUN_00001998

applicants, the Department of Justice, or an administrative law judge, and their respective employees, without restrictions as to disclosure acceptable to the Review-Journal and Donrey, then the Review-Journal and Donrey shall have the unilateral right to withdraw the application and dismiss any further hearing or proceedings concerning the application.

Each party shall pay its own costs and professional fees in connection with the formulation and drafting of this Agreement and the preparation and filing of the application to the Department of Justice. From and after the filing of such application all costs and professional fees shall be borne equally by the parties with each party having reasonable approval of costs and fees to be incurred.

1.2  Duration. Subject to the termination provisions set forth in Article 9, this Agreement shall continue for an initial period ending at the close of business on the 31st day of December of the fiftieth (50th) year following the Effective Date. The Agreement shall automatically renew for succeeding renewal periods of ten (10) years each unless either party shall notify the other in writing at least two (2) years prior to the end of the initial period that it elects to terminate the Agreement at the end of said fiftieth (50th) year, or unless either party shall notify the other in writing at least two (2) years prior to the end of the renewal period that it elects to terminate the Agreement as of the end of said renewal

-4-

APP0109
SA14
SUN_00001999

period. The phrase "term of this Agreement" as used hereafter shall mean the initial period and any renewal period or periods.

### ARTICLE 2

### AGENCY

Donrey of Nevada, Inc. now owns and operates the Review-Journal, together with other unrelated business operations in the State of Nevada. In order to facilitate management, administration, record keeping and tax administration under this Agreement, Donrey, as of the effective date of this Agreement, shall have established a separate Nevada business corporation which shall own or lease all assets related to the operation of the Las Vegas Review-Journal. Donrey shall cause such corporate entity to assume and agree to perform all duties and obligations of the Review-Journal under the terms of this Agreement.

### ARTICLE 3

### TRANSFER OF CONTRACTS AND SALE OF SUPPLIES, INVENTORY AND EQUIPMENT BY SUN TO REVIEW-JOURNAL

3.1 <u>Transfer to and Assumption by Review-Journal of Certain Contracts</u>. To enable Review-Journal to perform its functions hereunder on behalf of Sun, Sun shall (as of the Effective Date) transfer certain assets and assign certain contracts to Review-Journal subject to the procedures and conditions hereinafter specified in this Section 3.1.

3.1.1 <u>Delivery of Contracts and Data to Review-Journal</u>. Upon consent of the Attorney General as specified in Section 1.1, Sun shall furnish to the Review-Journal:

-5-

APP0110
SA15
SUN_00002000

3.1.1.1 <u>Circulation Contracts</u>. All subscription, bulk sales, circulation, dealer and sub-dealer, and delivery agent lists and contracts related to the Sun in the possession or control of Sun, and all books and statements of account, records and other information relating to or concerning routes, daily draws by editions, distribution, delivery, sales returns, or prepaid subscriptions of the Sun in any territory, but not including the Sun's general books of account.

3.1.1.2 <u>Contracts for Supplies</u>. All contracts and other available information as may be reasonably necessary to form business judgments respecting such contracts, then held by Sun for the purchase of newsprint, film, ink and supplies for the Sun's mechanical departments, and all other similar contracts (other than those relating to the Sun's news and editorial departments) which would be helpful or beneficial to the Review-Journal in fulfilling its obligations hereunder.

3.1.1.3 <u>Advertising Contracts</u>. A list of all contracts then outstanding for publication of advertising in the Sun, which list shall indicate in each case the date of the contract, the name and address of the advertiser, the amount of space used up to that time, the amount unpaid and owing the Sun for advertising run to that time, the amount prepaid as of the Effective Date, the frequency of insertions, the rate, the expiration date, and any special conditions, records, requirements or publication orders with the date thereof, and any special instructions, agreements or commitments made by the Sun with

-6-

APP0111
SA16
SUN_00002001

the advertiser with respect thereto, and all insertion orders for advertising subsequent to the Effective Date. Sun shall make available to the Review-Journal at the Review-Journal's request copies of any or all such contracts.

3.1.2 <u>Analysis of Contracts and Assumption by Review-Journal</u>. As soon as possible after such information and documents shall have been furnished to the Review-Journal, and in any event prior to the Effective Date, Review-Journal shall designate in writing to Sun those contracts that Sun shall assign to Review-Journal and which Review-Journal shall assume as of the Effective Date (excluding all portions which Sun had a duty to perform prior to the Effective Date); provided, that with respect to advertising contracts Review-Journal shall have no obligation to assume any advertising contract that is on a trade-out basis, and Review-Journal agrees that it will not refuse the assumption of any advertising contract solely on the basis of the contract rate. However, for advertising contracts containing rates which Review-Journal determines to be unreasonab: low, Review-Journal shall have the right to charge to Sun the difference between the contract rate and a rate determined by Review-Journal to be reasonable, effective ninety (90) days after the date of assumption and continuing for the balance of such contracts. Subject to the foregoing, Review-Journal shall use its best efforts to maximize its designation of such contracts

-7-

APP0112
SA17
SUN_00002002

to be assigned to and assumed by Review-Journal. Review-Journal pre-assumption analysis of such contracts and information may include consultation with the contracting parties, and Sun agrees to assist Review-Journal in that process. Sun shall remit to Review-Journal (a) all dealers', vendors' and carriers' cash deposits (to the extent that the same shall not be due and owing to such depositors on the Effective Date) and (b) all sums in respect of prepaid subscriptions and prepaid advertising received by Sun but not earned prior to the Effective Date. As to any assigned and assumed advertising contracts, Review-Journal shall have the right to make adjustments, such as rebates or short ratings of any of same so long as this shall not alter indebtedness due Sun prior to the Effective Date without Sun's approval. All such contracts to be assumed by Review-Journal shall be assigned to Review-Journal by Sun as of the Effective Date, and such contracts shall be assumed by Review-Journal as of that date and thereafter shall be performed by Review-Journal, and Sun shall be relieved from any and all performance obligations under such contracts accruing after the Effective Date.

3.2 <u>Newsprint</u>. Review-Journal shall procure, as of the Effective Date and thereafter, a supply of newsprint adequate to produce the Newspapers as defined in Section 5.1 below;

APP0113
SA18
SUN_00002003

provided, that Review-Journal shall have the purchase and assumption obligations specified in Section 3.3 as to Sun newsprint.

    3.3  Sale of Supplies, Inventory and Equipment. As of the Effective Date, Review-Journal agrees to purchase Sun's inventory of newsprint and supplies common to or usable in the operations of both newspapers (i.e., newsracks, production film, rubber bands, plastic bags, etc.). Upon the consent of the Attorney General as specified in Section 1.1, Sun shall deliver to Review-Journal a schedule identifying all supplies, inventory (on hand or in transit) and equipment owned or leased by Sun and used or available to be used in the production and distribution of the Sun. On or before the Effective Date, Review-Journal shall designate in writing which of the scheduled items of supplies, inventory and equipment it wishes to purchase or sublease, as the case may be.

    As to such of the equipment as is owned by Sun, which Review-Journal determines to purchase, Sun shall be obligated to sell and deliver same and Review-Journal shall be obligated to buy at a purchase price equal to the purchase cost of such equipment or its then market value, whichever is lower.

    As to such of the supplies and inventory which Review-Journal is obligated to purchase or designates for purchase by it, Sun shall be obligated to sell and deliver same and Review-Journal shall be obligated to buy at a purchase price equal to the cost of same to Sun, or its then market value, whichever is lower.

-9-

APP0114
SA19
SUN_00002004

Any newspaper production equipment of the Sun which is not purchased by the Review-Journal may be sold by the Sun to a third party, provided that the sale of any such equipment to any party within the State of Nevada shall require Donrey's prior approval.

## ARTICLE 4
### NEWS AND EDITORIAL COPY, FEATURES AND SERVICES

4.1  **Maintenance of News and Editorial Staff; Feature Materials.**  Review-Journal and Sun each shall maintain a staff of news and editorial employees, and shall license such feature materials (including, but not limited to, news and editorial services supplied by third parties), adequate to provide its respective newspaper with all of the news and editorial copy and related services deemed necessary by each of them as to its respective newspaper.

4.2  **News and Editorial Allocations.**  The Review-Journal and the Sun shall establish, in accordance with the provisions of Appendix A attached hereto and made a part hereof by reference, the amounts to be allocated to Agency Expense, as hereinafter defined, for each for news and editorial expenses.

4.3  **Furnishing News and Editorial Copy and Services.**  In furnishing features, news and editorial copy, and like materials to Review-Journal for publication in the Sun or the Sun portion of jointly published newspapers as provided in Section 4.4, and in providing layout for such material, Sun shall provide all such material in a form appropriate for the production of its

-10-

APP0115
SA20
SUN_00002005

newspaper or its portion of jointly published newspapers hereunder, in conformity with the mechanical standards, deadlines and production requirements which prevail in the Review-Journal plant from time to time, including page sizes, column widths, and cut-offs established by Review-Journal, upon reasonable notice to Sun. Sun shall acquire and maintain at its expense such newsroom equipment (including, but not limited to, typewriters, video terminals and news editing systems) as may be required as of the Effective Date to interface with Review-Journal production facilities. Any changes or additions thereafter required in such equipment shall be covered by Appendix B hereto. Newshole limitations and other matters for separate and jointly published newspapers are set forth in Appendix A hereto.

4.4 <u>Furnishing Copy, Features and Services for Jointly Published Newspapers</u>. Sun shall furnish editorial copy, features and comics to permit the Review-Journal to include them within jointly published newspapers, which shall be Sundays, Saturdays, holidays, other special editions and total market coverage editions. The Sun portion of jointly published newspapers shall be in accordance with Appendix A hereto. All components of jointly published newspapers shall bear the Review-Journal's headdress, typeface and style. The front page logo of all jointly published newspapers shall read "Las Vegas REVIEW-JOURNAL and SUN," and all folios shall similarly refer to both papers, except for editorial and other pages described in Appendix A as being for the use of only one newspaper, which

-11-

APP0116
SA21
SUN_00002006

pages shall bear only the name of such newspaper. The Review-Journal shall provide all of the news content of jointly published newspapers, except for stories and features included on those pages described in Appendix A as being only for the use of the Sun. The Review-Journal reserves the right to print conspicuous notices in jointly published newspapers to the effect that the news content of the non-Sun portion of the newspaper, including locally produced supplements, is produced by Review-Journal personnel.

4.5  Showbiz Magazine. Showbiz Magazine, which is owned or controlled by Sun, is carried as an insert by the Sun and distributed to hotels in Las Vegas. As of the Effective Date, Showbiz Magazine shall be a department or division of the Sun and subject to the terms of this Agreement. If the Review-Journal determines that it no longer desires Showbiz Magazine to be governed by the terms of this Agreement and/or no longer desires to carry Showbiz Magazine as an insert in the jointly published Sunday newspaper, Review-Journal shall give sixty (60) days prior written notice to Sun, and Sun shall have the right to transfer Showbiz Magazine out of Sun, or continue publication and distribution of Showbiz Magazine, and in either case, outside the terms of this Agreement. In this event, Review-Journal agrees to perform, at the request of Sun, composition, production and printing services at reasonable costs and further agrees not to engage in the production of an entertainment magazine for distribution to Las Vegas hotels for a period of two (2) years.

-12-

APP0117
SA22
SUN_00002007

## ARTICLE 5

### CONTINUING PUBLICATION AND
### NEWS AND EDITORIAL AUTONOMY

5.1  <u>Production and Promotion of the Newspapers</u>.  Subject to the terms of this Agreement, and as of the Effective Date, Sun shall be a daily afternoon newspaper and Review-Journal shall be a daily morning newspaper and on Saturday, Sunday, holidays, and other special editions the newspapers shall be jointly published as provided in Section 4.4.  So long as Sun furnishes news and editorial copy, features and services to Review-Journal in accordance with Article 4 of this Agreement, Review-Journal agrees to produce the Sun daily as an afternoon newspaper as provided herein, to include the Sun copy and features in jointly published newspapers as specified in Article 4 above, and to sell all advertising for, promote and circulate such newspapers as provided herein.  Review-Journal agrees that the afternoon Sun and the Sun portion of jointly published newspapers shall contain no editorial content other than that furnished by Sun.  Also subject to the terms of this Agreement, Review-Journal further agrees to publish and produce for the term of this Agreement the Las Vegas Review-Journal daily as a morning newspaper and to produce jointly published newspapers as provided herein.  The daily Sun and the Sun portion of jointly published newspapers, and the daily Review-Journal and the balance of the jointly published newspapers are hereinbefore and hereinafter referred to as the "Newspapers".

-13-

APP0118
SA23
SUN_00002008

Review-Journal shall print the Newspapers on equipment owned or leased by the Review-Journal in the Review-Journal plant or plants located at such place or places as Review-Journal may determine, and all operations under this Agreement, except the operation of the Sun's news and editorial department, shall be carried on and performed by the Review-Journal with Review-Journal employees and equipment and in the Review-Journal's said plant or plants or by independent contractors selected by the Review-Journal.

The Review-Journal shall control, supervise, manage and perform all operations involved in managing and operating under this Agreement, including printing, selling and distributing the Newspapers, shall determine page sizes, number of columns per page, cut-offs, page makeup of non-news and non-editorial content (subject to the newshole formula set forth in Appendix A), and all other mechanical and technical functions of the Newspapers, shall purchase newsprint, materials and supplies as required (subject to Sun's obligations under Section 3.2), shall determine the rates for, solicit and sell all advertising space in the Newspapers, shall determine circulation rates, collect the Newspapers' circulation and advertising accounts receivable which come into existence after the Effective Date, and shall make all determinations and decisions and do any and all acts and things related to the foregoing activities, provided:

-14-

APP0119
SA24
SUN_00002009

5.1.1 <u>Format</u>.  Review-Journal shall not change the format of the Sun to any size or format different from that of the Review-Journal without approval of Sun.

5.1.2 <u>Editions</u>.  The number of Sun editions shall not be changed without approval of Sun.

5.1.3 <u>Best Efforts</u>.  Review-Journal agrees that it will use its best efforts, using the same degree of diligence, to sell advertising space in the Sun and the Review-Journal and to promote and circulate the Sun and the Review-Journal.

5.1.4 <u>Promotional Activities</u>.  Review-Journal shall establish for each fiscal year a budget for promotional activities which shall be allocated between the Review-Journal and the Sun in accordance with the provisions of Appendix A, attached hereto and made a part hereof by reference.  Promotional activities may include radio and television, outdoor advertising, in-paper or house advertisements, and other advertising media.  All expenses of such promotional activities shall be Agency Expense, up to the amount of the promotional budget allocation.  If either the Review-Journal or the Sun determines that it wishes to incur expenses in excess of those in the promotional budget, such expenses shall not be included in Agency Expense.  Direct circulation sales expenses, including such items as carrier premiums and expenses of order generation shall not be included in the promotional budget and shall be allocated by Review-Journal between the newspapers so as to maximize the maintenance and enhancement of the circulation of the newspapers to the

-15-

APP0120
SA25
SUN_00002010

extent economically feasible. The newsroom of each newspaper shall determine the nature, extent and timing of its promotional activities and shall supply basic information therefor. Review-Journal promotion management shall be responsible for all final promotional copy preparation and placements.

5.1.5 <u>Rates</u>. Review-Journal shall not increase the single copy or subscription prices of the daily edition of the Sun to an amount higher than the comparable rates for the Review-Journal. Review-Journal shall not change the rates for advertising to be run solely in the Sun in relation to the rates charged for comparable advertising to be run solely in the Review-Journal, unless such change is justified by the then-relative circulation of the Sun and the Review-Journal and other factors considered relevant in the industry.

5.1.6 <u>Meetings of JOA Participants</u>. Periodically, not less than four times per year, Donrey senior management shall meet with Sun senior management to discuss operations under this Agreement and future plans and opportunities.

5.1.7 <u>Advertising Acceptability</u>. Sun may reject any advertising or types of advertising for the Sun which is in the opinion of Sun undesirable or inappropriate for publication therein, and shall notify Review-Journal in writing of any specific advertising or types of advertising that Sun deems undesirable for publication. Review-Journal shall accept all advertising for the Sun other than the advertising indicated on

-16-

APP0121
SA26
SUN_00002011

Sun's written notice, subject to all laws affecting the acceptability of advertising.

5.1.8 <u>Sun Distribution</u>. To the extent economically feasible, Review-Journal shall use its best efforts to substantiall maintain the historical area and extent of distribution of the Sun.

5.2 <u>News and Editorial Autonomy</u>. Preservation of the news and editorial independence and autonomy of both the Review-Journal and the Sun is of the essence of this Agreement. Sun shall have exclusive and complete control, authority and direction over the news and editorial content, features and services to be furnished by Sun to Review-Journal to be included in its newspaper and in its portion of the jointly published newspapers, including without limitation the right of selection of all its news and editorial employees, and the exclusive right to hire and discharge such employees. Review-Journal shall have exclusive and complete control, authority and direction over the news and editorial content, features and services in its newspapers and in its portion of the jointly published newspapers, including without limitation the right of selection of all its news and editorial employees, and the exclusive right to hire and discharge such employees. The Review-Journal and Sun each hereby agrees to preserve high standards of newspaper quality throughout the term of this Agreement. All news and editorial expense of the Sun or the Review-Journal in excess of the amounts set forth in Appendix A shall be borne by the respective newspaper.

-17-

APP0122
SA27
SUN_00002012

5.3   Performance and Cooperation.   Sun and Review-Journal agree to take all corporate action necessary to carry out and effectuate the intent, purposes and provisions of this Agreement, and to cooperate with the other party in every reasonable way that will promote successful and lawful operation under this Agreement for both parties.

5.4   Sun Office Space.   The Sun shall have the option to provide its own offices for its news and editorial department and senior management, or to occupy office space, to be provided by the Review-Journal, adjacent to the Review-Journal's newspaper building.

ARTICLE 6

PAYMENT OF EXPENSES, DISTRIBUTION OF REVENUES, AND OTHER FINANCIAL PROVISIONS

6.1   Expenses and Revenues.   Review-Journal shall pay and record all Agency Expense, as defined in Appendix B hereto, and collect and record all Agency Revenues as defined in Appendix C hereto, and shall pay to Sun, monthly, a sum for Sun news and editorial expense as provided in Appendix A hereto.

6.2   Accounting Records.   Accounting records of Agency Revenues and Agency Expense shall be maintained by Review-Journal.   Accounting records of news and editorial expense shall be separately maintained by the Review-Journal and the Sun for their respective newspapers.   All such records shall be kept on a fiscal year basis in reasonable detail and in accordance with generally accepted accounting principles.   Financial statements to be provided under Section 6.3 shall be prepared

-18-

APP0123
SA28
SUN_00002013

in accordance with generally accepted accounting principles and the applicable provisions of this Agreement.

6.3 <u>Financial Statements</u>.  Within ninety (90) days following the close of each fiscal year, Review-Journal shall furnish to Sun financial statements in respect of such year which summarize Agency Revenues and Agency Expense hereunder.  Within thirty (30) days after the end of each month, except the last month of the fiscal year, Review-Journal shall furnish to Sun a monthly financial statement summarizing Agency Revenues and Agency Expense.  All Agency financial statements furnished by Review-Journal shall be certified by a financial officer of Review-Journal.

6.4 <u>Distributions</u>.  Payments of Sun's share of operating profit, pursuant to Appendix D, shall be made with each financial statement to be furnished to Sun under the provisions of Section 6.3 above.

ARTICLE 7

<u>TRANSITIONAL MATTERS</u>

7.1 <u>Collection of Sun Receivables</u>.  After the Effective Date, Review-Journal shall use its best efforts (without any obligation to institute legal proceedings) to collect Sun advertising and circulation accounts receivable which are outstanding on the Effective Date and shall remit same to Sun on a monthly basis, less the Agency's reasonable collection costs specifically incurred in connection therewith.  Such collections and collection costs recovered by Review-Journal shall not be Agency Revenues or Agency Expense.  Any such

-19-

APP0124
SA29
SUN_00002014

advertising accounts which have not been collected by Review-Journal within sixty (60) days after the Effective Date shall be returned to Sun.  Collections from particular subscribers shall first be applied to circulation accounts receivable unless otherwise agreed by Sun.  As to any Sun advertising or circulation contracts assumed by Review-Journal under Section 3.1 above, Review-Journal will remit to Sun the portion of the receipts thereunder reflecting advertising run or circulation delivered by Sun prior to the Effective Date but not payable until on or after that date, and such portion shall not be Agency Revenues.

7.2  <u>Termination Obligations</u>.  Sun shall be solely responsible for all notices, severance allowances, accrued benefits, or other related payments or obligations which may become due or payable to any terminated employee or agent of Sun.

7.3  <u>Sun Personnel</u>.  Review-Journal shall be under no obligation to employ any terminated Sun employee.

ARTICLE 8

<u>NONLIABILITY PROVISIONS</u>

8.1  <u>Defense of Claims and Indemnification</u>.  Any claim, demand, suit, action, obligation or other liability asserted against or sustained by Review-Journal and Sun, or either of them, in respect of any third party ("Claims") shall be dealt with as provided in this Article 8.  For all purposes of this Article 8, the term "cost or expense" shall include reasonable attorneys' fees.

-20-

APP0125
SA30
SUN_00002015

8.1.1   <u>Claims Related to the Joint Operation</u>.  Review-Journal shall defend and shall control the defense or settlement of any third party Claims related to the joint operations or to its performance or non-performance under this Agreement (including but not limited to Claims arising from any advertising published in, or excluded from, any of the Newspapers -- except as provided in Section 8.1.2 -- and Claims in respect of feature, news and editorial content furnished by Sun hereunder arising as a result of any act or omission on the part of Review-Journal other than republication in the form furnished by Sun), devoting reasonable efforts to minimizing any resulting liability and related cost or expense.  Any such liability, and the cost or expense related thereto, shall be an Agency Expense, except to the extent any such Claim shall be covered by insurance. Review-Journal shall give written notice to Sun of any material Claims arising under this Section 8.1.1.

8.1.2   <u>Other Claims</u>.  Except as specifically provided in Section 8.1.1. or elsewhere in this Agreement, neither party hereto shall be charged with or held responsible for any third party Claims (except to the extent certain Sun contracts shall be assumed by Review-Journal under Article 3), arising before or after the Effective Date by reason of any act or omission on the part of the other party, and the responsible party shall indemnify and hold the other party harmless therefrom, including all related cost or expense.  The responsible party shall defend, settle, pay or discharge any such Claim and shall indemnify and hold harmless

-21-

APP0126
SA31
SUN_00002016

the other party against any such Claim, and from any liability, cost or expense arising therefrom. By way of example under this Section 8.1.2 and without limitation, the entire cost or expense of defending, settling or paying and discharging Claims relating to any feature, news or editorial copy published in, or excluded from the daily Review-Journal or the Review-Journal portion of the jointly published newspaper, or arising by reason of anything done or omitted by the news and editorial department of the Review-Journal in regard to its daily newspaper or the Review-Journal portion of the jointly published newspaper, or arising by reason of any advertising rejected by the Review-Journal or accepted by the Review-Journal in situations where such advertising would be rejected pursuant to Sun guidelines, shall be borne by the Review-Journal, and any such liability, cost or expense on account of Claims relating to any feature, news or editorial copy published in, or excluded by Sun from the daily Sun or the Sun portion of any jointly published newspaper, or arising by reason of anything done or omitted by the news and editorial department of the Sun, or arising by reason of any advertising rejected by the Review-Journal pursuant to Sun guidelines, or accepted in situations where such advertising would be rejected pursuant to Review-Journal guidelines, shall be borne by Sun, unless such Claims shall be an Agency Expense by reason of the operation of Section 8.1.1.

    8.1.3 <u>Insurance</u>. For the purposes of this Article 8, each party shall separately maintain and pay for, as an item of

-22-

APP0127
SA32
SUN_00002017

news and editorial expense, insurance to the extent reasonably available protecting against losses from libel, invasion of privacy, copyright or trademark infringement and other matters related to the gathering or preparation of news and editorial matter for publication, in such amounts as the parties may agree upon from time to time, but in no event less than Ten Million Dollars ($10,000,000), and the other party shall be named as an additional insured.

8.2   _Force Majeure_.   Neither party shall be liable to the other for any failure or delay in performance under this Agreement, occasioned by war, riot, government action, act of God or public enemy, damage to or destruction of facilities, strike, labor dispute, failure of suppliers or workers, inability to obtain adequate newsprint or supplies, or any other cause substantially beyond the control of the party required to perform, provided that in the event partial performance under this Agreement is feasible, notwithstanding the occurrence of one or more of the foregoing, performance shall be allocated between the newspapers by the Review-Journal, in its sole judgment, and if it is feasible to publish only one newspaper product, Review-Journal shall exercise its best efforts to produce a jointly published newspaper in which the Sun portion shall be determined by Review-Journal, notwithstanding the provisions of Appendix A hereto, provided, that the Sun portion shall not be less than two (2) pages.

-23-

APP0128
SA33
SUN_00002018

## ARTICLE 9

### TERMINATION

9.1  Events of Termination.  This Agreement shall continue in full force and effect unless and until it may be terminated by the occurrence of one of the following events of termination:

9.1.1  Voluntary Termination.  Voluntary termination under the provisions of Section 1.1.

9.1.2  Bankruptcy or Default.  If either party hereto makes an assignment of its assets for the benefit of creditors, is adjudged a bankrupt or has a receiver appointed for its business by a court of competent jurisdiction (provided, that such adjudication shall continue unstayed on appeal or otherwise in effect for a period of ninety (90) days after the entry of the decree related thereto before such adjudication becomes an event of termination, and further provided that the appointment of the receiver must continue unvacated, not set aside, not stayed or otherwise in effect for a period of ninety (90) days after such appointment before such appointment becomes an event of termination), or if either party defaults in the performance of any of its material obligations hereunder and does not cure such default within sixty (60) days after receiving written notice thereof from the other party, then such other party may, at its election, and in addition to all other remedies available to it at law or in equity, terminate this Agreement upon thirty (30) days' written notice by the Sun and sufficient notice by the Review-Journal to enable the Sun to arrange for the separate

-24-

APP0129
SA34
SUN_00002019

production of the Sun, but not to exceed six (6) months; provided, that in the event of default, the other party shall have the additional option to cure such default and, on demand, be reimbursed by the defaulting party for all costs and expenses related thereto.

9.1.3  <u>Change of Controlling Interest</u>.  In view of the nature of the relationship established by this Agreement and the fact that the Sun is published under the direction and control of Herman M. Greenspun and Brian L. Greenspun, the Review-Journal shall not be required to carry out the terms of this Agreement or be associated with another party to which it objects.  Accordingly, ownership or control of the Sun shall not be transferred to any other entity or person without notice to and prior approval by the Review-Journal, provided that the Review-Journal will not object to any transfer of the ownership or control of Sun to any entity under the immediate direction and control of Herman M. Greenspun, or Brian L. Greenspun, or any other lineal descendant of Herman M. Greenspun.  If, following an approved or permitted change of control of Sun, a subsequent change of control occurs, notice as hereinabove shall be given and the Review-Journal may exercise the rights provided herein.

9.1.4  <u>Loss Operation</u>.  If there are any two (2) consecutive years in which the Agency does not have an operating profit (Agency Expenses in excess of Agency Revenues), despite the Review-Journal's good faith efforts to produce an operating

-25-

APP0130
SA35
SUN_00002020

profit, the Review-Journal may terminate this Agreement upon ninety (90) days written notice.

9.2   <u>Mechanics of Termination</u>.   Upon termination of this Agreement, Review-Journal shall take appropriate action to transfer to Sun:   (a) all then current circulation contracts, agreements or lists concerning bulk sales, subscriptions, dealers and sub-dealers, distributions, deliveries, sales returns and prepaid subscriptions of the Sun's daily newspaper, and of all jointly published newspapers, plus all pertinent portions of then current records and data pertaining thereto, and all sums received by Review-Journal in respect of prepaid subscriptions and cash deposits relating to daily Sun circulation, and a pro rata portion of all sums received by Review-Journal in respect of such subscriptions and deposits relating to the jointly published newspaper circulation, and (b) all then current advertising contracts and all pertinent portions of then current records and data relating to advertising to be published in the Sun and in all jointly published newspapers. Review-Journal shall further provide Sun with the originals and all copies of all contracts relating solely to circulation and advertising of the daily Sun, and copies of all other contracts referred to in the immediately preceding sentence.

ARTICLE 10

<u>MISCELLANEOUS</u>

10.1   <u>Notices</u>.   Each notice or other communication given pursuant to this Agreement shall be given in writing, delivered

-26-

APP0131
SA36
SUN_00002021

in person or mailed by registered or certified mail, addressed to the respective parties as follows:

| | |
|---|---|
| Review-Journal: | Donrey, Inc.<br>P. O. Box 410<br>Las Vegas, NV 89125<br>Attention:  Fred W. Smith |
| Sun: | Las Vegas Sun, Inc.<br>P. O. Box 4279<br>Las Vegas, NV 89127<br>Attention:  Brian L. Greenspun |

or, in the case of either party hereto, at such other address or marked for the attention of such other person, as such party may set forth in a written notice to the other party.

10.2  <u>Disclaimer of Labor Related Obligations</u>.  The parties specifically agree that neither party hereby assumes any obligations of the other party related to its employment practices or to any of its employees, whether or not arising under any collective bargaining agreements or arising prior to, on or subsequent to the Effective Date.

10.3  <u>Inspection of Books and Records</u>.  Either party shall have the right to authorize its independent certified public accountants or any of its corporate officers to inspect the books and records of the other party hereto at reasonable times and intervals in regard to the financial statements specified in Article 6, but only as to the three (3) years preceding the exercise of the right of inspection, commencing with the year immediately preceding the year in which the right is exercised. The expenses of any such inspection shall be borne by the party

-27-

APP0132
SA37
SUN_00002022

causing such inspection to be made and shall not be included in Agency Expenses.

10.4  **Limited Effect.**  Nothing herein contained shall constitute the parties hereto partners, joint venturers, successors, alter egos, joint employers, an unincorporated association, or as having any relationship other than as specifically provided by this Agreement.  This Agreement is intended solely for the benefit of the parties hereto, and their permitted successors and assigns and not for the benefit of any other person or party.  This Agreement, including Appendices A through D hereto, and contracts and agreements supplemental hereto, comprises the entire understanding and agreement of the parties hereto on the subject matter herein contained and any and all other representations or agreements, which heretofore may have been made on such subject matter, whether oral or in writing, by any agent of either party shall be null, void and of no effect whatsoever.  Time is of the essence of this Agreement.

10.5  **Community Cable TV.**  As of the Effective Date, Sun shall assign or cause to be assigned to Donrey the right to receive ten percent (10%) of all dividends or distributions of any kind paid or made by Community Cable TV ("CCTV"), a Nevada corporation which owns and operates a cable television system serving Las Vegas and surrounding communities and certain unincorporated areas of Clark County, Nevada, to any of its shareholders, including any payments in excess of current salaries or current percentages of income as management or

-28-

APP0133
SA38
SUN_00002023

consultant fees paid by CCTV to any of its shareholders. With respect to payments to be made to Donrey hereunder, Sun shall cause CCTV to make such payments, or make such payments directly to Donrey. As soon as permitted under the terms of certain shareholder and financing agreements, CCTV shall issue to Donrey ten percent (10%) of the total issued and outstanding common stock of CCTV, which shall be issued as fully paid and nonassessable. In addition, at such time as Sun or its affiliates have purchased all of the issued and outstanding common stock of CCTV owned by third parties, Donrey shall have the right to purchase an additional thirty-five percent (35%) of the issued and outstanding common stock of CCTV on the same terms and conditions, including price, as those on which Sun or its affiliates acquired such stock, which shall be issued as fully paid and nonassessable. In the event of the sale by Sun or its affiliates of any interest in CCTV prior to Donrey's acquisition of stock, Donrey shall be entitled to receive ten percent (10%) of the net sale proceeds, and Donrey's right to receive its ten percent (10%) stock interest shall be ratably reduced. Donrey's rights with respect to CCTV as herein provided shall survive the expiration or termination of this Agreement, provided, in the event the Review-Journal and Donrey withdraw from the application to the Department of Justice, pursuant to Section 1.1 of this Agreement, or if the Review-Journal terminates this Agreement pursuant to Section 9.1.4. within the first three (3) years of the term of this Agreement, Donrey's rights with

-29-

APP0134
SA39
SUN_00002024

respect to CCTV shall terminate, and in the event Donrey has received any payments, issuances, or transfers of or with respect to CCTV stock pursuant hereto prior to Donrey's withdrawal from the application to the Department of Justice or the Review-Journal's termination of this Agreement as herein provided, such payments, issuances or transfers of or with respect to CCTV stock shall be refunded or rescinded.

10.6   Sun Trademark, Tradenames, Service Marks and Copyrights. In its use of such Sun trademarks, tradenames, service marks and copyrights as may be required to perform its obligations under this Agreement, Review-Journal shall use its best efforts to comply substantially with all relevant laws of the State of Nevada and of the United States pertaining to trademarks, tradenames, service marks and copyrights in force at any time during the term of this Agreement.  Sun shall use its best efforts to maintain in effect said trademarks, tradenames, service marks and copyrights, and shall make applications for the registration and/or renewal thereof if and when required by law.  Review-Journal acknowledges Sun's right, title and interest in and to said trademarks, tradenames, service marks and copyrights and all renewals thereof, and agrees that it shall not at any time permit, take, or cause to be taken any action within its control in any way impairing or tending to impair any part of such right, title and interest.  Review-Journal agrees to publish such notices in the Sun and the jointly published newspapers as Sun reasonably may request in order to protect

-30-

APP0135
SA40
SUN_00002025

said trademarks, tradenames, service marks and copyrights, or any of them. Review-Journal shall not in any manner represent that it has any ownership interest in said trademarks, tradename. service marks or copyrights or in the registration thereof, and Review-Journal acknowledges that its use hereunder of said trademarks, tradenames, service marks or copyrights shall not create in its favor any right, title or interest in or to same beyond those created by this Agreement.

10.7 <u>Tax Treatment of Payments to Sun</u>. It is contemplated by the parties that the payments to Sun under Section 6.4 of this Agreement will be, for federal income tax purposes, ordinary income to Sun and will be deductible by Review-Journal as a business expense.

10.8 <u>Specific Performance</u>. Because of the public interest of maintaining editorially and reportorially independent and competitive newspapers in Las Vegas and its environs, and because of the inadequacy of damages in the event of default in the performance of material obligations hereunder, each party shall have the right to seek specific performance of the material provisions of this Agreement, provided, that in the event of any action by Sun for specific performance against Review-Journal, if Sun does not obtain an order of specific performance, Review-Journal shall be entitled to recover in such action its attorneys' fees and costs.

-31-

APP0136
SA41
SUN_00002026

10.9   Successors and Assignment.  This Agreement shall be binding upon and shall inure to the benefit of each of the parties hereto and their permitted successors and assigns.

10.10   Governing Law; Modification.  This Agreement shall be construed and enforced in accordance with the laws of the State of Nevada.  This Agreement may not be changed orally, but only by an agreement in writing and signed by the party against whom enforcement of any waiver, modification or discharge shall be sought.

10.11   Headings.  Headings have been inserted in this Agreement for the purpose of convenience only.  They shall not be used to interpret or construe the meaning of any Articles or Sections, nor shall they have the effect of limiting or enlarging the meaning thereof.

IN WITNESS WHEREOF, this Agreement has been executed by the parties' respective corporate officers thereto duly authorized as of the day and year first above written.

DONREY, INC.

By _____
Fred W. Smith
President

LAS VEGAS SUN, INC.

By _____
Brian L. Greenspun
President

-32-

APP0137
SA42
SUN_00002027

APPENDIX A

A.1.  Pursuant to Section 4.2 of this Agreement, for each fiscal year after the Effective Date Review-Journal shall establish an allocation for Review-Journal news and editorial expenses, and the allocation for, news and editorial expenses for the Sun shall be equal to sixty-five percent (65%) of the Review-Journal allocation, subject to a minimum of Two Million Two Hundred Fifty Thousand Dollars ($2,250,000) per fiscal year, which shall be increased each year by a percentage equal to the percentage increase in the CPI for the Las Vegas metro area. Such allocations shall be prorated for any period less than a full fiscal year.  The aggregate allocations for news and editorial expenses shall constitute Agency Expense.  On the first day of each month following the Effective Date, Review Journal shall pay to Sun an amount equal to one-twelfth (1/12th) of the Sun's annual allocation for news and editorial expenses as herein provided.

A.2.  Pursuant to Sections 4.3 and 4.4 of this Agreement, the reading content of the newspapers shall be in accordance with the following formulas:

(a) For Monday through Friday editions, the number of pages of the Sun and the number of pages of the Review-Journal shall be determined by the ratio of the number of inches of advertising to be printed in each newspaper and the size of the newshole in each newspaper shall be determined by the same ratio, provided that in no event

APP0138
SA43
SUN_00002028

shall the average newshole of the Sun in any month be less than eighty-five percent (85%) of the newshole of the Review-Journal in such month.

(b) For the jointly published Sunday edition, Sun shall be entitled to a separate section of three (3) open pages (one cover page, one editorial page and one op. ed. page), plus four hundred fifty (450) column inches, provided, that the Review-Journal may add additional pages to the Sun section comprised of news and advertising, as may be required by composition or printing requirements. The Review-Journal shall attempt to place the Sun section within the first four (4) sections of the Sunday edition. The Review Journal shall determine the number of pages for a comic section for jointly published Sunday editions which shall consist of strips and features selected equally by the Review-Journal and the Sun.

(c) For jointly published Saturday and holiday editions, the Sun shall be entitled to one editorial or op. ed. page and one comic page.

A.3. Pursuant to Section 5.1.4 of this Agreement, the Review-Journal shall establish for each fiscal year after the Effective Date a budget for promotional activities of the Review-Journal and the Sun and at least forty percent (40%) of each total budget shall be allocated to the Sun.

A.4. Edition times for Monday through Friday issues of the Review-Journal and the Sun and for jointly published Sunday,

-2-

APP0139
SA44
SUN_00002029

Saturday and holiday editions shall be established by the Review-Journal in accordance with normal industry standards.

A.5.  If the Review-Journal determines that it is feasible to publish an "extra" edition, such edition shall be a jointly published edition, but the content of any "extra" edition shall be determined solely by the Review-Journal.

-3-

APP0140
SA45
SUN_00002030

## APPENDIX B

B.1.  Except as otherwise expressly provided for in this Agreement, the term "Agency Expense" shall mean and include all costs and expenses of the performance of the Review-Journal's obligations under this Agreement, including but not limited to:

B.1.1.  The amounts allocated to Review-Journal and Sun for news and editorial expenses and for promotional expenses as set forth in Appendix A.

B.1.2.  Costs and expenses incurred by Review-Journal, with respect to the newspapers, supplements and Showbiz Magazine, for composition, printing, and distributing; news content of Showbiz Magazine; solicitation and sale of advertising; circulation sales expenses; collection of circulation and advertising accounts receivable, including a reasonable allowance for doubtful receivables and write-offs of receivables deemed uncollectible.

B.1.3.  Compensation of Review-Journal's non-news and non-editorial employees, including, without limitation, salaries, commissions, payroll taxes, the cost of group insurance, retirement benefits, workers' compensation coverage, and other benefits for such employees as may be customary in the newspaper industry from time to time.

B.1.4.  Accrued vacation or severance pay for Review-Journal's non-news and non-editorial employees.


costs s/h/ include
income taxes
RJ liable ins.

APP0141
SA46
SUN_00002031

B.1.5.   Costs for supplies, postage, private couriers, freight, Sunday comics and supplements, film, photo paper and chemicals, ink, newsprint, plates, cuts and mats and contract trucking, and similar costs for all Review-Journal newspaper departments, other than news and editorial.

B.1.6.   Expenses for travel, auto allowances, mileage reimbursement, employee relations, recruiting, and attendance at seminars and conventions for Review-Journal's non-news and non-editorial employees.

B.1.7.   Sales and use taxes on equipment and personal property purchased for use by Review-Journal or otherwise applied to Agency operations under this Agreement to the extent that such taxes are not capitalized for purposes of depreciation or amortization.

B.1.8.   Taxes, license or permit fees paid by Review-Journal with respect to or resulting from the conduct of business under this Agreement or with respect to property used by Review-Journal in the operations under this Agreement, except federal, state or local taxes, if any, measured by net income.

B.1.9.   The cost of membership for Review-Journal and Sun and their non-news and non-editorial employees in the Better Business Bureau, Las Vegas Chamber of Commerce, and other business-oriented

-2-

APP0142
SA47
SUN_00002032

memberships which shall be determined by Review-Journal to be in the best interests of the Agency.

B.1.10.  The cost of Review-Journal and Sun membership in the Newspaper Advertising Bureau, American Newspaper Publishers Association, and other similar newspaper organizations.

B.1.11.  The cost of public liability insurance, insurance against interruption or suspension of publication of the newspapers, carrier insurance, and libel, invasion of privacy and related insurance covering advertising printed in the newspapers. Insurance costs relating to the news or editorial activities of the Review-Journal or the Sun shall not be considered Agency Expense and such costs shall be borne separately by the parties; provided, that each party shall attempt to add the other as an additional named insured under such insurance, but Review-Journal may procure libel, invasion of privacy and related insurance to cover any otherwise inadequately insured exposure it may have as a republisher of Sun news, editorial or advertising copy, and the cost of such additional insurance shall be an Agency Expense.

B.1.12.  The cost of fire and casualty insurance on buildings, equipment, and other property utilized by Review-Journal in the performance of the Agreement.



-3-

APP0143
SA48
SUN_00002033

B.1.13.   The cost of all utilities related to the Review-Journal's performance of the Agreement.

B.1.14.   Costs and expenses incurred in connection with hazardous waste materials.

B.1.15.   Costs and expenses incurred by Review-Journal in obtaining legal and other professional services which it deems necessary in performing its obligations under this Agreement, including but not limited to the costs and fees related to any defense against third party claims, charges, complaints and related matters asserted against the Review-Journal related to the Agreement or Review-Journal's performance of the Agreement; provided, that such costs and fees related to news and editorial liabilities as defined in Section 8.1.2 shall not be Agency Expense, except insofar as such liabilities are asserted against Review-Journal solely due to its republication of Sun news, editorial or feature material or advertising copy.

B.1.16.   A monthly charge of Five Hundred Fifty Thousand Dollars ($550,000) for the rental value of all Review-Journal real property, plant and equipment (including the value of Sun office space provided by Review-Journal under Section 5.4 of the Agreement), except that devoted to non-agency activities such as the Review-Journal's news and editorial operations. The rental charge would be adjusted each five (5)

-4-

APP0144
SA49
SUN_00002034

years on the basis of the change in the CPI for the Las Vegas, Nevada, market.

B.1.17. A monthly charge equal to one and one-half percent (1-1/2%) of the cost of all equipment acquired, expansion or remodeling of buildings, or other capital expenditures, in connection with Agency activities, subsequent to the date of the Agreement. The monthly charge would be subject to adjustment at any time on the basis of increases in the prime interest rate at First Interstate Bank, Las Vegas, Nevada. The Review-Journal shall have sole discretion regarding the purchase of equipment or other necessary capital expenditures for the performance of the Agreement.

B.1.18. A monthly charge for general management services equal to three and one-half percent (3-1/2%) of Agency Revenues.

B.2. All costs and expenses in connection with the news content, composition, production, distribution and advertising sales in connection with Showbiz Magazine shall be included in Agency Expense for the period Showbiz Magazine is governed by the terms of this Agreement, pursuant to Section 4.5.

B.3. Changes or additions in the Sun's newsroom equipment which may be required after the Effective Date to interface with Review-Journal production facilities shall be purchased or paid for by Review-Journal and a monthly charge equal to one and one-half percent (1-1/2%) of the cost thereof shall be

-5-

APP0145
SA50
SUN_00002035

included in Agency Expense. This monthly charge would be subject to adjustment at any time on the basis of increases in the prime interest rate at First Interstate Bank, Las Vegas, Nevada.

-6-

APP0146
SA51
SUN_00002036

## APPENDIX C

### AGENCY REVENUES

C.1.  Except as otherwise expressly provided in this Agreement, the term "Agency Revenues" shall mean and include:

C.1.1.  All advertising and circulation revenues of the newspapers, subject to the provisions of Section 7.1 of this Agreement with respect to accounts receivable outstanding on the Effective Date.

C.1.2.  All revenues from sales incidental to the publication of the newspapers or involving either the facilities used to produce the newspapers or personnel whose compensation is included in Agency Expense, such as sales of commercial printing, waste paper, press plates, and other production materials.

APP0147
SA52
SUN_00002037

APPENDIX D

Operating profit under the Agreement shall mean the excess of Agency Revenues over Agency Expense, and shall be distributed as follows:

For each fiscal year during the term of the Agreement the operating profit shall be distributed ninety percent (90%) to the Review-Journal and ten percent (10%) to the Sun, with payment to be made to the Sun pursuant to the provisions of Section 6.4 of the Agreement, provided, that for the first fiscal year the Sun shall be guaranteed a minimum operating profit distribution of Three Million Dollars ($3,000,000).

APP0148
SA53
SUN_00002038

## APPENDIX D

Operating profit under the Agreement shall mean the excess of Agency Revenues over Agency Expense, and shall be distributed as follows:

For each fiscal year during the term of the Agreement the operating profit shall be distributed ninety percent (90%) to the Review-Journal and ten percent (10%) to the Sun, with payment to be made to the Sun pursuant to the provisions of Section 6.4 of the Agreement.

APP0149
SA54
SUN_00002039

# EXHIBIT 6

Amended and Restated Agreement
(the "Amended JOA")
(SUN_00002045-69)

# EXHIBIT 6

APP0150
SA146

# AMENDED AND RESTATED AGREEMENT

This Amended and Restated Agreement ("Restated Agreement") dated as of June 10, 2005 between DR Partners, a Nevada General Partnership, the successor-in-interest to Donrey of Nevada, Inc. ("DR") and the Las Vegas Sun, Inc., a Nevada corporation ("Sun").

## PRELIMINARY STATEMENT

WHEREAS, DR owns and publishes in Las Vegas, Nevada, a morning newspaper on weekdays, a morning newspaper on Saturdays and holidays, and a Sunday newspaper, each known as the Las Vegas Review-Journal (hereinafter referred to as the "Review-Journal"); and

WHEREAS, Sun owns in Las Vegas, Nevada, an afternoon newspaper on weekdays, known as the Las Vegas Sun (hereinafter referred to as the "Sun") and a combined Saturday and Sunday paper with the Review-Journal; and

NOW, THEREFORE, in consideration of the premises and of the mutual covenants and agreements hereinafter set forth, the parties hereto agree as follows:

## ARTICLE I
## REGULATORY FILING AND TERM

1.1    Regulatory Filing.  Within ten business days (or on such later day as the parties may agree) the Parties agree to file the Restated Agreement with the Attorney General of the United States under the Newspaper Preservation Act within the Department of Justice and to use their best efforts and take all action necessary to effect the intent of this Restated Agreement.  In the event of any action by the United States Department of Justice after the filing of the Restated Agreement which, in the sole opinion of either party, hinders, impairs, seeks to halt or otherwise materially impacts this Restated Agreement, then either party may declare the Restated Agreement null and void, and the 1989 Agreement between the parties shall be reinstituted and remain in full force and effect.  The Restated Agreement does not constitute any limitation on either party's obligation to engage in good faith labor negotiations if and as required by the National Labor Relations Act, and to implement any understandings it may reach in such negotiations.

Upon execution hereof, each party shall furnish to the other a written opinion of its counsel that all necessary corporate or partnership action has been taken to authorize this Restated Agreement and that, subject to the conditions of the preceding paragraph, this Restated Agreement shall constitute the valid and binding obligation of the respective party.  The parties agree to cooperate in coordinating meetings with government officials, community leaders, employees and their representatives, advertisers and others to explain the Restated Agreement.

1

JOA 020705

SaltLake-251719.2 0062095-00001

APP0151
SA147
SUN_00002045

Each party shall pay its own costs and professional fees in connection with the formulation and drafting of the Restated Agreement and the preparation and filing of the Restated Agreement with the Department of Justice. From and after the filing of such Restated Agreement, all costs and professional fees in connection with seeking any required approval by the Department of Justice shall be controlled and approved by the Review-Journal and such cost and shall be borne solely by Review-Journal.

1.2    Term. The term of this Restated Agreement shall begin at 12:00 a.m. on June 10, 2005 ("the Effective Date"). The 1989 Agreement shall remain in full force and effect through September 30, 2005 (the "Transition Date"). Subject to the termination provisions set forth in Article 9, the Restated Agreement shall continue for an initial period ending at the close of business on the 31st day of December of the fiftieth (50th) year from July 1, 1990. The Restated Agreement shall then automatically renew for succeeding periods of ten (10) years unless either party shall notify the other in writing at least two (2) years prior to the end of the then current period that it elects to terminate the Restated Agreement at the end of said period. The phrase "term of this Agreement" as used hereafter shall mean the initial period and any renewal period or periods.

## ARTICLE 2
## AGENCY
## Intentionally omitted

## ARTICLE 3
## Intentionally omitted

## ARTICLE 4
## NEWS AND EDITORIAL COPY, FEATURES AND SERVICES

4.1    Maintenance of News and Editorial Staff; Feature Materials. Review-Journal and Sun each shall maintain a staff of news and editorial employees, and shall license such feature materials (including, but not limited to, news and editorial services supplied by third parties), adequate to provide its respective newspaper with all of the news and editorial copy and related services deemed necessary by each of them as to its respective newspaper. Review-Journal shall use commercially reasonable efforts to cause third party suppliers of feature materials and professional associations to provide such feature materials and association memberships to Sun at rates equivalent to those currently charged to Sun.

4.2    News and Editorial Allocations. The Review-Journal and the Sun shall each bear their own respective editorial costs and shall establish whatever budgets each deems appropriate.

4.3    Furnishing News and Editorial Copy and Services. In furnishing features, news and editorial copy, and like materials to Review-Journal for publication in the Sun, and in providing layout for such material, Sun shall provide all such material in a form appropriate for the production of its newspaper, in conformity with the mechanical standards, deadlines and production requirements which prevail in the Review-Journal plant from time to time, including

2

JOA 020705

SaltLake-251719.2 0062095-00001

APP0152
SA148
SUN_00002046

deadlines, page sizes, column widths, and cut-offs established by Review-Journal, upon reasonable notice to Sun.  Sun shall acquire and maintain at its expense such newsroom equipment (including, but not limited to, newspaper production systems, i.e., "front-end" systems) as may be required to interface with Review-Journal production facilities.  In the event that the newspaper production system used by the Review-Journal is changed and (i) the Sun has utilized a production system that is current with systems commonly employed in the newspaper industry; (ii) the change by the Review-Journal results in any loss of a fully functional interface with the Sun newspaper production system, the Review-Journal shall be responsible to furnish such additional software, hardware and technical services to the Sun as may be necessary to establish such an interface.  The Review-Journal shall give Sun ninety (90) days advance notice of anticipated changes to the Review-Journal's production system, including technical specifications for the new or modified system.  The Sun shall treat any software provided as confidential and conform to all applicable licensing requirements for such software.  Newshole limitations and other matters are set forth in Appendix A hereto.  The parties agree to begin the publication cycle changes for the Sun on the Transition Date (or on such latter day as the parties may agree).  The Review-Journal reserves the right to print conspicuous notices to the effect that the news content of the non-Sun portion of the Newspapers, including locally produced supplements, is produced by Review-Journal personnel.  The Sun reserves the right to print conspicuous notices to the effect that the news content of the non-Review-Journal portion of the Newspapers, including locally produced supplements, is produced by Sun personnel.

    4.4    <u>Intentionally omitted</u>.

ARTICLE 5

CONTINUING PUBLICATION AND<br>NEWS AND EDITORIAL AUTONOMY

    5.1    <u>Production and Promotion of the Newspapers</u>.  Subject to the terms of the Restated Agreement, and as of the Transition Date, Sun shall be a daily morning newspaper as specified in Appendix A.  The Review-Journal shall be a daily morning newspaper, as specified in Appendix A, including such sections and materials as are consistent with custom and practice in the United States metropolitan daily newspaper industry.  So long as Sun furnishes news and editorial copy, features and services to Review-Journal in accordance with Article 4 of this Restated Agreement, Review-Journal agrees to produce the Sun daily as a morning newspaper as provided herein to include the Sun copy and to sell all advertising for, promote and circulate such newspapers as provided herein.  The daily Sun and the daily Review-Journal are hereinbefore and hereinafter referred to as the "Newspapers".  Review-Journal shall print the Newspapers in the Review-Journal plant or plants located at such place or places as Review-Journal may determine, and all operations under this Restated Agreement, except the operation of the Sun' news and editorial department, shall be carried on and performed by the Review-Journal with Review-Journal employees and equipment and in the Review-Journal's said plant or plants or by independent contractors selected by the Review-Journal.  All costs, including capital expenditures, of operations under this Restated Agreement, except the operation of the Sun's news and editorial department, shall be borne by Review-Journal.

3

APP0153
SA149
SUN_00002047

The Review-Journal shall control, supervise, manage and perform all operations involved in managing and operating under this Restated Agreement, including the need, if any, for Sunday supplements and comics, total or zoned market coverage, direct mail or other publication programs, zoned editions, and printing, selling and distributing the Newspapers, shall determine page sizes, number of columns per page, cut-offs, page makeup of non-news and non-editorial (subject to Appendix A), and all other mechanical and technical functions of the Newspapers, shall purchase newsprint, materials and supplies as required and shall determine the rates for, solicit and sell all advertising space in the Newspapers, shall determine circulation rates, collect the Newspapers' circulation and advertising accounts receivable, and shall make all determinations and decisions and do any and all acts and things related to the foregoing activities, provided:

5.1.1   Format.  Review-Journal shall not change the format of the Sun to any size or format different from that of the Review-Journal without approval of Sun.

5.1.2   Sun Editions.  The number of Sun editions shall not be changed without approval of Sun.

5.1.3   Circulation.  Review-Journal shall use commercially reasonable efforts to maximize the circulation of the Newspapers.

5.1.4   Promotional Activities.  Review-Journal shall use commercially reasonable efforts to promote the Newspapers.  Any promotion of the Review-Journal as an advertising medium or to advance circulation shall include mention of equal prominence for the Sun.  Either the Review-Journal or Sun may undertake additional promotional activities for their respective newspaper at their own expense.  For all promotional activities for the Newspapers paid for by the Review-Journal, the Review-Journal shall be responsible for all promotional copy preparation and placement, provided however, that the Sun shall have the right to approve all promotional copy for the Sun that does not generically and concurrently promote both Newspapers.

5.1.5   Intentionally omitted.

5.1.6   Meetings of JOA Participants.  DR senior management shall meet quarterly with Sun senior management to discuss performance under this Restated Agreement.

5.1.7   Advertising Acceptability.  Sun may reject any advertising or types of advertising for the Sun which is, in the opinion of Sun, undesirable or inappropriate for publication therein, and shall notify Review-Journal in writing of any specific advertising or types of advertising that Sun deems undesirable for publication.  Review-Journal shall accept all advertising for the Sun other than the advertising indicated on Sun's written notice, subject to all laws affecting the acceptability of advertising.

5.1.8   Intentionally omitted.

4

JOA 020705

SaltLake-251719.2 0062095-00001

APP0154
SA150
SUN_00002048

5.2.    News and Editorial Autonomy. Preservation of the news and editorial independence and autonomy of both the Review-Journal and the Sun is of the essence of this Restated Agreement.  Sun shall have exclusive and complete control, authority and direction over the news and editorial content, features and services to be furnished by Sun to Review-Journal to be included in its newspaper, including without limitation the right of selection of all its news and editorial employees, and the exclusive right to hire and discharge such employees. Review-Journal shall have exclusive and complete control, authority and direction over the news and editorial content, features and services in its newspapers, including without limitation the right of selection of all its news and editorial employees, and the exclusive right to hire and discharge such employees.  The Review-Journal and Sun each hereby agrees to preserve high standards of newspaper quality throughout the term of this Restated Agreement consistent with United States metropolitan daily newspapers.

5.3.    Performance and Cooperation. Sun and Review-Journal agree to take all corporate action necessary to carry out and effectuate the intent, purposes and provisions of this Restated Agreement, and to cooperate with the other party in every reasonable way that will promote successful and lawful operation under this Restated Agreement for both parties.

5.4    Sun Office Space. The Sun shall provide and pay for its own offices for its news and editorial department and management.

ARTICLE 6
Intentionally omitted

ARTICLE 7
PAYMENT

During the term of this Restated Agreement, DR and the Sun shall receive the amounts set forth in Appendix D.

ARTICLE 8
NON-LIABILITY PROVISIONS

8.1    Defense of Claims and Indemnification. Any claim, demand, suit, action, obligation or other liability asserted against or sustained by Review-Journal and Sun, or either of them, in respect of any third party ("Claims") shall be dealt with as provided in this Article 8. For all purposes of this Article 8, the term "cost or expense" shall include reasonable attorneys' fees and costs, whether or not taken to trial or appeal or in any bankruptcy or other related proceeding.

8.1.1    Claims Related to the Joint Operation. Review-Journal shall defend and shall control the defense or settlement of any third party Claims related to the joint operations or to its performance or non-performance under this Restated Agreement (including but not limited to Claims arising from any advertising published in, or excluded from, any of the Newspapers -

5

APP0155
SA151
SUN_00002049

except as provided in Section 8.1.2 - and claims in respect of feature, news and editorial content furnished by Sun hereunder arising as a result of any act or omission on the part of Review-Journal other than republication in the form furnished by Sun), devoting reasonable efforts to minimizing any resulting liability and related cost or expense. Any such liability, and the cost of expense related thereto, shall be borne by the Review-Journal, except to the extent any such Claim shall be covered by insurance.

8.1.2   Other Claims. Except as specifically provided in Section 8.1.1. or elsewhere in this Restated Agreement, neither party hereto shall be charged with or held responsible for any third party Claims, arising before or after the Effective Date by reason of any act or omission on the part of the other party, and the responsible party shall defend and indemnify and hold the other party harmless therefrom, including all related cost or expense. The responsible party shall defend, settle, pay or discharge any such Claim and shall indemnify and hold harmless the other party against any such Claim, and from any liability, cost or expense arising therefrom. By way of example under this Section 8.1.2 and without limitation, the entire cost or expense of defending, settling or paying and discharging Claims relating to any feature, news or editorial copy published in, or excluded from the daily Review-Journal or arising by reason of anything done or omitted by the news and editorial department of the Review-Journal in regard to its daily newspaper or arising by reason of any advertising rejected by the Review-Journal or accepted by the Review-Journal in situations where such advertising would be rejected pursuant to Sun guidelines, shall be borne by DR and any such liability, cost or expense on account of claims relating to any feature, news or editorial copy published in, or excluded by Sun from the daily Sun or, or arising by reason of anything done or omitted by the news and editorial department of the Sun, or arising by reason of any advertising rejected by the Review-Journal pursuant to Sun guidelines, or accepted in situations where such advertising would be rejected pursuant to Review-Journal guidelines, shall be borne by Sun, unless such Claims shall be an expense of the Review-Journal by reason of the operation of Section 8.1.1.

8.1.3   Insurance. For the purpose of this Article 8, each party shall separately maintain and pay for, as an item of news and editorial expense, insurance to the extent reasonably available protecting against losses from libel, invasion of privacy, copyright or trademark infringement and other matters related to the gathering or preparation of news and editorial matter for publication, in such amounts as the parties may agree upon from time to time, but in no event less than Ten Million Dollars ($10,000,000), and the other party shall be named as an additional insured.

8.2   Force Majeure. Neither party shall be liable to the other for any failure or delay in performance under this Restated Agreement, occasioned by war, riot, government action, act of God or public enemy, acts of terrorism, damage to or destruction of facilities, strike, labor dispute, failure of suppliers or worker, inability to obtain adequate newsprint or supplies, or any other cause substantially beyond the control of the party required to perform, provided that in the event partial performance under this Restated Agreement is feasible, notwithstanding the occurrence of one or more of the foregoing, performance shall be allocated between the newspapers by the Review-Journal, in its sole judgment, notwithstanding the provisions of Appendix A hereto, provided, that the Sun portion shall not be less than six (6) pages.

6

JOA 020705

SaltLake-251719.2 0062095-00001

APP0156
SA152
SUN_00002050

## ARTICLE 9
## TERMINATION

9.1     Events of Termination.  This Restated Agreement shall continue in full force and effect unless and until it may be terminated by the occurrence of one of the following events of termination:

9.1.1     Stated Duration.  Expiration of the term set forth in Section 1.1

9.1.2     Bankruptcy or Default.  If either party hereto makes an assignment of its assets for the benefit of creditors, an order of relief is entered by any bankruptcy court or has a receiver appointed for its business by a court of competent jurisdiction (provided, that such assignment, order of relief or adjudication shall continue unstayed on appeal or otherwise in effect for a period of ninety (90) days after the assignment, the entry of the order of relief or decree related thereto before such assignment or adjudication becomes an event of termination, and further provided that the appointment of the receiver must continue unvacated, not set aside, not stayed or otherwise in effect for a period of ninety (90) days after such appointment before such appointment becomes an event of termination), or if either party defaults in the performance of any of its material obligations hereunder and does not cure such default within sixty (60) days after receiving written notice thereof from the other party, then such other party may, at its election, and in addition to all other remedies available to it at law or in equity, terminate this Restated Agreement.  In the event of the entry of an unstayed order of relief in an involuntary bankruptcy by DR, the Sun shall have the right, at its option, to purchase from DR, the equipment necessary to publish the Sun.  The value of the equipment shall be set by the bankruptcy trustee.  In the event of an unstayed order of relief in an involuntary bankruptcy, the Sun may lease, at fair market value, for a period not to exceed five (5) years the assets necessary to the publish the Sun.

9.1.3.     Change of Controlling Interest.  In view of the nature of the relationship established by this Restated Agreement and the fact that the Sun is published under the direction and control of the Estate of Herman Greenspun and Brian L. Greenspun, the Review-Journal shall not be required to carry out the terms of this Restated Agreement or be associated with another party to which it reasonably objects.  Accordingly, ownership or control of the Sun shall not be transferred to any other entity or person without notice to and prior approval by the Review-Journal, provided that the Review-Journal will not object to any transfer of the ownership or control of Sun to any entity under the immediate direction of Brian L. Greenspun, or any other lineal descendant of Herman M. Greenspun.  Notwithstanding the foregoing, controlling interest of the Sun may be transferred to any person that can provide the necessary editorial background and expertise to produce the Sun pursuant to the terms of this Restated Agreement.  Following an approved or permitted change of control of Sun, if a subsequent change of control occurs, notice as hereinabove shall be given and the Review-Journal may exercise the rights provided herein.

9.1.4     Intentionally omitted.

7

JOA 020705

SaltLake-251719.2 0062095-00001

APP0157
SA153
SUN_00002051

9.2     Intentionally omitted.

9.3     Duties Upon Termination.  Upon termination of this Restated Agreement, either by expiration of its term or otherwise, the Review-Journal shall provide Sun with a complete list (including all contact information) of current newspaper subscribers and advertisers.

ARTICLE 10
MISCELLANEOUS

10.1    Notices.  Each notice or other communication given pursuant to this Agreement shall be given in writing, delivered in person or mailed by registered or certified mail, addressed to the respective parties as follows:

| Review-Journal: | DR Partners |
|---|---|
| | P. O. Box 70 |
| | Las Vegas, NV 89125 |
| | Attention: Sherman Frederick |
| | |
| Sun: | Brian L. Greenspun, Esq. |
| | President & Editor |
| | Las Vegas Sun |
| | 2275 Corporate Circle Drive |
| | Suite 300 |
| | Henderson, Nevada 89074 |

Or, in case of either party hereto, at such other address or marked for the attention of such other person, as such party may set forth in a written notice to the other party.

10.2    Disclaimer of Labor Related Obligations.  The parties specifically agree that neither party hereby assumes any obligations of the other party related to its employment practices or to any of its employees, whether or not arising under any collective bargaining agreements or arising prior to, on or subsequent to the Effective Date.

10.3    Intentionally omitted.

10.4    Limited Effect.  Nothing herein contained shall constitute the parties hereto partners, joint venturers, successors, alter egos, joint employers, an unincorporated association, or as having any relationship other than as specifically provided by this Restated Agreement. This Restated Agreement is intended solely for the benefit of the parties hereto, and their permitted successors and assigns and not for the benefit of any other person or party.  This Restated Agreement, including Appendices A through D hereto, and the contracts and agreements supplemental hereto, comprises the entire understanding and agreement of the parties hereto on the subject matter herein contained and any and all other representations or agreements, which heretofore may have been made on such subject matter, whether oral or in

8

JOA 020705

SaltLake-251719.2 0062095-00001

APP0158
SA154
SUN_00002052

writing, by any agent of either party shall be null, void and of no effect whatsoever. Time is of the essence of this Restated Agreement.

10.5   Intentionally omitted.

10.6   Sun Trademark, Tradenames, Service Marks and Copyrights. In its use of such Sun trademarks, tradenames, service marks and copyrights as may be required to perform its obligations under this Restated Agreement, including promotion of the Newspapers, Review-Journal shall use commercially reasonable effort to comply substantially with all relevant laws of the State of Nevada and of the United States pertaining to trademarks, tradenames, service marks and copyrights in force at any time during the term of this Restated Agreement. Review-Journal shall have the exclusive right and the obligation to distribute the Sun through electronic replica technology (i.e. technology customarily used by metropolitan daily newspapers which transmits an entire Sun page to the subscriber or consumer in any form) to the same extent the Review-Journal distributes its own pages by such means provided, however, that Sun shall have the right to republish, license, or otherwise use its editorial content in any form or media, other than as an entire Sun page or pages, upon the earliest of: (i) 7:00 a.m., (ii) the time the Review-Journal guarantees delivery to its subscribers, or (iii) the time the Review-Journal first uses its editorial content in any form or media other than in the printed newspaper or replica technology. Sun shall use commercial reasonable efforts to maintain in effect said trademarks, trade names, services marks and copyrights, and shall make applications for the registration and/or renewal thereof if and when required by law. Review-Journal acknowledges Sun's right, title and interest in and to said trademarks, trade names, service marks and copyrights and all renewals thereof, and agrees that it shall not at any time permit, take, or cause to be taken any action within its control in any way impairing or tending to impair any part of such right, title and interest. Review-Journal agrees to publish such notices in the Sun as Sun reasonably may request in order to protect said trademarks, trade names, service marks and copyrights, or any of them. Review-Journal shall not in any manner represent that it has any ownership interest in said trademarks, trade names, services marks or copyrights or in the registration thereof, and Review-Journal acknowledges that its use hereunder of said trademarks, trade names, services marks or copyrights shall not create in its favor any right, title or interest in or to same beyond those created by this Restated Agreement. The Review-Journal shall have the right to republish, license, or otherwise use its editorial content in any form or media.

10.7   Tax Treatment of Payments to Sun. Its is contemplated by the parties that the payments to Sun under Appendix D of this Restated Agreement will be, for federal income tax purposes, ordinary income to Sun and will be deductible by DR as a business expense.

10.8   Specific Performance. Because of the public interest in maintaining editorially and reportorially independent and competitive newspapers in Las Vegas and its environs, and because of the inadequacy of damages in the event of default in the performance of material obligations hereunder, each party shall have the right to seek specific performance of the material provisions of this Restated Agreement, provided, that in the event of any action by either party for specific performance, if that party does not obtain an order of specific

9

JOA 020705

SaltLake-251719.2 0062095-00001

APP0159
SA155
SUN_00002053

performance, the other party shall be entitled to recover in such action its attorneys' fees and costs.

10.9  Successors and Assignment. This Restated Agreement shall be binding upon and shall inure to the benefit of each of the parties hereto and their permitted successors and assigns.

10.10  Governing Law; Modification. This Restated Agreement shall be construed and enforced in accordance with the laws of the State of Nevada. This Restated Agreement may not be changed orally, but only by an agreement in writing and signed by the party against whom enforcement of any waiver, modification or discharge shall be sought.

10.11  Headings. Headings have been inserted in this Restated Agreement for the purpose of convenience only. They shall not be used to interpret or construe the meaning of any Articles or Sections, nor shall they have the effect of limiting or enlarging the meaning thereof.

10.12  Ancillary Publications. Nothing in this Restated Agreement shall preclude either party from engaging in any lawful business outside of this Restated Agreement, except that neither Review-Journal, or any Affiliate of Review-Journal nor Sun, or any Affiliate of Sun, shall, outside of this Restated Agreement, publish a newspaper that is published three or more days per week and that is directed primarily to Clark, Nye, or Lincoln Counties, Nevada or any parts thereof. As used in this Restated Agreement, "Affiliate" means any person, corporation, partnership, trust or other entity which controls, is controlled by, or is under common control with either party.

10.13  Release. As a material inducement to DR to enter into this Restated Agreement, and for other good and valuable consideration, Sun, for itself, and its assigns, hereby unconditionally releases and forever discharges DR and the Las Vegas Review-Journal and their partners, predecessors, successors, assigns, agents, stockholders, directors, officers, current or former employees, representatives, attorneys, divisions, subsidiaries, affiliates, receivers, trustees, shareholders and all persons acting by, through, under or in concert with any of them from any and all charges, complaints, claims, liabilities, obligations, promises, agreements, controversies, damages, actions, causes of action, suits, rights, demands, costs, losses, debts and expenses, including, but not limited to, attorneys' fees and costs actually incurred of any nature whatsoever with respect to all those claims asserted or which could have been asserted which arise out of, or are related to, operation of the Las Vegas Review-Journal or Sun between June 17, 1989, and June 10, 2005, known or unknown, including, but not limited to, any claims connected with operations under the 1989 Joint Operating Agreement between the parties, during that time period, including those items set forth on Exhibit C to a release agreement between the parties dated June 20, 2002 and any claims related to the conduct or operation of lvrj.com, reviewjournal.com, lasvegasnewspapers.com.

As a material inducement to Sun to enter into this Restated Agreement, and for other good and valuable consideration, DR, for itself, its affiliates and assigns, hereby unconditionally releases and forever discharges Sun its partners, predecessors, successors, assigns, agents, stockholders, directors, officers, current or former employees, representatives, attorneys,

10

APP0160
SA156
SUN_00002054

divisions, subsidiaries, affiliates, receivers, trustees, shareholders and all persons acting by, through, under or in concert with any of them from any and all charges, complaints, claims, liabilities, obligations, promises, agreements, controversies, damages, actions, causes of action, suits, rights, demands, costs, losses, debts and expenses, including, but not limited to, attorneys' fees and costs actually incurred of any nature whatsoever with respect to all those claims asserted or which could have been asserted which arise out of, or are related to, operation of the Las Vegas Review-Journal or Sun between June 17, 1989, and June 10, 2005, known or unknown, including, but not limited to, any claims connected with operations under the 1989 Joint Operating Agreement between the parties, during that time period, including those items set forth on Exhibit D to a release agreement between the parties dated June 20, 2002 and any claims related to the conduct or operation of lasvegassun.com or lasvegasnewspapers.com.

11

JOA 020705

SaltLake-251719.2 0062095-00001

APP0161
SA157
SUN_00002055

IN WITNESS WHEREOF, this Restated Agreement has been executed by the parties' respective

corporate officers thereto duly authorized as of the day and year first above written.


DR PARTNERS.
By: Stephens Group, Inc.
General Partner

By: _Warren A. Stephens_
Warren Stephens
Chief Executive Officer

LAS VEGAS SUN, INC.
By: _____
Brian L. Greenspun
President


12

JOA 020705

SaltLake-251719.2 0062095-00001

APP0162
SA158
SUN_00002056

## APPENDIX A

A.1. <u>Intentionally omitted</u>

A.2. Pursuant to Section 4.3. of this Restated Agreement, the number, placement, and characteristics of Sun pages shall be in accordance with the following specifications:

(a)    For Monday through Friday editions, the Sun shall be composed of an open front page with the Las Vegas Sun flag and seven (7) additional editorial pages (or the lineage equivalent thereof) of which three (3) shall be open pages as determined by the Sun. The remaining pages may include advertising, subject to the restrictions in (d) below.  For Monday-Friday editions, the Review-Journal shall be composed of as many pages as Review-Journal management determines in its sole discretion.

(b)    For the Sunday edition, the Sun shall be composed of an open front page with the Las Vegas Sun flag and nine (9) additional editorial pages (or the lineage equivalent thereof) of which three (3) shall be open pages as determined by the Sun.  The remaining pages may include advertising, subject to restrictions in (d) below.  The Review-Journal shall determine the number of pages for a comic section for the Sunday edition which shall consist of strips and features selected by the Review-Journal.  The Sunday paper, including comics, shall be composed of as many Review-Journal pages as Review-Journal management determines in its sole discretion.

(c)    For Saturday and holiday editions, the Sun shall be composed of an open front page with the Las Vegas Sun flag and five (5) additional editorial pages (or the lineage equivalent thereof) of which three (3) shall be open pages as determined by the Sun.  The Saturday and holiday editions shall be composed of as many Review-Journal pages as Review-Journal management determines in its sole discretion.  The remaining pages may include advertising, subject to restrictions in (d) below.

(d)    The Sun shall not include any Review-Journal editorial content. Standard materials such as weather pages, comics, standardized television listings and the like shall not be considered Review-Journal editorial material and may be included in the Sun as additional pages unless the Sun objects in writing thereto.  Other than open pages, the Sun may include advertising.  No Sun page shall be more than 50% advertising, except for full page ads, and no advertising shall appear "above the fold" in the Sun, except for full page ads.  Notwithstanding the foregoing, pages may contain, from time to time, more than 50% advertising due to production issues and advertising demands.  Advertising will not be stacked in a pyramid format and shall be evened out in terms of height on the page.  The Monday-Sunday editions of the Review-Journal shall include a noticeable mention of the

13

APP0163
SA159
SUN_00002057

Sun, on the front page of the Review-Journal. The noticeable mention will appear in a box above the Review-Journal's masthead (the "Sun Box") and shall be in the form shown on Appendix B. The Sun Box shall not be smaller in proportion than shown in Appendix B. The Sun Box shall also include the Sun's masthead, and any emblem that is part of the Sun's masthead. The Sun Box shall include a promotion of a story in the Sun and refer readers to the Sun inside. The type face, editorial artwork, font, and editorial promotional content appearing in the Sun Box shall be determined by Sun, in its sole discretion. Any color in the Sun Box shall be restricted to constituent colors used by the Review-Journal on its front page. The Sun Box shall be the left-hand box unless it would be obscured by a spaeda fold, in which case the Sun Box shall be the right-hand box. In the event of major breaking news or for exigent production circumstances, the Sun Box may be moved below the Review-Journal's masthead. The Sun, on average, will receive as much editorial color as the local news section of the Review-Journal.

A.3. Edition times for Monday through Sunday issues of the Review-Journal shall be established by the Review-Journal in accordance with normal industry standards. Deadlines for the Sun shall be the same as those established for the last local news sections of the Review-Journal. The Sun will be placed as the third section of the Newspapers except on occasions when exigent production circumstances require that it be placed as the fourth section. The Sun will be printed in the same press run as the Review-Journal local news section. The Review-Journal shall be solely responsible for determining the need for replating the Newspapers, and shall treat the Sun and the Review-Journal equally with respect to replating of page one for major breaking national or international news events

A.4. If the Review-Journal determines that it is feasible to publish an "extra" edition, such edition shall be a Review-Journal edition and the content of any "extra" edition shall be determined solely by the Review-Journal.

A.5. In the event the Review-Journal determines that the Sun's continued placement in the Review-Journal has a material and substantial negative financial impact on the revenue and profit of the Newspapers it may deliver the Sun separately from the Review-Journal but at the same time, place, and manner as the Review-Journal. The Review-Journal shall provide written notice to the Sun within fifteen (15) days of beginning such separate delivery specifying in detail the factual basis for its determination.

In the event the Sun disagrees with the Review-Journal's determination, it shall within seven (7) days of receipt of notice from the Review-Journal, request that the matter be submitted to arbitration by an arbiter mutually agreed upon by the parties. If Sun requests arbitration, the Review-Journal shall not deliver the Sun separately until sixty (60) days after selection of the arbitrator. In the event the parties are not able to agree upon an arbiter within seven (7) days, an arbiter shall selected by the Chairman of the Department of Journalism of Northwestern University, Evanston, Illinois, or a similar journalism school if Northwestern University has ceased operations of its School of Journalism. The parties shall request the arbitrator to render a decision within sixty (60) days of his or her selection, and Sun and the Review-Journal each

14

JOA 20705

SaltLake-251719.2 0062095-00001

APP0164
SA160
SUN_00002058

hereby covenant to cooperate with the arbitrator to facilitate such request.

The arbitrator shall have experience in the senior management of metropolitan daily newspapers. In determining material and substantial negative financial impact, only the following factors shall be considered; advertiser abandonment of the Newspapers specifically due to the Sun's inclusion within the Review-Journal or subscriber cancellations of the Newspapers specifically due to the Sun's inclusion within the Review-Journal. The material and substantial negative financial impact shall be determined by reference to generally accepted standard newspaper industry sources. The decision of the arbitrator shall be final. The cost of the arbitration shall be borne by the non-prevailing party. The Review-Journal's rights under this section shall be cumulative and may not be exercised more often than once every eighteen (18) months.

In the event Sun determines, in its sole discretion, that the Sun's continued placement in the Review-Journal negatively impacts the Sun, the Review-Journal shall, upon fifteen (15) day written notice from Sun, thereafter deliver the Sun separately from the Review-Journal but at the same time, place and manner as the Review-Journal, provided that Sun shall pay any incremental expenditure reasonably incurred because of such separate delivery, which separate delivery shall be effected without any derogation in the publication, production, or delivery of the Review-Journal. Prior to giving its fifteen (15) day written notice, Sun may request and the Review-Journal shall provide a good faith estimate of such incremental expenditures and the parties shall meet and confer regarding the estimate. If the Sun is separately delivered, it will no longer receive noticeable mention in the Review-Journal.

JOA 20705

SaltLake-251719.2 0062095-00001

APP0165
SA161
SUN_00002059

APPENDIX B

[Sample to be attached]

16

JOA 20705

SaltLake-251719.2 0062095-00001

APP0166
SA162
SUN_00002060

APPENDIX B

Help pick the new Las Vegas city seal

**DRAW YOUR OWN SEE LIVING**



# Batter Up

After finally breaking their 86-year-old Curse, the Red Sox start the season in a new role: defending champs

**SEE SPORTS**

## LAS VEGAS SUN

DOE knew of Yucca e-mails in December

**INSIDE | SECTION E**

**MONDAY**

# LAS VEGAS
# REVIEW-JOURNAL

www.reviewjournal.com

50 CENTS

MONTH XX, 2005

## Agency pursued damage control

*Documents show how DOE coped with e-mails about Yucca Mountain*

By STEVE TETREAULT
STEPHENS WASHINGTON BUREAU

WASHINGTON — Although there were hints on a big "black eye" for the Energy Department, released officials believed it was not that reports of possible falsified documents would mar efforts the science supporting the Yucca Mountain nuclear waste site, documents made public Monday show.

Three dozen pages of newly released memos and other internal documents show how federal officials scrambled to weigh the effect after discovering a cache of e-mail messages in which scientists discussed using "fudge factors" and fabricating quality assurance of computer models used to estimate how water would escape from the mountain.

The e-mails were brought to the department's attention on March 11 and were announced on March 16.

In the days between their discovery and the announcement, officials discussed the matter in messages written between May 15, 1998, and March 20, 2004. They prepared an initial assessment and taking steps to be disclosed with Energy Secretary Samuel Bodman and used in public disclosures, memos show.

A briefing by a Yucca proponent by a Yucca manager in Las Vegas, Bodman was told officials that disclosing to the public the information in the e-mails does not implicate the Yucca site communication, and we do not believe that the questionable data has any meaningful effect on the safety case to show that the site is a nuclear waste repository.

During the time period, officials started a more detailed investigation, the documents show.

They also show the Energy Department was sensitive to how the disclosure would reflect on the Yucca Mountain
► SEE YUCCA MOUNTAIN PAGE 4A

## PUBLIC VIEWING OF POPE

# Mourners pay respects



The late Pope John Paul II is carried to St. Peter's Basilica at the Vatican Monday for a period of public viewing before he is buried in the grotto of the Basilica after his funeral Friday.

*Thousands pack St. Peter's Square to see John Paul II ahead of burial*

By WILLIAM J. KOLE
and MARIA FALCONE
THE ASSOCIATED PRESS

VATICAN CITY — The mourners stood in line hour after hour, starting when the sun's heat blazed off the Vatican's old stones, and into the late night chill. Pilgrims older than the late pope struggled to remain standing. Young children, even infants, were unusually well behaved.

All the time, as the line inched forward, it grew longer and longer out of St. Peter's Square, stretching out of sight down the Via Della Conciliazione. Police said close to midnight it was two miles long, and many people wide.

For pilgrims mourning Pope John Paul II, it was a deeply moving scene: the pope lying lifeless on a crimson platform, wearing a pair of the simple brown leather shoes he so often wore on his trips around the world.

There was no stopping for a lingering view, a meticulous moment of reflection. Many wept as they walked past the bier. Some collapsed against the wall outside after leaving St. Peter's Basilica, where the pope's remains were on public view Monday afternoon. He will be buried Friday.

People who had never had an audience with the pope felt as if they had lost a dear one. "Every time I saw him (on television), he told me something, he gave me a message,"



PETER DEJONG/THE ASSOCIATED PRESS
A mourner weeps Monday as John Paul II's body is carried through St. Peter's Square.

said Silvio Seralica, 23, a student in Rome, after viewing the body. "Now, I just saw him."

"His face was suffering," said Sister Emma, a 36-year-old Italian nun who saw the pope's body. "I felt a sense of sadness, even though I know he's in heaven."

The crowd cheerfully chanted and clapped hands on the street leading to St. Peter's Square as it moved slowly toward the basilica. As soon as they entered the square, people fell silent. It became a procession of mourning, with people holding their hands tightly and whispering the rosary.

After taking a quick glimpse at the pope's remains as police whispered "Hurry up," many leaned against the walls of the basilica and sobbed.
► SEE POPE PAGE 10A

► AMERICAN CATHOLICS HOPE FOR MAJOR CHANGES PAGE 10A
► POPE'S FUNERAL DELAYS CHARLES' WEDDING PAGE 12A

---

# Oil concerns increase as prices soar to record level

*Limited supply, rising demand, continued weakness of U.S. dollar cited*

By BRAD FOSS
THE ASSOCIATED PRESS

Oil prices briefly climbed to record territory above $58 a barrel Monday, as concerns about growing demand and potential supply disruptions once again overshadowed improving crude inventories.

"I've been doing this for 22 years, and I've never seen anything like this," said oil analyst Ken Miller at Purvin & Gertz in Houston. "I view this as a very unstable situation."

Late in the day, traders took profits and considered a possible production increase by the Organization of Petroleum Exporting Countries, sending light, sweet crude for May delivery down 26 cents to $57 on a barrel on the New York Mercantile Exchange.

Prices had climbed as high as $58.28, topping the previous intraday record of $57.79 a barrel reached Friday, when futures settled at a record $57.27.
► SEE OIL PAGE 4A

---

## Supreme Court rules IRAs protected from bankruptcy

By ANNE GEARAN

► SUPREME COURT ASKED TO BLOCK AWARD AGAINST



# Witness says Michael Jackson molested him

By LINDA DEUTSCH
THE ASSOCIATED PRESS

SANTA MARIA, Calif. — In a halting, emotion-choked voice, the son of Michael Jackson's former housekeeper testified Monday, trying to show the jury that the singer has a pattern of abusing young boys.

The judge told jurors the evidence of past unchanged crimes was being offered to show a "propensity" by the defense to weigh "by a preponderance of the evidence."

"Complicated, yes," the judge said, and promised to give them the instructions again later.

The witness, a tall, slender,

APP0167
SA163
SUN_00002061

APPENDIX B

## LAS VEGAS SUN
DOE knew of Yucca
e-mails in December
**INSIDE | SECTION E**



## Batter Up
After finally breaking their 86 year-old
Curse, the Red Sox start the season in a
new role: defending champs
**SEE SPORTS**

Help pick the
new Las Vegas
city seal
**DRAW YOUR OWN
SEE LIVING**

**MONDAY**

# LAS VEGAS
# REVIEW-JOURNAL

www.reviewjournal.com

50 CENTS

MONTH XX, 2005

---

# Agency pursued damage control

*Documents show how DOE coped with e-mails about Yucca Mountain*

By STEVE TETREAULT

WASHINGTON — A Fazanli they were bracing for a big blow, one Energy Department officials believed would be told reports of possible falsified documents would not affect the science supporting the Yucca Mountain nuclear waste site, documents made public on Monday show.

There were dozens of newly released memos and other internal documents show how federal officials scrambled to weigh the effect after disclosure of a cache of e-mail messages in which scientists discussed faking studies and falsifying quality assurance of computer models used for climate and water studies.

The e-mails were brought to the department's attention on March 11 and were transmitted on March 16.

In the days between disclosure and the announcement, officials discussed the e-mail messages written between May 19, 1998, and March 29, 2000. They prepared an initial assessment and taking pains to be discussed with Energy Secretary Samuel Bodman had acted in public disclosures, memos show.

According to a memo prepared by a Yucca manager on that the information in the e-mails "does not impact the Yucca site recommendation, and we do not believe that the scientific data has any meaningful effect on the science supporting the site as a nuclear waste repository."

During the same period, officials started a more detailed investigation, the documents show.

They also said the Energy Department was sensitive to how the disclosure would affect the Yucca Mountain.

► SEE YUCCA MOUNTAIN PAGE 6A

---

**PUBLIC VIEWING OF POPE**

# Mourners pay respects



The late Pope John Paul II is carried to St. Peter's Basilica at the Vatican Monday for a period of public viewing before he is buried in the grotto of the Basilica after his funeral Friday.

## Thousands pack St. Peter's Square to see John Paul II ahead of burial

By WILLIAM J. KOLE
and MARTA FALCONI
THE ASSOCIATED PRESS

VATICAN CITY — The mourners stood in line hour after hour, starting when the sun's heat blazed off the Vatican's old stones, and into the late night chill. Pilgrims older than the late pope struggled to remain standing. Young children, even infants, were unusually well behaved.

All the time, as the line inched forward, it grew longer and longer, out of St. Peter's Square, stretching out of sight down the Via Della Conciliazione. Police said close to midnight it was two miles long, and many people wide.

For pilgrims mourning Pope John Paul II, it was a deeply moving scene: the pope lying lifeless on a crimson platform, wearing a pair of the simple brown leather shoes he so often wore on his trips around the world.

There was no stopping for a lingering view, a motionless moment of reflection. Many wept as they walked past the bier. Some collapsed against the wall outside after leaving St. Peter's Basilica, where the pope's remains went on public view Monday afternoon. He will be buried Friday.

People who had never had an audience with the pope felt as if they had lost a dear one. "Every time I saw him (on television), he told me something, he gave me a message,"



A mourner weeps Monday as John Paul II's body is carried through St. Peter's Square.

said Silvio Sandon, 23, a student in Rome, after viewing the body. "Now, I just saw him."

"His face was suffering," said Sister Emma, a 76-year-old Italian nun who saw the pope's body. "I felt a sense of sadness, even though I know he's in heaven."

The crowd cheerfully chanted and clapped hands on the street leading to St. Peter's Square as it moved slowly toward the basilica. As soon as they entered the square, people fell silent. It became a procession of mourning, with people holding their hands tightly and whispering the rosary.

After taking a quick glimpse of the pope's remains, as some whispered "thank you," many leaned against the walls of the basilica and sobbed.

► SEE POPE PAGE 10A

► AMERICAN CATHOLICS HOPE FOR MAJOR CHANGES PAGE 12A
► POPE'S FUNERAL DELAYS CHARLES' WEDDING PAGE 18A

---

# Oil concerns increase as prices soar to record level

*Limited supply, rising demand, continued weakness of U.S. dollar cited*

By BRAD FOSS
THE ASSOCIATED PRESS

Oil prices briefly climbed to record territory above $58 a barrel Monday, as concerns about growing demand and minimal supply disruptions once again overshadowed the growing crude oil inventories.

"I've been doing this for 22 years, and I've never seen anything like this," said oil analyst Ken Miller at Purvin & Gertz in Houston. "I view this as a very unstable situation."

Late in the day traders took profits and considered a possible production increase by the Organization of Petroleum Exporting Countries, sending light, sweet crude for May delivery down 26 cents to $57.01 a barrel on the New York Mercantile Exchange.

Prices had climbed as high as $58.28, topping the previous intraday record of $57.70 a barrel reached Friday, when futures settled at a record $57.27.

► SEE OIL PAGE 6A

---

# Supreme Court rules IRAs protected from bankruptcy

By HOPE YEN

ASSOCIATED PRESS

WASHINGTON — The

► SUPREME COURT ASKED
TO BLOCK AWARD AGAINST
FORMER IRAQI REGIME



# Witness says Michael Jackson molested him

By LINDA DEUTSCH
THE ASSOCIATED PRESS

SANTA MARIA, Calif. — In a halting, emotion-choked voice, the son of Michael Jackson's former housekeeper testified Monday that the pop star molested him, trying to show the jury that the singer has a pattern of abusing young boys.

The judge told jurors the evidence of past uncharged crimes was being offered to show a "propensity" by the defendant to commit similar acts, their weight "by a preponderance of the evidence."

"Complicated, yes?" the judge said, and promised to give them the instructions again later.

The witness, a tall, slender, dark-haired young man, said

---

APP0168
SA164
SUN_00002062



**LAS VEGAS SUN**



# Batter Up

After finally breaking their 86-year-old Curse, the Red Sox start the season in a new role: defending champs

**SEE SPORTS**

Help pick the new Las Vegas city seal

**DRAW YOUR OWN**
**SEE LIVING**

**MONDAY**

## LAS VEGAS
# REVIEW-JOURNAL

www.reviewjournal.com

50 CENTS          MONTH XX, 2005

*masthead / flag*



DOE knew of Yucca e-mails in December

**INSIDE | SECTION E**



# Batter Up

After finally breaking their 86-year-old Curse, the Red Sox start the season in a new role: defending champs

**SEE SPORTS**

Help pick the new Las Vegas city seal

**DRAW YOUR OWN**
**SEE LIVING**

**MONDAY**

## LAS VEGAS
# REVIEW-JOURNAL

www.reviewjournal.com

50 CENTS          MONTH XX, 2005

APP0169
SA165
SUN_00002063

APPENDIX C
Intentionally omitted

17

JOA 20705

SaltLake-251719.2 0062095-00001

APP0170
SA166
SUN_00002064

APPENDIX D

Sun shall receive an annual profits payment (the "Annual Profits Payment"), one-twelfth (1/12th) of which shall be paid monthly in advance on the first day of each month during the Term. For the fiscal year beginning April 1, 2005, the Annual Profits Payment shall be Twelve Million Dollars ($12,000,000), provided, however, that payments to Sun shall continue in accordance with the 1989 Agreement until the Transition Date. Each fiscal year thereafter during the term of this Agreement the Annual Profits Payment shall be adjusted as set forth in this Appendix D. Within thirty (30) days following the beginning of each such fiscal year, Review-Journal shall calculate the percentage change (the "Percentage Change") between the earnings, before interest, taxes, depreciation and amortization ("EBITDA") for the fiscal year immediately preceding (the "LTM EBITDA") and the EBITDA for the penultimate fiscal year (the "Prior Period EBITDA"). The Annual Profits Payment shall be increased, or decreased, as the case may be, by the Percentage Change between the LTM EBITDA and the Prior Period EBITDA.

In calculating the EBITDA (i) for any period that includes earnings prior to April 1, 2005, such earnings shall not be reduced by any amounts that during such period may have been otherwise been deducted from earnings under section A.1 of Appendix A or sections B.1.16, B.1.17, B.1.18, or B.3 of Appendix B of the 1989 Agreement and (ii) for any period whether before or after April 1, 2005, such earnings shall not be reduced by any amounts paid to Sun as a percentage of operating profit under Appendix D of the 1989 Agreement or under this Appendix D. Any expense of the Review-Journal attributable to a transaction with an Affiliate shall not exceed fair market value. EBITDA shall include the earnings of the Newspapers and the

18

APP0171
SA167
SUN_00002065

earnings of the Review-Journal's Affiliates derived from publications generally circulated in Clark, Nye, or Lincoln Counties, Nevada or any parts thereof. For purposes of this paragraph, Press Equipment shall mean the press equipment currently owned by the Review-Journal and identified in Appendix D-1 and any additional equipment, whether owned by the Review-Journal or third parties, to the extent that it produces substantially the same product or result, and Other Equipment shall mean all equipment and facilities used for production or operation of the printed Newspapers or other print publications whose earnings are included in EBITDA other than Press Equipment. EBITDA, whether determined for any period before or after April 1, 2005, shall not include (a) any expense for rents, leases or similar expense for Other Equipment (i) if such expense, under generally accepted accounting principles, should be treated as a capitalized lease obligation, or (ii) if such expense is made for the use of any capital asset the use of which is intended to replace any item of Other Equipment that is owned by the Review-Journal as of the Effective Date or (b) any expense for rents, leases, or similar expenses for Press Equipment, including any portion of a printing services contract that is fairly attributable to the use of Press Equipment. All calculations shall be made in accordance with generally accepted newspaper industry accounting principles consistently applied. The Parties intend that EBITDA be calculated in a manner consistent with the computation of "Retention" as that line item appears on the profit and loss statement for Stephens Media Group for the period ended December 31, 2004. Sun shall have the right, exercisable not more than once every twelve months and only after providing written notification no less than thirty days prior thereto, to appoint an certified public accounting firm or law firm as Sun's representative to examine and audit the books and records of the Review-Journal and the other publications whose earnings are included in EBITDA for purposes of verifying the determinations of the changes to the Annual Profit

19

JOA 20705

SaltLake-251719.2 0062095-00001

APP0172
SA168
SUN_00002066

Payments. Such representative shall agree in writing to maintain the confidentiality of all such financial records inspected. The confidentiality agreement shall not restrict the representative from disclosing to the management of Sun information concerning the audit of the Review-Journal, but shall restrict the representative from disclosing any specific individual salary information or advertiser-specific information (e.g., names, prices, contract terms, discounts, total inches) for the other publications whose earnings are included in EBIDTA. With respect to such other publications, the representative may only disclose summary information (e.g., total advertising revenue or total salaries) that is not identifiable with individual advertisers or employees. If as a result of such an audit, there is a dispute between Sun and the Review-Journal as to amounts owed to Sun and they are not able to resolve the dispute within 30 days, they shall select a certified public accountant to arbitrate the dispute. The arbitration shall be conducted according to the commercial arbitration rules of the American Arbitration Association, including such rules for the selection of a single arbitrator if Sun and the Review-Journal are not able to agree upon an arbitrator. Sun and the Review-Journal shall request the arbitrator to render a decision within sixty (60) days of his or her selection, and Sun and the Review-Journal each hereby covenant to cooperate with the arbitrator to facilitate such request. The arbitrator shall agree to be bound by terms of confidentiality to the same extent as the Sun's representative. The arbitrator shall make an award to Sun in the amount of the arrearage, if any, found to exist, together with interest thereon from the date any arrearage was due until paid at the corporate prime rate as quoted by the Wall Street Journal on the first business day of each month. The arbitrator shall also make an award of the fees and cost of arbitration, which may include a division of such fees and costs among the parties in a manner determined by the arbitrator to be reasonable in light of the positions asserted and the determination made.

20

JOA 20705

SaltLake-251719.2 0062095-00001

APP0173
SA169
SUN_00002067

DR shall be entitled to all of the profits of the Newspapers after the payments set forth above to the Sun during the term of this Restated Agreement.

21

JOA 20705

SaltLake-251719.2 0062095-00001

APP0174
SA170
SUN_00002068

## APPENDIX D-1

1 Goss Urbanite Press (Pama Lane)
1 Goss Community Press (Press Annex)
2 Goss Newsliner presses (Main pressroom)
1  Didde press (Mailroom)
2 Lines of Heidelberg Inserters and GMA/Alphaliners

22

JOA 20705

SaltLake-251719.2 0062095-00001

APP0175
SA171
SUN_00002069

# EXHIBIT B

Attorney General Order Approving JOA, dated June 1, 1990 [SUN_0024372]

APP0176
APP_000007

BEFORE THE
ATTORNEY GENERAL OF THE UNITED STATES

| | |
|---|---|
| In the Matter of: ) | Public File No. : |
| Application by Las Vegas Sun, Inc., and ) | |
| Donrey of Nevada, Inc., for Approval ) | 44-03-14 |
| of a Joint Newspaper Operating ) | |
| Arrangement Pursuant to the Newspaper ) | |
| Preservation Act, 15 U.S.C. §§ 1801-1804 ) | |

ORDER

Upon consideration of the entire record and the applicable law,

IT IS ORDERED:

The Application for Approval of a Joint Newspaper Operating Arrangement, filed by Las Vegas Sun, Inc., and Donrey of Nevada, Inc., is approved pursuant to the Newspaper Preservation Act, 15 U.S.C. §§ 1801-1804, effective on the 10th day after filing of this Order.

DICK THORNBURGH
Attorney General

Dated:  June  1, 1990

APP0177
APP_000008
SUN_00024372

# EXHIBIT DD

Notes by Brian Greenspun ("Discussion re joa")

APP_000222APP0178

Discussion re joa

My business and life for over 55   years. Not just selling out of joa but ending my commitment to Las Vegas through a daily newspaper. Ending HANK'S legacy. What will remain will be a small piece of what he started and what I ended. This ain't easy.

Not going to get into rights and wrongs and responsibilities. If there is no agreement we can go down that road. And we will. There are 23 years left so you and my daughter can deal with each other if necessary.

I have found a part of journalism that I like. My weekly newspapers and my tourist publications which I started 30 years ago. I love daily newspapers but I understand that sheldons goals --which I understand probab;y better than anyone-- will make my own very difficult to achieve with just 8 pages. I would need a full daily to have the input that I think is necessary to achieve both political and financial,success.

So I am prepared to exit the joa.

However, to make the changes necessary requires a lot of good faith and there is one gating issue which puzzles me and makes me question your intent. I was told that our contract language was plain enough for frank to accept but that he wanted to wait til our case was over with Stephens. Now that it is over--it was settled quite nicely -- that tune has changed and it is suggested that we have to relitigate , re arbitrate the same issue. I understand why's the-hens was so stubborn in the face of the facts but I don't understand why you want to force us through the same procedure, especially;Lu when the outcome is so clear. That suggests that going forward we,will be constantly fighting . I don't want to go there for obvious reasons.

Wants--

Presence hard and fast and inviolate at least once a week and twice if I want it . If it is a page , it has to be prominent and anchored, mine to do what I want and untouchable by RJ.  Ex6reme penalties without litigation should there be any equivocation.

The space for my weeklies and tourist books _-print, digital and otherwise -- will not be entered by RJ for length of joa --23 years.

I will be out of daily newspaper,business. We both can operate our news websites .

RJ to cover expense of one person of my choosing who will edit my page 3 days a week of my choosing in a position to be pre-determined and untouchable. Page three, front cover of second section, etc.

RJ will pay. X dollars for joa. X dollars annually for editor of sun page, it will contribute x dollars to a,charitable foundation for brian and Myra to administer as our own.

Lv sands will sign long term contract with lv mag and v2go distribution and an annual,advertising commitment of x to gmg products for x years.

Approriate use of lv sun masthead on our page and on RJ website. Brian's page/column to be displayed prominently on website.

**EXHIBIT**

**332**

exhibitsticker.com

# EXHIBIT PP

"A note from the Sun," published in the Las Vegas Sun on January 11, 2018

APP_000363PP0180

EXHIBIT

330

exhibitsticker.com

**2009 PULITZER PRIZE WINNER FOR PUBLIC SERVICE    LASVEGASSUN.COM**

# LAS VEGAS SUN

LOCALLY OWNED AND INDEPENDENT    THURSDAY, JANUARY 11, 2018

## A note from the Sun

The Las Vegas Sun is joining other media companies across the country that operate their online site as a hybrid free content/subscription content system called a "metered paywall."

Like so many other media companies, we have made this decision to help defray the enormous costs of generating the editorial content you love to read, and which we are proud to provide to you. Providing fact-based news and information — that essential ingredient to a functioning democracy — is an expensive undertaking.

So, what exactly does this mean?

It's fairly simple. Our award-winning website, lasvegassun.com, will continue to offer readers a lot of free content. However, there will be a cap on the number of stories you can read before being asked to subscribe. Currently, that cap is 10 stories per month, which has become the de facto standard in the industry.

Once you reach the cap, you'll be asked to subscribe in order to read more. At all times the section fronts on our site will remain free, so that you can get a quick overview of the news of the day there without limit.

Similarly, plenty of digital content produced by our company will remain free. That includes the entertainment content from the Las Vegas Weekly as well as material produced with our fantastic content partners.

Why are we taking this step? Two main reasons.

First, producing quality editorial content is a very expensive proposition, and providing it entirely for free on the web has proven to be difficult to sustain for most newspaper companies. Ours is no exception.

Second, and the most important reason for this decision, requires a little explanation.

A major source of our newsroom funding has dried up. Years ago, the Las Vegas Sun stopped publishing our print newspaper and stopped selling newspaper advertising in competition with the Las Vegas Review-Journal. In 1990, we combined our print operations (as well as our circulation) with the Review-Journal. The Review-Journal took responsibility for printing, distributing and selling advertising for the Sun and benefited mightily from this arrangement. The quid pro quo was that the Las Vegas Sun would get a small percentage of R-J profits that we could use to help fund the continuing operations of our newsroom. In short, the combination with the Review-Journal provided much of the money necessary to pay for the quality journalism the Las Vegas Sun provides.

For decades this approach benefited the R-J, and every management team there delivered a profit — a little less of a profit each year, but still healthy enough to help us offset the significant costs of our news operations.

Unfortunately, that has changed.

The current management of the Review-Journal plunged the newspaper into a loss immediately after purchasing the newspaper in 2015. To date, the Review-Journal's management continues to run a money-losing newspaper. We hope they find a way to turn the R-J around in the face of ongoing revenue and circulation decline. (And no, purchasing a print subscription to the Sun and R-J doesn't benefit the Sun in this current scenario.)

Our initiative with the metered paywall is an effort to replace some of that lost funding for the newsroom.

Unlike other online subscriptions across the nation, ours comes with an important pledge: 100 percent of the revenue generated will go directly to funding editorial efforts.

Also, for our online advertisers a quick note: None of this should affect your advertising performance and our delivery of promised page views. We'll still be providing millions and millions of pages of free content to readers each month.

So why should you subscribe to the Las Vegas Sun online?

Because you will be supporting the finest journalists in the state as they continue to do what they do best: tell the story of life in Southern Nevada.

And, in turn, you will be doing your part in providing fact-based, quality journalism to readers across the valley who depend on that information for their daily family, business and political decision-making. We hope you'll join us in supporting the unique, independent and necessary voice of the Sun because, by doing so, you will ensure that Nevada has multiple, vibrant viewpoints on the news and competing opinions about what the news means to each of us.

We're offering two subscription levels — the basic subscription, which allows unfettered access to all our content, is $8.99 per month. The second is a premium membership for $149.99 per month. That one offers subscribers access to special quarterly newsroom events where you can meet with our editors and reporters, access to special events as well as mailed copies of Las Vegas Weekly or The Sunday to your home.

We're sure you love reading what we produce as much as we love producing it for you. Please join us in our mission to tell the story of this wonderful place we all call home by subscribing online at www.lasvegassun.com/subscribe.

— *Brian Greenspun*



LuSun looks at his phone at an exhibit during CES International. Artificial intelligence and internet connectivity in everyday products, including cellphones, will be among the topics in discussion and on display at the annual technology showcase this week in Las Vegas.

JOHN LOCHER / AP

**CES**

# As technology advances, smartphones will offer even greater experiences

**BY MICK AKERS**
*A version of this story was posted on lasvegassun.com.*

Smartphones have become a gadget most can't live without.

With advancements made each time a new phone model is released, what is new today won't necessarily hold up as the norm tomorrow, industry experts said Monday during a discussion at CES at the Las Vegas Convention Center.

They gave a glimpse at what's the new normal in smartphones and what is on the horizon for everyone's favorite pocket gadgets.

Although CES, the tech industry's annual international trade show, is not known for phone debuts, Justin Denison, Samsung's vice president of marketing, said it's more about what's being showcased around the company's smartphones.

"We'll talk about how were building that intelligence into our ecosystem of our devices, so you get more out of them," Denison said. "Things that will change people's lives and become the new norm."

The phone industry will still focus on display, battery and camera innovation. Major developments will be made with connectivity, artificial intelligence and other nonhardware-based improvements in the cellular realm.

**5G**

With the introduction of 5G connectivity on the horizon over the next year and a half for most areas, faster speeds and better connectivity are on the way.

Cities that have smart city technology — such as downtown Las Vegas' Innovation District — will really take off.

The 5G technology will be 100

[See Technology, Page 4]

---

## THE SUN'S MOST-READ STORIES

*The most-read stories on lasvegassun.com as of 9 a.m. Wednesday.*

**1** **People rescued from floodwaters, flights canceled as rain soaks valley.** Tuesday's rainfall created the wettest day in January on record in Las Vegas, the National Weather Service said.

**2** **LVCVA: Shooting, room remodels cause 2017 visitor volume to drop.** In 2017, 42.2 million people visited Las Vegas, a 1.7 percent drop compared to 2016, according to the Las Vegas Convention and Visitors Authority.

**3** **Stan Fulton, casino owner, video slot machine pioneer, dies in Las Vegas, N.M.** Fulton joined the U.S. Air Force in the 1950s before embarking on a career where he built cable television systems and entered the gaming industry.

**4** **Teens arrested in shooting that left 1 dead, 1 injured.** The two were booked Monday at the Clark County Detention Center on counts that included murder, attempted murder and conspiracy to murder.

**5** **Teenage pedestrians blindsided by car in North Las Vegas; 1 dead.** A driver veered off the road Tuesday, mowing down two teenage boys, killing one of them and seriously injuring the other, according to police.

---

**CORPORATE RESPONSIBILITY**

# Major investors prod Apple on devices' effects on children

**BY DAVID GELLES**
*New York Times News Service*

A creator of the iPhone called the device "addictive."

A Twitter founder said the "internet is broken."

An early Facebook investor raised questions about the social network's impact on children's brains.

Now, two of the biggest investors on Wall Street have asked Apple to study the health effects of its products and to make it easier for parents to limit their children's use of iPhones and iPads.

Once uncritically hailed for their innovation and economic success, Silicon Valley companies are under fire from all sides, facing calls to take more responsibility for their role in

everything from election meddling and hate speech to physical health and internet addiction.

"Companies have a role to play in helping to address these issues," said Barry Rosenstein, managing partner of Jana Partners, an investment firm that wrote an open letter to Apple this weekend pushing it to look at its products' health effects, especially on children. "As more and more founders of the biggest tech companies are acknowledging today, the days of just throwing technology out there and washing your hands of the potential impact are over."



The backlash against big tech has been growing for months. Facebook and Twitter are under scrutiny for their roles in enabling Russian meddling in the 2016 presidential election and for facilitating abusive behavior. Google was hit with a record antitrust fine in Europe for improperly exploiting its market power.

But until now, Apple had escaped largely unscathed, and concerns about the deleterious effects of excessive technology use have not been among the most pressing matters for Silicon Valley executives.

Jana, an activist hedge fund, wrote its letter with CalSTRS, the California State Teachers' Retirement System, which manages the pensions

[See Apple, Page 5]

**2009 PULITZER PRIZE WINNER FOR PUBLIC SERVICE** LASVEGASSUN.COM

# LAS VEGAS SUN

LOCALLY OWNED AND INDEPENDENT | THURSDAY, JANUARY 11, 2018

## A note from the Sun

The Las Vegas Sun is joining other media companies across the country that operate their online site as a hybrid free content/subscription content system called a "metered paywall."

Like so many other media companies, we have made this decision to help defray the enormous costs of generating the editorial content you love to read, and which we are proud to provide to you. Providing fact-based news and information — that essential ingredient to a functioning democracy — is an expensive undertaking.

So, what exactly does this mean?

It's fairly simple. Our award-winning website, lasvegassun.com, will continue to offer readers a lot of free content. However, there will be a cap on the number of stories you can read before being asked to subscribe. Currently, that cap is 10 stories per month, which has become the de facto standard in the industry.

Once you reach the cap, you'll be asked to subscribe in order to read more. At all times the section fronts on our site will remain free, so that you can get a quick overview of the news of the day there without limit.

Similarly, plenty of digital content produced by our company will remain free. That includes the entertainment content from the Las Vegas Weekly as well as material produced with our fantastic content partners.

Why are we taking this step? Two main reasons.

First, producing quality editorial content is a very expensive proposition, and providing it entirely for free on the web has proven to be difficult to sustain for most newspaper companies. Ours is no exception.

Second, and the most important reason for this decision, requires a little explanation.

A major source of our newsroom funding has dried up. Years ago, the Las Vegas Sun stopped publishing our print newspaper and stopped selling newspaper advertising in competition with the Las Vegas Review-Journal. In 1990, we combined our print operations (as well as our circulation) with the Review-Journal. The Review-Jour-



JOHN LOCHER / AP

*Lu Sun looks at his phone at an exhibit during CES International. Artificial intelligence and internet connectivity in everyday products, including cellphones, will be among the topics in discussion and on display at the annual technology showcase this week in Las Vegas.*

**CES**

## As technology advances, smartphones will offer even greater experiences

APP_000374 APP0182

# LAS VEGAS SUN

LOCALLY OWNED AND INDEPENDENT | THURSDAY, JANUARY 11, 2018

## A note from the Sun

The Las Vegas Sun is joining other media companies across the country that operate their online site as a hybrid free content/subscription content system called a "metered paywall."

Like so many other media companies, we have made this decision to help defray the enormous costs of generating the editorial content you love to read, and which we are proud to provide to you. Providing fact-based news and information — that essential ingredient in a functioning democracy — is an expensive undertaking.

So, what exactly does this mean?

It's fairly simple. Our award-winning website, lasvegassun.com, will continue to offer readers a lot of free content. However, there will be a cap on the number of stories you can read before being asked to subscribe. Currently, that cap is 10 stories per month, which has become the de facto standard in the industry.

Once you reach the cap, you'll be asked to subscribe in order to read more. At all times the section fronts on our site will remain free, so that you can get a quick overview of the news of the day there without limit.

Similarly, plenty of digital content produced by our company will remain free. That includes the entertainment content from the Las Vegas Weekly as well as material produced with our fantastic content partners.

Why are we taking this step? Two main reasons.

First, producing quality editorial content is a very expensive proposition, and providing it entirely for free on the web has proven to be difficult to sustain for most newspaper companies. Ours is no exception.

Second, and the most important reason to this decision, requires a little explanation.

A major source of our newsroom funding has dried up. Years ago, the Las Vegas Sun stopped publishing our print newspaper and stopped selling newspaper advertising in competition with the Las Vegas Review-Journal. In 1990, we combined with the Review-Journal. The Review-Journal took responsibility for printing, distributing and selling advertising for the Sun and benefited mightily from this arrangement. The quid pro quo was that the Las Vegas Sun would get a small percentage of R-J profits that we could use to help fund the continuing operations of our newsroom.

In short, the combination with the Review-Journal provided much of the money necessary to pay for the quality journalism the Las Vegas Sun provides.

For decades this approach benefited the R-J and every management team there delivered a profit — a little less of a profit each year, but still healthy enough to help us offset the significant costs of our news operations.

Unfortunately, that has changed.

The current management of the Review-Journal plunged the newspaper into a loss immediately after purchasing the newspaper in 2015. To date, the Review-Journal's management continues to run a money-losing newspaper. We hope they find a way to turn the R-J around in the face of ongoing revenue and circulation decline. (And no, purchasing a print subscription to the Sun and R-J doesn't benefit the Sun in this current scenario.)

Our initiative with the metered paywall is an effort to replace some of that lost funding for the newsroom.

Unlike other online subscriptions across the nation, ours comes with an important pledge: 100 percent of the revenue generated will go, directly, to funding editorial efforts.

Also, for our online advertisers a quick note. None of this should affect your advertising performance and our delivery of promised page views. We'll still be providing millions and millions of pages of free content to readers each month.

So why should you subscribe to the Las Vegas Sun online?

Because you will be supporting the finest journalists in the state as they continue to do what they do best: tell the story of life in Southern Nevada.

And, in turn, you will be doing your part in providing fact-based, quality journalism to readers across the valley who depend on that information for their daily family, business and political decision-making. We hope you'll join us in supporting the unique, independent and necessary voice of the Sun because, by doing so, you will ensure that Nevada has multiple, vibrant viewpoints on the news and competing opinions about what the news means to each of us.

We're offering two subscription levels — the basic subscription, which allows unfettered access to all our content, is $8.99 per month. The second is a premium membership for $15.99 per month. That one offers subscribers access to special quarterly newsroom events where you can meet with our editors and reporters, access to special events as well as mailed copies of Las Vegas Weekly or The Sunday to your home.

We're sure you love reading what we produce as much as we love producing it for you. Please join us in our mission to tell the story of this wonderful place we all call home by subscribing online at www.lasvegassun.com/subscribe.

— Brian Greenspun



JOHN LOCHER / AP

In .Sunboku at his phone at an exhibit during CES International. Artificial intelligence and internet connectivity in everyday products, including cellphones, will be among the topics in discussion and on display at the annual technology showcase this week in Las Vegas.

CES

# As technology advances, smartphones will offer even greater experiences

**BY MICK AKERS**
A version of this story was posted on lasvegassun.com.

Smartphones have become a gadget most can't live without.

With advancements made each time a new phone model is released, what is new today won't necessarily hold up as the norm tomorrow, industry experts said Monday during a discussion at CES at the Las Vegas Convention Center.

They gave a glimpse at what's the new normal in smartphones and what is on the horizon for everyone's favorite pocket gadgets.

Although CES, the tech industry's annual international trade show, is not known for phone debuts, Justin Denison, Samsung's vice president of marketing, said it's more about what's being showcased around the company's smartphones.

"We'll talk about how were building that intelligence into our ecosystem of our devices, so you get more out of them," Denison said. "Things that will change people's lives and become the new norm."

The phone industry will still focus on display, battery and camera innovation. Major developments will be made with connectivity, artificial intelligence and other nonhardware-based improvements in the cellular realm.

**5G**

With the introduction of 5G connectivity on the horizon over the next year and a half for most areas, faster speeds and better connectivity are on the way.

Cities that have smart city technology — such as downtown Las Vegas' Innovation District — will really take off.

The 5G technology will be 100

[See Technology, Page 4]

## THE SUN'S MOST-READ STORIES

The most-read stories on lasvegassun.com of 9 a.m. Wednesday

**1** People rescued from floodwaters, flights canceled as rain soaks valley. Tuesday's rainfall created the wettest day in January on record in Las Vegas, the National Weather Service said.

**2** LVCVA: Shooting, room remodels cause 2017 visitor volume to drop. In 2017, 42.2 million people visited Las Vegas, a 1.7 percent drop compared to 2016, according to the Las Vegas Convention and Visitors Authority.

**3** Stan Fulton, casino owner, video slot machine pioneer, dies in Las Vegas, N.M. Fulton joined the U.S. Air Force in the 1950s before embarking on a career where he built cable television systems and entered the gaming industry.

**4** Teens arrested in shooting that left 1 dead, 1 injured. The two were booked Monday at the Clark County Detention Center on counts that included murder, attempted murder and conspiracy to murder.

**5** Teenage pedestrians blindsided by car in North Las Vegas; 1 dead. A driver veered off the road Tuesday, mowing down two teenage boys, killing one of them and seriously injuring the other, according to police.

CORPORATE RESPONSIBILITY

# Major investors prod Apple on devices' effects on children

**BY DAVID GELLES**
New York Times News Service

A creator of the iPhone called the device "addictive."

A Twitter founder said the "internet is broken."

An early Facebook investor raised questions about the social network's impact on children's brains.

Now, two of the biggest investors on Wall Street have asked Apple to study the health effects of its products and to make it easier for parents to limit their children's use of iPhones and iPads.

Once uncritically hailed for their innovation and economic success, Silicon Valley companies are under fire from all sides, facing calls to take more responsibility for their role in everything from election meddling and hate speech to physical health and internet addiction.

"Companies have a role to play in helping to address these issues," said Barry Rosenstein, managing partner of Jana Partners, an investment firm that wrote an open letter to Apple this weekend pushing it to look at its products' health effects, especially on children. "As more and more founders of the biggest tech companies are acknowledging today, the days of just throwing technology out there and washing your hands of the potential impact are over."

The backlash against big tech has been growing for months. Facebook and Twitter are under scrutiny for their roles in enabling Russian meddling in the 2016 presidential election and for facilitating abusive behavior. Google was hit with a record antitrust fine in Europe for improperly exploiting its market power.

But until now, Apple had escaped largely unscathed, and concerns about the deleterious effects of excessive technology use have not been among the most pressing matters for Silicon Valley executives.

Jana, an activist hedge fund, wrote its letter with CalSTRS, the California State Teachers' Retirement System, which manages the pensions

[See Apple, Page 5]

E. Leif Reid, Nevada Bar No. 5750
Kristen L. Martini, Nevada Bar No. 11272
Nicole Scott, Nevada Bar No. 13757
CLARK HILL PLC
1700 S. Pavillion Center Dr., Suite 500
Las Vegas, Nevada 89135
Tel: 702.862.8300
Fax: 702.778.9709
Email: lreid@clarkhill.com
        kmartini@clarkhill.com
        nscott@clarkhill.com

James J. Pisanelli, Nevada Bar No. 4027
Todd L. Bice, Nevada Bar No. 4534
PISANELLI BICE PLLC
400 South 7th Street, Suite 300
Las Vegas, Nevada 89101
Tel: 702.214.2100
Fax: 702.214.2101
Email: JJP@pisanellibice.com
        TLB@pisanellibice.com

*Attorneys for Plaintiff/Counterdefendants*

Jordan T. Smith, Nevada Bar No. 12097
BROWNSTEIN HYATT FARBER SCHRECK, LLP
100 North City Parkway, Suite 1600
Las Vegas, Nevada 89106
Tel: 702.464.7022
Fax: 702.382.8135
Email: jsmith@bhfs.com

Joseph M. Alioto, *PRO HAC VICE*
ALIOTO LAW FIRM
One Sansome Street, 35th Floor
San Francisco, California 94104
Tel: 415.434.8900
Fax: 415.434.9200
Email: jmalioto@aliotolaw.com

### UNITED STATES DISTRICT COURT
### DISTRICT OF NEVADA

LAS VEGAS SUN, INC., a Nevada corporation,

        Plaintiffs,

v.

SHELDON ADELSON (Estate Of), an individual, and as the alter ego of News+Media Capital Group LLC, Las Vegas Review-Journal, Inc., and Interface Operations LLC dba Adfam; PATRICK DUMONT, an individual, and as alter ego of Las Vegas Review-Journal, Inc., News+Media Capital Group, LLC, and Interface Operations LLC dba Adfam; NEWS+MEDIA CAPITAL GROUP LLC,, a Delaware limited liability company; LAS VEGAS REVIEW-JOURNAL, INC., a Delaware corporation; INTERFACE OPERATIONS LLC dba ADFAM, a Delaware limited liability company and as the alter ego of Las Vegas Review-Journal, Inc., and News+Media Capital Gorup, LLC; and DOES,

Case No.: 2:19-CV-01667-ART-MDC

**(REDACTIONS/FILED UNDER SEAL)**

**PLAINTIFF/COUNTERDEFENDANTS'** *EMERGENCY* **MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

APP0184

necessary" to comply with the NPA's requirements and cooperate to ensure the parties' "lawful operation" under the JOAs.[1] In fact, the Sun and RJ further solidified their intentions to ensure their operations were always lawful by memorializing a contingency provision providing for reversion to the 1989 JOA if the DOJ hindered or impaired the parties' 2005 amendment. In the simplest of terms, the RJ cannot now claim that the joint operation can be terminated when it expressly and willingly agreed to revert back to the 1989 JOA in all circumstances where the 2005 JOA was otherwise ineffective.[2] And the RJ is required to use its best efforts to obtain the Attorney General's consent for the 2005 JOA (bearing all costs in doing so), reverting to the 1989 JOA in the meantime and permanently in the event the Attorney General does not approve the 2005 JOA.[3] The RJ's obligations to the joint operation remain materially the same. Under all circumstances, terminating the joint operation was never the outcome of an invalid 2005 JOA.

Over 36 years ago, under the NPA[4] and with the Attorney General's blessing, the RJ voluntarily agreed to possess complete control over, and bear sole responsibility for, all non-editorial and -reportorial operations of the Sun, and they shared in the joint operation's profits. As a result of their combined operations in 1989, the Sun became entirely dependent on the RJ for business management, and printing, distributing, promoting, and accounting and disbursing profits to the Sun. After availing itself for decades of the benefits and privileges of its dominance, the RJ has wielded its power as a sword, undertaking a litany of anticompetitive conduct to terminate the longstanding, voluntary, and beneficial course of dealing under the joint operation, thereby reducing competition and harming the Sun and consumers. This is the opposite of the NPA's purpose and the Attorney General's intent when approving the parties' combination. The RJ's control over the joint operation was bestowed to *preserve* the Sun, not eliminate it. The 1989 JOA required the RJ to continue to print and distribute the Sun through 2040. These obligations, in all material respects, remained unchanged under the 2005 framework and remain unchanged today.

---

[1] *See* 2SA293 § 1.1; 2SA310 § 5.3; 2SA449 § 1.1; 2SA453 § 5.3. The Sun's citations to its Appendices are in the form of: Volume "SA" page number.
[2] *See* 2SA294 § 1.1.
[3] *Id*. § 1.1.
[4] The NPA refers to the Newspaper Preservation Act of 1970, 15 U.S.C. §§ 1801-04.

APP0185

voice, the loss of competition to attract creators of news, editorial, and entertainment content, and the loss of jobs "would severely harm the public interest" "this factor weighs in favor of granting injunctive relief." *See Gannett*, 99 F. Supp. 2d at 1254.

### E.    A Bond Should Not be Required

The Court has broad discretion to set a bond under Federal Rule of Civil Procedure 65(c), including a nominal bond or no bond at all in cases involving the public interest. *E.g.*, *Barahona-Gomez v. Reno*, 167 F.3d 1228, 1237 (9th Cir. 1999), *supplemented by Baharona-Gomez v. Reno*, 236 F.3d 1115 (9th Cir. 2001); *Moltan Co. v. Eagle-Picher Industries, Inc.*, 55 F.3d 1171, 1176 (6th Cir. 1995). If any bond is required, it should be *de minimis*. The Sun's financial resources are already significantly strained because of the RJ's Anticompetitive Conduct. Additionally, this case centers around the public's interest in maintaining competition and a diverse newspaper editorial voice. *See Gannett*, 99 F. Supp. 2d at 1255 (ordering a nominal bond due to the plaintiff's financial resources). If the Court orders a bond at all, it should not exceed $5,000.

### V.    CONCLUSION

For the foregoing reasons, this Court should issue a TRO and preliminary injunction that: (1) enjoins the RJ from unilaterally ending the joint operation and ceasing to print and distribute the Sun during the pendency of this litigation, (2) compels the RJ to use its best efforts to and take all action necessary to obtain Attorney General written consent of the 2005 JOA, and (3) compels the RJ to revert to the 1989 JOA until a final judgment on the merits or an earlier order of the Attorney General granting written approval of the 2005 JOA under 28 C.F.R. § 48.14.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

42

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

**FILED**

FEB 25 2026

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

LAS VEGAS SUN, INC.,

    Plaintiff - Appellee,

v.

SHELDON ADELSON; et al.,

    Defendants - Appellants.

No. 24-2287

D.C. No.
2:19-cv-01667-ART-MDC

District of Nevada,
Las Vegas

MANDATE

The judgment of this Court, entered August 04, 2025, takes effect this date.

This constitutes the formal mandate of this Court issued pursuant to

Rule 41(a) of the Federal Rules of Appellate Procedure.

FOR THE COURT:

MOLLY C. DWYER
CLERK OF COURT

APP0187

E. LEIF REID, Nevada Bar No. 5750
KRISTEN L. MARTINI, Nevada Bar No. 11272
NICOLE SCOTT, Nevada Bar No. 13757
CLARK HILL PLC
1700 S. Pavillion Center Dr., Suite 500
Las Vegas, Nevada 89135
Tel: 702.862.8300
Fax: 702.778.9709
Email: lreid@clarkhill.com
        kmartini@clarkhill.com
        nscott@clarkhill.com

JAMES J. PISANELLI, Nevada Bar No. 4027
TODD L. BICE, Nevada Bar No. 4534
PISANELLI BICE PLLC
400 South 7th Street, Suite 300
Las Vegas, Nevada 89101
Tel: 702.214.2100
Fax: 702.214.2101
Email: JJP@pisanellibice.com
        TLB@pisanellibice.com

JORDAN T. SMITH, Nevada Bar No. 12097
BROWNSTEIN HYATT FARBER
SCHRECK, LLP
100 North City Parkway, Suite 1600
Las Vegas, Nevada 89106
Tel: 702.464.7022
Fax: 702.382.8135
Email: jsmith@bhfs.com

JOSEPH M. ALIOTO, *PRO HAC VICE*
ALIOTO LAW FIRM
One Sansome Street, 35th Floor
San Francisco, California 94104
Tel: 415.434.8900
Fax: 415.434.9200
Email: jmalioto@aliotolaw.com

*Attorneys for Plaintiff/Counterdefendants*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

| | |
|---|---|
| LAS VEGAS SUN, INC., a Nevada corporation,<br><br>　　　　　　Plaintiffs,<br><br>v.<br><br>SHELDON ADELSON (Estate Of), an individual, and as the alter ego of News+Media Capital Group LLC, Las Vegas Review-Journal, Inc., and Interface Operations LLC dba Adfam; PATRICK DUMONT, an individual, and as alter ego of Las Vegas Review-Journal, Inc., News+Media Capital Group, LLC, and Interface Operations LLC dba Adfam; NEWS+MEDIA CAPITAL GROUP LLC,, a Delaware limited liability company; LAS VEGAS REVIEW-JOURNAL, INC., a Delaware corporation; INTERFACE OPERATIONS LLC dba ADFAM, a Delaware limited liability company and as the alter ego of Las Vegas Review-Journal, Inc., and News+Media Capital Gorup, LLC; and DOES, | Case No.: 2:19-CV-01667-ART-MDC<br><br>**PLAINTIFF'S MOTION FOR LEAVE TO MODIFY THE SCHEDULING ORDER AND AMEND AND SUPPLEMENT THE COMPLAINT (ECF NO. 621)** |

ClarkHill\105559\1015963\286715615.v1-3/1/26

I-X, inclusive,

           Defendants.

LAS VEGAS REVIEW-JOURNAL, a Delaware corporation,

           Counterclaimant,

v.

LAS VEGAS SUN, INC., a Nevada corporation; BRIAN GREENSPUN, an individual and as alter ego of Las Vegas Sun, Inc.; GREENSPUN MEDIA GROUP, LLC, a Nevada limited liability company, as the alter ego of Las Vegas Sun, Inc.,

           Counterclaim Defendants.

Plaintiff Las Vegas Sun, Inc. ("Sun"), through counsel of Clark Hill PLC, Pisanelli Bice PLLC, Brownstein Hyatt Farber Schreck, LLP, and Alioto Law Firm, moves the Court pursuant to Federal Rule of Civil Procedure 16(b)(4) and Local Rule 26-3, and Federal Rule of Civil Procedure 15(a)(2) and (d), for leave to modify the Scheduling Order and file its proposed Second Amended and Supplemental Complaint for Divestiture, Injunction, and Damages by Reason of Defendants' Violations of the Sherman Antitrust Act, the Clayton Antitrust Act, and the Nevada Unfair Trade Practices Act ("Second Am. Compl."). The Sun's proposed Second Amended Complaint is attached as **Exhibit 1** to this Motion in accordance with LR 15-1(a).

This Motion is based on the following Memorandum of Points and Authorities, the attached **Exhibit 1**, and the pleadings and papers on file herein.

Dated this 2nd day of March, 2026.

APP0189

ClarkHill\105559\1015963\286715615.v1-3/1/26

## MEMORANDUM OF POINTS AND AUTHORITIES

**I.    INTRODUCTION**

On August 4, 2025, the Ninth Circuit issued its Opinion in the RJ's interlocutory appeal. The Opinion has a profound, but not dispositive, impact on the landscape of this case as it moves forward. In sum and substance, the Ninth Circuit rejected all existing caselaw, DOJ Regulations, and the DOJ's and NPA lawyers' longstanding practices and beliefs that existed prior to that point in time. In short, the Ninth Circuit said, for the first time anywhere, that even amendments to previously approved, post-1970 JOAs needed Attorney General approval under 15 U.S.C. § 1803(b). It thereby concluded that because the 2005 JOA "did not receive the required 'prior written consent of the Attorney General,' the 2005 JOA is unlawful and unenforceable." *Las Vegas Sun, Inc. v. Adelson*, 147 F.4th 1103, 1121 (9th Cir. 2025). Needless to say, this ruling was a significant intervening change in the law.

Importantly, the Ninth Circuit's Opinion did not end this case. Even with the Ninth Circuit's ruling, the unenforceability of the 2005 JOA cannot function to end the joint operation under any circumstance, or absolve the RJ of liability for the litany of anticompetitive conduct it has undertaken in violation of the Sherman Act.

Instead, the Ninth Circuit's Opinion imposed upon the Sun the obligation to conform its pleadings to comport with this new law. That is what the Sun seeks now. The Sun comes to the Court requesting leave to file an amended and supplemental pleading to take into consideration the impact of this new law on the Sun's existing claims and allegations previously presented in its operative First Amended Complaint (ECF No. 621). To be clear, the Sun does not offer new facts, circumstances, or even claims that were not already the subject of discovery or that this Court has not already considered. The Sun's proposed pleading alleges the same claims for relief, the same relevant market, the same anticompetitive conduct, and the same antitrust injury that the parties have been litigating for the past six years. This Court is vastly familiar with all of it. *See* ECF No. 970; *see also* ECF Nos. 836, 870, 902. The Sun merely seeks leave to supplement its pleading to address the recent change in the law, and amend its allegations to explain why the RJ's previously alleged conduct is still anticompetitive under antitrust laws. In making its amendment, the Sun

1

updates its allegations to conform to the evidence, which this Court already specifically analyzed at summary judgment: there is nothing in the Sun's proposed Second Amended Complaint that this Court has not read before. *See id.*

Nor is there any serious argument that the Sun has acted in any way but expeditiously and in good faith in bringing this Motion. Because each of the factors under Rules 15, 16, and Local Rule 26-3 favor the Sun, an Order granting the Sun's Motion is warranted.

## II. STATEMENT OF THE RELEVANT FACTS

The Sun filed its complaint initiating this action on September 24, 2019. ECF No. 1. The RJ moved to dismiss under Rule 12(b)(6), which this Court denied as to the Sun's Section 2 claims under the Sherman Act on November 30, 2020. *See* ECF No. 243. When the parties entered the discovery phase on the Sun's claims for monopolization, attempted monopolization, and alter ego, and the RJ's subsequent counterclaims, the written discovery proved expansive. This, together with the substitution of the Magistrate Judge, led this Court to vacate all case deadlines and appoint a special master. *See, e.g.*, ECF Nos. 383, 389-391, 393. On May 3, 2021, the amended Scheduling Order set December 23, 2021, as the "Last Day to Amend Pleadings for all parties." ECF No. 393 at 3.

Before the December 23 deadline expired, the Sun sought leave to amend and supplement its complaint to add Defendant Interface Operations LLC, dba Adfam ("Adfam"), and a Section 1 claim under the Sherman Act. *See* ECF Nos. 537/539 (FUS). The Sun's request was based on new evidence uncovered in discovery. *Id.* This Court granted the Sun's motion for leave to file its first amended complaint on March 18, 2022 (ECF No. 619), which the RJ subsequently moved to dismiss under Rule 12(b)(6). *See generally* ECF No. 632. While the RJ's Rule 12 motion was pending, the parties continued with written discovery, fact depositions, and expert discovery. They explored at length the Sun's claims under Sections 2 and 1 of the Sherman Act, and the Nevada Unfair Trade Practices Act. Their discovery on these claims involved the Sun's alleged relevant market, the economic competition between the Newspapers, and the Sun's antitrust injury (among all other aspects). The parties also engaged in fulsome discovery on the RJ's counterclaims and affirmative defenses challenging the enforceability of the 2005 JOA under Section 1803(b) of the

2

APP0191

the Sun's proposed Second Amended Complaint does not seek to add new parties, additional claims, or otherwise seek to expand the scope of the case. *Compare* ECF No. 621 *with* **Ex. 1**; *see also* ECF No. 1062. The Sun's proposed pleading alleges the same claims for relief, anticompetitive conduct, relevant market, and antitrust injury that the parties have been litigating for the past six years—all with which this Court is intimately familiar. *See* ECF No. 970.

The Sun's Second Amended Complaint merely supplements its allegations to address the RJ's efforts to obtain the Ninth Circuit's Opinion and what the Opinion held, to bring the factual history of the case current. As a result, the Sun's proposed pleading amends its allegations to explain how the Sun's existing claims for relief survive despite the Ninth Circuit's Opinion. In doing so, the Sun also amends its existing allegations to conform to the facts and evidence that the parties have extensively litigated and that this Court specifically analyzed when ruling on the parties' cross-motions for summary judgment. None of the Sun's amended allegations are new to the RJ or this Court. They relate to the same conduct, transactions, and occurrences alleged in the Sun's first amended complaint.

While the Sun expects that supplementation of its expert reports would be required to address the intervening change in law, the potential need for supplementary discovery (such as depositions of experts regarding their updated reports) would necessarily be limited and appropriately tailored. And the Sun is willing to undertake and accomplish any supplemental discovery within a timeframe that this Court deems is reasonable and just.

The law does not recognize prejudice to the RJ under these circumstances, and granting modification would have minimal impact on these proceedings. Again, a trial date has yet to be set. The present circumstances satisfy the first "danger of prejudice" and the second "the length of delay and its potential impact on the proceedings" factors under the excusable neglect standard.

### 3.    The Sun's Motion is Made in Good Faith

When a plaintiff seeks leave to amend or supplement, as the Sun now does, "because of a recent change in law, … the good faith factor weighs in plaintiff's favor." *Est. of Browning v. Las Vegas Metro. Police Dep't*, 2023 WL 3340880, at *2 (D. Nev. May 10, 2023); *see also infra* § IV(B)(1) (further establishing the absence of bad faith or dilatory motive). Clearly, the Sun's

ClarkHill\105559\1015963\286715615.v1-3/1/26

# EXHIBIT 1

Plaintiff's proposed Second Amended and Supplemental Complaint for Divestiture, Injunction, and Damages by Reason of Defendants' Violations of the Sherman Antitrust Act, the Clayton Antitrust Act, and the Nevada Unfair Trade Practices Act

# EXHIBIT 1

APP0193

E. LEIF REID, Nevada Bar No. 5750
KRISTEN L. MARTINI, Nevada Bar No. 11272
NICOLE SCOTT, Nevada Bar No. 13757
CLARK HILL PLC
1700 S. Pavillion Center Dr., Suite 500
Las Vegas, Nevada 89135
Tel: 702.862.8300
Fax: 702.778.9709
Email: lreid@clarkhill.com
        kmartini@clarkhill.com
        nscott@clarkhill.com

JAMES J. PISANELLI, Nevada Bar No. 4027
TODD L. BICE, Nevada Bar No. 4534
PISANELLI BICE PLLC
400 South 7th Street, Suite 300
Las Vegas, Nevada 89101
Tel: 702.214.2100
Fax: 702.214.2101
Email: JJP@pisanellibice.com
        TLB@pisanellibice.com

JORDAN T. SMITH, Nevada Bar No. 12097
BROWNSTEIN HYATT FARBER
SCHRECK, LLP
100 North City Parkway, Suite 1600
Las Vegas, Nevada 89106
Tel: 702.464.7022
Fax: 702.382.8135
Email: jsmith@bhfs.com

JOSEPH M. ALIOTO, *PRO HAC VICE*
ALIOTO LAW FIRM
One Sansome Street, 35th Floor
San Francisco, California 94104
Tel: 415.434.8900
Fax: 415.434.9200
Email: jmalioto@aliotolaw.com

*Attorneys for Plaintiff/Counterdefendants*

## UNITED STATES DISTRICT COURT
### DISTRICT OF NEVADA

LAS VEGAS SUN, INC., a Nevada
corporation,

         Plaintiff,

v.

SHELDON ADELSON, an individual, and as
the alter ego of News+Media Capital Group
LLC, Las Vegas Review-Journal, Inc., and
Interface Operations LLC dba Adfam;
PATRICK DUMONT, an individual, and as
alter ego of Las Vegas Review-Journal, Inc.,
News+Media Capital Group, LLC, and
Interface Operations LLC dba Adfam;
NEWS+MEDIA CAPITAL GROUP LLC, a
Delaware limited liability company; LAS
VEGAS REVIEW-JOURNAL, INC., a
Delaware corporation; INTERFACE
OPERATIONS LLC DBA ADFAM, a
Delaware limited liability company and as alter
ego of Las Vegas Review-Journal, Inc., and
News+Media Capital Group, LLC; and DOES,
I-X, inclusive,

Case No. 2:19-cv-01667-ART-MDC

**SECOND AMENDED AND
SUPPLEMENTAL COMPLAINT FOR
DIVESTITURE, INJUNCTION, AND
DAMAGES BY REASON OF
DEFENDANTS' VIOLATIONS OF THE
SHERMAN ANTITRUST ACT, THE
CLAYTON ANTITRUST ACT, AND THE
NEVADA UNFAIR TRADE PRACTICES
ACT**

**JURY DEMAND**

116312629.2
ClarkHill\105559\1015963\286715632.v1-3/2/26

APP0194

Defendants.

LAS VEGAS REVIEW-JOURNAL, INC., a
Delaware corporation,

Counterclaimant,

v.

LAS VEGAS SUN, INC. a Nevada corporation;
BRIAN GREENSPUN, an individual and as the
alter ego of Las Vegas Sun, Inc.; GREENSPUN
MEDIA GROUP, LLC, a Nevada limited
liability company, as the alter ego of Las Vegas
Sun, Inc.,

Counterclaim Defendants.

## INTRODUCTION

Defendant Sheldon Adelson has been a long-time enemy of the First Amendment and the press. For decades, he has filed and prosecuted one frivolous and ultimately unsuccessful defamation case after another. His objective has always been clear: chill free speech and silence those that would speak out against him. Against this campaign of oppression, courageous journalists have nonetheless doggedly investigated Adelson's suspicious business dealings, lawsuits, and political activities while shining a disinfecting sunlight on his actions. Honest reporters, scathing editorials, and negative press coverage have continually plagued and maddened Adelson. In December 2015, Adelson's intolerance for the Fourth Estate finally boiled over when he sought to commit a modern-day smashing of the printing presses. He purchased Las Vegas Review-Journal, Inc.,[1] and the Review-Journal newspaper—one of only two daily print newspapers published and distributed in Clark County, Nevada—and began a systematic silencing of all his local media critics. He used his family members, including his son-in-law Defendant Patrick Dumont, and other controlled entities, with their significant resources, to accomplish his grand scheme.

Not only did Adelson remove any Review-Journal reporter who dared to challenge him, he began a calculated scheme to monopolize the local newspaper industry by strangling the sole remaining competitor and dissenting voice—the Las Vegas Sun ("the Sun"). Since 1989, the

---

[1] Defendant Las Vegas Review-Journal, Inc., is also referred to herein as "Review-Journal" or "RJ."

- 2 -

116312629.2
ClarkHill\105559\1015963\286715632.v1-3/2/26

Review-Journal has been in control of and responsible for all non-editorial and non-reportorial functions of the Sun, including printing, distributing, circulation, and promotion. The Review-Journal's dominant position resulted from the parties' voluntary combination to enter into a 50-year Joint Operating Agreement ("JOA"). The parties' original, 1989 JOA was authorized by the Newspaper Preservation Act (the "NPA") and approved by the Attorney General. The NPA provides a limited antitrust exemption for newspapers to combine production, marketing, distribution, and sales, so long as their editorial and reportorial functions remained separate and independent. Congress designed the NPA, and allowed JOAs, to preserve the publication of competing newspapers that are facing economic distress. As a result of the parties' original combination, the Sun became dependent on the Review-Journal, having been divested of its printing press and all infrastructure necessary to independently publish and distribute its newspaper.

When the parties amended the 1989 JOA in 2005 at the RJ's insistence, they continued the material elements of their original combination and, to further reduce the joint operation's production and distribution costs, they agreed to print and distribute the Sun and the Review-Journal newspapers (the "Newspapers") in a separately identified but dually packaged bundle as they previously did on weekends and holidays (the "Newspaper Bundle"). Both parties believed that the 2005 JOA was lawful and valid under the NPA. They complied with the existing practice and DOJ regulations for amendments to previously approved JOAs in submitting the 2005 JOA to the DOJ for review and investigation, which the DOJ did. Never did the DOJ or anyone else challenge the Newspapers' continued combination under the amended agreement. Consequently, for 14 years the parties voluntarily continued their joint operation under the framework of the 2005 JOA while adhering to the material elements of their original combination.

Adelson and Defendants, however, weaponized the Review-Journal's control and dominance over the joint operation for the opposite purpose. They wielded the parties' longstanding combination and operating framework to place the Sun *into* economic distress. Defendants, working together, eliminated all of the Sun's profit share by engaging in anticompetitive accounting and operational abuses to reduce any amount to zero. Abusing Defendants' control, the Review-Journal

- 3 -

also omitted the Sun from promotional advertising and covered up the Sun's presence on the front page of the Newspaper Bundle, obscuring the visibility of the Sun and impeding consumer awareness.

Despite these and other efforts to suffocate the Sun, the Sun remains steadfast. The Sun's diverse editorial voice stands as a political and philosophical counterbalance to the Review-Journal. The Sun covers local news in greater depth, breadth, and accuracy. It reports on breaking stories and provides a more attractive mix of news, features, and formats. The Sun's editorial page often speaks the truth to Defendants' power.

Unable to financially blot out the Sun, and tired of publishing his only rival, Adelson and the Review-Journal filed a baseless and unlawful claim in Nevada state court seeking to prematurely end the parties' 34-year joint operation and immediately cease printing and distributing the Sun. Because of the parties' multi-decade course of dealing, and the Sun's operational and economic dependence on the Review-Journal's control over the joint operation, ending the joint operation would effectively kill the Sun. The consequence: Defendants' plan to achieve 100% monopoly power in the market of local daily print newspapers in Las Vegas and stifle all dissenting, competing views would be complete.

By reasons of Defendants' antitrust violations, under the authority of Sections 4 and 16 of the Clayton Antitrust Act, 15 U.S.C. §§ 15, 26,[2,3] and Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2,[4,5] an injunction should and must be issued to prevent any efforts by Defendants

---

[2] Under Section 4 of the Clayton Act, 15 U.S.C. § 15, "Any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States . . . and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee."

[3] Under Section 16 of the Clayton Act, 15 U.S.C. § 26, "Any person, firm, corporation, or association shall be entitled to sue for and have injunctive relief, in any court of the United States having jurisdiction over the parties, against threatened loss or damage by a violation of the antitrust laws. . . . ."

[4] Under Section 1 of the Sherman Act, 15 U.S.C. § 1, "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal."

[5] Under Section 2 of the Sherman Act, 15 U.S.C. § 2, "Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony . . . . "

- 4 -

to terminate the Review-Journal and Sun's joint operation and cease printing and distributing the Sun. Further, because they have misused their fiduciary responsibilities to the specific detriment to the Sun, the Court must divest the RJ of any control over the Review-Journal.

In addition, any damages found by a jury for the substantial loss of profits, the harm to the Sun brand, and the value of the Sun as a going concern, must be trebled by the Court as a just and reasonable estimate, which actual damages are reasonably believed to be in excess of tens of millions of dollars before trebling, and an award of attorney's fees and costs.

## THE PARTIES

### Plaintiff Sun

1. Las Vegas Sun, Inc. (the Sun), a Nevada corporation, publishes the Sun Newspaper in Clark County, Nevada. The Sun is a wholly owned subsidiary of Greenspun Media Group, LLC, which publishes various weekly magazines in Clark County, Nevada.

2. The Sun is the second longest running daily newspaper in Las Vegas's history. The first edition of the Sun was published under the name, "Las Vegas Morning Sun," on July 1, 1950, by Hank Greenspun.[6] Hank Greenspun remained the Sun's editor and publisher until he passed away in 1989. Hank's son, Brian Greenspun, has been the Sun's editor since 1989 and the publisher since 2010.

3. The Sun's distinct journalistic voice is grounded in the Newspaper's rich history. Hank Greenspun, who wrote a front-page column entitled, "Where I Stand," was known for taking on U.S. Senator Patrick McCarran and the casinos in federal court in 1952 for orchestrating an illegal group boycott of advertising in the Sun Newspaper, and for his public battles with Senator Joseph McCarthy. The Sun's record of "courageous reporting" and "forthright journalism" has garnered it numerous awards and industry recognition, including: the Pulitzer Prize for Public Service in 2009 for its reporting on construction deaths on the Las Vegas Strip; the Alfred I. duPont-Columbia University Award in 2010 for its coverage of gambling addiction; first place for the Best Editorial Page in 2018 from the Nevada Press Association, "Better Newspaper Contest"; first place

---

[6] https://lasvegassun.com/history/timeline/, last visited March 1, 2026.

- 5 -

in Editorial Writing, Editorial of the Year, and Sports Feature Writing for 2019 from the Nevada Press Association; and a multitude of other national, state, and regional awards.

4. Today, the Sun is considered a left-leaning editorial voice in Southern Nevada for its liberal tilting editorials and its frequent endorsement of Democratic candidates. It is known for its editorials by Brian Greenspun, the longest running metro columnist in Las Vegas history, which speak to everything from local events to observations of national politics, including challenging Donald Trump, the Review-Journal, and Adelson himself. In 2019, the Sun and its sister publications employed approximately 90 individuals in Southern Nevada.

**Defendant Las Vegas Review-Journal, Inc.**

5. Defendant Las Vegas Review-Journal, Inc. (the "Review-Journal"), is a Delaware corporation doing business in the State of Nevada. Upon information and belief, the Review-Journal is a wholly owned subsidiary of News+Media Group LLC ("News+Media"). The Review-Journal operates and publishes the Review-Journal daily print newspaper in Clark County, Nevada. The Review-Journal began as a daily newspaper publication in 1929, under the name, "Las Vegas Evening Review-Journal." It is the longest running daily newspaper in Las Vegas.

6. Today the Review-Journal is known as a right-leaning newspaper that mirrors the conservative views and personal business interests of its owners, casino magnate Sheldon Adelson and the Adelson family. The Review-Journal was the one of only two of the largest 100 newspapers in the country to endorse Donald J. Trump for President in 2016.

**Defendant News+Media Capital Group LLC**

7. Defendant News+Media Capital Group LLC ("News+Media") is a Delaware limited-liability company, doing business in the State of Nevada. News+Media acquired the Review-Journal on December 10, 2015, from New Media Investment Group Inc. for $140 million. As part of the transaction, New Media Investment Group Inc.'s subsidiary, GateHouse Media LLC ("GateHouse"), agreed to continue operating the Review-Journal under a management agreement. The management agreement ended within only six weeks after the acquisition, when the Review-Journal hired a new publisher to replace the one under the GateHouse management agreement.

- 6 -

8.      News+Media continues to operate as the parent company to the Review-Journal, its subsidiary. Upon information and belief, News+Media does not have any employees who are not also co-employed by the Review-Journal. News+Media has one member: Orchid Flower LLC, which is wholly owned by The Orchid Trust, whose Trustees are Dr. Miriam Adelson, Defendant Dumont, and Sivan Ochshorn-Dumont.

9.      News+Media is managed solely by Stephen O'Connor, who also holds all corporate positions with the Review-Journal. O'Connor is the Chief Financial Officer of Interface Group Massachusetts, which owns Defendant Interface Operations LLC dba Adfam ("Adfam"), an entity whose sole purpose is to benefit and promote the business and personal interests of the Adelson family. In his role with Adfam, Mr. O'Connor works with and directs employees under the Adfam umbrella.

**Defendant Sheldon Adelson**

10.      Defendant Sheldon Adelson (now substituted with the Estate of Defendant Sheldon Adelson), was a resident of Nevada. In 2019, Adelson was the 24th richest person in the world,[7] and the billionaire founder, chairman, and chief executive officer of the Las Vegas Sands Corporation (the "Sands"). The Sands owns and operates luxury hotels and casinos, including the Venetian Las Vegas and The Palazzo Las Vegas, among others. Mr. Adelson, his family members and trusts, and other entities established for the benefit of Mr. Adelson and/or his family members, own[ed] approximately 56% of the Sands' outstanding common stock as of December 31, 2018. As a result, "Mr. Adelson exercise[d] significant influence over the [Sands] business policies and affairs."[8] Adelson, now through his Estate, is sued as an individual and as the alter ego of News+Media, the Review-Journal, and Adfam.

11.      Upon information and belief, Mr. Adelson, his family members and trusts, and other entities established for the benefit of Mr. Adelson and/or his family members, own News+Media and the Review-Journal. As he did with the Sands properties, Mr. Adelson exercised significant

---

[7] https://www.forbes.com/billionaires/#2add0a251c71, last visited Sept. 24, 2019.
[8] https://s21.q4cdn.com/635845646/files/doc_financials/2018/annual/Annual-Report-2018.pdf, at p. 27, last visited Sept. 24, 2019.

- 7 -

influence over the RJ's business policies and affairs, including its editorial content. For example, until his death, Mr. Adelson was secretly "co-employed" by Las Vegas Review-Journal, Inc., and News+Media as "Co-Publisher" of the Review-Journal, which afforded Mr. Adelson the unfettered right:

> to confer with and provide editorial advice and assistance) as appropriate, to the President and Publisher and other editorial employees and contributors to the Las Vegas Review-Journal (the "Newspaper") concerning the direction of the Newspaper, topics for day-to-day or investigative or other coverage by the Newspaper and, from time to time, published or unpublished information obtained or prepared in gathering, receiving or processing information for communication by the Newspaper to the public, including the sources for and reliability of the information.

For pretense only, Mr. Adelson was given a nominal annual salary of $2,000. Despite his unfettered control and authority over the Review-Journal, Mr. Adelson was never disclosed to the public on the Review-Journal's masthead or otherwise in the Newspaper.

12.     Adelson was well-known for his record-breaking donations to Republican political candidates and causes and "established himself as an influential figure in American politics with the amount of money that he has contributed."[9] Forking over $30 million, Adelson was the largest donor to Donald Trump's presidential campaign in 2016 and of the entire presidential election. Adelson gave more than $100 million to support the Republican party in the 2018 midterm elections, and in 2020 set a new donation record in a single election cycle, giving $172.7 million. Adelson's surviving family continued his donor legacy by donating over $100 million to a pro-Trump Super PAC in 2024, a top political donation.[10]

**Defendant Patrick Dumont**

13.     Defendant Patrick Dumont, an individual, is a resident of Nevada and is an officer and owner of Defendant News+Media. He is also an employee of both the Review-Journal and

---

[9]   https://www.theguardian.com/us-news/2018/jun/08/sheldon-adelson-trump-middle-east-policy, last visited Sept. 24, 2019.

[10] https://www.politico.com/live-updates/2024/10/15/2024-elections-live-coverage-updates-analysis/miriam-adelson-donations-trump-super-pac-00183805, last visited Feb. 27, 2026.

- 8 -

News+Media, and, upon information and belief, the Deputy Publisher of the Review-Journal. Dumont, a trustee of The Orchid Trust (the entity that ultimately owns News+Media), speaks as the primary voice for all trustees on issues related to the Review-Journal. The former executive vice president and Chief Financial Officer of the Sands, as of January 2021, Dumont became the President and Chief Operating Officer of the Sands and a member of its Board of Directors. Dumont is the son-in-law of Sheldon Adelson and "orchestrated" the Adelson family's purchase of the Review-Journal, under the direction of Adelson.

### Defendant Interface Operations LLC dba Adfam

14.    Defendant Adfam is a Delaware limited liability company doing significant business in the State of Nevada (Adfam, together with Adelson, News+Media, the Review-Journal, and Dumont are referred to as the "RJ" or "Defendants").

15.    Adfam was founded by Adelson and operates as the private family office of Dr. Miriam and Sheldon G. Adelson and their family. Adfam provides professional services to support the Adelson family and members' personal and business interests, including the Review-Journal and News+Media.

16.    Mr. Adelson and his family members, including Dumont, use Adfam as a tool to exercise significant corporate, strategic, and day-to-day control over the Review-Journal.

17.    Upon information and belief, Adelson and Dumont appointed the family office's long-time Chief Financial Officer, Steven O'Connor, to serve as the only corporate officer of the Review-Journal, *i.e.*, its President, Secretary, Treasurer, and Director. Likewise, Mr. O'Connor is the sole manager of News+Media. O'Connor is not a "newspaper person," does not have any newspaper industry experience, and did not build his career in the newspaper business. He is employed strictly by the family office and does not receive compensation for services rendered for or on behalf of the Review-Journal from the Review-Journal or News+Media.

18.    Adfam shares such a unity of interest and decision-making with Defendants Review-Journal and/or News+Media, that they function as a single economic unit. In the alternative, Adfam

- 9 -

116312629.2
ClarkHill\105559\1015963\286715632.v1-3/2/26

APP0202

is an entity sufficiently separate and distinct as an economic unit from Defendants the Review-Journal and/or News+Media such that they operate as separate decision-makers.

**Doe Defendants**

19.    The Sun alleges that Defendants named herein as Does I through X are individuals, corporations, limited-liability companies, partnerships, associations, or other persons or entities who are responsible in some manner or capacity for the acts alleged herein, but whose names are unknown to the Sun at this time. The Sun will seek leave to amend this Complaint to include the names of Does I through X when the identities of such defendants become known to the Sun.

**JURISDICTION, VENUE, AND INTERSTATE COMMERCE**

20.    This action is brought under Sections 4 and 16 of the Clayton Antitrust Act, 15 U.S.C. §§ 15, 26, for damages and for injunctive relief for Defendants' monopolization, attempted monopolization, and conspiracy to monopolize the relevant market of English-language local, daily print newspapers in Clark and Southern Nye Counties, Nevada, in violation of Sections 2 and 1 of the Sherman Act, 15 U.S.C. §§ 2, 1, and Nevada's Unfair Trade Practice Act, NRS Chapter 598A, and for injunctive relief to prohibit the unlawful elimination and/or acquisition of the Sun by the RJ.

21.    This Court has subject matter jurisdiction of the federal antitrust claims asserted in this action under Sections 4 and 16 of the Clayton Act, 15 U.S.C. Sections 15, 26, and 28 U.S.C. Sections 1331 and 1337. This Court has supplemental jurisdiction over the Sun's claim arising under Nevada's Unfair Trade Practice Act pursuant to 28 U.S.C. Section 1367.

22.    Defendants reside in or maintain offices, transact business, and own substantial assets in this District. Accordingly, this Court has personal jurisdiction over Defendants. Because Defendants transact business in this judicial district, venue is proper pursuant to 15 U.S.C. Sections 15, 22 and 26, and 28 U.S.C. Section 1391.

23.    Both the Review-Journal and the Sun publish substantial quantities of local, state, national, and international news. The parties both pay substantial sums for such news and for material sent to them from various parts of the United States and the rest of the world. The

116312629.2
ClarkHill\105559\1015963\286715632.v1-3/2/26

APP0203

Newspaper Bundle carries substantial quantities of national advertising sent to them from throughout the United States. In addition, purchases of materials to publish the Newspapers, including paper and ink, involve transactions in interstate or foreign commerce. Thus, Defendants' violations of the antitrust laws involve and affect interstate commerce.

## FACTUAL BACKGROUND AND HISTORY

### The Newspaper Preservation Act of 1970

24.     In response to the Supreme Court's decision in *Citizen Publishing Co. v. United States*, 394 U.S. 131 (1969) (which held that a joint newspaper operating agreement that fixed prices, pooled profits under an inflexible ratio, and divided the fields of publication violated antitrust laws), Congress enacted the Newspaper Preservation Act, 15 U.S.C. §§ 1801-04 (the NPA), in 1970. In so doing, Congress determined that the public interest in preserving multiple independent editorial voices was best served by permitting joint newspaper operations in the same market. While the NPA exempts newspapers in a JOA from some provisions of the antitrust laws, it expressly excludes conduct that would otherwise be unlawful under any antitrust law if engaged in by a single entity from antitrust immunity. 15 U.S.C. § 1803(c).

### 1989 Joint Operating Agreement

25.     By the late 1980s, the Sun had been operating at a substantial loss and was in probable danger of financial failure. To ensure the continued publication of two separate and independent daily newspapers in Las Vegas, in June 1989, the Sun and the Review-Journal's prior owners voluntarily entered into a 50-year Joint Operating Agreement (the "1989 JOA"), to combine all non-editorial and -reportorial operations pursuant to the NPA, with the intention that the joint operation would continue until December 31, 2040 (with the possibility of renewal). *See* 1989 JOA, Prelim. Statement & § 1.2.

26.     The Sun and the RJ were explicit as to the significant purpose of their combination. They expressed their firm belief that the "continued publication of at least two newspapers of general circulation, editorially and reportorially separate and independent, is of paramount

- 11 -

importance to the citizens of Las Vegas and its environs." *Id.* at Prelim. Statement. Their belief reflected Congress's purpose in enacting the NPA:

> In the public interest of maintaining a newspaper press editorially and reportorially independent and competitive in all parts of the United States, it is hereby declared to be the public policy of the United States to preserve the publication of newspapers in any city, community, or metropolitan area where a joint operating arrangement has been heretofore entered into because of economic distress or is hereafter effected in accordance with the provisions of this chapter.

15 U.S.C. § 1801.

27.     In further conjunction with this express public policy, the parties reiterated the importance of preserving their respective editorial and reportorial independence and autonomy as "the *essence*" of their agreement. 1989 JOA § 5.2 (emphasis added). They mandated that the parties "shall have exclusive and complete control, authority and direction" over their respective "news and editorial content, [and] features and services." *Id.* The "public interest of maintaining editorially and reportorially independent and competitive newspapers in Las Vegas and its environs" was so imperative, they included specific performance as an express remedy. *Id.* § 10.8.

28.     The Sun and RJ agreed that merging non-editorial and -reportorial operations under the RJ's stewardship would preserve the Sun as a distinct newspaper voice:

> The parties further believe that publication of the Sun c[ould] be carried on profitably, and its continued editorial existence and independence thereby assured, if its production, distribution and advertising functions and related non-news and non-editorial activities are conducted and performed by the Review-Journal, through a single staff of Review-Journal employees utilizing the Review-Journal's plant and equipment under a joint newspaper operating arrangement . . . , under which the Review-Journal will act on its own behalf with respect to the Las Vegas Review-Journal and on behalf of the Sun with respect to the Las Vegas Sun.

*Id.* at Prelim. Statement.

29.     The parties' combination aligned with Congress's delineation of a proper arrangement under the NPA; that is, to merge production facilities and joint operations for the: "printing; time, method, and field of publication; allocation of production facilities; distribution;

- 12 -

advertising solicitation; circulation solicitation; business department; establishment of advertising rates; [and] establishment of circulation rates and revenue distribution." 15 U.S.C. § 1802(2).

30.  The Sun consented and the RJ voluntarily agreed that the RJ would be responsible for and in control of all business aspects of the joint operation, including: "control[ling], supervis[ing], manag[ing] and perform[ing] all operations involved in managing and operating" the joint operation (1989 JOA § 5.1); acting on behalf of both Newspapers (*id.* at Prelim. Statement); printing and producing the Newspapers, using the RJ's printing plant, employees, and equipment (*id.*; *id.* §§ 4.3, 5.1); sales and distribution (*id.* § 5.1); purchasing newsprint, materials, and supplies (*id.*); soliciting, selling, and collecting on the Newspapers' advertising and circulation (*id.*; *id.* § 5.1.3); promoting and circulating the Newspapers, using the RJ's "best efforts" (*id.* §§ 5.1, 5.1.3-.4); establishing advertising and circulation rates for the Newspapers (*id.* § 5.1); paying, recording, and maintaining all expenses and revenues of the joint operation (*id.* §§ 6.1, 6.2); accounting to the Sun after the close of each fiscal year (*id.* § 6.3); and distributing the Sun's share of the joint operation's profits, derived from all advertising and circulation revenues of the Newspapers and sales incidental to the publication of the Newspapers or involving the Review-Journal's facilities or personnel. *Id.* § 6.4. "So long as [the] Sun furnish[ed] news and editorial copy, features and services to [the] Review-Journal in accordance with Article 4" (setting forth the technical specifications for publishing), the RJ "agree[d] to produce the Sun" and "include the Sun copy and features in jointly published newspapers ... and to sell all advertising for, promote and circulate such newspapers." *Id.* § 5.1. Because of the RJ's complete control over the joint operation, the Sun also had the right to inspect the Review-Journal's books and records for the joint operation's finances and profit payments. *See id.* § 10.3.

31.  For the format of the Newspapers, the RJ voluntarily agreed to produce the Sun as an afternoon newspaper and the Review-Journal as a morning newspaper, with the Newspapers being published in a joint edition bundle on weekends, holidays, and special editions. *Id.* § 4.4 &. App'x A.2. The joint edition included the Sun within the sections of the Review-Journal and featured both the Sun and the Review-Journal on the front-page nameplate and on all folios. *Id.*

- 13 -

32.     Regarding their profit sharing from the joint operation, the parties agreed that the RJ would receive 90% and the Sun would receive 10%. *Id.* § 6.4 & App'x D.

33.     The Sun also received an allocation for its news and editorial expenses in the amount of 65% of the Review-Journal's news and editorial expense allocation, "subject to a minimum of Two Million Two Hundred Fifty Thousand Dollars ($2,250,000) per fiscal year, . . . ." *Id.* at App'x A § A.1.

34.     With respect to each Newspaper's promotional activities expenses, "the Review-Journal shall establish for each fiscal year after the Effective Date a budget for promotional activities of the Review-Journal and the Sun and at least forty percent (40%) of each total budget shall be allocated to the Sun." *Id*. at App'x A § A.3.

35.     As a result of their combination and "[t]o enable Review-Journal to perform its functions" as manager and controller of the joint operation, the Sun was required to dispose of or relinquish its equipment (including its printing press), supplies (including its newsprint, newsracks, and production film), contracts (including for circulation, supplies, and advertising), and all other non-editorial and -reportorial infrastructure that would allow the Sun to publish and distribute its Newspaper independently. *Id.* at Art. 3. The Sun therefore became entirely dependent on the RJ for the Sun's continued printing, distribution, and operation. As such, the Sun relied on the RJ to use its best efforts in managing and controlling the joint operation, for the benefit of both Newspapers. *Id.* §§ 5.1.3, 5.1.8, § 5.3. The 1989 JOA was binding upon and inured to the benefit of the parties and their successors and assigns. *Id.* § 10.9.

36.     As additional consideration for their combination, and in exchange for the ability to remain in publication until at least December 31, 2040, the Sun was required to assign a percentage of all dividends and distributions of CCTV stock to the RJ. *Id.* § 10.5.

37.     The parties sought to avail themselves of the limited antitrust exemption for their combined operations offered by the NPA, and thus agreed "to pursue diligently the filing of the application for approval of th[e 1989 JOA] to the Department of Justice and to use their best efforts

- 14 -

to take all action necessary to obtain such written consent as expeditiously as possible within the procedures set forth in applicable regulations of the Department of Justice." *Id.* § 1.1.

38.    Upon execution of the 1989 JOA, they jointly applied for Attorney General approval pursuant to Section 1803(b), governing agreements "not already in effect." 15 U.S.C. § 1803(b).

39.    The parties followed the NPA's Regulations' application procedures. They provided the required documents to the DOJ and published notice of their application in their Newspapers.

40.    The DOJ published the parties' application in the Federal Register, and thoroughly investigated the 1989 JOA and the parties' separate businesses. It issued civil investigative demands, conducted interviews, and received public comment.

41.    The purpose of the DOJ's investigation was to determine whether the 1989 JOA met the requirements of 15 U.S.C. Section 1083(b), *i.e.*, "(1) that at least one of the participating newspapers is a 'failing newspaper,' and (2) that approval of the arrangement would 'effectuate the policy and purpose' of the [NPA]."

42.    The DOJ found that the Sun's losses were "genuine" and satisfied the "failing newspaper test." In determining if the arrangement served the purpose of the NPA, the DOJ examined whether, under the 1989 JOA, "as a practical matter, the failing newspaper will remain capable of maintaining independent reporting and editorial activities after the JOA goes into effect."

43.    The DOJ concluded that the 1989 JOA provided the Sun "sufficient operating guarantees" "to enable it to continue to provide an independent reportorial and editorial voice in the Las Vegas community," despite that the RJ would be "responsible for and have ultimate decision-making authority with respect to advertising and circulation rates, printing functions, managerial services, and all other functions of both newspapers except for news and editorial functions."

44.    Because the RJ could not unilaterally revise or reduce the Sun, and could not interfere with the Sun's editorial and reportorial autonomy (among other Sun protections), and the arrangement afforded the Sun additional protections, the DOJ found that the 1989 JOA "[w]as designed to allow the parties to continue to produce separate and independent editorial products,

- 15 -

116312629.2
ClarkHill\105559\1015963\286715632.v1-3/2/26

thereby effectuating the purpose of the [NPA]," further expressly recognizing the parties' "joint edition" publication "on Saturday, Sunday and holidays."

45.    Since the 1989 JOA satisfied the two requirements of Section 1803(b), the DOJ recommended the Attorney General approve it.

46.    The Attorney General adopted the DOJ's recommendation and granted its written approval of the 1989 JOA. In doing so, the Attorney General restated that the "proposed JOA is intended to combine the business operations of the two newspapers, while preserving the newspapers' editorial and reportorial independence." It noted the parties' "joint edition on Saturdays, Sundays, and holidays," and focused on the parties' intent and agreed-upon undertakings to: "combine the business operations" (with the Review-Journal bearing responsibility for "the management, printing, and other commercial functions of the newspapers"); share the profits from the joint operation 90/10; and "preserv[e] their respective editorial and reportorial independence," further maintaining separate staff, editors, and reporters. After concluding that the Sun was a "failing newspaper," the Attorney General agreed that the 1989 JOA would effectuate the policy and purpose of the NPA by "preserv[ing] the Sun in operation . . . as a second editorial voice." The Attorney General entered its written opinion of approval without an evidentiary hearing.

47.    The Attorney General concluded that the Sun was a "failing newspaper" and that approval of the 1989 JOA would effectuate the policy and purpose of the NPA by "preserv[ing] the Sun in operation . . . as a second editorial voice." The Attorney General approved the 1989 JOA without an evidentiary hearing.

48.    The Sun became profitable under the 1989 JOA. And the parties operated under that framework for 16 years, with the Sun's continued dependence on the joint operation and the RJ's control and management thereof.

**The 2005 Amended and Restated Joint Operating Agreement**

49.    In 2005, the Sun remained without infrastructure to independently print, publish, or distribute its Newspaper. The Sun was facing economic pressure and the RJ sought to amend the

- 16 -

1989 JOA. They entered into the Amended and Restated [Joint Operating] Agreement (the "2005 JOA") on June 10, 2005.

50. Based on existing caselaw throughout the country and over 30 years of the DOJ's, NPA lawyers', and JOA newspapers' practice, both parties believed that the 2005 JOA would be valid and enforceable upon submission of the amendment to, and absent an enforcement action by, the DOJ.

51. Thus, to maintain the immunity afforded by their original combination, and at the advice of the parties' counsel (who were NPA and former DOJ antitrust lawyers), the Sun and RJ agreed to continue their original combination in all material respects, which were the focus of the DOJ and Attorney General's approval 15 years prior. The parties tracked the 1989 JOA as closely as possible. And the RJ remained in complete control over, and continued bearing all responsibility for, the non-editorial and -reportorial aspects of the joint operation and the Sun.

52. Under the 2005 JOA, the parties voluntarily continued the 50-year term of the 1989 JOA, intending their joint operation to run to December 31, 2040 (with the possibility of renewal). 2005 JOA § 1.2.

53. As they agreed in 1989, the parties reaffirmed their commitment to the public interest in remaining editorially independent, as required by the NPA and the Attorney General, repeating the importance of preserving their respective editorial and reportorial independence and autonomy, stating, "Preservation of the news and editorial independence and autonomy of both the Review-Journal and the Sun is of the *essence* of this restated agreement." 2005 JOA § 5.2 ("News and Editorial Autonomy"). They again mandated that the parties "shall have exclusive and complete control, authority and direction" over their respective "news and editorial content, [and] features and services." *Id.* They reiterated that, "[b]ecause of the public interest in maintaining editorially and reportorially independent and competitive newspapers in Las Vegas and its environs," specific performance was an available remedy. *Id.* § 10.8.

54. The parties' ongoing combination remained in alignment with Congress' specifications of a proper arrangement under the NPA, *i.e.*, undertaking joint operations for the:

- 17 -

"printing; time, method, and field of publication; allocation of production facilities; distribution; advertising solicitation; circulation solicitation; business department; establishment of advertising rates; [and] establishment of circulation rates and revenue distribution." 15 U.S.C. § 1802(2).

55. Their ongoing combination remained in alignment with Congress' specifications of a proper arrangement under the NPA, *i.e.*, undertaking joint operations for the: "printing; time, method, and field of publication; allocation of production facilities; distribution; advertising solicitation; circulation solicitation; business department; establishment of advertising rates; [and] establishment of circulation rates and revenue distribution." 15 U.S.C. § 1802(2).

56. Operating under the same material framework approved by the Attorney General in 1989, the RJ would still be responsible for and in control of all business aspects of the joint operation, including: "control[ling], supervis[ing], manag[ing] and perform[ing] all operations involved in managing and operating" the joint operation (2005 JOA § 5.1); acting on behalf of both Newspapers (*see generally* 2005 JOA); printing and producing the Newspapers, using the RJ's printing plant, employees, and equipment (*id.* §§ 4.3, 5.1); sales and distribution (*id.* § 5.1); purchasing newsprint, materials, and supplies (*id.* § 4.3); soliciting, selling, and collecting on the Newspapers' advertising and circulation (*id.* §§ 5.1, 5.1.3); promoting and circulating the Newspapers, using "commercially reasonable efforts to maximize the circulation of the Newspapers" and the same efforts to "promote the Newspapers" (*id.* §§ 5.1, 5.1.3-.4); establishing advertising and circulation rates for the Newspapers (*id.* § 5.1); paying, recording, and maintaining all expenses of the joint operation (*id.* at App'x D); accounting to the Sun after the close of each fiscal year (*id.*); and distributing the Sun's share of the joint operation's profits, derived from all advertising and circulation revenues of the Newspapers, and sales incidental to the publication of the Newspapers or involving the Review-Journal's facilities or personnel. *Id.* Just as they agreed in 1989, "[s]o long as the Sun furnish[ed] news and editorial copy, features and services to the Review-Journal in accordance with Article 4" (setting for the technical specifications for publishing), the RJ would "produce the Sun" and "include the Sun copy and to sell all advertising for, promote and circulate such newspapers." *Id.* § 5.1. Because of the RJ's continued control over the joint operation,

- 18 -

the Sun retained rights to examine (and also audit) the Review-Journal's books and records. *Id.* at App'x D.

57. In order to further reduce the joint operation's production and distribution costs, the parties elected to print and distribute the Newspapers on a daily basis in a joint edition like they had been doing for nearly 15 years on weekends, holidays, and special editions (the Newspaper Bundle). *Id.* at App'x A.2-.4. And, like before, the Newspaper Bundle included the Sun within the sections of the Review-Journal and continued to feature both the Sun and Review-Journal on the front page. *Id.* § 5.1.

58. To maintain visibility of the Sun and promote its branding in the Newspaper Bundle, the RJ voluntarily agreed to publish a box above the Review-Journal's nameplate containing a "noticeable mention" with the Sun's logo and a headline promoting the Sun's lead story (the "Sun Box"). *Id.* at App'x A.2-.4.

59. The parties agreed as follows:

> The Monday-Sunday editions of the Review-Journal shall include a noticeable mention of the Sun, on the front page of the Review-Journal. The noticeable mention will appear in a box above the Review-Journal's masthead (the "Sun Box") and shall be in the form shown on Appendix B. The Sun Box shall not be smaller in proportion than shown in Appendix B. The Sun Box shall also include the Sun's masthead, and any emblem that is part of the Sun's masthead. The Sun Box shall include a promotion of a story in the Sun and refer readers to the Sun inside. The type face, editorial artwork, font, and editorial promotional content appearing in the Sun Box shall be determined by Sun, in its sole discretion. Any color in the Sun Box shall be restricted to constituent colors used by the Review-Journal on its front page. The Sun Box shall be the left-hand box unless it would be obscured by a spaeda fold, in which case the Sun Box shall be the right-hand box. In the event of major breaking news or for exigent production circumstances, the Sun Box may be moved below the Review-Journal's masthead. The Sun, on average, will receive as much editorial color as the local news section of the Review-Journal.

*Id.* at App'x A.2(d). The RJ had physical control over publishing the Sun Box along with the rest of the Newspaper Bundle.

- 19 -

116312629.2
ClarkHill\105559\1015963\286715632.v1-3/2/26

60. The RJ also remained in control of promoting the Sun in other respects, as it had since 1989. In contemplation of the Newspaper Bundle, the RJ agreed to market and promote the Sun using commercially reasonable efforts to maximize the circulation of both Newspapers. *Id.* § 5.1.4. The RJ agreed to include the Sun in equal prominence to the Review-Journal in the RJ's promotional material and activities:

> 5.1.4 Promotional Activities. Review-Journal shall use commercially reasonable efforts to promote the Newspapers. Any promotion of the Review-Journal as an advertising medium or to advance circulation shall include mention of equal prominence for the Sun. Either the Review-Journal or Sun may undertake additional promotional activities for their respective newspaper at their own expense. For all promotional activities for the Newspapers paid for by the Review-Journal, the Review-Journal shall be responsible for all promotional copy preparation and placement, provided however, that the Sun shall have the right to approve all promotional copy for the Sun that does not generically and concurrently promote both Newspapers.

*Id.* This ensured that Sun's brand remained as visible and robust as the Review-Journal's.

61. In similar vein, to account for the new electronic replica edition created after 1989, and controlled by the RJ, the RJ also voluntarily agreed that the Sun would be a part of the electronic replica edition of the Newspapers distributed to consumers. The 2005 JOA, in part, provides:

> Review-Journal shall have the exclusive right and obligation to distribute the Sun through electronic replica technology (i.e. technology customarily used by metropolitan daily newspapers which transmits an entire Sun page to the subscriber or consumer in any form) to the same extent the Review-Journal distributes its own pages by such means provided.

*Id.* § 10.6.

62. The Sun and the RJ further intended that each would "bear their own respective editorial costs," and "maintain a staff of news and editorial employees." *Id.* §§ 4.2, 4.1.

- 20 -

63. As before, the parties continued sharing in the joint operation's profits. They agreed that the "Sun shall receive an annual profits payment" that shall be paid monthly in advance of the first day of each month during the term of the agreement. The amount of subsequent Annual Profits Payments would fluctuate in direct correlation with the amount of the joint operation EBITDA. These payments are the only source of revenue for the Sun's newsroom. Similar to the 90/10 split under the 1989 JOA, the Sun's profit share for each year under the 2005 JOA formula approximated 9.87 percent of the previous year's reported joint operation EBITDA.

64. Between 2005 and 2015, the Annual Profits Payments to the Sun had been as much as $12 million per year, and never less than $1.3 million per year.

65. Moreover, if the RJ determined that "the Sun's continued placement in the Review-Journal has a material and substantial negative financial impact on the revenue and profit of the Newspapers it may deliver the Sun separately from the Review-Journal but at the same time, place, and manner as the Review-Journal" with 15 days' notice of the RJ's intent to change the manner in which the RJ publishes the Sun. The RJ agreed that the Sun could arbitrate the RJ's notice, at which time the arbitrator's decision would be limited to determining whether the Sun's inclusion in the Newspaper Bundle had a material and substantial negative financial impact. *Id.* at App'x A.5. "[O]nly the following factors shall be considered[ in making that determination:] advertiser abandonment of the Newspapers specifically due to the Sun's inclusion within the Review-Journal or subscriber cancellations of the Newspapers specifically due to the Sun's inclusion within the Review-Journal." *Id.*

66. Having agreed to the terms of the 2005 JOA, and having already received Attorney General consent for their combination in 1989, the Sun and the RJ followed all procedures and practices confirmed by existing caselaw, the DOJ, NPA lawyers, and JOA newspapers, to ensure that their joint operation under the 2005 JOA was valid, lawful, and enforceable.

67. Accordingly, as their 2005 JOA was an amendment to their previously approved, post-1970 JOA, the Sun and the RJ "agree[d] to file the Restated Agreement" with the DOJ. *Id.* § 1.1.

- 21 -

68.    Had the parties known or believed that they were required obtain Attorney General consent under the NPA for their amendment, they would have applied for that consent in accordance with the DOJ Regulations like they had with the 1989 JOA.

69.    The RJ again covenanted "to use [its] best efforts and take all action necessary to effect the intent of this Restated Agreement" in this process. *Id*. It reaffirmed the same obligation when "agree[ing] to take all corporate action necessary *to carry out and effectuate the intent, purposes* and provisions of th[e] Restated Agreement, and to cooperate with the [Sun] in every reasonable way that will promote *the successful **and lawful** operation* under this Restated Agreement for both parties." *Id.* § 5.3 (emphasis added). The RJ was to bear all fees and costs of post-submission proceedings connected to "seeking any required approval by the Department of Justice" from and after the filing of the 2005 JOA. *Id.* § 1.1.

70.    The parties also included a contingency provision in the 2005 JOA to ensure that their joint operation would sustain to 2040:

> In the event of any action by the United States Department of Justice after the filing of the Restated Agreement which, in the sole opinion of either party hinders, impairs, seeks to halt or otherwise materially impacts this Restated Agreement, then either party may declare the Restated Agreement null and void, and the 1989 Agreement between the parties shall be reinstituted and remain in full force and effect.

*Id.*

71.    On June 15, 2005, the parties submitted the 2005 JOA to the DOJ for review and investigation. The DOJ accepted the filing and thoroughly investigated the amendment. Like before, the DOJ focused on whether the 2005 JOA preserved the Sun's as a separate and independent editorial and reportorial voice in the community. The RJ represented to the DOJ that the RJ could not unilaterally terminate the 2005 JOA and that the Sun had exclusive control over its content.

72.    The DOJ closed its investigation without an enforcement action. It explained that only the ancillary conduct "***not integral*** to the parties' ***revised*** arrangements for the ***joint***

- 22 -

*distribution of the Review-Journal and the Sun*, the effects of which we reviewed as part of our investigation—remain[ed] subject to antitrust scrutiny."

73. Based on the existing law and practice, the parties understood that this "no action letter" confirmed that the DOJ was not bringing an enforcement action and allowed the parties to operate under the 2005 JOA. No one believed the DOJ's letter hindered or otherwise impaired the joint operation.

74. For nearly 15 years, the parties believed that the 2005 JOA was lawful and enforceable under the NPA. They, along with the rest of the country, believed that they followed the proper procedures under the NPA.

75. However, at the behest of the RJ, on August 5, 2025, the Ninth Circuit entered its Opinion diverging from half a century of caselaw, DOJ Regulations, and practice. After the parties had been operating under and relying on the 2005 JOA for 20 years, the Ninth Circuit concluded that the 2005 JOA was unenforceable under Section 1803(b) of the NPA due to lack of Attorney General approval. *See Las Vegas Sun v. Adelson*, 147 F.4th 1103 (9th Cir. 2025).

## NATURE OF TRADE AND COMMERCE

### Relevant Product Market

76. English-language, local, daily print newspapers are recognized by the industry, courts, the DOJ, and the public as a separate economic entity. Newspapers have peculiar characteristics and uses, comprising of a unique bundle of characteristics that readers value, not possessed by other media. They supply readers with a mix of national, state, and local news, sports information, commentary, and opinion, among other features like local event calendars, movie and television listings, classified and commercial advertisements, legal notices, comics, syndicated columns, and obituaries. Newspapers offer content in a timely manner and in a convenient, portable, hardcopy format, allowing the reader to read the news, advertisements, and other information at his/her own convenience without the need to use an electronic device to access content. Local newspapers are able to offer news stories with more in-depth coverage than the news reported by radio or television, and they cover a wider array of topics of interest to local readers—not just

- 23 -

breaking news and major news stories of the day. Newspapers are also inexpensive, meaning there are virtually no socio-economic barriers for citizens to have access to news and information about their community, including those who are unable to afford internet services. Additionally, they have unique production facilities in that they are created, placed in a template, and printed by a newspaper printing press, which is distinct from other types of media. Newspapers are platforms that serve multiple, distinct sets of customers, including older readers, and advertisers, which have been recognized by both economists and courts. Newspapers are priced distinctly when compared to other media, particularly in that newspapers have a price and many other news media are free. They have specialized vendors in the form of their home delivery network. Most readers of local, daily print newspapers in Clark and Southern portions of Nye Counties do not consider weekly newspapers, radio news, television news, internet news, or any other media to be adequate substitutes for the only two local daily newspapers serving Las Vegas and the surrounding areas. There is a low cross-elasticity between the Newspapers and other media products.

77.     Thus, English-language, local, daily print newspapers are a distinct relevant product market and line of commerce within the meaning of Section 2 of the Sherman Act and Section 7 of the Clayton Act.

**Relevant Geographic Market**

78.     The Sun and the Review-Journal are produced, published, and distributed to readers in or near Clark County, and Southern portions of Nye County, Nevada (together, "Clark County"). Both Newspapers provide news relating to Clark County, in addition to state, national, and international news. These two organizations gather Clark County news to include in their print Newspapers as well as their associated news websites.

79.     English-language, local, daily print newspapers that are not produced, published, and distributed in Clark County do not regularly provide local news specific to that county. Local, daily print newspapers from outside of Clark County do not have any significant circulation or sales inside Clark County. Thus, English-language, local, daily print newspapers serving areas outside of Clark County are not acceptable substitutes for the Sun and the Review-Journal.

- 24 -

80.    Accordingly, Clark County, Nevada, is the relevant geographic market and section of the country for antitrust purposes under Sections 2 and 1 of the Sherman Act. This relevant geographic market, together with the relevant product market defined above, is referred to as the "Newspaper Market."

**Market Power**

81.    The Newspapers have been published and distributed under the framework of their original combination and their continued practice under the 2005 JOA since 1989. By virtue of the parties' original combination approved by the Attorney General in 1989, the Review-Journal and the Sun together account for 100% of the newspaper circulation in the Newspaper Market today. As of September 2019, the Newspaper Bundle that includes the Review-Journal and the Sun had a paid circulation for Sunday of 86,593 and an average daily (non-Sunday) paid circulation of 67,514. Since 1989, the Sun has been operationally and economically dependent on the joint operation, which is exclusively controlled by the RJ. 1989 JOA § 5.1; 2005 JOA § 5.1. The Sun has neither printing facilities nor a newspaper distribution network, among other assets and infrastructure necessary to operate a newspaper. Terminating the joint operation would immediately destroy the Sun because of the large startup costs and inability to reach a financially viable scale.

82.    The RJ has had exclusive and unilateral control over the prices charged by the RJ and its sole competitor (the Sun) spanning back to 1989. 1989 JOA § 5.1; 2005 JOA § 5.1. The Sun has no ability to set prices, and no control over subscription sales and circulation.

83.    In the past, the RJ has substantially raised the price of the Newspaper Bundle but has seen little effect on circulation levels, and those large price increases were profitable for the RJ.

84.    The RJ also has the ability to exercise direct control over the Sun's output, and exercises direct control over the Sun's payments. In addition to controlling overall pricing and marketing of the Newspaper Bundle and the relative promotion of the RJ and Sun (all of which affects the Newspaper Bundle's sales and thus the Sun's output), the RJ controls the number of pages available to the Sun for news and editorial content (*i.e.*, the size of the Sun's newshole). The

- 25 -

116312629.2
ClarkHill\105559\1015963\286715632.v1-3/2/26

APP0218

Sun would need the RJ's permission and agreement to expand its output per issue. 2005 JOA § 4.3, App'x A.2.

85. Furthermore, the RJ possesses high market share, much greater than 50 percent, by all applicable measures including readership, newshole, newsroom staff, division of joint operation profits, and capacity.

86. The RJ controls inputs (*e.g.*, suitable printing facilities and a home-delivery distribution network) essential to the production of daily print newspapers in Clark County. These inputs could not be replicated by a new entrant in the Newspaper Market on commercially viable terms because it would have difficulty reaching efficient scale or density.

**Barriers to Entry**

87. Entry into the Newspaper Market is not timely, likely, or sufficient to prevent harm to competition that would result from the Sun's elimination from the market.

88. English-language, local, daily print newspapers possess large economies of scale, incurring significant fixed costs, including building or gaining access to a printing facility, establishing a distribution network, hiring reporters and editors, news gathering, and marketing the newspaper, among others, that present barriers to entry.

89. By way of example, printing presses for daily newspapers can cost more than $100 million. Any new local, daily print newspaper would require a massive printing facility, typically over 150,000 square feet, to house and store newsprint, that includes a sufficiently large loading dock capable of taking 1-ton rolls of newsprint in and feeding out thousands of printed newspapers to be distributed. There is no printing facility in the Clark County market that can efficiently and effectively print a local, daily print newspaper for a timely and reasonable distribution other than the facilities owned and controlled by the RJ.

90. By way of further example, establishment of a highly efficient distribution operation capable of circulating a newspaper across Clark County immediately after printing is complete and the corresponding need to develop a network of drivers to support home delivery presents another barrier to entry in the market.

- 26 -

91.    More generally, the capital investments required, lack of access to established distribution channels, limited market resources (consumers and advertising), constraints on consumer willingness to pay, workforce requirements, economic advantages of incumbent competitors (economies of scale and marginal costs), and competitive advantages of incumbent competitors (quality, reputation, market knowledge, and contracts) are significant barriers to entry into the Newspaper Market.

92.    No local, daily print newspaper has attempted to enter the Clark County market since the Las Vegas Valley Times (the "Valley Times") in 1975 when it converted from a weekly newspaper to a daily. The Valley Times was a small, community paper, with a maximum circulation of 10,000. That paper, which closed in 1984, was sold only in racks and never competed in a meaningful way against the Sun or the Review-Journal. The Sun is the last successful new entrant into the Newspaper Market since 1950.

93.    Further, expansion of local, daily print newspapers in areas adjacent to Clark County is not timely, likely, or sufficient to prevent the harm to competition resulting from the threatened elimination of the Sun from the market. There are no English-language, local, daily print newspapers adjacent to Clark County. The nearest English-language, local, daily print newspapers are hundreds of miles away and do not regularly provide local news specific to Clark County. Expanding into Clark County would require local, daily print newspapers in areas hundreds of miles away to expand their coverage of local news specific to Clark County, to attract local advertisers who target readers in those counties, and to expand their distribution into those counties.

**DEFENDANTS' EXCLUSIONARY CONDUCT AND ANTICOMPETITIVE SCHEME**

94.    Before the RJ acquired the Review-Journal, it undertook extensive due diligence for the purchase, where the then-owner informed the Adelson family and its team of newspaper industry consultants and operators about the 2005 JOA and the Review-Journal's obligations thereunder. The Sun and the Review-Journal had been operating under the 2005 JOA for 10 years at that point, and all believed it was the valid and enforceable, governing agreement between them.

- 27 -

116312629.2
ClarkHill\105559\1015963\286715632.v1-3/2/26

APP0220

Even then, the Adelson family and their due diligence team started looking for ways to terminate it. No one contended the 2005 JOA was unenforceable.

95.     Dumont and Adelson agreed to purchase the Review-Journal, which was inspired, in part, by their belief that the Review-Journal was a significant opportunity to influence public perception and achieve a monopoly position in the Newspaper Market. Defendants Adelson and Dumont wanted a newspaper in their hometown that reflected their conservative political views, that took favorable stances on their "passion topics" (*i.e.*, opposing the legalization of marijuana, attacking competitors of the Sands, advancing specific state legislation and amendments to the Nevada Constitution to benefit their companies, applying pressure to judges overseeing cases involving Adelson, and highlighting the Adelson family's involvement with the Oakland Raiders' planned move to Las Vegas and the Sands' convention business competitors), and that printed coverage biased in their favor of any ongoing court proceedings in which Adelson may be involved. Unlike most people, Adelson was in a financial position to buy the sympathetic press coverage he craved by acquiring a paper over which he could have complete and unfettered editorial control. To that end, Adelson, his family, and Defendants, acquired the Review-Journal on December 10, 2015.

96.     Despite advice to the contrary from retained industry experts and consultants, at first, Adelson and Dumont attempted to conceal the Adelson family's interest in the Review-Journal by naming an unknown and unqualified figurehead to lead the RJ, Michael Schroeder, so that Adelson could manipulate the content of the Review-Journal without people realizing it was being controlled. Soon after the deal closed, reporters at the newly acquired Review-Journal broke the story of his ownership. In response, the Adelson family released a statement acknowledging their new stake in the paper:

> Today we are proud to announce that the Adelson family has purchased the Review-Journal through a wholly owned fund both as a financial investment as well as an investment in the future of the Las Vegas community.

97.     One of Adelson's first actions, even before the purchase transaction closed, exerted control over the Review-Journal by ordering RJ reporters to be stationed in the courtroom of Nevada

- 28 -

District Judge Elizabeth Gonzalez. Judge Gonzalez was presiding over a high-profile wrongful termination case in which Adelson was a defendant and had issued rulings unfavorable to Adelson. Adelson's objective was to intimidate Judge Gonzalez by seating reporters in her courtroom all day long to search for dirt.

98.     Prior to the announcement of the sale, Adelson and Dumont directed Michael Schroeder to use one of Schroeder's Connecticut newspapers and write and publish an article condemning Judge Gonzalez's record, which also contained plagiarized material and fabricated quotes. Schroeder did so under the pen name Edward Clarkin. As one 20-year journalist who worked for Schroeder announced during his departure from Schroeder's newspaper, Schroeder had funneled "a terrible, plagiarized piece of garbage about the court system" into the paper, and had "used the pages of my newspaper, secretly, to further the political agenda of his master out in Las Vegas." Dumont was the point person for Schroeder's disparaging article, with Adelson weighing in. Dumont reviewed, approved, and applauded drafts sent to him by Schroeder, and, upon information and belief, reported his impressions of the article to Adelson, who was similarly pleased when the article was published.

99.     As soon as Adelson and Defendants took over the Review-Journal, and even earlier, Adelson began taking an active role in its editorial voice by weighing in on the Review-Journal's coverage in advance of its publication, holding almost daily teleconferences with then-publisher Jason Taylor. They directed Adfam lawyers to draft secret employment agreements with nominal salaries for Adelson and all trustees of The Orchid Trust (Dumont, Sivan Ochshorn-Dumont, and Dr. Miriam Adelson)—the parent of Orchid Flower LLC—under the façade of legitimacy all while guaranteeing they each had unrestrained, and undisclosed, control over the Review-Journal.

100.    Even after the Adelson family was forced to disclose their ownership interests in the Review-Journal, Adelson and Dumont continued to conceal the extent of their influence over the editorial content and operations of the Newspaper. The Review-Journal discloses in each print publication its publishers and other key employees, but it has never disclosed Adelson's or Dumont's roles as Co-Publisher or Deputy Publisher, respectively. Likewise, it has never disclosed

- 29 -

Dr. Miriam Adelson's, Sivan Ochshorn-Dumont's, or Adfam's or its employees' key roles in the Review-Journal either.

101. But just one thing, or one newspaper, stood between the Adelson family and their vision of the Review-Journal as their mouthpiece and sole editorial voice in the Las Vegas area—the Sun. The parties' original combination, and continued practice under the 2005 JOA, envisioned the continued existence and the RJ's printing and distribution of two distinct editorial voices, including when packaged in a joint edition/Newspaper Bundle, for readers in the community. The Sun often expresses attitudes that are contrary to Adelson's, and when necessary, features pieces that take direct aim at Adelson himself. On one occasion, Adelson showed Taylor a liberal column written by Brian Greenspun, and suggested that he did not want to include the Sun.

102. During negotiations for the purchase of the Review-Journal, Dumont led the due diligence team using Adfam's services, employees, and consultants, on behalf of and in collaboration with Adelson.

103. Along with Adfam's Chief Accounting Officer and other Adfam employees, Adfam retained several consultants to conduct due diligence on behalf of the Adelson family. Adfam's General Counsel advised the Adelson family on strategies regarding the parties' combination and practices under the 2005 JOA, and the Review-Journal's business performance, employment, salary information, and commercial agreements, and provided analysis and assessment of this information and the overall strengths and weaknesses of the Review-Journal. The due-diligence consultants, along with Adfam employees, including Adfam's General Counsel and Chief Accounting Officer, reported to Dumont. Upon information and belief, Adfam's lawyers ultimately determined the corporate structure of the RJ entities, including the relationship between Defendants and Orchid Flower LLC (the sole member of News+Media). After the purchase was consummated, Adfam remained, and still remains today, intimately involved with the business of the Review-Journal, including overseeing, advising on, and participating in the control of the Review-Journal's accounting and operations.

- 30 -

116312629.2
ClarkHill\105559\1015963\286715632.v1-3/2/26

APP0223

104. To maximize their influence and power in the Newspaper Market, Adelson and Dumont sought to eliminate the Sun. Believing that the 2005 JOA was valid and enforceable, before the purchase transaction closed, the RJ orchestrated and implemented a multi-faceted anticompetitive scheme to eliminate the RJ's sole competitor—the Sun—and to monopolize, attempt to monopolize, and conspire to monopolize the Newspaper Market. For its strategy, the RJ would abuse its management of and complete control over the joint operation, and therefore the Sun, by manipulating the 2005 JOA framework under which the parties had been operating for the last decade to reduce competition, harm the Sun, and harm consumers.

105. From the inception of the due diligence process, both Dumont and Adelson began exploring ways to end the joint operation, including by theorizing termination of the 2005 JOA to do so, or acquiring the Sun to eliminate the combination. In meetings held before and after Defendants' acquisition of the Review-Journal, Adelson, and his son-in law, Patrick Dumont, asked Taylor how they could get out of the JOA with the Sun, whether the Sun had to exist at all, and how they could either buy Greenspun out or get rid of the Sun. During one such meeting, Adelson asked what would happen to the Sun if there was no joint operation profit, and in other meetings continued to hypothesize about what would happen to the Sun if the RJ squeezed the Sun out of the market by eliminating its profits payments from the joint operation.

106. These discussions launched Defendants' exclusionary and anticompetitive scheme further, whereby the RJ used its power over the joint operation and the Sun—harnessed since 1989—to manipulate the framework under which both parties believed was valid and enforceable to: (1) fail to maximize the joint operation's profits to drive the joint operation into a loss and eliminate the Sun's profits; (2) abuse the RJ's control over the joint operation accounting to further reduce and eliminate the Sun's profit payments; (3) reduce the Sun's visibility and consumers' knowledge of the Sun; and (4) threatening unilateral termination of the joint operation through pretextual, sham litigation (together, "Anticompetitive Conduct").

- 31 -

APP0224

**The RJ has Wielded Its Control Over the Joint Operation, and Failed to Maximize the Joint Operation's Profits**

107.   Both newspaper owners in a JOA traditionally have strong economic interests in the success of the joint operation and the combined financial results.

108.   Since 1989, the RJ committed to the Sun—and the DOJ—that it would control and manage the joint operation in furtherance of the NPA and preservation of the Sun's competing editorial voice.

109.   This commitment included using its "best efforts" or, at minimum "commercially reasonable efforts," to maximize the Newspapers' circulation, and agreeing to take all reasonable measures to promote the successful operation of the Newspapers for the benefit of both parties. 1989 JOA §§ 5.1.3, 5.1.8, 5.3; 2005 JOA §§ 5.1.3, 5.1.4, 5.3. This commitment originated in the 1989 JOA and continued through the course of the RJ's control over all non-editorial and -reportorial functions of the joint operation, and the Sun.

110.   Especially in a declining market, newspapers have an increased incentive to generate even incremental profits.

111.   However, the RJ has used its power and control over the joint operation to exploit its dominant position and fail to maximize the joint operation's profits by failing to undertake commercially reasonable efforts to: reduce the costs of (and refrain from charging disallowed expenses to) the joint operation; and raise the revenues of the joint operation.

112.   As one method of the RJ's failure to maximize the joint operation's profits, it unreasonably rejected revenue and expense initiatives set out by the Review-Journal's then-publisher Jason Taylor; instead, the RJ removed and replaced Taylor with a publisher who would accomplish the RJ's plan to drive the joint operation EBITDA into the ground and eliminate the Sun.

113.   Taylor, publisher of the Review-Journal from July 2015 to January 2016, was brought in initially by the Review-Journal's prior owner, GateHouse, to turn around declining

- 32 -

trends at the Review-Journal. Taylor is known in the industry as having success in generating revenue and being a powerful force, and he has won countless industry awards and honors.

114.    Soon after Taylor's arrival, he began implementing a strategic plan to reverse the Review-Journal's—and consequently, the joint operation's—declining trends by reducing unnecessary costs, increasing revenue through improved advertising sales and circulation, increasing the RJ's visibility, and modernizing its brands, among other things. Taylor's plan began to see improved financial performance almost immediately.

115.    In a meeting with Greenspun before Defendants' acquisition of the Review-Journal, Taylor projected that the joint operation would have a financially strong close for fiscal year-end 2016, and that, based on trend, the Sun's profit payments could increase by more than 18% in 2017. Under Taylor's plan, the joint operation profits in 2016-2017 were projected to be substantial. Taylor's projections were consistent with the RJ's valuation obtained during its purchase of the Review-Journal from a third-party valuation firm. The RJ heavily lobbied for Taylor to remain as publisher after the Adelson family's purchase, which Taylor did.

116.    Taylor was also vocal about the value of the Sun and desired to strengthen the partnership between the Newspapers.

117.    As Review-Journal publisher, Taylor also discovered that the Review-Journal's former owner, Stephens Media Group, had been dishonest in calculating the profit payments pursuant to the 2005 JOA—which all believed was valid and enforceable under long-standing law and practice, and under which the parties had been operating for over a decade—and concluded payments were due and owing to the Sun. Because Taylor believed it was important to resolve any outstanding profit payment issues with the Sun in order to successfully implement his strategic plan for the Review-Journal, he raised the issue with Adelson on several occasions. But no resolution ever came.

118.    Even though Dumont was involved in interviewing Taylor and Adelson had lobbied for Taylor to stay on as publisher of the Review-Journal after its acquisition, six weeks later, Taylor

- 33 -

was removed from the Review-Journal because Adelson and Dumont wanted someone who was more in line with their vision and control.

119. Consistent with journalistic practices, Taylor had been determined to insulate the newsroom from direct Adelson influence.

120. In Taylor's place, Defendants hired Craig Moon as the new publisher of the Review-Journal in January 2016. Thereafter, the RJ did not follow Taylor's commercially reasonable strategic plan, or any other commercially reasonable strategy. The RJ not only diverged from implementing Taylor's or any other reasonable expense initiatives, but, as company revenue was decreasing, the RJ also unreasonably increased the joint operation's expenses. Naturally, the revenue that was trending upward under Taylor quickly evaporated after his departure.

121. At the close of the fiscal year March 31, 2016—buoyed by Taylor's performance the prior year—the JOA still reported a profit, though much smaller than Taylor had projected. Under Moon's tenure, the RJ's fortunes quickly began to deteriorate. Moon executed on Defendants' strategy to financially starve the Sun and to force it out of business.

122. A meeting was held on or about January 25, 2017, to preview financial results for the end of the fiscal year, in which Moon, Robert Cauthorn (the Sun's COO), Greenspun, and Adelson's newspaper consultant Frank Vega were in attendance. At that meeting, the Sun was informed that its Annual Profits Payments were expected to significantly decrease as a result of poor performance of the joint operation, and that the RJ did not project *any* profits going forward for the joint operation. At that same meeting, Greenspun and Cauthorn were also informed that, "Patrick [Dumont] says the JOA [*i.e.*, the joint operation] will never be worth more than it is now and Brian should call Patrick to make a deal."

123. Alarmed at the situation, at the conclusion of the meeting the parties discussed the terms of a possible deal, but no offer made by Defendants was sufficient to maintain the Sun as an independent editorial voice.

124. The RJ made good on its threats to squeeze the Sun out by eliminating the joint operation profits.

- 34 -

116312629.2
ClarkHill\105559\1015963\286715632.v1-3/2/26

APP0227

125.    In March 2017, before the close of the fiscal year, Moon directed the RJ accounting department to write off hundreds of thousands of dollars so that when the Sun's profit payment was calculated, the payment owed to the Sun would be close to zero.

126.    Upon the close of the first full fiscal year under the Adelson family's ownership (ending March 31, 2017, a mere two months after Taylor's departure), the RJ reported a negative joint operation EBITDA for the first time in the history of the parties' combination. As the RJ intended, the Sun's profit payment for the following year was, in fact, zero.

127.    The Sun has not received a profit payment since the close of the fiscal year on March 31, 2017.

128.    Taylor was removed by the RJ as an act in furtherance of its anticompetitive plan. Because Taylor advocated ceasing the RJ's dishonest accounting practices and resolving the profit payments to the Sun, and projected Annual Profits Payments *increases* to the Sun under his new strategic plan—contrary to Adelson and the remaining Defendants' plan to starve the Sun of funds needed to operate—Taylor was removed to pave the way for another publisher, Craig Moon, who would agree to engage in exclusionary conduct to eliminate the Sun.

129.    Despite his role as President of the Review-Journal, and highlighting the charade that is his so-called leadership position, O'Connor was not involved in the removal of Taylor as publisher of the Review-Journal or the selection of Moon as Taylor's replacement. Instead, the Adelson family made the decision with no input from the supposed corporate head.

130.    As the manager, controller, and dominant party responsible for all business aspects of the joint operation, the RJ was obligated to operate it in a commercially reasonable fashion. The RJ's failure to implement the Taylor plan, or any similarly profitable plan, was commercially unreasonable.

131.    The RJ's failure to undertake commercially reasonable efforts to lower the costs and raise the revenues of the joint operation reduced and eliminated the Sun's profit payments. The RJ has failed to take all reasonable measures to promote the successful operation for the benefit of both

- 35 -

Newspapers and abused its power to drive the joint operation into a loss, in turn, threatening the Sun's existence.

132.    The RJ's failure to maximize the profits of the joint operation was a part of the RJ's anticompetitive scheme to eliminate the Sun.

**The RJ, Through Its Control Over the Joint Operation, Exploited Its Power and Abused the Joint Operation Accounting to Reduce Profit Payments to the Sun**

133.    The NPA does not determine how JOA newspapers are to account for their joint operation's revenues and expenses.

134.    Rather, the NPA's standard is "the public interest of maintaining a newspaper press editorially and reportorially independent and competitive in all parts of the United States …." 15 U.S.C. § 1801.

135.    Consequently, how the newspapers account for joint operation expenses and revenues are determined by the parties, and are sufficient so long as the weaker newspaper has enough resources to deliver on the NPA's policy and purpose.

136.    The Sun's share of the joint operation's profits under both JOAs approximated 10 percent, which the DOJ deemed a "sufficient operating guarantee[ ]" "to enable [the Sun] to continue to provide an independent reportorial and editorial voice in the Las Vegas community."

137.    Yet, by manipulating the 2005 JOA formula the RJ agreed to (and which all thought was valid and enforceable) and weaponizing the Sun's reliance and dependence, the RJ abused its control over the joint operation accounting. The RJ knew that its exclusive power over the joint operation accounting to increase expenses, charge disallowed expenses to the joint operation, and divert joint operation revenue to the RJ's outside entity, was unbridled. Under the belief that the 2005 JOA was valid and enforceable, the RJ knew that higher operating expenses under the 2005 JOA formula would reduce the joint operation EBITDA and, consequently, lead to lower profit payments to the Sun.

138.    The RJ's plan to deprive the Sun of funds needed to operate by recording zero profit was successful by the fiscal year ending March 31, 2017. The RJ, for the first time in the history of

- 36 -

the joint operation, recorded a negative EBITDA in the amount of negative $2.25 million, constituting a negative 122.43% EBITDA change from the year prior.

139.    The RJ had increased the Review-Journal's editorial costs by almost 40 percent—over $3 million—in 2017 and charged all of the Review-Journal's editorial costs against the joint operation, even though under the 2005 JOA the parties had agreed to "bear their own respective editorial costs."

140.    For perspective, the Review-Journal's editorial costs in 2017 were over 30 percent more than the Review-Journal's editorial costs in 2005, when the RJ was calculating the joint operation EBITDA under the 2005 JOA as far greater—$121.56 million. The RJ continued to charge the Review-Journal's editorial costs against the joint operation and did so even after the 2019 arbitration judgment confirmed it legally could not.

141.    The RJ, again under the belief that the 2005 JOA was valid and enforceable, further manipulated and abused the joint operation accounting under that framework to harm the Sun by: charging disallowed promotional expenses that did not include equal mention of the Sun, and/or that promoted the RJ's separate digital entity; charging the RJ's separate, non-JOA digital entity's expenses to the joint operation; charging other, miscellaneous disallowed expenses; removing joint operation revenue categories; and diverting joint operation revenue to the RJ's separate digital entity. Compounding these accounting abuses, the RJ systematically failed to maintain separate books and records for the joint operation, conflating the joint operation accounting with its separate accounting (which included the RJ's separate digital entity), even after the arbitrator criticized the RJ's practices in 2019. The RJ concealed this conduct by blocking the Sun's attempts to review the RJ's books and records.

142.    The RJ has systematically failed to maintain separate books and records for the joint operation, conflating the joint operation accounting with its separate accounting, which included the RJ's separate digital entity.

143.    Each of the RJ's abuses under the accounting formula that both parties believed governed their joint operation, and on which the Sun relied, overstate the costs attributable, and

- 37 -

understate the revenues attributed to the joint operation, thereby suppressing the joint operation EBITDA and reducing the Sun's profit payments. The RJ's conduct was in furtherance of its unlawful plan to put the Sun out of business and to extinguish its distinct and independent editorial voice in Clark County.

**The RJ has Exploited Its Control Over the Sun's Promotions, and has Suppressed Promotion of the Sun, Which Further Reduced the Payments to the Sun**

144.    The RJ has been responsible for and in control of promoting the Sun since 1989. 1989 JOA §§ 5.1, 5.1.3, 5.1.4; 2005 JOA § 5.1.4. The RJ has always been required to use, at minimum, commercially reasonable efforts in doing so. 1989 JOA § 5.1.3; 2005 JOA § 5.1.4. The Sun, like all weaker newspapers in a JOA, has a long-term interest in ensuring that its voice is preserved, a key part of which is how the Sun's separate brand and content are promoted. If the RJ were honoring the joint operation and the intent of the NPA, the RJ would share in that interest, too. Ensuring that both Newspapers are healthy benefits the joint operation by expanding consumer awareness of the diverse editorial voices, bolstering joint operation revenue.

145.    Promotion of the Sun bolsters the Sun's appearance and its ability to communicate with consumers and potential readers about its Newspaper. It also raises awareness of the Sun in the market. In turn, promotion of the Sun enhances its value and brand.

146.    Yet again, the RJ has exploited its control over the Sun's promotions and brand visibility by taking actions that undermine the Sun's ability to communicate with consumers about the nature and value of its Newspaper and brand, in turn reducing people's awareness of the Sun's presence and content. The RJ's anticompetitive promotional abuses involve its (1) failure to promote the Sun in equal prominence with the RJ, (2) destroying the Sun Box and diminishing the Sun's presence on the front page of the Newspaper Bundle, and (3) omitting the Sun from the electronic replica edition of the Newspaper Bundle.

147.    The RJ voluntarily agreed to mention the Sun in "equal prominence" with the Review-Journal in any promotion of the Review-Journal as an advertising medium or to advance circulation to ensure the Sun's brand remained as robust as the Review-Journal's.

- 38 -

148. Nearly all promotion for a newspaper is either to promote it as an advertising medium or to advance circulation.

149. The RJ's exclusionary tactics include marketing and promoting the Review-Journal in various advertising mediums without any mention of the Sun, or displaying the Sun's logo disproportionately to the Review-Journal's. Then, compounding the effect of these failures to promote the Sun, the RJ charged these separate expenses against the joint operation, further reducing the Sun's payments.

150. Virtually none of the RJ's promotional efforts include mention of the Sun in equal prominence, and nearly all omit the Sun entirely. The RJ's exclusion of the Sun in equal prominence from promotion is a change, distinguishable from the past practices of the Review-Journal pre-Adelson purchase.

151. Practically all external RJ advertising—including sponsorships, billboards, banners, displays, other signage, events, house ads and circulars, bills and renewal notices, television and radio advertising, and trade and barter agreements—omit the Sun entirely.

152. When the Sun challenged the RJ to produce examples of promotional activities that mention the Sun in equal prominence, Defendants could not do so.

153. Defendants admit that they have excluded the Sun from their advertising initiatives. Below is one example of an RJ advertisement that makes no mention of the Sun:

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

- 39 -



154.    In the less than 1 percent of times the RJ did mention the Sun, it displayed the Sun's logo disproportionately to the Review-Journal's. The RJ's exclusion of the Sun in equal prominence from the Review-Journal's promotions is a change from past practices pre-Adelson family purchase.

155.    Exerting its control over the physical printing of the Newspaper Bundle, the RJ also diminished the Sun's noticeable mention on the front page of the Newspaper Bundle. The Sun's noticeable mention, *i.e.*, the Sun Box, communicated the Sun to consumers to advance their knowledge of the Sun and its brand.

156.    In 2017, shortly after promising no further profit payments to the Sun and attempting to coerce the Sun into selling, the RJ abruptly informed the Sun that it was unilaterally changing the format of the front page of the Newspaper Bundle. The Sun was without recourse.

157.    Two days later, the RJ commenced publishing a new front-page design that eliminated the Sun Box entirely and deviated from the parties' longstanding practice of printing the Sun's noticeable mention in the specified Sun Box format for the preceding 12 years.

- 40 -

116312629.2
ClarkHill\105559\1015963\286715632.v1-3/2/26

158. Upon information and belief, Dumont was a key decision-maker in the RJ's redesign and approved the redesign on behalf of the Adelson family.

159. An example of the Sun Box on the Review-Journal front page from March 31, 2017, before the changes were unilaterally made by the RJ, is shown below:



160. An example of the unilaterally redesigned noticeable mention of the Sun on the Review-Journal front page from April 2, 2017, after the changes were unilaterally made by the RJ and the new design was rolled out, is shown below:



161. By destroying the Sun Box, the RJ also ensured that when a "spadea fold" (an advertising element covering approximately 40% of the left side of the page) was published, the Sun's RJ-designed banner would be covered. The parties had always intended that the Sun Box

- 41 -

move to the right side when a spadea is present, ensuring the Sun is always visible. That is no longer the case.

162.    Compounding the harm to the Sun's visibility, the RJ places advertising stickers on top of the Sun's logo and mentions on the front page of the Newspaper Bundle, obscuring the Sun's message and making it less visible and accessible to readers. It does so with strategic intent: in both the 2016 and 2018 elections, the Sun's announcements of political endorsements were covered by advertising stickers placed by the RJ. In the 2018 example, the Sun specifically asked the Review-Journal publisher not to cover the endorsement announcements. He refused and the Sun's endorsements were covered on the front page.

163.    The RJ continues to publish the unauthorized front-page design over the Sun's repeated objections.

164.    In addition, the RJ voluntarily exercised its control over publishing and distributing the electronic replica edition of the Newspapers and removed the Sun from it. *See* 2005 § 10.6. Both parties agree that the electronic replica edition constitutes a meaningful percentage of the Newspapers' circulation and is mostly used in educational environments to communicate with younger readers. It is one of the Sun's promotional strategies to advance these readers' knowledge of the Sun and its brand. The RJ had a longstanding practice (13 years) of including the Sun in the electronic replica edition of the Newspapers.

165.    However, on or about January 25, 2018, the RJ stopped including the Sun in the electronic replica edition of the Newspapers.

166.    On or about May 3, 2019, Keith Moyer, the Review-Journal's current publisher and editor, telephoned Mr. Cauthorn, COO for the Sun, stating the RJ restored the Sun in the replica edition that day. Mr. Moyer further stated that he had looked into the removal and stated it was "kind of a unilateral decision by Craig Moon. He said, 'just take it out.'"

167.    The RJ only restored the Sun in the electronic replica edition on May 3, 2019, amidst the parties' 2019 arbitration.

- 42 -

168.    The electronic replica edition constitutes a meaningful percentage of Review-Journal circulation and is mostly used in educational environments; hence, the RJ deprived the Sun of an opportunity to reach new young readers to allow its voice to be introduced to future readers, reducing the Sun's visibility.

169.    Defendants have not used commercially reasonable efforts to promote the Sun. They continue to refuse to use commercially reasonable efforts to promote the Sun, and continue to wrongly charge the RJ's unilateral promotional activities against the joint operation. The RJ's various actions harmed the Sun's ability to communicate with consumers about the nature and value of its Newspaper and brand, reducing people's awareness of the Sun's presence and content, and harming the Sun's brand and value.

170.    These are overt acts in furtherance of Defendants' plan to eliminate the Sun and to monopolize the Newspaper Market.

**Defendants Blocked the Sun from Examining the Review-Journal's Books and Records, Concealing the Extent of the RJ's Anticompetitive Conduct in Furtherance of the RJ's Plan to Eliminate the Sun**

171.    As a result of the RJ's complete control over all business functions of the joint operation, the Sun is entitled to inspect the RJ's books and records. This had been the longstanding practice of the parties prior to Adelson's purchase.

172.    On May 12, 2016, the Sun notified the RJ of the Sun's intent to examine and audit the Review-Journal's books and records to verify the RJ's Annual Profits Payment calculation, and ensure that Defendants had not illegally redirected revenues from or charged expenses to the joint operation.

173.    The Sun forwarded its initial list of documentation, and Defendants rejected the Sun's request in late July 2016.

174.    Following the RJ's objection, the Sun attempted to informally negotiate with Defendants to obtain documents from the Review-Journal, party-to-party.

175.    Unable to reach an agreement, on September 5, 2017, the Sun renewed its formal audit request, expressly appointing its chosen law firm auditor to examine and audit the books and

- 43 -

records of the Review-Journal, under the practice the RJ voluntarily agreed to. The RJ rejected the request on the grounds that it "far exceed[ed] the limited audit provisions" of the 2005 JOA (which the RJ believed to be valid at that time), even though all requested material had been available in prior audits when other ownership was in charge. The RJ's refusal was a deviation from the parties' longstanding practice.

176.   Instead, the RJ agreed to gather relevant, albeit very limited, information for production in due course. The RJ changed its position on November 16, 2017, and again disputed the validity of the Sun's audit. On November 28, 2017, the RJ changed course again when it agreed to produce limited categories of documents requested by the Sun.

177.   After further discussions between counsel, on December 21, 2017, the RJ represented that its anticipated production would occur within the first two weeks of January 2018.

178.   The RJ never voluntarily produced the requested documents: they were provided only after the Sun filed an action in state court and the matter was compelled to arbitration, and after the Sun initiated this action.

179.   Defendants' efforts to prevent the Sun from inspecting the RJ's books and records, including through an audit, and from uncovering the truth regarding the RJ's accounting and operational abuses are acts in furtherance of Defendants' illegal plan.

**Defendants Seek to Terminate the Joint Operation and Eliminate the Sun on Made-Up and Legally Deficient Grounds in Furtherance of Its Anticompetitive Conduct**

180.   Because the Sun gave up control of its assets and non-editorial and -reportorial operations as a condition of entering into the 1989 JOA, the Sun lost its ability to independently print and distribute its Newspaper and became dependent on the joint operation and the RJ. 2005 JOA at Prelim. Statement, §§ 5.1.3, 5.1.8, § 5.3; 2005 JOA at Art. 3 & §§ 3.1, 4.3, 5.1. The Sun did so based on the parties' and the DOJ's intentions that the Sun would be preserved as a second, independent Newspaper voice until at least 2040.

181.   Following Defendants' loss in arbitration (in which they sought to enforce the 2005 JOA), and their efforts to starve the Sun out of existence were decelerated, the RJ moved to amend

- 44 -

its answer and assert counterclaims in the state court action to terminate the JOA. The purpose was to eliminate the joint operation entirely. The grounds upon which the RJ sought to terminate the joint operation were founded on the 2005 JOA, claiming that the Sun purportedly "fails to meet the JOA's required high standards of newspaper quality," breached the 2005 JOA, and force majeure. These bases are not only bogus but are also objectively baseless, unreasonable, and impermissible grounds for termination. No reasonable litigant could realistically expect success on the merits. The counterclaims are a sham meant to directly interfere with, and destroy, a competitor.

182.    During this litigation, as an alternative strategy to prematurely end the joint operation, the RJ asserted the belated claim that the 2005 JOA was unlawful and unenforceable under Section 1803(b) of the NPA for lack of written Attorney General consent.

183.    The RJ was attempting to explore ending the joint operation even before its purchase transaction for the Review-Journal closed. However, at no time during the due diligence process or in the years after did the RJ ever allege that the 2005 JOA was unenforceable under the NPA.

184.    Instead, the RJ waited until the Sun initiated this antitrust litigation—after the parties had been operating under the 2005 JOA for 14 years—to argue that it could cease printing and distributing the Sun, and terminate the joint operation, because the parties did not follow the correct procedure.

185.    And at no time did the RJ "use their best efforts to take all action necessary" to effectuate the intent of the 2005 JOA, including for "the successful and lawful operation" thereunder, but seeking Attorney General consent under the NPA. Nor did the RJ accept reversion to the 1989 JOA.

186.    Instead, while asserting that the 2005 JOA was unlawful, the RJ simultaneously claimed that the 2005 JOA effectively terminated the 1989 JOA, allowing the RJ to end the joint operation and cease printing and distributing the Sun.

187.    At every step, the RJ rejected the continued enforceability of the 1989 JOA and the lawfulness of the material aspects of their original combination that were approved by the Attorney General in 1989. These material aspects, which remain in full force and effect under the 1989

- 45 -

framework and decades of the RJ's voluntary practice include the RJ's responsibility for and complete control over: business management of the joint operation, including "control[ling], supervis[ing], manag[ing] and perform[ing] all operations involved in managing and operating" the joint operation; acting on behalf of Sun in the joint operation; printing and producing the Sun using the RJ's printing plant, employees, and equipment; the Sun's sales and distribution; purchasing newsprint, materials, and supplies for the joint operation; soliciting, selling, and collecting on the Newspapers' advertising and circulation; promoting and circulating the Sun, using commercially reasonable efforts in promoting and circulating the Sun; establishing advertising and circulation rates for the Sun; paying, recording, and maintaining all expenses of the joint operation; accounting to the Sun after the close of each fiscal year; and distributing the Sun's share of payments from the profits of the joint operation derived from all advertising and circulation revenues of the Newspapers and sales incidental to the publication of the Newspapers or involving the Review-Journal's facilities or personnel.

188.   Both parties cross-moved for summary judgment on the RJ's challenge to the enforceability of the 2005 JOA, and this Court granted summary judgment in the Sun's favor.

189.   The RJ appealed this Court's grant of summary judgment to the Sun on the enforceability of the 2005 JOA for lack of Attorney General consent. The Ninth Circuit reversed. While it concluded that the 2005 JOA was unlawful and unenforceable strictly based on the language of Section 1803(b) alone for lack of Attorney General approval, it gave no consideration to the 1989 JOA, the RJ's continuing obligations and control over the joint operation, or the last 20 years of the parties' joint operations.

190.   The United States Supreme Court denied the Sun's Petition for Certiorari on February 23, 2026. The Ninth Circuit issued its mandate two days later on February 25.

191.   The RJ's efforts to terminate the joint operation by having the 2005 JOA declared unenforceable for lack of Attorney General approval, yet having failed to seek the proper approval or revert to the 1989 JOA, is objectively baseless, unreasonable, and impermissible grounds for termination of the joint operation, or to cease printing and distributing the Sun. Each of the material

- 46 -

components and the RJ's obligations are valid and enforceable as a result of the valid and enforceable 1989 JOA that the Attorney General already approved. No reasonable litigant could realistically expect success on the merits. The RJ's counterclaims are a sham meant to directly interfere with, and destroy, a competitor.

192. Each of Defendants' steps to end the joint operation and cease printing and distributing the Sun are overt acts in furtherance of their scheme to monopolize the Newspaper Market in violation of antitrust laws.

## ANTICOMPETITIVE EFFECTS

193. The Review-Journal and the Sun are the only English-language, local, daily print newspapers in Clark County. They compete editorially and reportorially, which is economic competition under antitrust laws. If the RJ's Anticompetitive Conduct is permitted to continue unchecked and/or if the RJ ends the joint operation and ceases to print and distribute the Sun, Defendants will control and monopolize 100% of the Newspaper Market. The RJ's Anticompetitive Conduct undertaken in the Newspaper Market harms competition by weakening and threatening to eliminate the Review-Journal's only competition in the market—the Sun—thereby harming consumers.

194. There is no compelling commercial benefit under the joint operation for the RJ to attempt to end the parties' longstanding combination. The RJ's actions speak to its true motive: more than simply a commercial monopoly, it wants a literal monopoly in the Newspaper Market, having exclusivity on thought and expression and to end all diverse editorial viewpoints, and silence those who would disagree. This is exactly the circumstance the NPA, the parties' original combination in 1989, and their continued practices under the 2005 amendment, sought to prevent. The RJ's actions are intended to prevent anyone from naysaying the Newspaper's owner in front of the important print audience. Absent the Sun's editorial voice, the RJ would gain unrivaled powers in the Newspaper Market.

195. The owners of the Sun and the Review-Journal have always competed vigorously against each other for readers. They do so in various ways, such as seeking to generate original

- 47 -

news and other content of interest to readers; trying to cover local news with greater depth, breadth, and accuracy; breaking stories first; and offering the most attractive mix of news, features, and editorials to readers. This head-to-head competition between the owners of the Sun and the Review-Journal will be lost unless the RJ's Anticompetitive Conduct is enjoined.

196.    The RJ's Anticompetitive Conduct has already had and will continue to have the effect of reducing output (both quality and quantity) of newspapers. By way of example, as a direct result of the RJ's plan to squeeze out the Sun, the Sun had to lay off staff, including cutting back on their night staff in January 2018. The practical consequence of cutting back on night staff meant that instead of sending stories over to the Review-Journal for print at 10:00 p.m., as it used to, the limited Sun staff now has to send stories to the Review-Journal for print at 4:00 p.m. Before, a story arriving at 5:00 p.m. or later might have made it to print in the Sun the next morning. Now, it appears later than it otherwise would have in print.

197.    The termination of the parties' joint operation will eliminate the Sun Newspaper by leaving the Sun with no infrastructure or facilities within which to produce, print, and distribute its Newspaper. It will also improperly deprive the Sun of a print audience it has worked to build for more than 60 years.

198.    Further, the RJ's Anticompetitive Conduct threatens to decrease output. From 2015-2018, the national total circulation revenue for newspapers increased by 1.1%. During that same time period, 2015-2018, circulation revenue for the Review-Journal decreased by a whopping 16%. Without the constraining influence of the Sun, and the independent editorial voice in the Las Vegas community that readers want, circulation, and therefore output, is likely to decrease even further.

199.    The RJ's Anticompetitive Conduct harms competition and is not competition on the merits.

200.    The RJ's Anticompetitive Conduct has: improperly reduced and eliminated the Sun's payments and similarly weakened the Sun's ability to compete and threatening the Sun's shut down; created uncertainty that has raised the Sun's costs and weakened the Sun's investment incentives; and reduced consumers' awareness and knowledge of the Sun and its brand, harming

- 48 -

APP0241

competition by weakening the Sun's ability and incentive to compete. Each of these different elements of the RJ's Anticompetitive Conduct reinforce each other to harm competition.

201.    Readers benefit from editorial and reportorial competition between the Sun and the Review-Journal. Consumers benefit from the choice and variety that competition between the Sun and Review-Journal offers them today, as recognized by the Attorney General's approval of the parties' original combination in 1989 JOA—to preserve the Sun for the benefit of the paramount public interest in maintaining two distinct newspaper voices in Clark County.

202.    The RJ's Anticompetitive Conduct harms consumers by robbing them of the choice of an independent editorial voice in the Las Vegas area, offering them a check on and an alternative to Review-Journal coverage, and by limiting the Sun's ability to produce quality content. After the RJ announced its intention to seek termination of the 2005 JOA, end the joint operation, and cease printing and distributing the Sun, consumers loudly voiced their objections.

203.    Further, the Sun's readers' concerns are confirmed by a study of 2008-2009 data following the ending of a joint operating agreement between the Denver Post and the Rocky Mountain News.[11] The Rocky Mountain News printed its last edition on February 27, 2009. Comparing civic engagement following the death of the JOA to other cities in the nation, the study concluded that, "eliminating a local newspaper from a community leads to less civic engagement in the immediate aftermath among the citizens of that community."

204.    Absent outside influences or monopolistic business misconduct, neither the Sun nor the Review-Journal is in danger of failing in the near future. The 1989 JOA, approved by the Attorney General, ensures continued publication of both Newspapers until December 31, 2040.

### DEFENDANTS' JOINT AND SEVERAL, AND ALTER EGO, LIABILITY

205.    Defendants Adelson, Dumont, Adfam, News+Media, and the Review-Journal, each personally, individually, and directly, knowingly engaged and participated in the Anticompetitive Conduct alleged herein.

---

[11] Lee Shaker, *Dead Newspapers and Citizens' Civic Engagement,* http://leeshaker.com/wp-content/uploads/2013/01/Dead-Newspapers-and-Citizens-Civic-Engagement-Lee-Shaker-Forthcoming-in-Political-Communication.pdf, last accessed on September 20, 2019.

- 49 -

206.    Defendants have a unity of interest and at all relevant times have acted together in a coordinated activity, and collectively as a part of a single enterprise, or in the alternative as co-conspirators, in furtherance of the anticompetitive scheme.

**Defendants Adelson and Dumont**

207.    Adelson and Dumont used corporate shells the Review-Journal, News+Media, and Adfam as their alter egos in committing the legal violations alleged herein. To the extent that Adfam, the Review-Journal, and News+Media are held liable for acts, actions, and violations herein, Defendants Adelson and Dumont should be held liable based on alter ego liability.

208.    There is such unity of interest and ownership that the separate personalities of Defendants Adelson and Dumont cannot be separated from those of the Review-Journal, News+Media, and Adfam.

209.    The Review-Journal, News+Media, and Adfam are so dominated by Defendants Adelson and Dumont that the corporate form of the Review-Journal, News+Media, and Adfam can be disregarded.

210.    Specifically, as further alleged herein, one or more of the following are present, which permits personal liability against Defendants Adelson and Dumont for the acts of the Review-Journal and News+Media:

(i)      the significant exercise of editorial control as alleged herein;

(ii)     the absence of corporate formalities such as holding regular corporate meetings, keeping corporate minutes, election of directors, etc.—O'Connor, since being appointed to every corporate role for the Review-Journal and sole manager for News+Media in early 2016 has not noticed formal corporate meetings, nor does he keep corporate minutes;

(iii)    inadequate or under capitalization—Adelson family members, including Dumont, who are trustees of The Orchid Trust, have infused millions of dollars into the Review-Journal, and the trustees have approved the Review-Journal's budget to operate at a loss each year since the Adelson acquisition;

- 50 -

116312629.2
ClarkHill\105559\1015963\286715632.v1-3/2/26

APP0243

(iv)    overlap in ownership, officers, directors, and personnel—upon information and belief, all or most "employees" of News+Media are "co-employed" by the Review-Journal;

(v)    the lack of arm's-length dealing between Defendants Adelson and Dumont and the corporations—Adelson and Dumont influence, control, and direct the business of the Review-Journal and News+Media, including financial decisions and funding decisions;

(vi)    the significant influence and control over the Review-Journal, News+Media's business policies and affairs, and;

(vii)    the use of Adfam's services to benefit the Review-Journal and News+Media, which in turn, only benefits Adelson and Dumont.

211.    Similarly, as further alleged herein, one or more of the following are present which permits personal liability against Defendants Adelson and Dumont for the acts of Adfam:

(i)    significant influence and control over Adfam's policies and affairs—Adfam's sole purpose is to support and promote the Adelson family, and the family ultimately directs all of Adfam's decisions;

(ii)    the lack of arms-length dealing between Dumont and Adelson and Adfam;

(iii)    the corporate structure and purpose of Adfam, which is designed solely to benefit the affairs and finances of Adelson and Dumont and their family members;

(iv)    inadequate or undercapitalization—upon information and belief, Adfam has no business interests that are not ultimately funded or supported by the Adelson family;

(v)    the absence of corporate formalities;

(vi)    the use of corporate assets as an extension of individual assets, and;

(vii)    the admitted use of employees/personnel and Adfam services to serve Dumont and Adelson's individual business and personal interests.

212.    Adelson and Dumont have integrated the operations and resources of the Review-Journal, News+Media, and Adfam to achieve a common business purpose such that disregarding their individual entities is necessary to avoid an unjust result.

- 51 -

116312629.2
ClarkHill\105559\1015963\286715632.v1-3/2/26

APP0244

213.  To control the Review-Journal and News+Media, Adelson and Dumont selected a loyal Adfam employee, O'Connor, to hold every corporate role at the Review-Journal and at News+Media. Despite his leadership and supposed role as head of the Review-Journal and News+Media, O'Connor's work consists of little more than holding corporate titles. Mr. O'Connor invests very little time in the Review-Journal's business. The Review-Journal's publisher reports to the Adelsons, not to O'Connor. O'Connor is not involved in operational matters; he is not involved in the hiring or firing of key employees, including publishers; he does not make any independent decisions on behalf of either the Review-Journal or News+Media; he does not approve budgets or funding requests; he does not know basic information about the Review-Journal such as the price of a newspaper subscription or the pattern of advertising rates, and; O'Connor is not paid by either the Review-Journal or News+Media. Rather, O'Connor is merely a tool for the Adelson family, employed by the family business—to control the Review-Journal. The Adelson family makes all decisions about the Review-Journal and O'Connor views his role as information gatherer for the Adelson family to "carry out their wishes." For example, despite being the President of the Review-Journal, O'Connor executed Adelson's Employment Agreement without ever discussing the Agreement with Adelson. Instead, Adfam attorneys drafted the Employment Agreement, instructed Mr. O'Connor to sign it, and Mr. O'Connor did so at their behest.

214.  Defendant Adelson has a pattern of creating corporate forms to serve as the entity to run and manage his business interests, even though these businesses are only shell corporations that serve as his personal alter ego. It is not uncommon for Adelson to have O'Connor serve as apparent corporate head of Adelson's companies.

215.  Upon information and belief, the Review-Journal, News+Media, and Adfam would not be able to pay an eventual judgment without resort to Defendants Adelson's and Dumont's assets.

216.  Failure to disregard the Review-Journal, News+Media, and Adfam's corporate personalities and pierce the corporate veil would result in fraud or injustice.

- 52 -

**Defendant Adfam**

217.    Adfam also acts as alter ego to the Review-Journal and News+Media.

218.    The Adelson family, including Adelson and Dumont, own, either directly or through another entity, Adfam. Adfam provides services to Adelson family businesses, including the Review-Journal and its parent company, News+Media. The intimately intertwined nature of the relationship between Adfam and the Review-Journal/News+Media results in the Review-Journal/News+Media being nothing more than an instrument and/or conduit of Adfam in the pursuit of a single business venture and/or enterprise, which, in turn, benefits Adelson and Dumont. Economic unity exists between Adfam, Adelson, Dumont, News+Media, and the Review-Journal.

219.    Similarly, as further alleged herein, one or more of the following are present, which permits personal liability against Adfam for the acts of the Review-Journal and News+Media:

(i)    Adfam possesses and dominates control over the Review-Journal's finances, policies, and business practices, and Adfam directly and personally participated in the accounting and operational abuses alleged herein.

(ii) Adfam and the Review-Journal/News+Media share common directors, officers, and consultants/employees, and jointly benefit from transactions entered into by one another;

(iii)    upon information and belief, Adfam fails to adhere to corporate formalities such as holding regular corporate meetings, keeping corporate minutes, election of directors, etc.;

(iv)    inadequate or under capitalization—upon information and belief, Adelson family members have infused millions of dollars into Adfam-run or -operated businesses for their own benefit;

(v)    the lack of arm's-length dealing between Adfam and the Review-Journal and News+Media—Adelson and Dumont and other Adelson family members influence, control, and direct the business of Adfam, including financial decisions and funding decisions;

(vi)    the significant influence and control over the Review-Journal/News+Media's business policies and affairs as alleged herein, and;

- 53 -

116312629.2
ClarkHill\105559\1015963\286715632.v1-3/2/26

APP0246

(vii)    the use of Adfam's services to benefit the Review-Journal and News+Media, which in turn, only benefits Adelson and Dumont.

220.    Critical to this case, Adfam's Chief Financial Officer lead a team that developed accounting policies and procedures for the Review-Journal, which were in contravention of the joint operation. On at least a monthly basis, Adfam received and continues to receive sensitive financial information and documents from the Review-Journal's Chief Financial Officer, publisher, and Controller, and weighs in on the Review-Journal's financial and operational decisions. Adfam also reviews, oversees, and is the intermediary communicator to Dumont, Adelson, and other involved members of the Adelson family, regarding the Review-Journal's funding requests. Adfam receives quarterly and monthly budget updates from the Review-Journal to provide to Adelson, Dumont, and other involved members of the Adelson family. Adfam's employees perform monthly control checks on the Review-Journal, including creating internal controls separate from the Review-Journal's independent accounting firm. Adfam further drafts and provides, on the Review-Journal's behalf, yearly "going concern" letters to the Review-Journal's outside auditing firm, which are approved by Dumont and executed by O'Connor, Chief Financial Officer for the Adelson family office. Upon information and belief, Adfam employees and/or owners participated in the redesign of the Newspapers' front page to reduce the Sun's visibility.

221.    Defendants established this corporate relationship to avoid liability and to promote injustice.

## FIRST CLAIM FOR RELIEF

### (Violation of Section 2 of the Sherman Act – Monopolization, 15 U.S.C. § 2)

222.    Plaintiff realleges and incorporates by reference as though fully set forth herein the allegations contained in the above paragraphs.

223.    The relevant market is the Newspaper Market.

224.    The RJ has gained and maintains monopoly power in the Newspaper Market through the parties' original combination in 1989, expressly approved by the Attorney General under the Newspaper Preservation Act of 1970. 15 U.S.C. §§ 1801-04. The RJ abused and maintained such

- 54 -

APP0247

power through its Anticompetitive Conduct that is patently exclusionary, including, exploiting its powers and responsibilities over the joint operation to deprive the Sun of its sole revenue source, by reducing the visibility of the Sun to consumers, and by threatening to end the joint operation and cease printing and distributing the Sun.

225. The RJ has the power to control prices and exclude competition in the Newspaper Market.

226. The RJ possesses a significantly dominant share of the Newspaper Market protected by substantial barriers to entry and expansion.

227. The RJ has the power to exclude competition in the Newspaper Market and have used that power, including by way of its exclusionary Anticompetitive Conduct as described herein, in order to maintain and expand its monopoly power in the Newspaper Market.

228. The RJ's willful acquisition and/or maintenance of its monopoly power is from its exclusionary Anticompetitive Conduct—conduct that weakens the Sun's ability to compete and is not competition on the merits.

229. The RJ behaved as alleged herein to maintain and grow its monopoly in the Newspaper Market with the effect that competition is foreclosed, and consumer choice is gravely diminished in that the Sun's editorial voice in the Las Vegas community has been impaired. Further, the RJ's actions have and will decrease output (quantity and quality) of newspapers.

230. There is no business necessity or other pro-competitive justification for the RJ's Anticompetitive Conduct.

231. The Sun has been injured and will continue to be injured in its business and property as a result of the RJ's Anticompetitive Conduct, by way of the diminished value to the Sun's brand and business and as a result of the fraudulent and deficient profits payments to the Sun by Defendants. *See* 15 U.S.C. § 15.

232. The Sun is entitled to preliminary and permanent injunctive relief to prevent the RJ from persisting in its unlawful, inequitable, and unjustified behavior to the Sun's detriment, with such an injunction: prohibiting the RJ from ending the joint operation, prohibiting the RJ from

- 55 -

ceasing to print and distribute the Sun; prohibiting the RJ from abusing its control over the joint operation to eliminate the Sun from the market; and ordering the RJ to divest itself of the Newspaper, or in the alternative to divest itself of the Newspaper's non-editorial business operations and to require the creation of an independent agency (or trustee) to conduct the non-editorial business of the joint operation. *See* 15 U.S.C. § 26.

## SECOND CLAIM FOR RELIEF

**(Violation of Section 2 of the Sherman Act – Attempted Monopolization, 15 U.S.C. § 2)**

233.    The Sun realleges and incorporates by reference as though fully set forth herein the allegations contained in the above paragraphs.

234.    The relevant market is the Newspaper Market.

235.    The RJ has attempted to monopolize the Newspaper Market. The RJ has gained and maintains monopoly power in the Newspaper Market through the parties' original combination in 1989, expressly approved by the Attorney General under the Newspaper Preservation Act of 1970. The RJ has abused and maintained such power through patently exclusionary Anticompetitive Conduct, including exploiting their powers and responsibilities over the joint operation to deprive the Sun of its sole revenue source, by reducing the visibility of the Sun to consumers, and by threatening to end the joint operation and cease printing and distributing the Sun.

236.    The RJ has created a dangerous probability of success that it will achieve monopoly power in the Newspaper Market.

237.    The RJ has a specific intent to achieve monopoly power in the Newspaper Market, as alleged in the paragraphs above. Now, if its Anticompetitive Conduct is not checked, the RJ has a dangerous probability of success of monopolizing the Newspaper Market.

238.    The RJ has the power to exclude competition in the Newspaper Market, and has used that power, including by way of its Anticompetitive Conduct in restraint of trade as described herein, in an attempt to monopolize that Newspaper Market.

- 56 -

116312629.2
ClarkHill\105559\1015963\286715632.v1-3/2/26

APP0249

239. The RJ has behaved as alleged herein in an attempt to obtain a monopoly in the Newspaper Market with the effect that competition is foreclosed, and consumer choice is gravely diminished in that the Sun's editorial voice in the Las Vegas community has been impaired and may be eliminated altogether. Further, the RJ's Anticompetitive Conduct has and will continue to decrease output (quantity and quality) of newspapers.

240. There is no business necessity or other pro-competitive justification for the RJ's Anticompetitive Conduct.

241. The Sun has been injured and will continue to be injured in its business and property as a result of the RJ's Anticompetitive Conduct, by way of the diminished value to the Sun's brand and business and as a result of the fraudulent and deficient profits payments to the Sun by the RJ. *See* 15 U.S.C. § 15.

242. The Sun is entitled to preliminary and permanent injunctive relief to prevent the RJ from persisting in its unlawful, inequitable, and unjustified behavior to Plaintiff's detriment, with such an injunction: prohibiting the RJ from ending the joint operation, prohibiting the RJ from ceasing to print and distribute the Sun; prohibiting the RJ from abusing its control over the joint operation to eliminate the Sun from the market; and ordering the RJ to divest itself of the Newspaper, or in the alternative to divest itself of the Newspaper's non-editorial business operations and to require the creation of an independent agency (or trustee) to conduct the non-editorial business of the joint operation. *See* 15 U.S.C. § 26.

### THIRD CLAIM FOR RELIEF
#### (Violation of Nevada Unfair Trade Practices Act – NRS 598A)

243. The Sun realleges and incorporates by reference as though fully set forth herein the allegations contained in the above paragraphs.

244. The Nevada Unfair Trade Practices Act is construed in conformity with federal antitrust laws.

245. The RJ's violation of the Nevada Unfair Trade Practices Act has caused or will cause injury to the Sun as set forth above.

- 57 -

116312629.2
ClarkHill\105559\1015963\286715632.v1-3/2/26

246. The Sun is entitled to damages for the RJ's violation of the Nevada Unfair Trade Practices Act, in an amount to be demonstrated.

247. The Sun is entitled to obtain preliminary and permanent injunctive relief for the RJ's violation of the Nevada Unfair Trade Practices Act.

## FOURTH CLAIM FOR RELIEF

### (Violation of Section 1 of the Sherman Act – 15 U.S.C. § 1)

248. The Sun realleges and incorporates by reference as though fully set forth herein the allegations contained in the above paragraphs.

249. Defendants knowingly acted in concert in furtherance of a common scheme to eliminate the Sun and monopolize the Newspaper Market.

250. These actions were undertaken as a result of agreement, both express and tacit, between and among Defendants.

251. Defendants' Anticompetitive Conduct has produced, and if unchecked will continue to produce, significant anticompetitive effects in the Newspaper Market. Defendants' actions have increased, and if unchecked will continue to increase, the RJ's market power, which harms consumers and reduces consumer welfare.

252. Defendants' actions constitute a conspiracy or combination in restraint of trade, which restraint is unreasonable, so inherently anticompetitive due to the predictable and pernicious anticompetitive effect and so lacking in procompetitive benefit that it is unlawful in and of itself, or its principal or only effect is anticompetitive.

253. The Sun has been injured and will continue to be injured in its business and property as a result of Defendants' Anticompetitive Conduct, by way of the diminished value to the Sun's brand and business and as a result of the fraudulent and deficient profits payments to the Sun by the RJ. *See* 15 U.S.C. § 15.

254. By reason of this violation, the Sun is threatened with irreparable harm for which damages will be inadequate to fully compensate it.

- 58 -

116312629.2
ClarkHill\105559\1015963\286715632.v1-3/2/26

APP0251

255.   The Sun is entitled to bring suit under Section 16 of the Clayton Act, 15 U.S.C. § 26, to obtain preliminary and permanent injunctive relief, with such an injunction: prohibiting the RJ from ending the joint operation, prohibiting the RJ from ceasing to print and distribute the Sun; prohibiting the RJ from abusing its control over the joint operation to eliminate the Sun from the market; and ordering the RJ to divest itself of the Newspaper, or in the alternative to divest itself of the Newspaper's non-editorial business operations and to require the creation of an independent agency (or trustee) to conduct the non-editorial business of the joint operation. *See* 15 U.S.C. § 26.

## JURY TRIAL DEMANDED

256.   The Sun demands a trial by jury as its right under the Seventh Amendment to the Constitution of the United States or as given by statute. Fed. R. Civ. P. 38.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests the following relief:

A.   A judicial declaration that:

(1)   Defendants have unlawfully monopolized, attempted to monopolize, and/or conspired to monopolize the Newspaper Market in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2;

(2)   Defendants' Anticompetitive Conduct violates the Nevada Unfair Trade Practices Act;

(3)   Defendants' Anticompetitive Conduct also constitutes a conspiracy or combination in restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1;

B.   That the Court enter judgment granting Plaintiff an injunction requiring Defendants to cease the Anticompetitive Conduct described herein;

C.   That the Court enter judgment enjoining Defendants from unilaterally ending the joint operation and ceasing to print and distribute the Sun until 2040;

D.   That the Court enter judgment granting Plaintiff a preliminary and permanent injunction ordering the RJ to divest itself of the Newspaper, or in the alternative to divest itself of the Newspaper's non-editorial business operations and to require the creation of an independent

- 59 -

agency (or trustee) to conduct the non-editorial business of the joint operation as done in other similar JOAs;

  E. That the Court enter judgment for the Plaintiff to recover treble damages in the amount of three times the actual damages found by the jury (*see* 15 U.S.C. § 15(a));

  F. That the Court grant such additional orders or judgments as may be necessary to remedy or prevent the unlawful practices complained of herein; and

  G. That the Court enter judgment granting Plaintiff its cost of suit, including reasonable attorney's fees, costs, and expenses, as provided by Section 4 of the Clayton Act, 15 U.S.C. § 15; Section 16 of the Clayton Act, 15 U.S.C. § 26, and NRS 598A.210.

  DATED this _____ day of _____, 2026.

CLARK HILL PLC

By: */s/* _____
  E. Leif Reid, Nevada Bar No. 5750
  Kristen L. Martini, Nevada Bar No. 11272
  Nicole Scott, Nevada Bar No. 13757
  1700 S. Pavillion Center Drive, Suite 500
  Las Vegas, Nevada 89169

  PISANELLI BICE PLLC
  James J. Pisanelli, Nevada Bar No. 4027
  Todd L. Bice, Nevada Bar No. 4534
  400 South 7th Street, Suite 300
  Las Vegas, Nevada 89135

  BROWNSTEIN HYATT FARBER SHRECK, LLP
  Jordan T. Smith, Nevada Bar No. 12097
  100 North City Parkway, Suite 1600
  Las Vegas, Nevada 89106

  ALIOTO LAW FIRM
  Joseph M. Alioto, Pro Hac Vice
  One Sansome Street, 35th Floor
  San Francisco, California 94104

  *Attorneys for Plaintiff/Counterdefendants*

- 60 -

**CERTIFICATE OF SERVICE**

I certify that I am an employee of CLARK HILL PLC, and I caused a true and correct copy of the foregoing **SECOND AMENDED AND SUPPLEMENTAL COMPLAINT FOR DIVESTITURE, INJUNCTION, AND DAMAGES BY REASON OF DEFENDANTS' VIOLATIONS OF THE SHERMAN ANTITRUST ACT, THE CLAYTON ANTITRUST ACT, AND THE NEVADA UNFAIR TRADE PRACTICES ACT** to be served by electronically filing the foregoing with the CMECF electronic filing system which will send notice of electronic filing to:

J. Randall Jones, Esq.
Michael J Gayan, Esq.
Mona Kaveh, Esq.
KEMP JONES, LLP
3800 Howard Hughes Parkway, 17th Floor
Las Vegas, NV 89169

Michael J. Gayan
CLAGGETT & SYKES LAW FIRM
4101 Meadows Lane, Suite 100
Las Vegas, NV 89107

Amy M. Gallegos, Esq.
David R. Singer, Esq.
Andrew G. Sullivan, Esq.
Alison I Stein, Esq.
JENNER & BLOCK LLP
515 South Flower Street, Suite 3300
Los Angeles, CA 90071

Richard L. Stone, Esq.
850 Deveon Avenue
Los Angeles, CA 90024

DATED: March ____, 2026.

/s/_____
An Employee of Clark Hill PLC

- 61 -

116312629.2
ClarkHill\105559\1015963\286715632.v1-3/2/26

APP0254

## CERTIFICATE OF SERVICE

I hereby certify that on March 18, 2026, I electronically filed the foregoing with the Clerk of the Court by using the appellate CM/ECF system. Service has been accomplished via email to the following counsel:

*Counsel for Real-Parties-in-Interest-Plaintiffs*:

Kristen L. Martini (kmartini@clarkhill.com)
E. Leif Reid (lreid@clarkhill.com)
Nicole Scott (nscott@clarkhill.com)
James J. Pisanelli (JJP@pisanellibice.com)
Todd L. Bice (TLB@pisanellibice.com)
Jordan T. Smith (jsmith@bhfs.com)
Joseph M. Alioto (jmalioto@aliotolaw.com)

The district court has been provided with a copy of this addendum volume 1 of 4 pursuant to Federal Rule of Appellate Procedure 21(a).

*s/ Ian Heath Gershengorn*
Ian Heath Gershengorn