No. __-____

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

SHELDON ADELSON; PATRICK DUMONT; NEWS+MEDIA CAPITAL GROUP, LLC; LAS VEGAS REVIEW-JOURNAL, INC.; INTERFACE OPERATIONS, LLC D/B/A ADFAM,

*Petitioners-Defendants,*

v.

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEVADA,

*Respondent*,

LAS VEGAS SUN, INC.,

*Real-Party-in-Interest-Plaintiff.*

## ADDENDUM VOLUME 2 OF 4
### (Pages APP0255 – APP0347)

J. Randall Jones
KEMP JONES LLP
3800 Howard Hughes Pkwy., 17th Fl.
Las Vegas, Nevada 89169
(702) 385-6000

Richard L. Stone
850 Devon Avenue
Los Angeles, California 90024
(310) 993-2068

Michael J. Gayan, Esq.
CLAGGETT & SYKES LAW FIRM
4101 Meadows Lane, Suite 100
Las Vegas, Nevada 89107
(702) 333-7777

Ian Heath Gershengorn
Tanner J. Lockhead
JENNER & BLOCK LLP
1099 New York Ave. NW, Suite 900
Washington, DC 20001
(202) 639-6000
igershengorn@jenner.com

David R. Singer
Amy M. Gallegos
JENNER & BLOCK LLP
515 South Flower Street, Suite 3300
Los Angeles, California 90071
(213) 239-5100

Gabriel K. Gillett
JENNER & BLOCK LLP
353 N. Clark Street
Chicago, IL 60654
(312) 840-7220

*Counsel for Petitioners-Defendants*

## Other Documents

2:19-cv-01667-ART-MDC Las Vegas Sun, Inc. v. Adelson et al

### United States District Court

### District of Nevada

## Notice of Electronic Filing

The following transaction was entered by Gayan, Michael on 3/4/2026 at 0:45 AM PST and filed on 3/4/2026

**Case Name:** Las Vegas Sun, Inc. v. Adelson et al

**Case Number:** 2:19-cv-01667-ART-MDC

**Filer:** Sheldon Adelson
Patrick Dumont
Interface Operations LLC
Las Vegas Review-Journal, Inc.
News+Media Capital Group LLC

**Document Number:** 1074

**Docket Text:**

SEALED UNREDACTED DOCUMENT to [1072] Redacted Version of Filed Document, *Appendix of Exhibits to Declaration of Michael J. Gayan in Support of Opposition to Motion for Temporary Restraining Order and Preliminary Injunction (FUS)* by Defendants Sheldon Adelson, Patrick Dumont, Interface Operations LLC, Las Vegas Review-Journal, Inc., News+Media Capital Group LLC. (Attachments: # (1) Exhibit, # (2) Exhibit, # (3) Exhibit, # (4) Exhibit, # (5) Exhibit, # (6) Exhibit, # (7) Exhibit, # (8) Exhibit)(Gayan, Michael)

**2:19-cv-01667-ART-MDC No electronic public notice will be sent because the case/entry is sealed.**

The following document(s) are associated with this transaction:

**Document description:**Main Document
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1101333072 [Date=3/4/2026] [FileNumber=12281534-0
] [d975f42f183a65044499fe62786a6ed26c25b36f34845e4fa7e64883f95f9bef88c
4f2a94fb6068d438c04a97aed1d3219e88efd86c9544f41913255359fe1bd]]
**Document description:**Exhibit
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1101333072 [Date=3/4/2026] [FileNumber=12281534-1
] [56fbb91edf35a979cca4e6e246ba0031cba392a6a80221eaad3d6d8d773cafd03de
546be28621585d3a7fbc694d518d2e50226b7d108c2bf5bcccacc2e490761]]
**Document description:**Exhibit
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1101333072 [Date=3/4/2026] [FileNumber=12281534-2
] [b275c7526c9ea337a76ee8cda7fb2d8003d9f18125d2ab9c364c7304b253a7a7934
af252d6ef11ca3643d004202c63f0d5afb9bdd74c4c64616a3347aaa8b7ec]]
**Document description:**Exhibit
**Original filename:**n/a
**Electronic document Stamp:**

APP0255

J. Randall Jones, Esq., SBN 1927
r.jones@kempjones.com
Mona Kaveh, Esq., SBN 11825
m.kaveh@kempjones.com
KEMP JONES LLP
3800 Howard Hughes Parkway, 17th Floor
Las Vegas, Nevada 89169
Telephone:      +1 702 385 6000

David R. Singer, Esq. (*pro hac vice*)
dsinger@jenner.com
Amy M. Gallegos, Esq. (*pro hac vice*)
agallegos@jenner.com
JENNER & BLOCK LLP
515 South Flower Street, Suite 3300
Los Angeles, California 90071
Telephone:      +1 213 239 5100
Facsimile:      +1 213 239 5199

Michael J. Gayan, Esq., SBN 11135
mike@claggettlaw.com
CLAGGETT & SYKES LAW FIRM
4101 Meadows Lane, Suite 100
Las Vegas, Nevada 89107
Telephone:      +1 702 333 7777
Facsimile:      +1 702 655 3763

Richard L. Stone, Esq. (*pro hac vice*)
rstone@fastmail.com
850 Devon Avenue
Los Angeles, California 90024
Telephone:      +1 310 993 2068

*Attorneys for Defendants/Counterclaimant*

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| LAS VEGAS SUN, INC., | Case No. 2:19-cv-01667-ART-MDC |
| Plaintiff, | **APPENDIX OF EXHIBITS TO DECLARATON OF MICHAEL J. GAYAN IN SUPPORT OF OPPOSITION TO MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION** |
| v. | |
| SHELDON ADELSON, et al., | |
| Defendants. | **(FILED UNDER SEAL)** |
| AND RELATED COUNTERCLAIM | |

Defendants, by and through their counsel of record, hereby submit their Appendix of Exhibits to Declaration of Michael J. Gayan in Support of Opposition to Motion for Temporary Restraining Order and Preliminary Injunction:

| Exhibit No. | Document | Bates No. |
|---|---|---|
| A | Assignment and Assumption Agreement (Stephens Media LLC to DB Acquisition, Inc.), dated March 18, 2015 | DEFS0018899– DEFS0018902 |
| B | Assignment and Assumption Agreement (DB Acquisition, Inc. to DB Nevada Holdings, Inc.), dated September 10, 2015 | DEFS0018903– DEFS0018904 |
| C | Excerpts of Deposition of Chris Allen Blaser as Rule 30(b)(6) Representative of Las Vegas Review-Journal, Inc., dated August 11, 2022 | |
| D | Email Chain Between Keith Moyer (Publisher, CEO and Editor, Las Vegas Review-Journal) and Robert Cauthorn (Las Vegas Sun), dated July 10, 2018 (with earlier messages beginning June 19, 2018), re: front page layout and ad sticker placement | SUN_00008920– SUN_00008921 |
| E | Complete Expert Rebuttal Report of David S. Evans, dated January 18, 2023 **[FILED UNDER SEAL]** | |
| F | Excerpts of Expert Rebuttal Report of David S. Evans, dated January 18, 2023 | |
| G | Certificate of Amendment of Certificate of Incorporation of DB Nevada Holdings, Inc. | DEFS0027576- DEFS0027577 |
| H | Excerpts of Brian Greenspun Text Messages **[FILED UNDER SEAL]** | SUN_00083091 |

Dated:    March 3, 2026                              CLAGGETT & SYKES LAW FIRM

By:    *Michael Gayan*

1

# EXHIBIT A

Assignment and Assumption Agreement, dated March 18, 2015 [DEFS0018899]

APP0258

## ASSIGNMENT AND ASSUMPTION AGREEMENT

THIS ASSIGNMENT AND ASSUMPTION AGREEMENT (this "Agreement") is made and entered into as of March 18, 2015, by between Stephens Media LLC, a Nevada limited liability company ("Assignor"), and DB Acquisition, Inc., a Delaware corporation (the "Assignee"). All capitalized terms used herein but not otherwise defined shall have the respective meanings ascribed to them in the Purchase Agreement (as defined below).

WHEREAS, DR Partners, a Nevada general partnership, as successor in interest to Donrey of Nevada, Inc. ("DR") and the Las Vegas Sun, Inc. are parties to an Amended and Restated Agreement dated as of June 10, 2005 (the "JOA"); and

WHEREAS, as of June 16, 2006, DR caused the JOA to be assigned to Assignor; and

WHEREAS, Assignor, Stephens Media Iowa, LLC, Stephens Media Intellectual Property, LLC (collectively, "Sellers") and Assignee have entered into that certain Asset Purchase Agreement, dated as of February 19, 2015, (the "Purchase Agreement") pursuant to which the Assignor has agreed to assign, transfer, convey and deliver the JOA to the Assignee, and the Assignee has agreed to acquire and accept from the Assignors, the entire right, title and interest of the Assignors in, to and under the JOA; and

WHEREAS, pursuant to the Purchase Agreement the Purchaser has agreed to assume, pay, discharge or perform when due, as appropriate, the JOA.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound, Assignors and Assignee hereby agree as follows:

1.      Assumption. Subject to Section 2 hereof, Assignor hereby conveys, transfers and assigns to the JOA, pursuant to and in accordance with the terms and conditions of the Purchase Agreement. The Assignee hereby assumes and agrees to pay, discharge and perform when due, as appropriate, the JOA, pursuant to and in accordance with the terms and conditions of the Purchase Agreement.

2.      Excluded Liabilities. Assignee does not assume or otherwise become obligated for, and the Sellers shall retain and pay, perform and discharge when due (or in good faith contest) the Excluded Liabilities, including, but not limited to, the Greenspun Matters (as defined in the Side Letter (as hereafter defined) which are the subject of an indemnification side letter agreement of even between and among the parties of even date herewith (the "Side Letter").

3.      No Modification. Nothing in this Agreement shall change, amend, extend or alter (nor shall it be deemed or construed as changing, amending, extending or altering) the terms or conditions of the Purchase Agreement or any liability or obligation of Sellers or the Assignee arising under the Purchase Agreement or any other document executed in connection with the Purchase Agreement. In the event of a conflict between the Purchase Agreement and this Agreement, the provisions of the Purchase Agreement shall control.

*ALB 1842970v1*

APP0259

DEFS0018899

4.      Successors and Assigns.  This Agreement shall bind and inure to the benefit of, and be enforceable by, the Assignee and the Assignors and their respective successors and assigns.

5.      Governing Law.  This Agreement and any disputes hereunder shall be governed by and interpreted and enforced in accordance with the Laws of the State of Delaware, without giving effect to any choice of Law or conflict of Laws rules or provisions (whether of the State of Delaware or any other jurisdiction) that would cause the application of the Laws of any jurisdiction other than the State of Delaware.

6.      Counterparts and Facsimile Signature.  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument.  This Agreement may be executed by facsimile or pdf scan signature.

[*Signature page follows.*]

*ALB 1842970v1*

APP0260

DEFS0018900

IN WITNESS WHEREOF, the parties have executed this Agreement as of the day and year first written above.

Stephens Media LLC, a Nevada limited liability company

By: _____
Name: Mark A. Hinueber
Title: Vice President


DB Acquisition, Inc.



By:_____
Name:
Title:

*Signature Page to JOA Assignment and Assumption Agreement*

APP0261

DEFS0018901

IN WITNESS WHEREOF, the parties have executed this Agreement as of the day and year first written above.

Stephens Media LLC, a Nevada limited liability company

By:_____
Name:
Title:

DB Acquisition, Inc.

By:_____
Name: *Mark Maring*
Title: *VP + Treasurer*

APP0262

DEFS0018902

# EXHIBIT B

Assignment and Assumption Agreement (DB Acquisition, Inc. to DB Nevada Holdings, Inc.),
dated September 10, 2015 [DEFS0018903]

## ASSIGNMENT AND ASSUMPTION AGREEMENT

THIS ASSIGNMENT AND ASSUMPTION AGREEMENT (this "Agreement") is made and entered into as of September 10, 2015, by and between DB Acquisition, Inc., a Delaware corporation (the "Assignor"), and DB Nevada Holdings, Inc., a Delaware corporation (the "Assignee").

WHEREAS, Assignor and Stephens Media Iowa, LLC and Stephens Media Intellectual Property, LLC (together, "Stephens") previously entered into that certain Asset Purchase Agreement, dated as of February 19, 2015, pursuant to which, among other things, Stephens agreed to assign, transfer, convey and deliver the Amended and Restated Agreement dated as of June 10, 2005 (the "JOA") to Assignor;

WHEREAS, as of March 18, 2015, Stephens caused the JOA to be assigned to Assignor; and

WHEREAS, Assignor desires to assign, transfer, convey and deliver the JOA to Assignee, and Assignee has agreed to accept from Assignor, the entire right, title and interest of the Assignor in, to and under the JOA.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound, Assignor and Assignee hereby agree as follows:

1. Assignment and Assumption. Assignor hereby conveys, transfers and assigns to Assignee the JOA, and Assignee hereby assumes and agrees to pay, discharge and perform when due, as appropriate, the JOA.

2. Successors and Assigns. This Agreement shall bind and inure to the benefit of, and be enforceable by, Assignee and Assignor and their respective successors and assigns.

3. Governing Law. This Agreement and any disputes hereunder shall be governed by and interpreted and enforced in accordance with the laws of the State of Delaware, without giving effect to any choice of law or conflict of laws rules or provisions (whether of the State of Delaware or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of Delaware.

4. Counterparts and Facsimile Signature. This Agreement may be executed in one or more counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument. This Agreement may be executed by facsimile or pdf scan signature.

*[Signature page follows]*

APP0264

DEFS0018903

IN WITNESS WHEREOF, the parties have executed this Agreement as of the day and year first written above.

DB Acquisition, Inc.

By: _____
Name: MARK MAKING
Title: V.P., Treasurer

DB Nevada Holdings, Inc.

By: _____
Name: MARK MAKING
Title: V.P., Treasurer

2

APP0265

DEFS0018904

# EXHIBIT G

Certificate of Amendment of Certificate of Incorporation of DB Nevada Holdings, Inc.

APP0266

# Delaware

Page 1

## The First State

I, JEFFREY W. BULLOCK, SECRETARY OF STATE OF THE STATE OF DELAWARE, DO HEREBY CERTIFY THE ATTACHED IS A TRUE AND CORRECT COPY OF THE CERTIFICATE OF AMENDMENT OF "DB NEVADA HOLDINGS, INC.", CHANGING ITS NAME FROM "DB NEVADA HOLDINGS, INC." TO "LAS VEGAS REVIEW-JOURNAL, INC.", FILED IN THIS OFFICE ON THE TENTH DAY OF DECEMBER, A.D. 2015, AT 2:16 O`CLOCK P.M.

A FILED COPY OF THIS CERTIFICATE HAS BEEN FORWARDED TO THE NEW CASTLE COUNTY RECORDER OF DEEDS.



Jeffrey W. Bullock, Secretary of State

5686324  8100
SR# 20151291788

Authentication: 10589879
Date: 12-10-15

You may verify this certificate online at corp.delaware.gov/authver.shtml

APP0267

DEFS0027575

State of Delaware
Secretary of State
Division of Corporations
Delivered 02:16 PM 12/10/2015
FILED 02:16 PM 12/10/2015
SR 20151291788 - File Number 5686324

# CERTIFICATE OF AMENDMENT

## OF

# CERTIFICATE OF INCORPORATION

## OF

# DB NEVADA HOLDINGS, INC.

**(Pursuant to Section 242 of the General
Corporation Law of the State of Delaware)**

DB Nevada Holdings, Inc. (the "Corporation"), a corporation incorporated on February 3, 2015 and existing under the General Corporation Law of the State of Delaware ("*DGCL*") does hereby certify:

1. That, pursuant to the provisions of Sections 141 and 242 of the DGCL, the Board of Directors of the Corporation, by the unanimous written consent of its members, adopted resolutions proposing and declaring advisable the following amendments to the Certificate of Incorporation of the Corporation:

RESOLVED, that the name of the Company be changed from "DB Nevada Holdings, Inc." to "Las Vegas Review-Journal, Inc."; and

RESOLVED, FURTHER, that first paragraph of the Corporation's Certificate of Incorporation, filed with the Secretary of State of the State of Delaware on February 3, 2015, be amended and replaced in its entirety to read:

"1. The name of the corporation (the "Corporation") is Las Vegas Review-Journal, Inc."

2. That in lieu of a meeting and vote of stockholder, the sole stockholder of the Corporation has given written consent to the amendments in accordance with the provisions of Section 228 of the DGCL.

APP0268

DEFS0027576

IN WITNESS WHEREOF, the undersigned, a duly authorized officer of the Corporation, has executed this certificate on this 10th date of December, 2015.

DB NEVADA HOLDINGS, INC.

By: _____

Name:      Michael Schroeder

Title:      Vice President

*[Signature Page to Certificate of Amendment]*

APP0269

DEFS0027577

J. RANDALL JONES, ESQ., SBN 1927
r.jones@kempjones.com
MONA KAVEH, ESQ., SBN 11825
m.kaveh@kempjones.com
KEMP JONES LLP
3800 Howard Hughes Parkway, 17th Floor
Las Vegas, Nevada 89169
Telephone:    +1 702 385 6000

DAVID R. SINGER, ESQ. (*pro hac vice*)
dsinger@jenner.com
AMY M. GALLEGOS, ESQ. (*pro hac vice*)
agallegos@jenner.com
JENNER & BLOCK LLP
515 South Flower Street, Suite 3300
Los Angeles, California 90071
Telephone:    +1 213 239 5100
Facsimile:    +1 213 239 5199

MICHAEL J. GAYAN, ESQ., SBN 11135
mike@claggettlaw.com
CLAGGETT & SYKES LAW FIRM
4101 Meadows Lane, Suite 100
Las Vegas, Nevada 89107
Telephone:    +1 702 333 7777
Facsimile:    +1 702 655 3763

RICHARD L. STONE, ESQ. (*pro hac vice*)
rstone@fastmail.com
850 Devon Avenue
Los Angeles, California 90024
Telephone:    +1 310 993 2068

Attorneys for Defendants/Counterclaimant

# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| LAS VEGAS SUN, INC., | Case No. 2:19-cv-01667-ART-MDC |
| Plaintiff, | **DECLARATION OF CHRIS BLASER IN SUPPORT OF DEFENDANT LAS VEGAS REVIEW-JOURNAL'S OPPOSITION TO PLAINTIFF'S EMERGENCY MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION** |
| v. | |
| SHELDON ADELSON, et al., | |
| Defendants. | |
| AND RELATED COUNTERCLAIM | **(REDACTED)** |

APP0270

**The Sun can launch a print product outside the JOA.**

23.     The Review-Journal's printing press is rented out at market rates. Multiple third-party publications pay for the use of the printing press. I have spoken with Keith Moyer, who has confirmed that the Review-Journal would allow the Sun to use the printing press at market rates.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated:    March 3, 2026

By: _____
Chris Blaser

7

APP0271

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

LAS VEGAS SUN, INC.,

                                    Plaintiff,

        v.                                          Case No. 2:19-cv-01667-ART-VCF

SHELDON ADELSON, *et al.*,

                                    Defendants.      ORDER ON MOTION TO DISSOLVE
                                                     AND MOTION FOR TEMPORARY
                                                     RESTRAINING ORDER (ECF Nos.
                                                     1055 and 1061)

LAS VEGAS REVIEW-JOURNAL, INC.,

                        Counter Claimant,
        v.

LAS VEGAS SUN, INC., *et al.*,

                        Counter Defendants.

This is an antitrust action between the Las Vegas Sun ("Sun") and the Las Vegas Review-Journal ("RJ"). Following a remand from the Ninth Circuit, the parties return to this Court with motions to dissolve the current preliminary injunction (ECF No. 1055), order new preliminary injunctive relief (ECF No. 1061), and for leave to file a new complaint consistent with the Ninth Circuit's opinion. (ECF No. 1065.) The Court now grants the RJ's unopposed motion to dissolve the operative preliminary injunction and grants in part the Sun's motion for a new Temporary Restraining Order, preserving the status quo insofar as necessary to prevent irreparable harm while the remaining requests are briefed and adjudicated in an orderly fashion.

## I.    BACKGROUND

The Sun filed this antitrust action against the RJ in 2019, bringing claims under the Sherman Act, the Clayton Act, and Nevada's Unfair Trade Practices

1

APP0272

Act. (ECF No. 621.) The RJ filed a motion to dismiss three of the Sun's claims, which was granted in part and denied in part. *Las Vegas Sun, Inc. v. Adelson*, No. 2:19-CV-01667-ART-MDC, 2024 WL 1382842, at *3 (D. Nev. Mar. 31, 2024), *rev'd in part on reconsideration,* No. 2:19-CV-01667-ART-VCF, 2025 WL 562654 (D. Nev. Feb. 20, 2025), *and rev'd and remanded,* 147 F.4th 1103 (9th Cir. 2025). After adjudication of the motion to dismiss, the operative complaint's remaining claims were for monopolization in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2; attempted monopolization in violation of the same statutory section; violation of the Nevada Unfair Trade Practices Act, NRS 598A, which is construed in conformity with the federal antitrust laws; and conspiracy or combination in restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. (ECF No. 621.) The Sun sought declaratory, monetary, and injunctive relief, including: an injunction requiring the RJ to cease alleged anticompetitive practices, including the threat to terminate the 2005 JOA; an injunction prohibiting the the RJ from acquiring the Sun; an injunction prohibiting the RJ from terminating the 2005 JOA; an injunction ordering the RJ to divest itself of the Sun, or in the alternative to divest itself of the Sun's non-editorial business operations and to require the creation of an independent agency or trustee to conduct the non-editorial business of the joint operation; and additional remedies as necessary. (*Id.*)

The context of the dispute was shaped by the parties' 2005 Joint Operating Agreement, which provided the terms under which they combined their publishing operations while preserving the independence of their editorial and reportorial staffs. At the beginning of the suit, the parties entered into a stipulated preliminary injunction whereby the RJ agreed that it would continue to perform under the 2005 JOA. (ECF No. 13.) The RJ moved for summary judgment on the basis that the Sun could not prove antitrust injury and therefore lacked standing, and that the Sun's antitrust claims failed because they were premised on the

APP0273

invalid and unenforceable 2005 JOA. (ECF No. 843.) The Court denied the RJ's motion for summary judgment on both grounds. *Las Vegas Sun, Inc.*, 2024 WL 1382842, at *7-15. Based on its finding that the 2005 JOA was enforceable, the Court denied the RJ's related motion to dissolve the stipulated preliminary injunction. *Id.* at *10. The RJ appealed the denial of the motion to dissolve the stipulated preliminary injunction to the Ninth Circuit, and during the pendency of the appeal the parties prepared and submitted a joint pretrial order and began anticipating the assignment of a trial date. (ECF No. 1008.) The Ninth Circuit reversed the denial of the Defendants' motion to dissolve the preliminary injunction, finding that the 2005 JOA was unlawful and unenforceable. *Las Vegas Sun, Inc. v. Adelson*, 147 F.4th 1103, 1122 (9th Cir. 2025).

The parties have responded to the Ninth Circuit's opinion with a flurry of new motions. The RJ moved this Court to dissolve the stipulated preliminary injunction in conformity with the remand (ECF Nos. 1055), which the Sun did not oppose (ECF No. 1067). Instead, the Sun moved for new preliminary injunctive relief, seeking to enjoin the RJ from unilaterally ending the joint operation and ceasing to print and distribute the Sun, among other requests. (ECF No. 1061.) Subsequently, the Sun moved for leave to amend its complaint a second time in order to address the Ninth Circuit's opinion and update its allegations to conform to the evidence. (ECF No. 1065.) The proposed amended complaint asserts the same causes of action, and seeks most of the same declaratory, monetary, and injunctive relief, except that the Sun's original requests to prohibit the RJ until 2040 from acquiring the Sun or terminating the 2005 JOA have been replaced by a request to enjoin the RJ from unilaterally ending the joint operation and ceasing to print and distribute the Sun. (ECF No. 1065-1.) Both the Sun's motion for preliminary injunctive relief and its motion to amend the complaint are vigorously opposed by the RJ. The RJ has also filed a renewed motion for summary judgment based on the Sun's operative complaint.

APP0274

(ECF No. 1084.)

The purpose of this order is to dissolve the stipulated preliminary injunction consistent with the Ninth Circuit's order on remand, while maintaining the status quo pending the orderly resolution of all other motions.

## II.    LEGAL STANDARD

A plaintiff seeking a temporary restraining order must demonstrate (1) a likelihood of success on the merits, (2) a likelihood of irreparable harm if preliminary relief is not granted, (3) that the balance of equities is in their favor, and (4) that an injunction is in the public interest. *See Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008); *Stuhlbarg Intern. Sales Co, Inc. v. John D. Brush & Co., Inc.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001) (noting that the analysis for a temporary restraining order is "substantially identical" to that of a preliminary injunction).[1] Courts in the Ninth Circuit evaluate "these factors on a sliding scale, such 'that a stronger showing of one element may offset a weaker showing of another.'" *Recycle for Change v. City of Oakland*, 856 F.3d 666, 669 (9th Cir. 2017) (quoting *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127,1131 (9th Cir. 2011)). For example, when the balance of equities "tips sharply in the plaintiff's favor," the plaintiff only needs to raise "serious questions" on the

---

[1] The RJ claims that two of the Sun's three requested forms of relief are mandatory, and that the Sun must show that the facts and law "clearly" favor their position. *Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*, 82 F.4th 664, 684 (9th Cir. 2023). The Sun concedes that it seeks mandatory relief where it asks the Court to compel the RJ to use its best efforts and take all action necessary to obtain Attorney General written consent of the 2005 JOA, and to compel the RJ to revert to the 1989 JOA. (ECF No. 1061 at 50.) The distinction between a mandatory and a prohibitory injunction is whether the court orders the parties to take action or refrain from taking action, or, in other words, whether the injunction preserves the status quo. *See Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1060-61 (9th Cir. 2014). This Order does not address the Sun's requests for mandatory relief. The only relief at issue in this Order is the Sun's request to enjoin the RJ from unilaterally ending the joint operation and ceasing to print and distribute the Sun. Since this relief is prohibitory, the usual preliminary injunction standard applies.

4                                                    APP0275

merits—a lesser showing than likelihood of success. *All. for the Wild Rockies*, 632 F.3d at 1131–32, 1134–35 (citation omitted); *see also Citigroup Glob. Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 35 (2d Cir. 2010). In other cases, "the less certain the district court is of the likelihood of success on the merits, the more plaintiffs must convince the district court that the public interest and balance of hardships tip in their favor." *Sw. Voter Registration Educ. Project v. Shelley*, 344 F.3d 914, 918 (9th Cir. 2003).

Private antitrust plaintiffs are entitled to preliminary and final equitable relief under Section 16 of the Clayton Act, which provides them with equitable remedies "when and under the same conditions and principles as injunctive relief … is granted by courts of equity, under the rules governing such proceedings." 15 U.S.C. § 26; *see Cal. v. Am. Stores Co.*, 495 U.S. 271, 279 (1990). Preliminary injunctive relief under Section 16 may encompass both structural relief and prohibitions on antitrust conduct. *See Am. Stores Co.*, 495 U.S. at 279. Relief must serve an antitrust purpose, such as ending conduct in violation of the antitrust laws, depriving violators of the benefits of that conduct, and restoring competition. *In re Multidistrict Vehicle Air Pollution*, 538 F.2d 231, 234-35 (9th Cir. 1976). Preliminary relief awarded should bear a "reasonable relationship" to the permanent relief requested, in that "the preliminary relief granted should ensure the availability of permissible permanent relief sought." *California v. American Stores Co.*, 872 F.2d 837, 845 (9th Cir. 1989) (overruled on other grounds).

### III.    DISCUSSION

#### A. Likelihood of Success on the Merits

To establish a claim for monopolization, the plaintiff must show: "(1) the defendant possesses monopoly power in the relevant market; (2) the defendant has willfully acquired or maintained that power; and (3) the defendant's conduct has caused antitrust injury." *Cost Mgmt. Servs., Inc. v. Wash. Nat. Gas Co.*, 99

APP0276

F.3d 937, 949 (9th Cir. 1996). To succeed on a claim for attempted monopolization, "a plaintiff must prove (1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power." *Cascade Health Solutions v. PeaceHealth*, 515 F.3d 883, 893 (9th Cir. 2008) (quotations omitted).

The Sun has at least raised serious questions regarding whether the RJ's conduct meets the relevant standards. Based on the evidence submitted with the motion for preliminary injunctive relief, there is at minimum a serious question on the merits of the Sun's claims that the RJ willfully acquired and maintained its dominant market position through the alleged anticompetitive acts, causing injury. The RJ has four responses to the Sun's argument of likely success on the merits. The RJ claims that the relevant market encompasses online news in addition to print; that it did not engage in anticompetitive conduct; that the Sun is not engaged in economic competition; and that the alleged harm did not flow from conduct that reduced lawful competition.

The Sun has at least shown serious questions going to the merits of their proposed market definition. Relying primarily on its expert's report, the Sun argues that under the *Brown Shoe* factors, the relevant market is English-language, local, daily print newspapers in Clark County and the Southern portion of Nye County, Nevada. *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962). The question of market definition has come up several times throughout the history of his case, and each time, it has been resolved in favor of the Sun. The RJ contested the Sun's proposed market definition in a motion to dismiss, which was decided in November 2020 against them. *Las Vegas Sun, Inc. v. Adelson*, No. 219CV01667GMNBNW, 2020 WL 7029148, at *5 (D. Nev. Nov. 30, 2020). The RJ moved to certify an interlocutory appeal on the subject of the Sun's market definition, but their motion was denied in 2021 on the grounds that there were no substantial grounds for a difference of opinion on controlling questions

APP0277

of law. *Las Vegas Sun, Inc. v. Adelson,* No. 219CV01667GMNBNW, 2021 WL 2169935, at *5 (D. Nev. May 27, 2021). Most recently, the RJ failed to contest the Sun's market definition for the purposes of summary judgment, and the Court accepted the Sun's definition for purposes of resolving that motion. *Las Vegas Sun, Inc.,* 2024 WL 1382842, at *11. The judicial system has an interest in consistency and in avoiding needless reconsideration. *See Ingle v. Cir. City*, 408 F.3d 592, 594 (9th Cir. 2005).

The Sun has at least raised serious questions that the RJ has engaged in cognizable anticompetitive conduct. The RJ argues that following the Ninth Circuit's holding that the 2005 JOA is unlawful and unenforceable, the Sun's allegations of anticompetitive conduct have no foundation. The Sun says that the RJ engaged in anticompetitive conduct when, "exploring ways to terminate the Sun," it took steps to weaken the Sun financially and reduce its visibility. (ECF No. 1061 at 22-23.) The Sun argues that in so doing, the RJ secured or attempted to secure a more dominant position in the market not through healthy competition, but by reducing the Sun's ability to compete. (*Id.* at 42-43.) *See Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 334 (1990) (showing a violation of the antitrust laws requires showing that there was some "competition-reducing aspect or effect of the defendant's behavior.") In resolving the RJ's motion for summary judgment, this Court held that the Sun was not precluded from making its antitrust claims just because the parties had previously arbitrated the RJ's intent to breach the implied covenant of good faith and fair dealing implicit in the 2005 JOA. *Las Vegas Sun, Inc.*, 2024 WL 1382842, at *16. In other words, the Sun's claims turn on allegations of anticompetitive conduct, not breach of the 2005 JOA.

The Sun has made out at least a serious question as to whether it engages in cognizable competition, and whether its requested relief would restore competition to the relevant market. The RJ's arguments to the contrary assume

APP0278

that the Sun and the RJ are not in competition, but this Court previously held that "editorial competition is commercial competition in the newspaper context." *Id.* at \*12. The theory, as laid out in comparable precedents, is that editorial competition between competing newspapers produces financial rewards, such as by increasing a newspaper's value, especially in the eyes of potential acquisitors, and enhancing its bargaining position when a JOA containing a profit-sharing agreement is up for renegotiation or termination. *Id.* Editorial competition may also increase traffic to the Newspapers' digital operations outside of the joint operation and promote their principal owners' economic or business interests more broadly. *Id.* Here, the parties have agreed that but for the Sun's requested relief, the RJ will stop printing the Sun. If the Sun is, as it claims, the RJ's only competitor in the relevant market, then there are at least serious questions as to whether the Sun's requested relief may maintain its operations and protect competition in the relevant marketplace for local print news.

### B. Likelihood of Irreparable Harm

The Sun has shown a likelihood of irreparable harm if interim injunctive relief is not granted. Section 16 of the Clayton Act authorizes courts to grant preliminary injunctive relief upon "a showing that the danger of irreparable loss or damage is immediate." 15 U.S.C. § 16. "[I]ntangible injuries, such as damage to ongoing recruitment efforts and goodwill, qualify as irreparable harm." *Rent-A-Center, Inc. v. Canyon Television and Appliance Rental, Inc.*, 944 F.2d 597, 603 (9th Cir. 1991). Only irreparable harm to the plaintiff itself may be considered. *See Winter*, 555 U.S. at 20 ("A plaintiff seeking a preliminary injunction must establish... that *he* is likely to suffer irreparable harm in the absence of preliminary relief") (emphasis added). Stopping the printing and distribution of the *Sun* would cause the Sun to suffer immediate and intangible harms in the form of "loss of staff and ability to recruit new employees... loss of readership and visibility, and loss of goodwill." (ECF No. 1028 at 184.) In terms of tangible harms,

APP0279

the Sun has credibly alleged that it faces an immediate risk of closure if the joint operation is terminated. "The threat of being driven out of business is sufficient to establish irreparable harm." *Am. Passage Media Corp. v. Cass Commc'ns, Inc.*, 750 F.2d 1470, 1474 (9th Cir. 1985).

### C. Balance of Equities

The balance of equities tips sharply in the Sun's favor. On the level of the business, the potential hardship to the Sun ranges from loss of institutional memory to "economic demise." *Hawaii ex rel. Anzai v. Gannett Pac. Corp.*, 99 F. Supp. 2d 1241, 1254 (D. Haw.), *aff'd sub nom. State of Hawaii v. Gannett Pac. Corp.*, 203 F.3d 832 (9th Cir. 1999). While the Sun may face a risk of closure if preliminary injunctive relief is not granted, the RJ faces no such corresponding risk. Considering the Sun's financial and legal interests, preliminary injunctive relief at this stage will be necessary so that the Sun may eventually obtain full relief if it prevails at trial. *See id.* (finding that the balance of hardships tipped in plaintiff-movant's favor where the threatened closure of the affected newspaper would "impair the ability of this Court to provide the relief requested").

Preliminary injunctive relief can be appropriately tailored to prevent hardship to the RJ. If the RJ is required to do nothing more than to continue printing and distributing the Sun, which it has done since 1989, several of the RJ's concerns going to the equities are moot. The RJ's only remaining objection is that this relief will impair their First Amendment rights. The District of Hawaii addressed precisely this concern in *Gannett*, where it held that enjoining a defendant from terminating a joint operating agreement furthered the aims of the First Amendment, rather than violating that defendant's First Amendment rights to refrain from speaking or publishing. *Gannett*, 99 F. Supp. 2d at 1252. Citing *Associated Press v. United States*, 326 U.S. 1, 20 (1945), the court explained that the Sherman Act protects the First Amendment where it prevents news media organizations from combining and reducing the diversity of editorial viewpoints.

9

APP0280

*See id.* (the First Amendment "rests on the assumption that the widest possible dissemination of information from diverse and antagonistic sources is essential to the welfare of the public, that a free press is a condition of a free society.") This same reasoning applies here because preserving two editorial voices in the relevant market furthers the aims of the First Amendment as expressed in *Associated Press.*

### D. The Public Interest

Parties agree that in the absence of preliminary injunctive relief, the Sun would no longer be printed. Public policy favors preserving local newspapers. 15 U.S.C. § 1801 (declaring that it is "public policy of the United States to preserve the publication of newspapers in any city, community, or metropolitan area where a joint operating arrangement has been heretofore entered into"). Studies have found that civic engagement fell faster in cities where one of two daily newspapers were lost, and that voter turnout was depressed in the areas where the defunct newspaper was once popular. (ECF No. 1034 ¶ 149.) Other studies have found that when local newspapers close, split-ticket voting goes down, municipal borrowing costs go up, and political engagement declines. (*Id.* ¶ 150.)

The motivating policies of antitrust law favor protecting the production and distribution of the Sun. Closing a local newspaper deprives readers, advertisers, and writers of the monetary and nonmonetary benefits of a free and open marketplace. *Gannett*, 99 F. Supp. 2d at 1250. In enacting the Sherman Act, Congress sought to protect consumers from corporate control over prices, output, and other forms of corporate control. *Id.* (citing *Apex Hosiery Co. v. Leader*, 310 U.S. 469, 493-94 (1940)). A competitive marketplace "advance[s] social welfare" by providing more desirable goods and services at a lower price. *Reilly v. Medianews Grp., Inc.*, No. C06-4332 SI, 2007 WL 1068202, at *5 (N.D. Cal. Apr. 10, 2007) (quoting *FTC v. Indiana Federation of Dentists*, 476 U.S. 447, 459 (1986)). The RJ's objections focus either on forms of relief not awarded in this

APP0281

order or First Amendment concerns already addressed *supra.* All these considerations counsel that the public interest weighs heavily in favor of maintaining two competing editorial voices in the relevant market, especially insofar as the failure to do so now may lead to irreversible harms and foreclose this Court's ability to consider injunctive relief if the Sun prevails at trial.

### E. Remedy

Preliminary injunctive relief "preserve[s] the status quo ante litem pending a determination of the action on the merits." *Boardman v. Pac. Seafood Grp.,* 822 F.3d 1011, 1024 (quoting *Sierra Forest Legacy v. Rey*, 577 F.3d 1015, 1023 (9th Cir. 2009)) "Status quo ante litem" refers to "the last uncontested status which preceded the pending controversy." *Id.* (quoting *GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1210 (9th Cir. 2000)). Preliminary injunctive relief must not be overbroad. *Id.*, 822 F.3d 1011, 1024. Generally, it does not remedy harms that may be adequately compensated by damages at the end of the litigation. *See In re Multidistrict Vehicle Air Pollution,* 538 F.2d at 234-235.

The Sun argues that during the status quo ante litem, the parties operated under the 1989 JOA, and that therefore the most appropriate form of preliminary injunctive relief is reversion to the 1989 JOA. (ECF No. 1091.) Although reversion was pleaded as an affirmative defense, the Sun's currently operative complaint does not plead it. (ECF No. 621.) Neither does the Sun's proposed amended complaint, which refers to the parties' "joint operation" without expressly stating whether the 1989 JOA might legalize the relief requested, or whether any form of legalization is necessary.

The RJ argues that the status quo ante litem was the state of play as of December 2015, before it allegedly began committing anticompetitive acts. (ECF No. 1088.) At the same time, the RJ objects to all proposed forms of relief that would preserve the essential elements of a 2015 status quo, maintaining that the 1989 JOA has been abandoned and is impracticable, among other defects; that

11

APP0282

the 2005 JOA is clearly unlawful; and that any new form of relief that compels the parties to maintain combined operations would constitute a new JOA that is unlawful under the Ninth Circuit's recent opinion. *Las Vegas Sun, Inc.*, 147 F.4th at 1122. In arguing against the re-imposition of the 1989 JOA as a form of relief, the RJ does not directly counter the Sun's theory that in invalidating the entire 2005 JOA, the Ninth Circuit also reversed the termination of the 1989 JOA. More relevantly to present purposes, the RJ does not address what remedies would be available to the Sun if it prevails on any of its antitrust claims. The Ninth Circuit's opinion did not address those antitrust claims or available remedies.

Under any interpretation of the status quo ante litem, the RJ printed and distributed the Sun, maintaining the existence of a second editorial voice in the relevant market for local news. The Ninth Circuit has directed that the initial stipulated injunction be dissolved. Under these circumstances, the value of preserving the core of the status quo arrangement cannot be reduced to an award of damages. Some interim injunctive relief is necessary to protect community and consumer interests, allow time to fully brief and adjudicate the Sun's motion to amend the complaint and preliminary injunction motion, and ensure the availability of any appropriate injunctive relief post-trial. The Sun's complaint raises substantial antitrust questions which should be resolved before an irremediable loss is dealt, not afterwards.

**F. Bond**

District courts have discretion to set the amount of security, "if any," for preliminary injunctive relief under Rule 65(c). *Jorgensen v. Cassiday*, 320 F.3d 906, 919 (9th Cir. 2003). Courts may dispense with the bond where the relief ordered creates "no realistic likelihood of harm to the defendant." *Id.* The RJ has argued that the Sun should be required to post a bond of at least $51.4 million, but the calculations that it relies upon in reaching that figure assume that it would be required to revive an afternoon-print newspaper. (ECF No. 1075 ¶¶ 4-

12

5.) An afternoon-print newspaper is not part of the relief ordered. In the absence of argument on the cost of the relief ordered, the Court declines to set bond at this time. This decision shall be without prejudice to any future requests for bond that the RJ may make connected with a preliminary injunction or other equitable relief.

## IV.    CONCLUSION

It is therefore ordered that the RJ's unopposed motion to dissolve the 2019 stipulated preliminary injunction is GRANTED.

It is further ordered that the Sun's motion for preliminary injunctive relief is GRANTED IN PART. The RJ is enjoined from ceasing to print or distribute the Sun.

It is further ordered that the hearing currently set for March 13, 2026 is VACATED.

It is further ordered that a preliminary injunction hearing is scheduled for April 10, 2026, at 10:00 a.m., before U.S. District Judge Anne R. Traum in a Las Vegas courtroom to be determined. Counsel will be notified of the courtroom location as soon as one is assigned.

It is further ordered that by April 3, 2026, the parties will file a status report with the Court detailing the evidence that they will present and the time allotted for presentation.

It is further ordered that the parties shall deliver by April 8, 2026, electronic exhibits to the courtroom deputy.

DATED: March 12, 2026

_____
ANNE R. TRAUM
UNITED STATES DISTRICT JUDGE

13

APP0284

# EXHIBIT LL

## (Filed Under Seal)

Expert Report of Kenneth A. Paulson, dated September 19, 2022

APP0285

The *Las Vegas Sun* in Print:
An Assessment of the Newspaper's Evolution, Content and Professional Practices

By Kenneth A. Paulson

## I.      Qualifications

1.      I've had the privilege of working in the field of journalism for 52 years, from my first paycheck as a freelance writer as a 16-year-old to my current role working on freedom of the press issues and writing about media matters for dozens of newspapers. Over the years, my engagement with journalism has taken many forms, but the common thread was an understanding of the importance of timely and accurate news to readers and their communities.

2.      My first full-time job in journalism was as a police reporter at the Fort Myers (Fla.) News-Press, fresh off my graduation from the University of Illinois College of Law. I had previously received a bachelor's degree in journalism in 1975 from the University of Missouri. After passing the Florida and Illinois Bar exams, the News-Press promoted me to courts reporter, where the investigative work I did about sentencing patterns in the 20th Judicial Circuit led to my winning the top journalism award from the Florida Bar. My tenure at the News-Press also gave me my first management experience as Cape Coral Bureau Chief, where I was responsible for ensuring that every edition had multiple news stories about Cape Coral.

3.      I was promoted by the Gannett Company to Metro Editor of the Bridgewater, NJ, Courier-News, where I oversaw about 20 local news reporters in a market serving 45 communities. My responsibilities included assigning reporters to local stories, editing their

1

                                                                      APP0286

articles and allocating resources so that there was adequate local news coverage in each of those communities.

4. In 1982, I was recruited to help start a new national newspaper in Washington D.C. called USA Today. I was a founding assistant national editor and later was responsible for overseeing every individual report from each of the 50 states. Even a national newspaper had to keep up on what was happening in cities and towns all across America.

5. By 1983, USA Today was up and running and I was promoted to become managing editor at the Bridgewater Courier-News. The promotion meant overseeing all local news coverage, editorials, columns, photographs, sports, features and other content in the newspaper, while supervising a staff of about 60 journalists.

6. A year later, I was named the editor-in-chief of the Green Bay, Wis. Press-Gazette, my first opportunity to be the chief news executive. We competed with another daily newspaper in Green Bay and understood that our long-term success depended upon a strong and timely local news report. I made daily decisions about what would be in the newspaper and worked with the publisher and editorial page editor to determine the Press-Gazette's editorial positions. The newsroom included about 65 journalists.

7. I served in that position for two years until I was promoted to chief of staff for Allen H. Neuharth, the chairman and CEO of the Gannett Company, which at the time owned about 95 newspapers, including USA Today, and dozens of broadcast properties. I led two ambitious projects on behalf of Neuharth. The first was a 1987 national newsgathering tour that took us to all 50 states in 6 months by bus, capturing what made each state special by interviewing residents in small towns and metro areas. We also interviewed all 50 governors,

2

APP0287

concluding with an interview with President Reagan in the Oval Office. The project led to extensive coverage in USA Today and other Gannett newspapers, as well as two books I co-authored: Profiles in Power and Truly One Nation. This successful project was followed by an international version in 1988, which encompassed news coverage from more than 30 countries.

8.      In 1988, I was named the top editor at Florida Today, a sister paper to USA Today based in Melbourne, Florida. I oversaw a staff of about 85 journalists and had oversight of all news, sports, features, business and editorial coverage. This was a newspaper whose success came from extensive local coverage, but also investigative and enterprise reporting. It was here in 1992 that I established one of the earliest online local news operations in partnership with Compuserve.

9.      In 1992, I was named the editor-in-chief of Gannett Suburban Newspapers, a metro New York newspaper that incorporated the work of 13 daily newspapers in the counties of Westchester, Rockland and Putnam. As in prior roles, I had full responsibility for all content and news departments. I had a staff of about 140 journalists and the newspaper's circulation was almost 200,000 on Sundays. Our chief competitor was the New York Times, which did not cover suburban counties in any depth. Again, a high volume of local news stories and enterprise reporting were at the core of our operations. It was here in 1994 that I launched my second online news product, a web-based report at nynews.com.

10.      From 1997 to 2004, I accepted a position as executive director at the First Amendment Center at Vanderbilt University (and senior vice-president of parent organization the Freedom Forum). In this role, I managed an online newsroom that reported on the First Amendment and the news media. I wrote a syndicated column on the same topics published by

CONFIDENTIAL

newspapers across the country. I also began more than a decade of lectures to newspaper professionals at the American Press Institute, one of the foremost journalism training centers in the U.S., along with prominent retired journalist John Seigenthaler. We presented seminars on freedom of the press, journalism ethics and leadership to hundreds of newspaper executives in every facet of the business.

11.      During this time, I entered another form of journalism with an interview television show called Speaking Freely. The show was distributed to PBS affiliates across the nation and was recognized with an Emmy Award. In this period, I also became an adjunct professor at the Vanderbilt University College of Law, where I developed and taught a course on the dynamics between news organizations and the courts system in addressing fair trial rights.

12.      In 2004, I was recruited back into daily newspaper work as the top editor and senior-vice president for news at USA Today and USA Today.com. I had a staff of 550 journalists at a newspaper with 2.3 million circulation, the largest in America. I was responsible for all news coverage on every platform and oversaw the editorial and opinions sections. The paper had grown dramatically since those 1982 origins, but that daily report from 50 states was still there. "The Nation's Newspaper" still understood the importance of reflecting readers' roots. Every day I reviewed the day's journalism and selected the best for page one of the newspaper. We beefed up our investigative coverage and were widely recognized for our efforts. I also had the opportunity to serve as a Pulitzer Prize juror for two consecutive years.

13.      In 2009 came a new opportunity, this time as president of the Newseum, a newly-built museum about news and history in Washington D.C. It was here that we hosted seminars

4

CONFIDENTIAL

and presentations on the news business, journalism ethics, digital journalism and the role of a free press in a free society.

14. By 2011, I had returned to the First Amendment Center as CEO. I also began writing as a columnist on the media and the First Amendment for USA Today. I also became president of the American Society of Newspaper Editors, the largest organization of newspapers editors in the U.S. I was also named chair of the Public Broadcasting Standards Review Committee for 2011-2012.

15. In 2013, I was recruited to be the dean of the College of Mass Communications at Middle Tennessee State University, overseeing the journalism school and the media arts and recording industry departments, while also serving as a member of the journalism faculty. I became involved in the accreditation of other journalism schools, reviewing curricula and the quality of journalism education on behalf of the Accrediting Council on Education in Journalism and Mass Communication. I have also testified before Congress about free speech on college campuses.

16. In 2019, I retired as dean and founded the Free Speech Center at Middle Tennessee State University, a public policy center similar to the First Amendment Center. As part of my role in overseeing the center, I supervise its news operations and write columns published in dozens of newspapers across the country. I remain a professor at MTSU and also serve as editor and publisher of the First Amendment Press, an academic press.

17. Over the years, I've been honored to be recognized for my work in journalism. The Society for Professional Journalists has named me a Fellow of SPJ, the highest honor the society awards. The University of Missouri School of Journalism has given me its Honors Medal for

5

Distinguished Service in Journalism. I've also been awarded honorary doctorates from American University and Buena Vista University.

18.     In the course of my 52-year career, I have worked in six newspaper newsrooms with a combined circulation of almost 2.8 million. Across these newsrooms, I managed more than 900 journalists in total over the years, and I edited or oversaw more than 9,000 staff-written editorials. My curriculum vitae, listing my education, experience, honors, and the publications I have authored in the past 10 years, is attached as Attachment 1.

## II.     Findings

In preparing this review and assessment of the *Las Vegas Sun* print newspaper,[1] I've relied primarily on its content spanning approximately 13 years,[2] plus a daily review of LasVegasSun.com since March 1, 2020. I was asked to analyze the content of the print newspaper and determine whether it has met the high standards of newspaper quality consistent with U.S. metropolitan daily newspapers. That measure comes from a 2005 agreement with the Las Vegas Review-Journal, which also specified that the newspapers would work cooperatively toward the success of a joint printed news product.

Based on my findings, detailed below, I conclude that the *Sun* has fallen well short of those standards.[3]

---

[1] In this report, the italicized terms "*Sun*" and "*Review-Journal*" refer to the newspapers of the same name, while the unitalicized terms "Sun" or "Las Vegas Sun, Inc." and "Review-Journal" or "Las Vegas Review-Journal" refer to the entities that control these newspapers.

[2] Print editions of the *Sun* were accessed using Shoom: a service that collects and maintains as-printed copies of print newspapers in PDF form. SHOOM, https://www.shoom.com/ (last visited Sept. 18, 2022). Microfilm records were used to review print editions of the Sun for 2009.

[3] *See*, *infra*, Findings 1–9.

6

CONFIDENTIAL                                                                 APP0291

The *Sun*'s greatest public recognition, of course came on April 21, 2009, when the paper was awarded the Pulitzer Prize for public service.[4]

Reporter Alexandra Burson had written a compelling series revealing how the construction industry and the Occupational Safety and Health Administration had turned a blind eye to worker safety, leading to 12 deaths in 18 months. Colleagues Natt Hufman and Dave Clayton hammered her findings home in powerful editorials, and the construction business responded with reforms.[5]

Buoyed by the win, *Sun* owner and publisher Brian Greenspun talked to a reporter that afternoon and promised more of the same.

Greenspun said people still want and need in-depth stories, "the ones that tell the 'why' and the 'how' — that makes a city and community better," according to the article in the *Sun*.[6]

That was an apt observation, but not an unusual one. In many ways, giving readers local news in a timely fashion has been at the heart of American newspapering since the birth of the industry in the U.S. about three centuries ago.

I've seen many newspapers climb to even greater heights after winning a Pulitzer Prize. As a former Pulitzer competition juror, I saw firsthand the extraordinary quality of the work submitted. Winning the award can dramatically enhance the reputation of a newspaper and make the recruiting of top journalists much easier.

---

[4] *Sun Wins the Pulitzer Prize*, LAS VEGAS SUN (April 21, 2009, 2:00 A.M.), https://lasvegassun.com/news/2009/apr/21/sun-wins-pulitzer-prize/.

[5] *Id.*

[6] *Id.*

CONFIDENTIAL

APP0292

Unfortunately, the Pulitzer did not set the *Sun* on a path to greater achievements. The *Sun* newspaper began a steady decline that continues to this date.

How did the *Sun* lose its way? The background: The newspaper was launched on May 21, 1950, by Hank Greenspun, the father of the current owner.[7] It was published in the mornings until a 1989 agreement with the Las Vegas Review-Journal, when the paper moved to afternoon publication.[8]

In 2005, the parties each promised to maintain minimum levels of newspaper quality for both newspapers: a new agreement between the two papers meant the *Sun* would be published each morning inside the *Review-Journal*, with the *Sun* freed of administrative and publishing responsibilities. Las Vegas Sun, Inc. would only be responsible for creating a local newspaper of high quality. The Sun, in turn, would receive a percentage of the profits, if any, from the joint operation.

In the 2005 agreement, the parties each promised to maintain minimum levels of newspaper quality for both newspapers: "The Review-Journal and Sun each hereby agrees to preserve high standards of newspaper quality throughout the term of this Restated Agreement consistent with United States metropolitan daily newspapers."[9]

There's another important requirement in the 2005 agreement: "Sun and Review-Journal agree to take all corporate action necessary to carry out and effectuate the intent, purposes and

---

[7] *About the Las Vegas Sun*, LAS VEGAS SUN, https://lasvegassun.com/about/ (last visited Sept. 16, 2022).
[8] *See* ECF No. 39-2 at 14 (1989 Joint Operating Agreement ("JOA") § 5.1).
[9] ECF No. 39-5 at 6 (2005 JOA § 5.2).

8

CONFIDENTIAL                                                      APP0293

provisions of this Restated Agreement, and to cooperate with the other party in every reasonable way that will promote successful and lawful operation . . . ."[10]

Taken together, the provisions require both the Review-Journal and the Sun to publish high quality newspapers comparable to other good metropolitan newspapers and that they cooperate in the success of their joint publication.

The Las Vegas Sun, Inc. retained full responsibility and profits for the online counterpart to the *Sun* newspaper, LasVegasSun.com.

Very quickly, the online operation became the focal point of Greenspun Media's operations. To be clear, many metro newspapers in this time period were investing in improving their online presence, but not at the expense of their print newspapers, which continued to drive the majority of their advertising revenues.

On January 13, 2008, in the *Sun*, owner Brian Greenspun announced the launch of a new website. He cast it not just as an improvement for Las Vegas residents, but also as a veritable revolution in American journalism:

"This is just the next step, albeit a very big one, in an overall plan that we believe will be the template for newspapers and media organizations across the country," said Brian Greenspun, quoted in a *Sun* article published that day.[11]

Mr. Greenspun continued: "I cannot say that this is the be-all and end-all of Internet news content. But what I do believe is that we are going to be closer to it than anybody else in the country. And we plan to keep plugging away until we get it absolutely right. I know that we are

---

[10] *Id.* (§ 5.3).

[11] *It's Here, All New: Lasvegassun.com*, LAS VEGAS SUN (Jan. 13, 2008, 2:00 A.M.), https://lasvegassun.com/news/2008/jan/13/its-here-all-new-lasvegassuncom/.

9

probably going to take some criticism for being too far out on the edge, for trying too many things; for trying to get too sticky, if you will. . . . But I would rather be accused of being too far out than too far back. And it's important to newspapers and media all over this country that we figure this out. And so the *Las Vegas Sun*, the Greenspun Media Group, will be at the forefront."[12]

Brian Greenspun was shifting the *Sun*'s creative energies and resources into what it viewed as a more exciting venture where Greenspun Media could keep all the profits and receive kudos from the entire industry.

Rob Curley, a prominent online news manager who would later be hired by Greenspun Media, wrote a rave review of the site in his January 16, 2008, blog.[13]

"You gotta give the company credit for investing heavily in a new-media strategy in 2008. Lots of newspapers were investing (at least a little) back in 1998, but how many are still investing now? From an online perspective, this newspaper seems to be going from zero to 100 miles-per-hour almost overnight. It's impressive and refreshing to see in this time of doom and gloom in our industry," Curley wrote.[14]

Suddenly, the *Sun* was all about digital delivery and new products that would fall outside of its agreement with the Review-Journal. And the shift was only beginning.

Curley's January 16 blog alluded to the new mindset:

"While I was in Las Vegas for CES last week, I got to spend some time with my friends on The *Sun*'s web staff on a couple of different evenings after the conference. I've seen some of the

---

[12] *Id.*

[13] Rob Curley, *Check Out the New Las Vegas Sun Site*, ROB CURLEY (Jan. 16, 2008), https://robcurley.com/2008/01/16/check-out-the-new-las-vegas-sun-site/.

[14] *Id.*

10

other new things they are building that will launch over the next few months, and it's some of the coolest shit I've ever seen a 'newspaper' do. I put quotes around 'newspaper' because these folks aren't acting like any newspaper I've ever seen, and that's pretty dang interesting."[15]

It wasn't long before Greenspun hired Curley to run his new product line.[16]

Then in 2009, Greenspun launched another non-print venture, a new TV show called 702.tv:

"The Greenspun media family is launching an alternative to traditional local TV news — a show its creators say is savvy, hip and fun, using elements drawn from the Web to provide coverage of entertainment, sports and news," the *Sun* reported.[17]

Curley's comments at the time were revealing. "If 'The Daily Show,' the Travel Channel, the Food Network and E! were to try to do a daily local show in Las Vegas, this is what it might look like," Curley told the *Sun*.[18]

If that sounded lightweight, Curley was quick to reassure: "We'll also tell you what the governor's latest vetoes are in Carson City, doing it in a way that puts a smile on your face or makes you chuckle a little."[19]

702.tv was cancelled within 4 months.[20]

---

[15] *Id.*

[16] Justin Ellis, *Las Vegas Sun*, ENCYCLO: NIEMAN JOURNALISM LAB (May 31, 2011), https://www.niemanlab.org/encyclo/las-vegas-sun/.

[17] Dave Toplikar, *A New Kind of Local TV News Show Debuts*, LAS VEGAS SUN (June 16, 2009), https://lasvegassun.com/news/2009/jun/16/new-kind-local-tv-news-show-debuts/.

[18] *Id.*

[19] *Id.*

[20] Ellis, *supra*, note 16.

CONFIDENTIAL                                          APP0296

On Dec. 7, 2009, the Greenspun Media Group made headlines in the *Las Vegas Business Press*:[21]

> ### Greenspun Media Group cuts staff again
> ***Editors, reporters laid off as publisher seeks sounder financial footing***
>
> **BY VALERIE MILLER**
>
> *The Greenspun Media Group, publisher of the Las Vegas Sun and In Business Las Vegas, laid off close to 30 employees Dec. 1 as part of a second major restructuring to consolidate its print and interactive operations.*
>
> *Veteran reporters and editors with the Sun, its sister publications and online were among those laid off. …*
>
> *Greenspun Media Group will "reorganize into a single location, with the goal of fully integrating print and interactive operations," according to a statement released by Greenspun Chairman Brian Greenspun.*
>
> *As part of that move, the company is combining the operations of its daily paper with the Las Vegas Sun Web site and the staffs of the Sun, Las Vegas Weekly, LasVegasWeekly.com, In Business Las Vegas, Las Vegas Magazine, Vegas Magazine and Vegas2Go. …*
>
> *The Greenspun Media operations will also be moved from two buildings into one location.*
>
> *"The effort aligns into one team the editorial, online, advertising, marketing, production, human resources and finance arms of the local media operation," the statement said in part. …*
>
> *The latest cuts follow the closure of Greenspun's community newspapers, the Henderson Home News and Boulder City News, and the shutdown of Web and TV program 702.tv.*

One important takeaway from the announcement was that the staffs of Greenspun Media operations were being combined into a single newsroom, generating content for all of the

---

[21] Valerie Miller, *Greenspun Media Group Cuts Staff Again: Editors, Reporters Laid Off as Publisher Seeks Sounder Financial Footing*, LAS VEGAS BUS. PRESS, Dec. 7, 2009.

CONFIDENTIAL

APP0297

properties.[22] Use of that staff could then be allocated to reflect Greenspun's priorities. That would prove revealing over time.

From 2009 on, Greenspun's commitment to the *Sun* in print would gradually disappear, with declining local news coverage spanning more than a decade.

The newspaper's quality has steadily eroded over the past decade. Today it's a substandard newspaper going through the motions, failing to serve its readers and community, and in clear violation of the 2005 agreement that mandated the high quality standards of metro newspapers, as this report will document.

## Finding #1: The print *Las Vegas Sun* rations local news stories, despite a wealth of local content created by Greenspun Media.

An important gauge of the quality of a newspaper is whether it informs its community. Does it fill its pages with content that is uniquely valuable to its hometown?

At its most basic, the question is, "Is there local news in the local *news*paper?"

In the case of the *Sun*, not much.

As explained further below, the *Sun* now offers readers an average of about two staff-written local news stories per day. This is all the locally produced coverage it has for government, crime, sports, business, education, health, the environment, gaming and more.

This report will detail the many ways the *Sun* in print abdicates its journalistic responsibilities. But the above statistic says it all. You cannot pretend to inform your community when you average just two stories a day over 8 pages, especially when more than a fourth of the newspaper's editions contain just one local news story.

_____

[22] *Id.*

13

Why is local news important to a local newspaper? It's important for the same reason that locally prepared food is critical to a local restaurant. It's the very reason for its existence.

When this report refers to "local news," that means news stories written by the local newspaper staff. Even articles written about national topics are local stories in the hands of local reporters. Whether it's about the election of a new president or the outbreak of a pandemic, a local story tells the impact of the national news on this particular community, often told through the views of local residents and experts.

Generations of journalists have been taught that local news consists of content that (1) is current and (2) reports on events that are nearby or that have a local impact. These basic criteria are often referred to as *timeliness* and *proximity* and are at the very foundation of local American journalism.

Consider the consensus of journalists, public relations professionals, educators and scholars on some of the most valuable elements of a good newspaper.

Almost all journalists and students of journalism in the United States have been exposed to the basic tenets that define news. Those tenets include timeliness, proximity, conflict, impact, human interest, and novelty according to Norma Green in her article "Concepts of News."[23]

The concepts emerged about 300 years ago and continue to guide journalists today. These criteria guide journalists, ranging from writers and editors to photographers and editorial cartoonists, in determining what is newsworthy, according to Green.[24]

---

[23] Norma Green, *Concepts of News*, *in* AMERICAN JOURNALISM: HISTORY, PRINCIPLES, PRACTICES 34–43 (W. David Sloan & Lisa Mulkin eds., 2002).

[24] *Id.*

14

In 2010, Colleen Cotter randomly chose five news writing textbooks and codified news values from those books, and she found that all the textbooks listed timeliness and proximity in the top four of journalism values. Timeliness is listed as the top news value by four of the five textbooks. Likewise, proximity was listed as second in import in four of the five news writing textbooks.[25]

These values provide objective, quantifiable metrics of news quality. One can simply observe the time between the occurrence of an event and the reporting of that event to quantify timeliness, for example. Newspaper content analyses of these and similar traits – traits identified by newspaper editors -- have, for years, been used by scholars to provide valid and reliable indications of news quality.[26]

While journalists may not specifically refer to these terms in day-to-day operations, they guide daily news selection and are operationalized through newsroom routines.[27] It is not surprising, then, that ongoing research shows these traditional news values, such as "timeliness," "proximity," "prominence and importance," "conflict and controversy," etc. contribute to the level of quality journalists perceive about their content.[28] Indeed, the ubiquity of these concepts extends to Western Europe, where they are cited as essential characteristics of news quality.[29]

Beyond scholars and academics, professional journalists also consistently cite the importance of immediacy and proximity.

---

[25] COLLEEN COTTER, NEWS TALK: INVESTIGATING THE LANGUAGE OF JOURNALISM (2010), https://doi.org/10.1017/CBO9780511811975.

[26] STEPHEN LACY & TOM ROSENSTIEL, DEFINING AND MEASURING QUALITY JOURNALISM 27–37 (2015), https://www.issuelab.org/resources/31212/31212.pdf.

[27] COTTER, *supra* note 25, at 72.

[28] Pamela Shoemaker & Stephen D. Reese, MEDIATING THE MESSAGE IN THE 21ST CENTURY: A MEDIA SOCIOLOGY PERSPECTIVE 171 (2013).

[29] Joy Jenkins & Rasmus Kleis Nielson, *Proximity Public Service,* 21 JOURNALISM STUD. 236, 236–53 (2020).

CONFIDENTIAL

The PBS Newshour, for example, places timeliness and proximity at the top of its list for student reporters[30]:



---

30 *What Is Newsworthy?*, PBS:NEWSHOUR STUDENT REPORTING LABS, https://www.pbs.org/newshour/classroom/app/uploads/2013/11/What-is-Newsworthy-Worksheet.pdf (last visited Sept. 11, 2022).

16

CONFIDENTIAL                                                                    APP0301

Based on a study of more than a century of journalism reporting and writing textbooks dating to 1894, former journalist Perry Parks concludes:

> Although texts have listed many dozens of discrete terms to describe news selection criteria **over the past century, a handful—timeliness, proximity**, prominence, unusualness, impact, human interest, and conflict—**stand out as resilient consensus values across time**.[31]

And the **Evangelical Press Association** notes:

- **Timeliness:** In the news business, newer is better, and stories grow old in a hurry. You can think of news as a baked good that is best served fresh -- after a while it's stale and nobody is interested.

- **Proximity:** People are more interested in home-grown news than in news from far-away places. A toxic waste dump in Russia is mildly interesting. A toxic waste dump in your neighborhood is major news![32]

In virtually any published list of news values, there are multiple elements, and each of the examples cited here list additional positive attributes. But none are more widely and emphatically cited as the need for news to be fresh and focused on the local community. These values are the very foundation of professional news coverage.

*Sun* owner Brian Greenspun clearly understands the importance of a timely and thorough local news report in print. In 2013 sworn testimony, he said, "To be full and complete, media is required to originate content, not simply recycle it or link to others."[33]

There was a time in the *Sun*'s history when the paper had a genuine and consistent commitment to Las Vegas.

---

[31] Perry Parks, *Textbook News Values: Stable Concepts, Changing Voices*, 96 Journalism & Mass Commc'n 784 (2019) (emphasis added), https://doi.org/10.1177/1077699018805212.

[32] *Journalism 101: What Makes a Story Newsworthy?*, EVANGELICAL PRESS ASSOC., https://www.evangelicalpress.com/jou101/ (last visited Sept. 11, 2022).

[33] Declaration of Brian L. Greenspun in Support of Plaintiff's Reply In Support of Emergency and for Preliminary Injunctive Relief ¶ 17, Greenspun v. Stephens Media LLC, No. 2:13-cv-01494 (D. Nev. Sept. 4, 2013).

17

CONFIDENTIAL

APP0302

A sampling shows that in 2009, with the same number of pages it has today, the *Sun* newspaper published about 91 staff-written articles, editorials and columns per week – **about 13 per day**. How would that compare today? As explained below, the current average of staff-written news stories in the *Sun* is about 2 per day. We also know that in the first 6 months of 2022, the *Sun* printed less than one staff-written editorial or opinion column per day – 0.51 such pieces on average per day to be precise.[34] That would mean a daily average of about 2.51 staff-written articles, editorials and columns per day in 2022, a reduction of 80 percent of the local news, editorials and columns once offered to readers of the print *Sun*. Today, despite its staff writing and creating dozens of locally produced articles each week used in Greenspun Media's other publications and available for the *Sun* newspaper to use, the print *Sun* averages only about two locally produced news stories a day.

The *Sun* is part of a media company that creates extensive local coverage spanning government, education, politics, health, sports, entertainment and much more. That information – created by the same merged newsroom that writes for the print product – appears on the online version of the *Sun*, and other print publications owned by Greenspun Media and largely not in the printed *Sun*.

The research for this report began with a review of the *Sun*'s local news content in print. Beginning in 2011, our research focused on the local news story count, with local opinion pieces included in a separate measure. We examined local news coverage for every year from 2011 forward, tallying local news content through scientifically random sampling, as described below.

_____

[34] From the period of 2011 forward, my review of the Sun newspaper separately tracked the incidence of staff-written news stories separate from my tracking of staff-written opinion and editorial columns.

CONFIDENTIAL



- In **2011**, the *Sun* averaged **7.07** local news stories per day.

- In **2012**, the *Sun* averaged **6.21** local news stories per day.

- In **2013**, the *Sun* averaged **4.28** local news stories per day.

- In **2014**, the *Sun* averaged **4.07** local news stories per day.

- In **2015**, the *Sun* averaged **2.43** local news stories per day.

- In **2016**, the *Sun* averaged **1.85** local news stories per day.

- In **2017**, the *Sun* averaged **1.71** local news stories per day.

- In **2018**, the *Sun* averaged **1.5** local news stories per day.

- In **2019**, the daily average was **2.14** local news stories per day. (In August of 2019, the Review-Journal filed litigation alleging that the *Sun* was saving its best content for its website and publishing "substandard and often stale content.")

- In **2020,** the *Sun* published an average of **2.14** local stories in its newspaper each day.

- And, in **2021**, the *Sun* published an average of **1.78** local stories in its newspaper each day.

From 2009 through 2010, the *Sun* was a robust local newspaper with extensive local content. This was a period during which Las Vegas and surrounding communities were clearly a priority for the *Sun*.

19

CONFIDENTIAL

APP0304

Today, as noted, despite its staff writing and creating dozens of locally produced articles each week used in Greenspun Media's other publications and available for the *Sun* newspaper to use, the print *Sun* averages only about two locally produced news stories a day.

Greenspun Media pours hundreds of staff-written local stories into LasVegasSun.com each year but withholds the vast majority of that content from the *Sun*'s print edition.

The data show a clear pattern. We did a side-by-side comparison, quantifying the total number of staff-written news articles posted on LasVegasSun.com from March 2020 through August 2022 and compared that with the subset of those staff-written news articles published in the print Sun during the same time period. **This comparison showed that 79 percent of the content created by the *Sun* staff was intentionally excluded from the Sun print paper and kept away from customers or potential customers of the joint print product.**

In response to business pressures during the pandemic, the *Sun*'s page count was reduced in March 2020 to 6 pages daily, down from the daily average of 8 pages. For almost 12 months, the *Sun* had 14 fewer pages each week. Did that have an impact on the quality of the *Sun*'s local news report? It did not.

There's no correlation between the number of pages in the print *Sun* and the number of local stories it publishes.

That's illustrated by the editions of the print *Sun* in the wake of COVID-19.

In January and February of 2020, before pages were reduced during March, the *Sun* averaged 2.13 local stories a day.

20

CONFIDENTIAL

In the first six months after the page reductions, the *Sun* averaged 2.26 local stories a day, despite the smaller paper. The newspaper publishes an average of two local stories a day, whether that's in a 6, 8 or 10-page edition.

The *Sun*'s refusal to publish more than a fraction of its local news stories in its flagship newspaper is inexplicable and intentional. Local news is the most valuable asset of a news organization and yet the *Sun* persistently deprives the readers of the joint print product of this content.

**Methodology:** I was assisted in the gathering of data for this report by Larry Dailey, Professor Emeritus, D.W. Reynolds School of Journalism at the University of Nevada, Reno, who worked at my direction and under my supervision.

The average daily story count for the years was determined by a content analysis[35] via an accepted sampling technique with roots in a 1952 study by Guido H. Stemple III.[36] The method was later refined and clarified by scholars such as Daniel Rifle, Charles E Aust and Stephen R. Lacy.[37] They found that a form of random sampling including two "constructed weeks," was sufficient to quantify a daily publication's content over a year's time. A constructed week randomly samples Mondays, Tuesdays, etc., over a period to construct a representation of newspaper content over that time. Since "[t]he distribution of newspaper stories is simply not normal, constructed weeks produce better estimates than purely random sample because they

---

[35] LACY & ROSENSTIEL, *supra* note 26, at 27–37

[36] Guido H. Stempel, *Sample Size for Classifying Subject Matter in Dailies*, 29 JOURNALISM Q. 333 (1952), https://www.proquest.com/openview/4700209f366114023e81d0d973dcfd91/1?pq-origsite=gscholar&cbl=181841 4.

[37] Daniel Rife, Charles F. Aust, Stephen R. Lacy, *The Effectiveness of Random, Consecutive Day and Constructed Week Sampling in Newspaper Content Analysis*, 70 JOURNALISM Q. 133 (March 1, 1993), https://doi.org/10.1177/107769909307000115.

21

avoid the possibility of oversampling Sundays or Saturdays."[38] Increased sampling frequency does not provide a statistically significant difference. In the course of my sampling, I used random weeks that were determined with the assistance of a random number generator.[39] An intercoder reliability[40] test was used to confirm that both individuals collecting this data (myself and Larry Dailey) were gathering statistically equivalent findings. As mentioned above, opinion content and local news were quantified in our review together as local content during the period of 2009 through 2010, and they were quantified separately for the period beginning in 2011.

Supplementing those statistics and providing an even fuller picture of the newspaper's evolution, we used the same sampling technique to get a sense of the *Sun* from 2009 through 2010, tallying the total number of staff-written news stories, editorials and opinion columns. We have also reviewed the *Sun* in full week analyses of the first week of each quarter in 2017, 2018 and 2019. For 2020 through August 31, 2022, there was a daily review of the content of every edition of the *Sun* in print, a total of 973 days.

---

[38] *Id.*

[39] *See* random.org.

[40] MATHEW LOMBARD, JENNIFER SNYDER-DUCH, CHERYL CAMPANELLA BRACKEN, PRACTICAL RESOURCES FOR ASSESSING AND REPORTING INTERCODER RELIABILITY IN CONTENT ANALYSIS RESEARCH PROJECTS (Oct. 23, 2004), https://www.researchgate.net/profile/Cheryl-Bracken/publication/242785900_Practical_Resources_for_Assessing_and_Reporting_Intercoder_Reliability_in_Content_Analysis_Research_Projects/links/0deec52e14791a0d6f000000/Practical-Resources-for-Assessing-and-Reporting-Intercoder-Reliability-in-Content-Analysis-Research-Projects.pdf; Klaus Krippendorff, *Reliability in Content Analysis*, 30 HUMAN COMMC'N RSCH. 411, 411-33 (2004), https://doi.org/10.1111/j.1468-2958.2004.tb00738.x.

22

CONFIDENTIAL

**Finding #2: The minimal local news published by the *Sun* is just a fraction of the percentage of local news coverage provided by comparable metro newspapers.**

One widely embraced measure of a newspaper's quality is how much of its content is generated by its own staff and what percentage is simply bought from other services.[41] It costs much more to create the former than to republish the latter, largely because local news requires local employees, equipment, facilities, and many other expenses. Of course, it would cost Las Vegas Sun, Inc. nothing more to place the local content it already has in the print newspaper.

A good local newspaper would rely largely on its own staff to fill a newspaper, strategically using "wire" stories for supplemental coverage. "Wire" content is an industry phrase for purchasing syndicated content from third parties who provide the same stories and features to newspapers across the country and often around the world. A lesser local paper will have fewer local stories and pad out their pages with wire copy.

The Sun, under the terms of its agreement with the Review-Journal, has agreed to maintain high quality standards consistent with United States metropolitan daily newspapers.

Determining whether the *Sun* is maintaining peer quality standards is a matter of comparing the *Sun* to peer newspapers. As a benchmark to assess relative quality, I looked to the *Sun*'s peer newspapers, specifically those daily-publishing newspapers that are in roughly the same sized metropolitan areas as the *Sun*. Those papers include the McClatchy-owned *Sacramento Bee*, which publishes in a metropolitan area slightly more populous than the *Sun*, as

---

[41] LEO BOGART, PRESS AND PUBLIC: WHO READS WHAT, WHEN, WHERE, AND WHY IN AMERICAN NEWSPAPERS (1989); Koang-Hyub Kim & Philip Meyer, *Survey Yields Five Factors of Newspaper Quality*, 26 NEWSPAPER RSCH. J. 6 (2005), https://doi.org/10.1177/073953290502600102; LACY & ROSENSTIEL, *supra* note 26; Stephen Lacy & Frederick Fico, *The Link Between Newspaper Content Quality and Circulation*, 29 NEWSPAPER RSCH. J. 333 (1991), https://doi.org/10.1177/073953299101200206.

CONFIDENTIAL

well as Gannett's *Cincinnati Enquirer* and *The Austin American-Statesman*¸ both of which publish in metropolitan areas that are slightly smaller than the Las Vegas area. And, of course, the *Review-Journal* is another of the *Sun*'s peer newspapers.

**Methodology:** The staff and wire counts for each of the above publications were determined using a content analysis that employed the same "constructed week" methodology explained above.[42] These newspapers were compared side-by-side with the *Sun* for two randomly determined weeks in 2019. We likewise employed the same intercoder reliability test discussed above to confirm that both individuals collecting this data (myself and Larry Dailey) were gathering statistically equivalent findings.



Simply put, in a sampling of the 2019 publication year, the *Sun* did not meet the quality standards of any of its peers. And a comparison extending into 2020 verifies that the trend continues.

During the sampled period, the *Sun's* local percentage averaged about 28 percent, while its peers averaged about 45 percent.

As anemic as that percentage is, the gap with other metro papers is actually more stark than that. The *Sun* selects extraordinarily long wire stories that often run a full page. The *Sun's*

---

[42] LACY & ROSENSTIEL, *supra* note 26; *see also* Stempel, *supra* note 36; Rife, Aust & Lacy, *supra* note 37.

24

percentage of local content is only in the double digits because it runs so few stories – local and wire – in any single edition.

There's a second important factor when comparing the *Sun*'s content with peer metro newspapers. Does the newspaper put most of its local online stories in the print product, enriching the print reader's experience, or does it hold a significant percentage back?

In January of 2022, we examined each of these newspapers and their websites on a daily basis, tallying the news content. I looked at the total number of local news stories – the population – posted by the newspaper in each market and assessed how much of that content was in turn shared with readers of the newspaper.

In every newspaper except the *Sun*, a majority – sometimes a vast majority – of the local stories posted online were published in the newspaper.



- In the *Las Vegas Review-Journal*, **91.6** percent of the online content appeared in the newspaper.

- In the *Austin American-Statesman*, that total was **86.1** percent.

- In *The Sacramento Bee*, the tally was **70.4** percent.

- In *The Cincinnati Enquirer*, **60.5** percent of the online content appeared in the newspaper.

- Far below is the *Las Vegas Sun*, which published just **23.8** percent of the local news stories it created and posted online.

The *Sun's* shared print/online newsroom generates so much local content that it could fill the paper with a wide range of articles every day. It does exactly that on the *Sun*'s website, which offers

25

APP0310

much deeper and more substantive news reporting than the print *Sun*. By tapping all of its enterprises for content, Greenspun Media enriches the *Sun* online, while undercutting the value of the *Sun* in print.

**Finding #3: The *Sun*'s print news report is often stale, with articles and columns that appeared days earlier in other publications.**

Of course, a core element of news is timely information.[43]

In fact, the word "News" is derived from "new"[44] and not the apocryphal acronym of North-East-West-South.[45]

Brian Greenspun himself stated in 2004 that "a stale, dated newspaper is not as important and valuable to its readers as is a current and fresh publication."[46] He predicted that if readers in a certain area were delivered copies of the *Sun* in print that were even one day old "demand for the *Sun* in this area will deteriorate."[47]

But today, much of the daily *Sun* in print is not "new" in any sense. As discussed below, the print *Sun* has been overwhelmingly stale, with staff-written stories first appearing on the web not being published in the newspaper for another two, three or more days later, if at all, and wire stories routinely delayed for a longer period.[48]

---

[43] Green, *supra* note 23, at 34, 69; Shoemaker & Reese, *supra* note 28, at 171.

[44] *News,* Oxford English Dictionary (3rd ed. 2003); *What Is Newsworthy*, *supra* note 30.

[45] Samantha Putterman, *No, 'Newspaper' Isn't an Acronym for 'North, East, West, South, Past and Present Event Report'*, POLITIFACT (Sept. 18, 2019), https://www.politifact.com/factchecks/2019/sep/18/facebook-posts/no-newspaper-isnt-acronym-north-east-west-south-pa/.

[46] DEFS0155423.

[47] *Id.*

[48] As discussed below, there has been a recent shift with respect to timeliness of publication of staff-written content beginning in 2020. While the publication of wire stories continues to be routinely delayed by the *Sun*, for the past two years, the *Sun* has improved the timeliness of its publication of staff-written content – a change that appears to have been prompted by the lawsuit.

CONFIDENTIAL

Most appalling is that this isn't journalistic negligence. It's in fact an intentional delaying of the news.

That is readily apparent from our review of the *Sun*'s content, and it is confirmed by a November 2016 email that related to a note from a reader who complained about not seeing a story in the *Sun* newspaper in timely fashion.[49]

Then-*Sun* Managing Editor Ric Anderson drafted the following response to the reader: "We typically **don't publish competitive breaking news in the Sun print publication** for two reasons. One, the R-J generally would publish their story in the A or B section, so it would appear to the casual reader that we'd be repeating the R-J's story. **Two, in order to optimize human resources, we publish the Sun print publication days in advance**."[50]

Anderson sent a copy of his note to *Sun* owner Brian Greenspun, writing: "If you'd like, I'd be happy to revisit these workflows and our content strategy for the Sun." Greenspun responded "Thanks, no worries."[51] Greenspun's response makes clear that delaying the news in print was the *Sun's* policy and strategy.

Most telling was Anderson's second explanation. The *Sun* pre-packages much of its daily content days in advance – in Anderson's words "to optimize human resources."[52] That's a euphemism for "we're not going to go to the trouble or expense of publishing timely local news." By letting the news sit for a couple of days, a staffer can get around to designing pages at his or her convenience after other duties are done.

---

[49] SUN_00083789–90.
[50] *Id.* (emphasis added).
[51] *Id.*
[52] *Id.*

CONFIDENTIAL

APP0312

This practice continued after Ray Brewer took over as managing editor of the *Sun*. In 2018, a third party emailed Brewer asking if a story on LasVegasSun.com would also appear in the *Sun*'s print edition. On a Wednesday, Brewer responded, "I will get the story in the paper in the next few days likely Friday or Monday."[53] He explained this two- to five-day delay to run the story in print like so: "We reverse publish here at the LV Sun, meaning **all stories appear online before the paper**. In fact, the paper—most editions—is **built a few days ahead of time**."[54]

These practices by the Sun have sent a clear signal that the print newspaper and its readers are Greenspun Media's lowest priority. The *Sun*'s staff are apparently receiving this signal loud and clear. One *Sun* copy editor wrote an email in 2014 describing a meeting in which *Sun* managers, including Anderson, demonstrated that they "care shit about Sun print."[55]

What does that mean for readers of the joint newspaper?

For years, it has meant that they would see a fraction of the local stories that appear in the online *Sun* and much of it was no longer news.

In addition to our sampling of the *Sun* newspaper during the years 2011 through 2020, we've also done a deeper exploration into the first week of every quarter in 2017, 2018 and 2019. That means a day-by-day assessment of the first week of January, April, July and October in each of those years.

We'll start with 2017. In each of these years, we'll provide an overview of the statistics based on the first week of each quarter. To illustrate how this data translates into the daily newspaper, included below is a day-by-day dive into the first week of each year.

---

[53] SUN_00068060

[54] *Id.* (emphasis added).

[55] SUN_00024669.

CONFIDENTIAL　　　　　　　　　　　　　　　　　　　　　　APP0313

Here, for example is the first week of 2017 in the print *Sun*:



*Sun* New Year's photo page, published on January 4, 2017, four days after the event.

**Sunday, January 1, 2017**

- Front page local story: Story about racial diversity in Valley neighborhoods. This was first posted online **6 days earlier.**[56]
- There's also a photo page showcasing the best 2016 work of staff photographer Steve Marcus.

**Monday, January 2, 2017**

- Page one local story: "New Las Vegas High School football coach eyes return to program's past glory," posted online **9 days earlier.**

**Tuesday, January 3, 2017**

- There was one local story. "Vetting Nevada's casino games takes a meticulous team," first published online **5 days earlier.**

**Wednesday, January 4, 2017**

- The one local story is headlined "Too few Rebel fans taking their seats," first published online **5 days earlier.**
- The edition also included a local photo page headlined "A very Vegas New Year's," from New Year's Eve, **4 days earlier.**

---

[56] I identified when the story was first posted online by locating the story (and the story's publication time stamp) on the Sun website using a Google search of the story's text.

29

**Thursday, January 5, 2017**

- The front-page local story was "How Nevadans can better handle holiday credit-card debt," which was published online 6 days earlier.
- A photo page "Looking Back at UFC 207" covered an event occurring the preceding Friday, **6 days earlier**.

**Friday, January 6, 2017**

- The front-page local story was "Ground broken on drone-testing range in Henderson," first published online **3 days earlier.**
- The edition also included a photo page "Faraday Future's FF91 wows at unveiling," from an event **3 days earlier.**

**Saturday, January 7, 2017**

- Page one local story: "Wait is over for the latest in TVs," first posted online **2 days earlier.**



*A UFC photo page that was published online six days prior to publication in the printed <u>Sun</u> newspaper.*

**Our examination of a full four weeks in 2017 shows that 28 of the 45 news stories and photo pages appeared more than 2 days after the event or being posted online, a percentage of 62 percent.**

30

APP0315

Turning to 2018, here's the first week of that year:



*Sun* front page from January 6, 2018. The entire edition contained no staff-written local stories. The "CES 2018" story, which is about a Las Vegas event, was written by *The New York Times*.

**Monday, January 1, 2018**

- Page one local story: "Some table games at Palace Station now feature smartphone charging outlets," published after being posted online **5 days earlier.**

**Tuesday, January 2, 2018**

- One local story on page one: "Hot team, hot bet" about betting on the Golden Knights to win the Stanley Cup, published after it was posted online **6 days earlier**.

**Wednesday, January 3, 2018**

- No local staff-written story in this edition.
- There is a photo page about New Year's Eve in Las Vegas, **3 days after the event.**

**Thursday, January 4, 2018**

- There is one local news story on page one. "Construction approaches on $58 million freeway enhancement near Apex." It appeared online **2 days earlier**.

- In this edition, there is also a photo page about Nevada's newest state park, published **3 days after the event.**

**Friday, January 5, 2018**

- The front page has a story about the Golden Knights' fans, "Because of you, Golden Knights have massive home-ice advantage." It appeared online **2 days earlier**.

31

**Saturday, January 6, 2018**

- There are **no local staff-written stories** in this edition. An **article by *The New York Times – about a Las Vegas event –*** is in the primary front-page position.

**Sunday, January 7, 2018**

- This edition has just one local news story, "Phase Two of convention center expansion to begin, clear way to attract more trade shows," published online **2 days earlier.**

**Our examination of a full four weeks in 2018 shows that 21 of the 45 news stories and local photo pages appeared more than 2 days after the event or being posted online, a percentage of 47 percent.**

Moving to 2019, this is the first week of the year in the print *Sun:*

**Tuesday, January 1, 2019**

- Front page local story: What's ahead for 2019, a compilation of sports predictions by the *Sun* staff. This was first posted online on December 27, 2018, **5 days earlier.**
- A second story in this edition is "Lady Gaga Launches in Las Vegas." This was first posted online on December 28, **4 days earlier**.

**Wednesday, January 2, 2019**

- Just one local story today, a sports story titled "What to expect from Runnin' Rebels" This was first posted on December 31, 2018**, 2 days earlier.**

**Thursday, January 3, 2019**

- There was one local story. "The Changing Look and Feel of University Life." First posted January 2, **1 day earlier**
- There's also a photo page of local children playing under the headline "Winter Wonderland." The photos were from an event held December 26, **9 days earlier**.

**Friday, January 4, 2019**

- The one local story is headlined "Manicurist killed by car was rock of her family." The article was first posted on January 2, **2 days earlier**.
- This edition also included a page of photos of Las Vegas New Year's Eve revelers by a staff photographer headlined "Nice to meet you 2019." Of course, New Year's Eve was **5 days earlier.**

32

APP0317

**Saturday, January 5, 2019**

- The only local article was a sports column by Ray Brewer about poor basketball attendance headlined "What a win for UNLV. Shame you didn't see it" The column was first posted on January 2, **3 days earlier**.

**Sunday, January 6, 2019**

- A front-page local story about water conservation was headlined "Other States Playing Catch-Up to Nevada" It was posted online **on the same day.**
- A local photo package was headlined "Knights Outlast Kings in New Year's Day Battle." The game **was 5 days earlier.**

**Monday, January 7, 2019**

- The one local story was headlined "The Don of CBD," about a local entrepreneur. It was first posted on Dec. 31, 2018, **8 days earlier.**
- The edition also included a photo page headlined College of Southern Nevada Tops Off New Student Building. The event occurred on December 18, 2018, **20 days earlier.**

  

*The New Year's Eve photo page, left and the Knights photo page, center, were both published five days following the respective events. The College of Southern Nevada photo page, right, was published twenty days after the event.*

CONFIDENTIAL

**Our examination of a full four weeks in 2019 shows that 31 of the news stories and photo pages appeared more than 2 days after the event or being posted online, a percentage of 51 percent.**

The print *Sun*'s standard operating procedure could not have been clearer: publish very few local stories and keep many of them on a shelf before doing so.

The *Sun* did not care at all about the timeliness of the print paper – until a year after this lawsuit was filed.

In September 2020, the *Sun* began publishing staff-written news stories in a more timely fashion. To be clear, the *Sun* has continued to routinely publish wire news stories and columns – which constitutes the majority of the content in its paper – days after they've already appeared online and in publications around the country.

For example, *The New York Times* News Service, which is used extensively by the *Sun* in print, routinely sends its stories to its client newspapers the same day as they are posted online, and never more than 24 hours later, according to Jackie Kincaid, a manager of *The New York Times* News Service, who responded to my inquiry on August 23, 2022.

The *Sun* frequently shelves those *New York Times* stories for days, if not weeks, using them when it's convenient for the *Sun*.

A look at the first week of each quarter of 2019 provides insights into this behavior:

- During the first week of January 2019, the *Sun* published 25 non-opinion *New York Times* stories. On average, it delayed the printing of those stories by 6.7 days.

- During the first week of April 2019, the *Sun* published 25 non-opinion *New York Times* stories. On average, it delayed the printing of those stories by 5.6 days.

- During the first week of July 2019, the *Sun* published 22 non-opinion *New York Times* stories. On average, it delayed the printing of those stories by 6.5 days.

34

CONFIDENTIAL                                                                                 APP0319

- During the first week of October 2019 the *Sun,* published 17 non-opinion *New York Times* stories. On average, it delayed the of printing those stories by 4.5 days.

Even *New York Times* articles that focus directly on Las Vegas are held for days. *The New York Times* published two national stories about the entertainment scene in Las Vegas in June 2021— a June 10 piece about shows re-opening and a June 11 feature story on the Jabbawockeez dance troupe. Both were delayed in the *Sun* newspaper until June 15, well after people across the country read them.

The *Sun* continues to delay *New York Times* stories in print. That's easily illustrated with a look at the editions of the *Sun* published in the last few days of August 2022, leading up to this report.

A *New York Times* article on veteran baseball player Yadier Molina getting his first chance to coach was published by the *Times* on August 19 but delayed in the print *Sun* until August 28.

A *Times* piece on how the phrase "American Dream" led to a "Republican battlefield" was first published on August 21 but delayed until the August 28 edition.

On August 31, the *Sun* printed a full-page story "On Tik Tok, election misinformation thrives before mid-terms." That was first published and distributed by *The New York Times* 17 days earlier, August 14. Newspapers across the country printed in the next two days, but they weren't the only ones.[57] All of that just scratches the surface. The story was widely published and shared around the world, but the *Sun* chose not to share it with its newspaper's readers for more than two weeks.

---

[57] Electionlawblog.org published it on August 14. Mediawell.ssrc.org did the same. The Straits Times published it on August 15, which was then picked up and shared on Flipboard. By August 18, the piece appeared in ForbesIndia.com.

CONFIDENTIAL                                                                                          APP0320

The *Sun* in print continues to be a paper without much "news."

**Finding #4: The *Sun* has abandoned investigative reporting.**

The daily *Sun*'s failure to meet the information needs of its print readers is disheartening, particularly because it runs counter to a good newspaper's civic obligations. It also runs counter to the journalistic philosophy the *Sun* espoused for much of its first 60 years. Investigative reporting and hell-raising were very much a part of the *Sun*'s identity in the 20th century.

There is no legal requirement that a news organization acts as a monitor of government conduct, but there is certainly a cultural and news industry expectation that newspapers operate in the public interest, serving as a watchdog on those in power and informing readers about all they need to know about their community.[58] The *Sun* does a poor job of both.

Over the past two years, there has been no investigative reporting in the *Sun*. True investigative reporting – also called "enterprise reporting" or "enterprise journalism" – occurs when a news organization thoroughly investigates a public concern through extensive reporting and documentation and makes public information that otherwise would never have seen the light of day. Of course, that's exactly how the *Sun* won its Pulitzer in 2009.

That kind of reporting is time-consuming. The *Sun* doesn't do it anymore.

In contrast, the *Las Vegas Review-Journal* does extensive investigative work and even reports back to its readers what it accomplished over the course of a year.

From the Dec. 29, 2021, edition of the *Review-Journal*[59]:

---

[58] *See* Ryan Lillis, *The Public Eye: How The Bee Is Holding the Powerful Accountable*, SACRAMENTO BEE (Mar. 23, 2021), https://www.sacbee.com/news/investigations/article249834248.html.

[59] Michael Scott Davidson, *RJ Watchdog Reporting Exposed Misconduct, Corruption in 2021*, Las Vegas Rev. J. (Dec. 29, 2021, 11:08 A.M.), https://www.reviewjournal.com/investigations/rj-watchdog-reporting-exposed-misconduct-corruption-in-2021-2504130/.

36

CONFIDENTIAL

*"We scoured thousands of public documents and filed hundreds of records requests, obtained damning video footage and interviewed countless Nevadans. We analyzed government data to determine the success of the COVID-19 response and discover why the state's early vaccine allotment was so low. We fought for public records that agencies wanted to keep hidden.*

*Our deep reporting uncovered federal investigations into local government officials. Our months-long investigation showed that police officers with repeated misconduct complaints and criminal charges remained on the job, and we revealed why dozens of state workers fired for serious sustained misconduct got their jobs back through arbitration.*

*We kept up with victims of the Alpine Motel Apartments fire and exposed how a top county official used his office to benefit himself on taxpayer time, and claimed degrees from a discredited diploma mill.*

*Without the Review-Journal, these stories would not have been told."*

There is similar investigative work in all of the peer newspapers reviewed for this report.

*The Sacramento Bee* has an impressive track record of investigative reporting and reaffirmed that last year with an ongoing series called The Public Eye. The *Bee's* announcement[60]:



*"The series launched March 11 with a deep dive into allegations of a toxic, male-dominated culture within the Sacramento Fire Department. The story – by The Bee's Black communities reporter, Marcus D. Smith – is based on a series of several interviews with current and former employees of the department.*

*The Public Eye will run at least twice a month and most stories will publish online Thursday mornings. Our team of reporters across the newsroom is digging into how state and local governments are spending your tax dollars, how schools are supporting our children and whether the policy makers at City Hall, the Board of Supervisors and state Capitol are doing enough to keep our communities safe, our housing affordable and to care for those most in need."*

---

[60] Lillis, *supra* note 58.

37

 APP0322

The *Austin American-Statesman* conducted an intensive investigation into the preventable and fatal consequences of an unexpected freeze in Texas in February 2021.

*Austin* Executive Editor Manny Garcia explained why the newspaper invested extensive resources into its investigation[61]:

---

*"No electricity. No heat. Temperatures so cold that toilet water turned to ice, and one woman's catheter froze, eventually killing her.*

*These are the devastating details American-Statesman journalists Katie Hall, Kelsey Bradshaw and Heather Osbourne found during months of reporting to determine whose deaths were related to the freeze in February.*

*Today we publish our report because the public needs to know the human toll of the power grid failure.*

*The investigation has been a passion project for the reporters and nothing short of a battle to obtain death records. At least 28 people locally died as a result of the freeze, but an accurate number might never be known."*

---



The Austin paper was also honored last year with the highly prestigious Edward R. Murrow Award for its 2020 investigation into the Williamson County sheriff's office and the death of Javier Ambler II, who died in the custody of Williamson County, Texas deputies.

---

[61] Manny Garcia, *The Deadly Texas Freeze: An Austin American-Statesman Investigation*, Austin Am.-Statesman (Nov. 14, 2021, 6:08 A.M.), https://www.statesman.com/story/news/2021/11/14/texas-freeze-deaths-austin-american-statesman-investigation/6336291001/.

38



The *Cincinnati Enquirer* also has a long history of investigative journalism. In 2021, it reported in depth on ties between a developer on a major project and the city's mayor, and the campaign cash that flowed to the mayor.

During the COVID crisis, the *Enquirer* published an investigation into nursing homes' failures to prevent basic infections.

These examples are just a small portion of a larger body of investigative work from the *Austin American-Statesman*, *Sacramento Bee*, *Cincinnati Enquirer* and *Las Vegas Review-Journal*. A commitment to investigative reporting is a core component of metro newspapers all across the country, but not at the *Sun*.

**Finding #5: Instead of publishing a strong local news report, the *Sun* publishes a voluminous amount of copy created by a single New York City newspaper.**

Given the *Sun*'s inclination to run wire stories instead of local news stories, what are the sources of that content? Overwhelmingly, that copy comes from *The New York Times*.

Every metro newspaper uses wire services, and often the service is The Associated Press ("AP"), which combines its own staff reporting with a compilation of news stories from AP

CONFIDENTIAL　　　　　　　　　　　　　　　　　　　　　　　　　　　　　APP0324

member newspapers across the country. That means content from multiple newsrooms, philosophies, and perspectives.

The *Sun* website publishes wire news stories from both The AP and *The New York Times*, but the *Sun* relies almost exclusively on the *The New York Times* for its wire news content.[62] This obsession with a single out-of-market paper means that on average, the *Sun* publishes more *New York Times* stories and columns than it does local news stories, local columns and local editorials combined.

In 2021, for example, the newspaper published 1,768 *New York Times* articles and just 578 local staff news stories.

In 2020, the newspaper published 1,378 *New York Times* articles and just 775 local staff news stories.

It's not as though the *Sun* is providing a service by giving Las Vegas access to the *Times*. The *Times* is readily available in the Las Vegas market in print and online.[63] This is not about filling a void; it's about filling pages. That can be seen in the extensive use of the *Times'* lengthiest feature stories. There's nothing wrong with long stories when they merit the space, but these are largely all about out-of-market topics, taking up space that could be used for locally produced news stories.

---

[62] The Sun also publishes syndicated opinion pieces from a handful of other sources, as discussed in further detail below.

[63] Digital and Home Delivery Subscriptions, N.Y. TIMES, https://www.nytimes.com/subscription? campaignId=9QY89&ds_c=71700000068509076&gclid=Cj0KCQjw6_CYBhDjARIsABnuSzrUB3Ui-ish94RJ6Ep_AqGD n5pNObE1xMZ5mi3ZjuHjCat0XEI7cuIaAm07EALw_wcB&gclsrc=aw.ds (offering "[n]ationwide delivery" of *The New York Times* in print "[a]ll across the United States," with an "all access" digital subscription included) (last visited, Sept. 11, 2022).

40

 APP0325

The dominance of *The New York Times* in the pages in the *Sun* is most evident in an examination of a single edition of the newspaper.

Here's the 8-page edition of the *Sun* on August 19, 2022:



*Page 1 of the Aug. 19, 2022* Sun, **left, with two of its three stories written by** The New York Times. **Page 2, right, contains only a** Times-**written editorial and letters to the editor.**

Page 1 includes the only local story from the *Sun* staff, a sports article about younger players competing for spots on the roster of the Las Vegas Raiders. There are two other stories on the front page – both from *The New York Times*. Next is an editorial page without a local editorial. Instead that position is taken by *The New York Times*.

41

Page 2 contains only a *Times*-written editorial and letters to the editor.

Page 3 contains no local content and no *New York Times* content. Instead, there are opinion columns from the *Washington Post*, *The Sacramento Bee*, and the *Cleveland Plain Dealer* on national topics.

On page 4, there are three articles, *all* from *The New York Times*.

Page 5 of the newspaper was devoted to three "jumps," the continuation of stories that appeared earlier in the paper.

On page 6, there's just one news story, accompanied by comics and puzzles. The story is from *The New York Times*.



*Page 4 of the Aug. 19, 2022 Sun, left, contains only articles written by the **Times**. The only story on p. 6, right, is also Times-written.*

42

APP0327

On page 7, there's one lengthy article by *The New York Times*. There is no additional content. Likewise, on page 8, there is one lengthy article by *The New York Times*. There is no additional content.



*Pages 8 and 9 of the Aug. 19, 2022 Sun each contained one story. In both cases, the story was written by the Times.*

To recap, in this edition, there was just one local story, a sports story, from the *Sun* staff.

The lead editorial was written by *The New York Times*. Of the 8 other news articles in the *Sun*, all 8 were written by *The New York Times*. That means 88 percent of the *Sun*'s news coverage

43

APP0328

(including the *Sun*'s sports story) was written by *The New York Times*. We found similar patterns from 2020-2022.

The *Sun's* peer newspapers are not permeated by a single, other newspaper. In the *Review-Journal,* you'll find the Associated Press (which is itself a co-op of more than a thousand news organizations, with its own reporters in 250 locations in 100 countries), and smaller content providers like the Mayo Clinic News Network and NerdWallet.

In the *Austin American-Statesman*, you'll find the AP*, USA Today*, the *USA Today* Network, Politfact.com, the *San Antonio Express News* and the *Daily Texan*.

In *The Sacramento Bee*, you'll find the AP, *Washington Post*, Bloomberg News, the *Philadelphia Inquirer*, the *Los Angeles Times* and *Congressional Quarterly*.

In the *Cincinnati Enquirer*, you'll see the AP, *USA Today*, the *USA Today* network and the *Columbus Dispatch.*

In the *Las Vegas Sun*, there's more *New York Times* than *Sun*.

## Finding #6: The *Sun* packs its pages with opinions, influencing rather than informing its readers.

We're increasingly seeing newspapers phase out or decrease editorials and opinion columns, both local and syndicated. It's a strategic decision not to alienate any readers in an increasingly polarized society.

It's not going to leave a big hole in most newspapers because that content has long represented a small percentage of the total article count, perhaps 5 percent. I've overseen editorial pages as part of my broader editor's duties, and it was rare to see a paper with more than a page of editorials and columns.

44

CONFIDENTIAL                                                                                      APP0329

In contrast, the *Sun* is dominated by opinion pieces, most of them not locally written.

To provide insights, here's the percentage of opinion pieces in the total article count of the *Sun*'s and its peer papers for the entire month of July 2019:

- The *Cincinnati Enquirer* published 1167 news articles and 65 opinion pieces resulting in **5.0 percent opinion.**
- The *Las Vegas Review-Journal* published 1642 news, and 72 opinion pieces, resulting in **4.4 percent opinion.**
- The *Austin American-Statesman* published 1593 news articles and 70 opinion pieces, resulting in **4.4 percent opinion.**
- *The Sacramento Bee* published 1272 news articles and 85 opinion pieces, resulting in **6.7 percent opinion.**
- The *Sun* published 269 news articles and 114 opinion pieces, resulting in **42.4 percent opinion.**



As a further example, in the first 6 months of 2022, there were 785 opinion pieces in the *Sun*, **38 percent,** of the total article count (local and wire) for the same period.

*Opinion over news* appears to be a publishing strategy, offering an abundance of opinion while minimizing local news. In my years as an editor, I've never seen a metro newspaper with

45

 APP0330

such an imbalance. In today's social media world, opinion is everywhere and largely free of charge. But informative content – local news reporting and a thorough and timely national and international report – is in short supply in the *Sun*.

The *Sun* runs a daily editorial on page three, most often about national or world issues and often just reprinted from other newspapers located well outside of Nevada. There are occasional local guest columns. The rest of the opinion content comes primarily from three other newspapers: *The New York Times*, the *Washington Post* and the *Los Angeles Times*.

The *Sun* certainly plays favorites with owner Brian Greenspun. Mr. Greenspun's weekly local column is routinely published at the top of the front page and jumps inside where the remainder can dominate an inside page. It's rare in the 21st century for a newspaper owner to claim the best location in the biggest-selling edition of the week to share his views.

The risk, of course, is that readers may wonder where the news ends and the owner's opinions begin, a concern reinforced when the *Sun*'s news content and editorial are jarringly similar. On August 10, 2022, the *Sun* published a story at the very top of the front page with this headline. "Sheriff Sets Sights on *Sun*'s Demise – In text exchange, Lombardo talks of 'putting Brian Greenspun out of business.'"

The very next day, the *Sun* ran a local editorial headlined "Lombardo should resign from post as Las Vegas sheriff immediately."

The most stunning example of the *Sun*'s opinion-heavy approach was the front page of the May 17, 2020, print edition. There are just two articles on the front page. The first was an editorial warning that President Trump is on the path to becoming a dictator. It was so lengthy

46

that it continued to a full page inside. The second was an opinion column by Brian Greenspun

attacking Attorney General Barr as corrupt.



*Provocative editorials can be valuable, encouraging readers to think about issues, but I've never seen a newspaper dedicate its entire front page to its own opinions. The lengthy editorial continues inside*

A newspaper has every right to publish editorials and opinion columns. It's been part of

the fabric of American newspapers for centuries, with an eye toward addressing a community's

needs through thoughtful discourse.

CONFIDENTIAL

Here's how the *Cincinnati Enquirer*, one of the peer newspapers in this study, described the role of its editorial page on New Year's Day on Jan. 1, 2017:

> Philosophically, we are staying the course. We will continue to lift up and celebrate the rich diversity of our community. We will support solutions and policies that promote equality in treatment and opportunity. We remain committed to these words we published Jan. 3, 2016: "Pragmatism will be our mantra in all matters." We will continue to focus primarily – but not solely – on local and state issues.

Contrast that with the *Sun*, which routinely farms out its lead editorial to newspapers all over the country that have no ties to Clark County. This space is where newspapers have traditionally offered community leadership, focusing on issues of high importance to its hometown.

Instead, the *Sun* often abdicates that role, filling the slot with opinions written by newspapers across the country. In July 2022, for example, there were 32 editorials. Ten were written by the *Sun* staff. Three were from the *Virginian Pilot*. Three came from *The New York Times*. Two each came from *The Philadelphia Inquirer, Chicago Tribune*, and *Bangor Daily News*. The rest were from *The Salem News, The Portland Press Herald, The Charlotte Observer, The Citizens' Voice of Wilkes-Barre, Syracuse.com* and the *Fort Worth Star-Telegram*.

This practice does not meet the high standards of a metro area daily newspaper.

**Finding #7: The *Sun* minimizes its workload and shortchanges its readers with a "filler" strategy.**

The *Sun* has six to ten full and open pages every day. Its designers don't have to struggle with odd-shaped advertising that eats up a large section of the page.

48

 APP0333

As a newspaper editor, I would have loved this. Imagine having blank canvasses every single day where one can tell your community's story with a combination of articles, photos and graphics without having to jam an article into a small space next to an advertisement.



Instead, the *Sun* uses its full pages largely for wire stories from *The New York Times*, full pages of syndicated opinion columns and on Sunday, and a round-up of editorials from other newspapers. It's truly a squandered opportunity.

The *Sun* also regularly fills entire pages with what are ostensibly public service ads. Most common is a virtually weekly page labeled "Contact Your Local Officials." In and of itself, it's good practice for a newspaper to remind readers how to reach government employees.

But virtually every week *for years*? The feature was published as far back as April 2, 2017 in two-thirds of a page, before expanding to the current full page.

If this was a sincere effort to inform readers, why does it not appear prominently in the online version of the *Sun*?

49

In late 2021, a full page on how to sign up for the ACA Health Exchange appeared frequently. Again, that's a good cause, but where's the same effort online? And why does a basic message have to appear in a full-page graphic?

It's inescapable. The *Sun* cares about such matters when there's a big hole to fill, and it can avoid putting more local news in the paper from its ample supply.

### Finding #8: Greenspun Media has made a practice of promoting the online *Sun* at the expense of the joint print product.

One example of this was a feature called "The Sun's Most Read Stories," which appeared 5 days a week, calling attention to the stories that had the most traffic on its website. It's a common feature that addresses a few goals:

- It's interesting reading to know what other readers care about.

- It helps readers find stories they may have missed in print.

- It can introduce print readers to the online product, the platform that will survive for the long run.

In other papers, the most-read list typically includes the most popular stories that appeared in the paper on both the print and online platforms. Although the statistics only reflect online views of these articles, these popular articles need to be in print because that's where the



50

bulk of advertising income has long been derived. It would make no sense to undercut the primary source of your revenue stream.

The twist at the *Sun* is that it encouraged readers to access the online site, knowing that most of those stories would never be in print. At high-quality metro newspapers, this feature benefits readers regardless of platform. At the *Sun*, the unspoken message was "the good stuff is online."



Sun "Most Read"
Jan. & Apr 2020

This promotion—apparently discontinued on January 15, 2021 and after this litigation began—served, for the most part, to tell *Sun* print newspaper readers about the "most-read" information that they have been denied on paper.

In looking at a month's worth of these self-promotion advertisements from January 2020, only **thirteen of the 109** "most-read" online stories were also published in the printed newspapers. This meant that nearly 90 percent of the most read, and perhaps most important, online *Sun* content was withheld from its newspaper readers.

An examination of *Sun* content in April of 2020 showed the same pattern, with just **nine of the 95** "most read" online stories – 9.4 percent – appearing in print.

It's stunning that so many of the online stories never made it to print. The *Sun* was avoiding printing stories that they already knew were extremely interesting to readers.

51

Another example of Greenspun Media undercutting the joint product for its own benefit came when the online *Sun* began to charge for access.

Greenspun published this note on Jan. 11, 2018:

"The current management of the *Review-Journal* plunged the newspaper into a loss immediately after purchasing the newspaper in 2015. To date, the *Review-Journal*'s management continues to run a money-losing newspaper. We hope they find a way to turn the *R-J* around in the face of ongoing revenue and circulation decline. (And no, purchasing a print subscription to the *Sun* and *R-J* doesn't benefit the *Sun* in this current scenario.)"[64]

Translation: "Subscribe to us and not the combined *RJ-Sun*." That gamesmanship continued with an odd FAQ on the *Sun*'s website:

"I get home delivery of the newspaper. Do I get free access?

"The digital subscription to LasVegasSun.com is separate from a print subscription to the Las Vegas Review Journal/Las Vegas Sun. All revenue from your digital subscription goes entirely to support the Las Vegas Sun newsroom. Our digital product includes all Las Vegas Sun original content **as well as a great deal of content that does not appear in the print edition.** Currently, none of your print subscription to Review Journal/Las Vegas Sun goes to supporting the Sun's editorial efforts."[65]

Every *Sun* staff-written story "as well as a great deal of content that does not appear in the print edition" appears online. It essentially asks, "why would you ever waste money on a newspaper?"

---

[64] DEFS0194042 (*Sun* print edition front page, Jan 11, 2018, featuring "A Note From The Sun"). The note was also published online. A Note From The Sun, Las Vegas Sun (Jan. 11, 2018, 2:00 A.M.), https://lasvegassun.com/news/2018/jan/11/a-note-from-the-sun/.

[65] *FAQ*, Las Vegas Sun (emphasis added), https://lasvegassun.com/faq/#lvrj (last visited, Sept. 11, 2022)

CONFIDENTIAL                                                          APP0337

**Finding #9: As print newspapers nationwide decline and inevitably disappear, the print *Sun*'s failure to publish a good local news report undercuts the joint newspaper.**

Print newspapers are in steady decline, with estimates of two newspapers going out of business every week.[66]

Local print newspapers can best survive moving forward by focusing on their communities and providing a robust local news report.

Those are the inescapable conclusions from more than a decade of industry trends, research reports and analyses of the newspaper industry in America. As veteran publisher Andy Andrews said in his 2020 book of the same name, print newspapers have been "deemed nonessential."[67]

The newspaper industry has faced disruption since 1993, when Mosaic and other web browsers made the internet accessible to consumers. Throughout the '90s and into the new century, the internet looked more like a boon than a threat, though some observers began to recognize the future fragility of print.

The book *The Future of the Newspaper Industry: How Electronic Newspapers Will Outrun Their Competition* by Kenton W. Elderkin was published in 1996.[68] In 1998, Pew Research published its report "Internet News Takes Off."[69]

---

[66] David Bauder, US Newspapers Continuing to Die at Rate of 2 Each Week, AP News (July 1, 2022), https://apnews.com/article/journalism-united-states-39ef84c1131267233768bbb4dcaa181b.

[67] ANDY ANDREWS, DEEMED NONESSENTIAL: WHAT HAPPENED TO DAILY NEWSPAPERS? DEATH OF PRINT FROM THE INTERNET TO THE PANDEMIC (2020).

[68] KENTON W. ELDERKIN, THE FUTURE OF THE NEWSPAPER INDUSTRY: HOW ELECTRONIC NEWSPAPERS WILL OUTRUN THEIR COMPETITION (1996).

[69] *Internet News Takes Off*, PEW RSCH. CTR. (June 8, 1998), https://www.pewresearch.org/politics/1998/06/08/internet-news-takes-off/.

CONFIDENTIAL

APP0338

For years, newspapers have tried to have it both ways, publishing a print newspaper with paid circulation and high ad rates, while maintaining an online presence they hoped would grow and become much more lucrative. The latter hope never materialized in large part because advertising revenue was limited, due to the unyielding volume of competition on the web.

Over the past decade, newspapers have continued to flounder. There are three primary reasons for this decline: unprecedented competition, digital disruption and a defunct business model.

**1. Intense and unprecedented competition –** There once was a time when a print newspaper's only meaningful competition was another print newspaper. Today, a print newspaper must compete with everything on every platform that informs, entertains, engages, intrigues or provokes readers, listeners and viewers.

Studies suggest that most adult Americans consume about 13 hours of media per day,[70] but print newspapers are eclipsed by digital, cable and broadcast offerings. A 2020 Pew study found that only 29 percent often or sometimes use print publications for news.[71]

The shift to digital media is undeniable and unrelenting. A study by eMarketer's *Inside Intelligence* predicts that in 2023, Americans will consume and average of 8 hours and 20 minutes on digital media and 4 hours and 45 minutes on traditional media per day, the latter including television, radio and print.[72]

---

[70] Audrey Schomer, *US Adults Will Consume Almost as Much Media in 2021, but TV Viewing Will Backslide*, INSIDER INTELLIGENCE: EMARKETER (June 6, 2021), https://www.insiderintelligence.com/content/us-adults-will-consume-almost-much-media-2021-tv-viewing-will-backslide.

[71] News Consumption Omni 1, PEW RSCH. CTR. (2020), https://www.pewresearch.org/journalism/wp-content/uploads/sites/8/2020/12/PJ_2020.12.08_News-Consumption_Omni-Toplines.pdf.

[72] Schomer, *supra*, note 70.

54

Today print newspapers must compete against long odds for time, attention and revenue. Only the best will survive this decade. That means publishing unique and valuable content every day.

A key to survival is an ongoing relationship with readers in which they come back regularly to read your content. According to research by the Medill School of Journalism, the primary driver of "reader regularity" is local news and not syndicated or wire coverage.

From Northwestern University's Medill Local News Initiative:

In order to get subscribers to pay up, local news outlets must deliver something that readers can't get elsewhere. While commodity news may get page views, it's also available through wire services serving hundreds of other websites. In an era of shrinking staffs, duplicating the wires is a particularly costly waste of resources.[73]

**2. Digital disruption –** There's no denying that younger generations prefer screens to paper and digital to analog. Gen Z, comprised of those born from 1995 to 2012, is largely devoted to platforms that didn't even exist when they were born. According to a 2021 study by Attest, young Americans spend their days consuming digital content.[74]

On any day:

- 82 percent play games
- 61 percent watch YouTube
- 60 percent listen to streaming music
- 16 percent look at a print newspaper[75]

Of course, it's not just young people embracing digital media.

---

[73] Mark Jacob, *Medill Study Identifies 'Paradigm Shift' in How Local News Serves Readers*, LOCAL NEWS INITIATIVE: MEDILL (Feb. 5, 2019), https://localnewsinitiative.northwestern.edu/posts/2019/02/05/northwestern-subscriber-data/.

[74] ATTEST, US MEDIA CONSUMPTION REPORT 2021 (2021), https://www.askattest.com/reports-guides/us-media-consumption-report-2021-2.

[75] *Id.*

55

 APP0340

According to a Pew Foundation report released in January 2022, "On several fronts, adoption of key technologies by those in the oldest age group has grown markedly since about a decade ago, and the gap between the oldest and youngest adults has narrowed."[76]

According to the report, of Americans 65 and older:

- 61 percent have smartphones
- 45 percent use social media
- 44 percent own tablet computers
- 75 percent use the internet, home to all online newspapers[77]

There's no stopping digital communications. Usage will only grow.

**3. A defunct business model –** Print newspapers could once count on substantial revenue from subscribers and advertisers. In the 21st century, consumers are reluctant to pay for content and advertisers now have unprecedented avenues for sharing their marketing messages. Lower income has led newspapers to cut pages and staff, which in turn makes existing subscribers unhappy and unwilling to renew subscriptions. The free fall continues.

Among experts and analysts, there is little to no optimism about the continued viability of newspapers in print. In her book *Ghosting the News, Washington Post* Media Writer Margaret Sullivan points to Berkshire Hathaway Founder Warren Buffett's decision to sell all of the fund's newspaper properties as a turning point.[78]

---

[76] Michelle Faverio, *Share of Those 65 and Older Who Are Tech Users Has Grown in the Past Decade*, PEW RSCH. CTR. (Jan. 13, 2022), https://www.pewresearch.org/fact-tank/2022/01/13/share-of-those-65-and-older-who-are-tech-users-has-grown-in-the-past-decade/.

[77] *Id.*

[78] MARGRET SULLIVAN, GHOSTING THE NEWS: LOCAL JOURNALISM AND THE CRISIS OF AMERICAN DEMOCRACY (2020)

CONFIDENTIAL

APP0341

"They're going to disappear," Buffett said in a 2019 interview with Yahoo! Finance. In a particularly memorable description, he said the newspaper business over the past few decades "went from monopoly to franchise to competitive to . . . toast."[79]

Sullivan also cites a 2019 article by newspaper analyst and "Newsonomics" writer Ken Doctor, wrote about the merger of the Gannett and Gatehouse companies, which brought 265 daily newspapers into a single super chain. He described it as a stopgap measure that would buy the companies just a little more time.[80]

"Simply put, these companies' leaders think a megamerger buys two or three years — 'until we figure it out.' The 'it' is that long-hoped-for chimera of successful digital transformation," Doctor wrote.[81]

Print newspapers continue to be buffeted by rising costs. An article by *Seattle Times Free Press* Editor Brier Dudley notes, "Everyone is affected by the rising cost of necessities. It's even worse when you're already on the edge of bankruptcy. That's the case for local newspapers, which were in a tailspin before getting walloped by the pandemic, inflation and now soaring newsprint prices."[82]

Dudley describes remaining print newspapers as "generally hanging on by a thread."[83]

---

[79] Sam Ro, *Warren Buffet Says the Newspaper Business Is "Toast"*, Finance: Yahoo! (Apr. 29, 2019), https://www.yahoo.com/video/warren-buffett-newspapers-are-toast-exclusive-133720666.html?guccounter=1& guce_referrer=aHR0cHM6Ly93d3cuZ29vZ2xlLmNvbS8&guce_referrer_sig=AQAAAKgcevqfiLvekbWX63MnqOw_Z3i aeJjIHiGaRv48VAHuyjgRVBzVVaYrq6gMrV0evsMGQzWavOkX49_KRu-PyKN5L7k13BWjFf33kNgq8yxZErBKrdwPrgv MZzmH2nnvukpY94y9soCBBDHe0V8_mpWkNvG20gZf2TlMTkxL3fqY.

[80] Ken Doctor, *Newsonomics: It's Looking Like Gannett Will Be Acquired by GateHouse – Creating a Newspaper Megachain like the U.S. Has Never Seen*, Newsonomics (July 20, 2019), http://newsonomics.com/ newsonomics-its-looking-like-gannett-will-be-acquired-by-gatehouse-creating-a-newspaper-megachain-like-the-u- s-has-never-seen/.

[81] *Id.*

[82] Brier Dudley, *Soaring Newsprint Prices Worsen Local Journalism Crisis*, Seattle Times (June 10, 2022), https://www.seattletimes.com/opinion/soaring-newsprint-prices-worsen-local-journalism-crisis/.

[83] *Id.*

57

That thread-hanging has been documented in painful detail. The Poynter Institute, one of the nation's most respected journalism education centers, has regularly published updates on layoffs, shrinking resources and the disappearance of print newspapers. A recent 50-state update is 64 pages long.[84]

More irreverently, a website called "Newspaper Deathwatch" has chronicled one print newspaper setback after another.[85]

The situation is so urgent that Northwestern University has created the Medill Local News Initiative to explore the preservation of local journalism.[86] In a report issued on June 29, 2022, the center concluded that an average of two print newspapers a week are folding. According to the report, the nation's 8,891 newspapers in 2005 have dwindled to 6,377 newspapers today.[87] Newspaper newsrooms have been decimated since, with the number of journalists dropping from about 75,000 to an estimated 31,000, a jobs decline of almost 50 percent, the report noted.[88]

Since 2005, more than a quarter of American newspapers have shut down.[89] The Medill Local News Initiative predicts a full third will have disappeared by 2025.[90]

---

[84] Kristen Hare, *Here Are the Newsroom Layoffs, Furloughs, and Closures that Have Happened During the Coronavirus Pandemic*, POYNTER (Feb. 17, 2022), https://www.poynter.org/business-work/2022/here-are-the-newsroom-layoffs-furloughs-and-closures-caused-by-the-coronavirus/.

[85] Newspaper Deathwatch, http://newspaperdeathwatch.com/ (last visited, Sept. 11, 2022).

[86] *About Us*, LOCAL NEWS INITIATIVE: NORTHWESTERN MEDILL, https://localnewsinitiative.northwestern.edu/about/ (last visited Sept. 19, 2022).

[87] Penny Abernathy, *The State of Local News*, LOCAL NEWS INITIATIVE: MEDILL (June 29, 2022), https://localnewsinitiative.northwestern.edu/research/state-of-local-news/report/.

[88] *Id.*

[89] *Id.*

[90] *Id.*

CONFIDENTIAL
APP0343

In September 2022, the Atlanta Journal-Constitution confirmed that it will stop publishing its daily newspaper in print, leaving only a weekend print edition.[91]

Print newspapers are not the future.

## Conclusion: The *Sun* in print does not and has not met the high standards of newspaper quality consistent with United States metropolitan daily newspapers for years.

How do we assess the quality of the *Las Vegas Sun* today and in recent years? Let's return to Brian Greenspun's 2009 comments to a reporter at his own newspaper. He said that news stories in print should be "the ones that tell the 'why' and the 'how' — that make a city and community better."[92]

Another measure can be found in his 2013 testimony: "The printed newspaper will still be the in-depth, long-form chronicler of political, governmental, and societal events in this city that will be indispensable to those readers who demand as much information as they can get and in a form that is most comfortable to them."[93]

The *Sun* in print has abandoned all of those goals.

My extensive review of the *Sun* newspaper and website shows that the *Sun* has intentionally withheld local news, abandoned principles of timeliness, shifted its focus away from Las Vegas, and pumped up its pages with syndicated opinion content and *New York Times* stories.

The stories that do appear typically see print at least two days after they appeared online. Even the syndicated opinion columns are stale.

_____

[91] Maria Saporta, *AJC Plans to Discontinue Daily Print Editions, but Will Keep a Sunday/Weekend Newspaper*, SAPORTAREPORT (Sept. 2, 2022, 12:14 P.M.), https://saportareport.com/ajc-plans-to-discontinue-daily-print-editions-but-will-keep-a-sunday-weekend-newspaper/sections/reports/maria_saporta/.

[92] *Sun Wins the Pulitzer Prize*, *supra* note 4.

[93] Declaration of Brian L. Greenspun, *supra* note 33.

59

CONFIDENTIAL

The local stories are not investigative, in-depth or analytical in nature. Much of the government coverage (and there's not very much) is driven by conflict and outrageous comments by local lawmakers.

In sum, the *Las Vegas Sun* print newspaper falls far short of the high standards of quality consistent with United States daily metropolitan newspapers.

## III.   Other Information

### a.  Previous Expert Testimony

On June 12, 2019, I gave deposition testimony as an expert in the case K.G.S. v. Facebook, Inc., Case No. 2017-000255 (Cir. Ct. Jefferson Cnty. Ala.). The matter was dismissed prior to trial and the docket of this action is currently sealed. I have not testified as an expert at trial or by deposition in any other case.

### b.  Facts and Data Considered in the Course of Preparing this Report

In addition to my training and decades of experience described in Attachment 1, I considered the following in preparing this report:

1.  The Complaints, Answer, and Counterclaims filed in this action.

2.  Print issues of the *Las Vegas Sun* newspaper from Jan. 1, 2008, through the present. This included studying issues from 2008–2009 on microfilm, followed by sampling of issues from 2010-2019 that were reviewed using Shoom: a service that collects and maintains as-printed copies of print newspapers in PDF form. SHOOM, https://www.shoom.com/ (last visited Sept. 18, 2022). Beginning in 2020, every issue of the print *Sun* was examined and data was collected, which was then used as the basis for content analyses.

3.  A daily review of LasVegasSun.com from March 1, 2020, through the filing of this report.

60

APP0345

4. Data collected as part of the content analyses of the *Las Vegas Sun* print newspaper and LasVegasSun.com based on the periods noted above. The methodologies of these content analyses are described herein.

5. The 2005 Joint Operating Agreement.

6. The 2013 Declaration of Brian Greenspun in Support of Plaintiff's Reply In Support of Emergency and for Preliminary Injunctive Relief filed September 4, 2013 in the case Greenspun v. Stephens Media LLC, No. 2:13-cv-01494 in the United States District Court for the District of Nevada.

7. Documents produced in this litigation, including:

   a. Emails between Brian Greenspun and Ric Anderson, sent November 3, 2016, produced in this action as SUN_00083789.

   b. *Sun* newspaper print edition front page, Jan 11, 2018, produced in this action as DEFS0194042.

   c. The 2018 count of *Sun* news stories, opinion pieces and photo pages compiled by a newsroom clerk at Glen Cook's direction, produced in this action as DEFS0190555, DEFS0190558, and DEFS0190677–DEFS0190668.

8. Depositions taken in this matter and related exhibits, including the depositions of:

   a. Ric Anderson, taken January 12, 2022

   b. Glenn Cook, taken August 19, 2022.

9. *A Tale of Two Newsrooms*, LAS VEGAS CITYLIFE, Jan 28, 2010, NEWS BANK, Record No. 6f90a044681df49f5fa83a1b68621c04e4c7.

61

APP0346

10. Publicly available data regarding the newspaper industry, print journalism, media consumption patterns, the *Las Vegas Sun*, Greenspun Media Group, and the *Las Vegas Review-Journal* as referenced herein.

11. Other records produced in this litigation, as referenced herein.

### c. Compensation

My hourly rate for producing this report is $250. My hourly rate for providing deposition and trial testimony in this matter is $450. My conclusions and opinions in this report and the ultimate resolution of this case do not affect my compensation.

Kenneth A. Paulson
September 19, 2022

62

CONFIDENTIAL

APP0347

## CERTIFICATE OF SERVICE

I hereby certify that on March 18, 2026, I electronically filed the foregoing with the Clerk of the Court by using the appellate CM/ECF system. Service has been accomplished via email to the following counsel:

*Counsel for Real-Parties-in-Interest-Plaintiffs*:

Kristen L. Martini (kmartini@clarkhill.com)
E. Leif Reid (lreid@clarkhill.com)
Nicole Scott (nscott@clarkhill.com)
James J. Pisanelli (JJP@pisanellibice.com)
Todd L. Bice (TLB@pisanellibice.com)
Jordan T. Smith (jsmith@bhfs.com)
Joseph M. Alioto (jmalioto@aliotolaw.com)

The district court has been provided with a copy of this addendum volume 2 of 4 pursuant to Federal Rule of Appellate Procedure 21(a).

*s/ Ian Heath Gershengorn*
Ian Heath Gershengorn